# EXHIBIT I

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

| | |
|---|---|
| CITY OF ANN ARBOR, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Civil Action No. 25-cv-1973 |
| v. | CLASS ACTION COMPLAINT |
| OSHKOSH CORPORATION, PIERCE MANUFACTURING, INC., REV GROUP, INC., ROSENBAUER AMERICA LLC, and FIRE APPARATUS MANUFACTURERS' ASSOCIATION, | DEMAND FOR JURY TRIAL |
| Defendants. | |

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................................... 1

II.   PARTIES ............................................................................................................................... 4

    A.    Plaintiff City of Ann Arbor .......................................................................................... 4

    B.    Defendants ..................................................................................................................... 5

        1.    REV Group, Inc. .................................................................................................. 5

        2.    Oshkosh Corporation ......................................................................................... 6

        3.    Rosenbauer America LLC .................................................................................. 6

        4.    Fire Apparatus Manufacturers' Association ...................................................... 7

        5.    Co-Conspirators and Agents .............................................................................. 8

    C.    Ann Arbor Purchases of Fire Trucks Through the Sourcewell Purchasing Cooperative .... 8

III.  JURISDICTION AND VENUE ........................................................................................... 10

IV.   FACTUAL ALLEGATIONS ................................................................................................ 11

    A.    Relevant Markets ........................................................................................................ 11

        1.    Relevant product market .................................................................................. 12

        2.    Significant barriers deter new competitors from entering the market, thereby protecting Manufacturer Defendants' market power. ................................................. 15

    B.    Defendants' Consolidation of the Fire Truck Market and Evidence of Anticompetitive Intent ................................................................................................................................ 16

        1.    REV Group ....................................................................................................... 16

        2.    Oshkosh ............................................................................................................ 19

        3.    Rosenbauer ....................................................................................................... 21

    C.    The Fire Apparatus Manufacturer's Association ........................................................ 21

        1.    Data & Research Committee ............................................................................. 22

        2.    FAMA Spring and Fall Meetings ..................................................................... 24

    D.    Defendants' Successful Suppression of the Supply of Fire trucks ............................. 26

        1.    The backlog of fire trucks quadrupled during the Class Period ....................... 26

        2.    Despite increasing demand, Manufacturer Defendants decided against increasing their manufacturing capacity. ............................................................................... 29

    E.    Defendants' Successful Inflation of Fire Truck Prices in the United States ................ 31

        1.    Fire truck prices have doubled during the Class Period. ................................... 31

2.    Manufacturer Defendants used "floating prices" to increase their profits during the class period. .................................................................................................................... 34

3.    Manufacturer Defendants' revenues soared. ................................................................ 36

F.    Harm to Plaintiff and Other Communities Across the Country ....................................... 38

1.    Plaintiff and other Class Members have overpaid for fire trucks as a result of Defendants' conspiracy and anticompetitive behavior. .......................................... 38

2.    Inflated prices and extensive backlogs have prevented municipalities from replacing their old fire trucks, compromising their fleets. ...................................................... 39

3.    Compromised fire truck fleets are less able to respond to disasters. ........................... 42

V.    ANTITRUST INJURY & DAMAGES ....................................................................................... 44

VI.    CLASS ACTION ALLEGATIONS ............................................................................................ 45

VII.    FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING ................................... 48

VIII.    CONTINUING VIOLATION .................................................................................................... 49

IX.    CLAIM FOR RELIEF ................................................................................................................. 49

COUNT 1: Violation of Section 1 of the Sherman Act,
Conspiracy to Restrain Production 15 U.S.C. § 1 ................................................................ 49

COUNT 2: Violation of Section 1 of the Sherman Act,
Exchange of Competitively Sensitive Information 15 U.S.C. § 1 ....................................... 50

COUNT 3: Violation of the Arizona Uniform State Antitrust Act,
Ariz. Rev. Stat. §§ 44-1401, Et Seq. .................................................................................... 52

COUNT 4: Violation of California's Cartwright Act,
Cal. Bus. & Prof. Code § 16700, Et Seq. ............................................................................. 52

COUNT 5: Violation of California's Unfair Competition Law,
Cal. Bus. & Prof. Code § 17200, Et Seq. ............................................................................. 53

COUNT 6: Violation of Colorado's Antitrust Act,
Col. Rev. Stat. § 6-4-104, Et Seq. ........................................................................................ 53

COUNT 7: Violation of Connecticut's Antitrust Act,
Conn. Gen. Stat. § 35-24, Et Seq. ........................................................................................ 54

COUNT 8: Violation of the District of Columbia Antitrust Act,
D.C. Code § 28-4501, Et Seq. .............................................................................................. 54

COUNT 9: Violation of The Iowa Competition Law,
Iowa Code §§ 553.1, Et Seq. ................................................................................................ 55

COUNT 10: Violation of the Kansas Restraint of Trade Act,
Kan. Stat. Ann. §§ 50-101, Et Seq. ...................................................................................... 55

iii

COUNT 11: Violation of Maine's Monopolies and Profiteering Law,
Me. Rev. Stat. Ann. Tit. 10, §§ 1101, Et Seq.................................................................. 56

COUNT 12: Violation of the Maryland Antitrust Act,
Md. Code Com. Law § 11-204, Et Seq. .......................................................................... 56

COUNT 13: Violation of the Massachusetts Consumer Protection Act,
Mass. Gen. Laws. Ch. 93A § 1, Et Seq. .......................................................................... 57

COUNT 14: Violation of the Michigan Antitrust Reform Act,
Mich. Comp. Laws Ann. §§ 445.771, Et Seq. .................................................................. 57

COUNT 15: Violation of the Minnesota Antitrust Law,
Minn. Stat. Ann. §§ 325D.49, Et Seq. ............................................................................ 57

COUNT 16: Violation of the Mississippi Antitrust Statute,
Miss. Code Ann. §§ 75-21-3, Et Seq............................................................................... 58

COUNT 17: Violation of the Montana Antitrust (Unlawful Restraint of Trade) Act
Mont. Code Ann. §§ 30-14-205, Et Seq. ........................................................................ 58

COUNT 18: Violation of the Nebraska Junkin Act,
Neb. Code Ann. §§ 59-801, Et Seq. ............................................................................... 59

COUNT 19: Violation of the Nevada Unfair Trade Practices Act,
Nev. Rev. Stat. Ann. §§ 598A.010, Et Seq. .................................................................... 59

COUNT 20: Violation of the New Jersey Antitrust Act
N.J. Stat. Ann. § 56:9-3, Et Seq..................................................................................... 60

COUNT 21: Violation of the New Mexico Antitrust Act,
N.M. Stat. Ann. §§ 57-1-1, Et Seq. ............................................................................... 60

COUNT 22: Violation of the New York Donnelly Act
N.Y. Gen. Bus. Law §§ 340, Et Seq. .............................................................................. 61

COUNT 23: Violation of Chapter 75 of North Carolina's General Statutes
N.C. Gen. Stat. Ann. §§ 75-1, Et Seq.............................................................................. 61

COUNT 24: Violation of the North Dakota Uniform State Antitrust Act
N.D. Cent. Code §§ 51-08.1-01, Et Seq. ......................................................................... 62

COUNT 25: Violation of the Oregon Antitrust Act,
Or. Rev. Stat. §§ 646.705, Et Seq. ................................................................................. 62

COUNT 26: Violation of the Rhode Island Antitrust Act,
R.I. Gen. Laws §§ 6-36-1, Et Seq. .................................................................................. 63

COUNT 27: Violation of the South Carolina Unfair Trade Practices Act
S.C. Code Ann. §§ 39-5-10, Et Seq................................................................................. 63

iv

COUNT 28: Violation of South the South Dakota Antitrust Statute
S.D. Codified Laws §§ 37-1-3.1, Et Seq. .................................................................. 64

COUNT 29: Violation of Tennessee's Trade Practices Act
Tenn. Code Ann. §§ 47-25-101, Et Seq. .................................................................. 64

COUNT 30: Violation of the Utah Antitrust Act
Utah Code Ann. §§ 76-10-3101, Et Seq. .................................................................. 65

COUNT 31: Violation of the Vermont Consumer Fraud Act
Vt. Stat. Ann. Tit. 9, §§ 2451, Et Seq. .................................................................... 65

COUNT 32: Violation of the West Virginia Antitrust Act
W.V.a. Code §§ 47-18-1, Et Seq. ............................................................................ 66

COUNT 33: Violation of the Wisconsin Antitrust Act
Wis. Stat. §§ 133.01, Et Seq. .................................................................................. 66

X.    REQUEST FOR RELIEF ............................................................................................... 66
XI.   DEMAND FOR JURY TRIAL ....................................................................................... 68

Plaintiff City of Ann Arbor ("Plaintiff") brings this action individually and on behalf of a proposed class of indirect purchasers of fire trucks (the "Class Members") against Defendants Oshkosh Corporation, Pierce Manufacturing, Inc., REV Group, Inc., Rosenbauer America LLC, (together "Manufacturer Defendants") and the Fire Apparatus Manufacturers' Association (together "Defendants"), as well as unnamed co-conspirators. Plaintiff seeks treble damages, injunctive relief, and other relief pursuant to federal and state antitrust and related laws for the anticompetitive conduct alleged herein and demands a trial by jury on all triable matters.

## I.    INTRODUCTION

1.      From at least January 1, 2016 to the present, herein referred to as the "relevant time period," Defendants have conspired, colluded, and entered into an agreement to artificially suppress supply and raise the price of fire trucks in the United States. The victims of Defendants' conspiracy are fire departments, municipalities, and entities that purchased fire trucks during the relevant time period which are collectively referred to as "Class Members." As a result of Defendants' unlawful conduct, Plaintiff and Class Members paid artificially inflated prices for fire trucks during the relevant time period. Such prices exceeded the amount they would have paid in a competitive market.

2.      Fire truck prices in the United States have doubled in the last ten years. A fire truck that cost $500,000 in the mid-2010s now costs $1 million. More specialized trucks that used to cost $900,000 now cost more than $2 million. **Ann Arbor's most recent order for *one* fire truck came in at a whopping price of $2.38 million.** These prices, which cannot be explained by inflation alone, have squeezed municipal budgets and prevented communities from replacing outdated fire trucks.

3.      In the face of such staggering price increases, the delivery times for new fire trucks

1

have also increased. A truck that would have taken 18 months to deliver in the mid-2010s now takes four years from the date of order until delivery, resulting in an extensive backlog of fire truck orders in the United States.

4.      As a result of high prices and order backlogs, fire trucks that should have been retired after 15 or 20 years of service are now celebrating their 30th "birthdays" on the front lines. These older trucks break down more frequently and are more difficult to repair than new trucks, leaving gaps in communities' fire protection systems and putting the public in danger. It goes without saying that when a fire department is stretched too thin—when there are not enough viable fire trucks at the ready to respond to emergencies—the consequences can be deadly.

5.      Beginning no later than January 1, 2016, three fire truck manufacturers—REV Group, Inc. ("REV Group"), Oshkosh Corporation ("Oshkosh"), and Rosenbauer America LLC ("Rosenbauer") (herein collectively referred to as the "Manufacturer Defendants")—conspired, colluded, and entered into an agreement to artificially suppress the supply and raise the price of fire trucks. Manufacturer Defendants are the three largest manufacturers of fire trucks in the United States. Together, they control between 70 and 80 percent of the United States fire truck market. The Manufacturer Defendants *should* be in direct competition with one another. Instead, they unlawfully conspired together to leverage their collective market power to suppress the supply of fire trucks and artificially inflate prices to the detriment of Plaintiff and Class Members.

6.      In some instances, Defendants have unlawfully communicated with each other directly about what they perceive to be "negative competition."  For example, Mike Virnig, REV Group's Vice President of Sales in the Fire Group, stated, "What I won't tolerate is negative selling. ***I won't tolerate it with our competitors***, and I won't tolerate it within the group. If I even get a hint or see anything like a dealer taking a shot at another dealer, ***we step in and say, 'Stop***

*it*.'"

7.      In other instances, Defendants have channeled their unlawful communications through the closed-door sessions of the Fire Apparatus Manufacturing Association ("FAMA"). The Manufacturer Defendants have perpetuated their conspiracy through FAMA, the primary trade association for the fire truck industry in the United States. FAMA's membership consists of companies that manufacture fire trucks and fire truck components such as ladders and water hoses while, notably, consumers such as Plaintiff and Class Members are prohibited from becoming members.

8.      FAMA provides the framework and facilitating mechanism for the conspiracy. FAMA's members-only meetings provide a forum for Manufacturer Defendants to meet in person and communicate directly. FAMA also engages in a give-to-get information scheme whereby it solicits and collects competitively sensitive data from participating FAMA members that is compiled into a quarterly report and circulated exclusively to those same FAMA members who share their data in the scheme. FAMA's quarterly reports create an information asymmetry that benefits the Manufacturer Defendants at the expense of consumers, such as Plaintiff and Class Members, who are forced to operate at an information disadvantage.

9.      In a competitive market, sharing sensitive business information with a direct competitor would be contrary to an organization's self-interest as it would allow the competitor to undercut on price and take market share. In a cartel, however, access to this kind of information serves as a reassurance that cartel members are adhering to the conspiracy and declining to pursue co-conspirators' market share.

10.      Plaintiff City of Ann Arbor brings this suit individually and on behalf of all other similarly situated indirect purchasers against the Manufacturer Defendants and FAMA

3

(collectively, "Defendants") for their unlawful conduct, combination, or conspiracy to suppress supply and raise the price of fire trucks sold throughout the United States. Thanks to their conspiracy, Manufacturer Defendants have been able to increase their margins by several percentage points and boost total profits to the detriment of Plaintiff and the Class, all without concern that their competitors will try to steal market share. Nor are Manufacturer Defendants phased by potential new entrants to the market. High barriers to entry prevent new competitors from breaking into the industry—adding another layer of protection to Manufacturer Defendants' control of the United State fire truck market.

## II.    PARTIES

### A.    Plaintiff City of Ann Arbor

11.    The City of Ann Arbor ("Ann Arbor") is located in southeast Michigan with a population of approximately 121,000 people. Ann Arbor is consistently ranked as a top place to live in the country by various mainstream media outlets due to factors such as low crime rate, quality and availability of healthcare, and access to green spaces. It is also home to the University of Michigan, a top-ranked public university, which presents its own set of challenges for a fire department—celebratory fires and related incidents in response to winning college football national championships, for example.

12.    The number of service calls received by the Ann Arbor Fire Department ("AAFD") across its six fire stations has been steadily increasing for more than a decade, increasing from 6,953 in 2016 to 11,911 in 2024. Furthermore, a recent boom in downtown development as well as increasingly variable weather patterns have the AAFD facing a need for more specialized training in responding to additional challenges, such as how to navigate high-rise buildings and respond to damage caused by intense storms. To respond to such service calls, AAFD access to

4

fully functioning fire trucks is paramount.

13.     Throughout the relevant time period, Ann Arbor purchased fire trucks from separate authorized dealers of the Manufacturer Defendants. As a direct result of Defendants' conduct alleged herein, Plaintiff purchased these fire trucks at artificially inflated prices and suffered antitrust injury.

**B.     Defendants**

**1.     REV Group, Inc.**

14.     Defendant REV Group, Inc. ("REV Group") is incorporated in Delaware and is headquartered in Brookfield, Wisconsin. Throughout the relevant time period, REV Group produced and sold fire trucks and participated in a conspiracy to suppress the production and raise the price of fire trucks in the United States.

15.     In 2024, REV Group's full year net income was $257.6 million. Of the $3 billion in annual fire truck sales in the United States, REV Group captures $1 billion which is roughly 33 percent of the total annual market.

16.     Throughout the relevant time period, REV Group sold its fire trucks through a network of at least 113 dealers servicing all 50 states under a variety of brand names, including but not limited to E-ONE, Inc. ("E-ONE"), Kovatch Mobile Equipment Corporation ("KME"), Ferrara Fire Apparatus ("Ferrara"), Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively "Spartan"), Smeal Fire Apparatus ("Smeal") and Ladder Tower Company ("Ladder").

17.     REV Group currently operates manufacturing plants in Ocala, Florida (E-ONE); Hamburg, New York (E-ONE); Nesquehoning, Pennsylvania (KME); Ephrata, Pennsylvania (Ladder, KME, and Ferrara); Brandon, South Dakota (Spartan); Charlotte, Michigan (Spartan);

5

Snyder, Nebraska (Smeal); and Holden, Louisiana (Ferrara).

### 2.    Oshkosh Corporation

18.    Defendant Oshkosh Corporation ("Oshkosh") is incorporated in Wisconsin and headquartered in Oshkosh, Wisconsin. Throughout the relevant time period, Oshkosh produced and sold fire trucks and participated in a conspiracy to suppress the production and raise the price of fire trucks in the United States.

19.    In 2024, Oshkosh's full year net income was $681.4 million. Of the $3 billion in annual revenue for fire truck sales in the United States, Oshkosh captures $750 million which is roughly 25 percent of the total annual market.

20.    Throughout the relevant time period, Oshkosh sold its fire trucks through a network of 23 authorized dealerships to customers across all 50 states under a variety of brand names including but not limited to Pierce Manufacturing, Inc. ("Pierce"), Oshkosh Airport Products, and Maxi-Metal, Inc.

21.    Pierce is Oshkosh's leading North American fire truck brand. Pierce is incorporated in Delaware with headquarters located in Appleton, Wisconsin. There are Pierce manufacturing facilities in Appleton, Wisconsin and Bradenton, Florida. There are at least 23 Pierce dealerships which, together, service customers across all 50 states.

### 3.    Rosenbauer America LLC

22.    Defendant Rosenbauer America LLC ("Rosenbauer") is a wholly owned subsidiary of a publicly traded, Austrian-based company called Rosenbauer International AG ("Rosenbauer International"). Defendant Rosenbauer is incorporated in Delaware and headquartered in Lyons, South Dakota. Throughout the relevant time period, Rosenbauer produced and sold fire trucks and participated in a conspiracy to suppress the production and raise the price of fire trucks in the

United States.

23.     In 2024, Rosenbauer reported an annual revenue of approximately $220 million. Of the $3 billion in annual fire truck sales in the United States, Rosenbauer captures $307 million which is roughly 10 percent of the total annual market.

24.     Throughout the relevant time period, Rosenbauer sold fire trucks under its own brand name, Rosenbauer America LLC. Rosenbauer has production facilities located in Lyons, South Dakota; Wyoming, Minnesota; and Fremont, Nebraska. Throughout the relevant time period, Rosenbauer sold its brand name fire trucks through a network of at least 24 dealers which, together, services customers across all 50 states.

### 4.     Fire Apparatus Manufacturers' Association

25.     The Fire Apparatus Manufacturer's Association ("FAMA") is a not-for-profit trade association for fire truck manufacturers located in Ocala, Florida. During the relevant time period, FAMA was an active participant in the conspiracy to suppress the supply and raise the price of fire trucks in the United States.

26.     As of October 2025, FAMA had 135 member companies across North America. About 60% of FAMA's members are companies that manufacture components of a fire apparatus, such as a ladder or a hose. The other 40% of FAMA's members are companies who manufacture the fire apparatus itself, including the subsidiaries of Manufacturer Defendants: E-ONE, Ferrara, KME, Spartan, Pierce, and Rosenbauer– all of which are members of FAMA.

27.     Throughout the relevant time period, FAMA acted as a co-conspirator alongside Manufacturer Defendants. FAMA furthered the conspiracy by providing a forum for the manufacturers to meet in person and directly communicate with one another. FAMA also furthered the conspiracy by facilitating the exchange of proprietary and competitively sensitive information

7

regarding, among other things, prices, capacity, demand, sales volume, future sales strategy, and other key pricing and sales metrics. This willing exchange of confidential information had the intended effect of reducing competition in the United States fire truck market to the detriment of Plaintiff and Class Members.

### 5.    Co-Conspirators and Agents

28.    Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs, and for whom they are liable.

29.    Various individuals and entities that are not named as Defendants nonetheless participated as co-conspirators in the violations alleged herein and have performed acts in furtherance of the conspiracy. These other entities have facilitated, adhered to, participated in, aided and abetted, and otherwise acted in concert with Defendants to advance the objectives of the conspiracy to benefit Defendants and themselves by artificially inflating the price of fire trucks in the United States. Plaintiff reserves the right to name some or all of these entities as defendants to this litigation. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not they are named as defendants in this litigation.

### C.    Ann Arbor Purchases of Fire Trucks Through the Sourcewell Purchasing Cooperative

30.    Ann Arbor participates in a local government purchasing cooperative organized under the laws of the State of Minnesota known as Sourcewell. Under this arrangement, Sourcewell issues Requests for Proposal for various products and services and companies are invited to place bids for the provision of those products and services.

8

31.     Under this cooperative arrangement, Sourcewell issued a public solicitation for Firefighting Apparatus and Fire Service Vehicles, and the Oshkosh Corporation submitted bids to Sourcewell to supply such vehicles with Pierce Manufacturing listed as the vendor.

32.     Under the Sourcewell cooperative arrangement, the REV Group also submitted bids to Sourcewell to supply such vehicles, listing the E-ONE Group, Ferrara Fire Apparatus, KME Fire Apparatus, Spartan Fire, and Spartan Chassis brands—all housed within the REV Group—as available for purchase.

33.     Sourcewell executed contracts with both Oshkosh and the REV Group to provide firefighting apparatus and fire service vehicles to "Participating Entities" who are interested in purchasing such equipment. Ann Arbor is one such Participating Entity. The Sourcewell/Oshkosh contract was executed on April 5, 2022. The Sourcewell/REV Group contract was executed on February 24, 2022.

34.     Both the Sourcewell/Oshkosh contract and the Sourcewell/REV Group contract allows a Participating Entity like Ann Arbor to reference the contract and request execution of a purchase order for the desired equipment in one of two ways: 1) Ann Arbor will issue the order "directly to Supplier" or 2) Ann Arbor will issue the order to Supplier's "authorized subsidiary, distributor, dealer, or reseller."

35.     Referencing the Sourcewell/Oshkosh contract, Ann Arbor entered into purchase orders for the provision of Firefighting Apparatus vehicles on two occasions. On each occasion, Ann Arbor did not enter the purchase order directly with Supplier but, instead, executed the purchase order with Supplier's authorized "distributor, dealer or reseller." Since Ann Arbor's Sourcewell-based purchase orders were not executed directly with Defendants, they are referred to in this complaint as "indirect" purchases.

36.　Specifically, Ann Arbor executed purchase orders with Oshkosh/Pierce Manufacturing's authorized dealer as follows:

    i.　On June 14, 2022, Ann Arbor executed a purchase order with Halt Fire, Inc. for a 2022 Pierce Custom Enforcer A Pumper Fire Apparatus for a price of $662,453.00; and

    ii.　On February 4, 2025, Ann Arbor executed a purchase order with Halt Fire, Inc. for a Fire Tiller Pierce 107 Tractor Aerial Mounted for a price of $2,384,695.00.

Ann Arbor has received delivery of the 2022 Pierce Custom Enforcer A Pump Fire Apparatus. It awaits delivery of the Fire Tiller Pierce 107 Tractor Aerial Mounted.

37.　Ann Arbor also invoked the Sourcewell/REV Group contract to execute a purchase order with the REV Group's authorized dealer West Shore Fire Inc. On July 7, 2023, Ann Arbor executed a purchase order with West Shore Fire Inc. for a 2025 E-One Typhoon Engine for a price of $830,000.00. Nearly two and a half years after execution of the purchase order, Ann Arbor still awaits delivery of the E-One truck.

### III.　JURISDICTION AND VENUE

38.　This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1). This Court further has jurisdiction over this action pursuant to 28 U.S.C § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the putative class is a citizen of a different state from that of one of the Defendants.

39.　This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a). Plaintiff seeks damages in excess of $5,000,000. Plaintiff's state law claims derive from the same common nucleus of operative fact as their federal claims. Plaintiff brings state law class action claims on behalf of the State Law Classes to recover actual and/or

compensatory damages, treble damages, pre- and post- judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct in restricting the supply and increasing the price of fire trucks in the United States. Plaintiff also seeks equitable reformation of the price terms of outstanding fire truck purchases that have not yet been delivered.

40.    Pursuant to 28 U.S.C. § 1391(b) and (c), venue is proper in this District because during the relevant time period, one or more of the Defendants resided in this District, and all Defendants transacted business, were found, or had agents in this District.

41.    This Court has personal jurisdiction over Defendants because they: (1) transacted business throughout the United States, including this District; (2) have substantial contacts within the United States, including in this District; and/or (3) are engaged in an illegal anticompetitive scheme that was and is directed at, and had and has the intended effect of causing injury to persons residing in, located in, and/or doing business in the United States, including in this District.

42.    Defendants' activities were intended to and did have a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District. Defendants sell their products and services in the continuous and uninterrupted flow of interstate commerce, including in, into, and from this District.

## IV.    FACTUAL ALLEGATIONS

### A.    Relevant Markets

43.    Courts will often look at the relevant market in assessing the competitive effects of concerted action. The relevant market is the zone of competition among agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). For purposes of this litigation, the geographic market is the United States, and the product market is fire trucks as

11

described more fully below.

### 1.    Relevant product market

44.    Fire trucks are critical pieces of equipment for fire departments; there simply is no alternative product for fighting fires. According to the U.S. Fire Administration, there are approximately 30,000 fire departments and 52,000 fire stations across the United States ranging from large urban departments to small rural agencies. Every fire department across the country needs a fire truck, meaning there are thousands of fire departments, municipalities, and entities across the United States that purchased fire trucks from the Manufacturer Defendants during the relevant time period.

45.    This conspiracy concerns fire trucks as recognized by the National Fire Protection Association ("NFPA") Standard 1900 regarding automotive fire apparatus and the National Wildfire Coordinating Group Standards for Wildland Fire Resource Typing (together, the "standards"). These standards classify fire trucks within the United States into seven types, all of which are at issue in this case and are discussed below:

- **Type 1** fire trucks are often referred to as an engine company, engine pumper, or structural firefighting truck. This is the most common type of fire truck in use today. Urban, suburban, and rural fire departments all rely on Type 1 fire trucks. Type 1 fire trucks carry all required NFPA firefighting equipment and support both structural firefighting and initial emergency medical services. Every Type 1 fire truck is required to have a pump with a minimum tank size of 300 gallons and to be equipped with 2.5-and 1.5-inch hoses of varying lengths. These trucks must also include a full complement of ground ladders, nozzles, forcible entry equipment,

12

rear access and egress, and some level of first aid equipment. They are designed to carry four firefighters.

- **Type 2** fire trucks carry all required NFPA firefighting equipment and support both structural firefighting and initial emergency medical services. They are most commonly used in urban and suburban settings. They typically carry three to four firefighters.

- **Type 3** fire trucks are often referred to as a wildland fire truck or brush truck. They are typically used in rural and wildland settings. NFPA standards require a Type 3 engine to have a minimum of a 500-gallon water tank and a pump capable of a minimum of 150 US gallons per minute at a pressure of 250 pounds per square inch. Many Type 3 fire engines also feature an auxiliary pump in addition to the main water pump. The auxiliary pump can be powered by a separate diesel engine that is connected to the pump. This pump-and-roll technique means that a truck operator can drive the truck while crew members man the pump and hoses, allowing firefighters to follow along as forest fires and brush fires move with the weather, and to create fire lines, wetting down areas ahead of an advancing wildfire. Type 3 fire engines must be equipped to carry at least three firefighters.

- **Type 4** fire trucks, like Type 3 trucks, are often used in wildland firefighting. Compared to Type 3 trucks, Type 4 trucks have a larger water tank and reduced hose capacity requirements. Type 4 fire trucks must have a 750-gallon water tank that offers 50 gallon per minute of water transfer at a pressure of 100 pounds per square inch. Type 4 trucks must be equipped to carry at least two firefighters.

- **Types 5, 6, and 7** fire trucks are often grouped together because they feature many of the same design qualities. These vehicles are typically pick-up truck-based with four-wheel drive on a medium duty chassis. The main difference between Type 5, Type 6, and Type 7 fire trucks is the difference in their maximum gross vehicle weight rating ("GVWR"). Type 5 trucks have a maximum GVWR of 26,000 pounds, Type 6 trucks have a maximum GVWR of 19,500 pounds, and Type 7 trucks have a maximum GVWR of 14,000 pounds. Type 5, 6, and 7 trucks typically carry a 300-gallon water tank and a small booster pump with a minimum capacity of 50 gallons per minute. They must be equipped to carry two firefighters.

| Engine Typing Standard | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Types 1 and 2 are structure; Types 3-7 are wildland | | | | | | | |
| Requirements | Type 1 | Type 2 | Type 3 | Type 4 | Type 5 | Type 6 | Type 7 |
| Tank Minimum Capacity (gal) | 300 | 300 | 500 | 750 | 400 | 150 | 50 |
| Pump Minimum Flow (gal/min) | 1,000 | 500 | 150 | 50 | 50 | 50 | 10 |
| At Rated Pressure (psi) | 150 | 150 | 250 | 100 | 100 | 100 | 100 |
| Hose: 2 1/2-inch | 1,200 | 1,000 | N/A | N/A | N/A | N/A | N/A |
| Hose: 1 1/2-inch | 500 | 500 | 1,000 | 300 | 300 | 300 | N/A |
| Hose: 1-inch | N/A | N/A | 500 | 300 | 300 | 300 | 200 |
| Ladders per NFPA 1900 | Yes | Yes | N/A | N/A | N/A | N/A | N/A |
| Master Stream 500 gal/min. | Yes | N/A | N/A | N/A | N/A | N/A | N/A |
| Pump and Roll | N/A | N/A | Yes | Yes | Yes | Yes | Yes |
| Maximum GVWR (lb) | N/A | N/A | N/A | N/A | 26,000 | 19,500 | 14,000 |
| Personnel (minimum) | 4 | 3 | 3 | 2 | 2 | 2 | 2 |

N/A = Not Applicable
NFPA = National Fire Protection Association
GVWR = Gross Vehicle Weight Rating

Notes:
1. All types shall meet federal, state and agency requirements for motor vehicle safety standards, including all gross vehicle weight ratings when fully loaded.
2. Type 3 engines and tactical water tenders shall be equipped with a foam proportioner system.
3. All water tenders and engine types 3 through 6 shall be able to prime and pump water from a 10 foot lift.

*Image 1: Fire Truck Types*

46.    Some trucks are specially equipped to conform to additional standards. For example, NFPA Chapter 5 describes the requirement for a truck to be considered a Pumper Fire Apparatus, NFPA Chapter 9 describes the requirements for a Quint Fire Apparatus, NFPA Chapter

14

11 describes the requirements for a Mobile Foam Fire Apparatus, and NFPA Chapter 19 describes the requirements for Aerial Fire Apparatus (which include trucks equipped with aerial ladders, elevating platforms or towers, and water tower devices). These specialty trucks are also included in the relevant product market.

### 2. Significant barriers deter new competitors from entering the market, thereby protecting Manufacturer Defendants' market power.

47. As a result of industry roll-ups from the mid-2010s through today, discussed *infra*, the United States fire truck industry is primarily concentrated among the three Manufacturer Defendants—REV Group, Oshkosh, and Rosenbauer. Together, they capture between 70 and 80 percent of the relevant market. Possessing such market power has enabled Manufacturer Defendants to artificially raise prices in concert with one another without the risk of losing sales to competitors.

48. Fire trucks are highly specialized pieces of equipment that take a lot of time, money, and expertise to produce. As a result, the fire truck manufacturing industry has uniquely high barriers to entry that make it difficult for new competitors to enter, further insulating Defendants from the threat of new competition. One such barrier is the significant time and capital required for a firm to become operational in manufacturing fire trucks. Typically, only established and well-funded corporations can afford the initial investment required to break into the industry.

49. The specialized nature of manufacturing fire trucks serves as another barrier to entry; end-users of fire trucks can specify nearly every aspect of the apparatus. This demand for customization stems from the diversity of the customer base—each fire department (and sometimes each fire station) has specific requirements for their fire trucks. To meet these differing demands, fire truck manufacturers must possess highly technical and niche engineering expertise to meet industry standards and satisfy the needs of each individual customer. The time and effort

15

required to develop the necessary engineering expertise serves as a deterrent to new entrants.

50. These barriers to entry into the fire truck industry provide an additional layer of protection to Manufacturer Defendants' markets shares and make it easier for them to further their conspiracy and maintain control of the relevant market.

**B. Defendants' Consolidation of the Fire Truck Market and Evidence of Anticompetitive Intent**

51. The fire truck industry has seen its share of changes. During the industrial age, horse-drawn steam pumpers dominated the market. The subsequent shift to gas-powered vehicles meant that pumpers were no longer limited to a horse's ability and could instead be motorized.

52. The modern fire truck manufacturing industry boomed in the post-war decades of the 1950s and 1960s. At that time, fire truck manufacturers were small to midsized operations— typically family-owned and scattered throughout each region of the country, customizing vehicles to fit the specific needs of local fire departments. At that time, the industry was competitively diversified across at least two dozen companies. Healthy competition among smaller firms kept fire truck prices near costs, and in the decades that followed, the industry enjoyed relatively stable prices and ample production capacity. With few exceptions, the annual cost increase for new fire trucks prior to 2008 was around 3%.

53. However, when the 2008 recession forced municipalities to slash their budgets, fire departments nationwide had no choice but to stretch the lifespan of their active fire trucks rather than order new ones. By 2011, the market for new fire truck sales had fallen more than 40% from roughly 5,000 a year down to around 3,000 a year. The fire truck manufacturing industry subsequently took a hit, and many independent manufacturers could not afford to stay in business. It was then that the private equity industry saw an opportunity.

**1. REV Group**

54.    Capitalizing on the economic turbulence of the recession, a New York-based private equity firm called American Industrial Partners ("AIP") acquired E-ONE in 2008, the first fire truck manufacturer in AIP's portfolio. Dino Cusumano, the managing partner of AIP, commented "we are confident that our partnership with E-ONE will create an industry leading company…Our operating resources will allow [E-ONE] to achieve its full potential as an industry leader." This marked the start of AIP's efforts to roll up the fire truck industry.

55.    Between 2008 and 2010, AIP ramped up its consolidation efforts by acquiring several companies including Collins Industries, Inc., Halcore Group, Inc., and Fleetwood RV, Inc., eventually merging them into the diversified specialty vehicle conglomerate Allied Specialty Vehicles. In 2015, Allied Specialty Vehicles rebranded to REV Group, Inc., signaling a shift to a unified corporate identity ahead of its public market entry.

56.    In 2016, REV Group acquired Kovatch Mobile Equipment Corporation ("KME"), a leading manufacturer in the Mid-Atlantic region with operations in Pennsylvania, Virginia, New York, and California. KME produces a broad array of fire apparatus, including pumpers, aerials, and tankers. At the time, KME had approximately 800 associates.

57.    In 2017, REV Group purchased Ferrara Fire Apparatus, Inc., a leading manufacturer of custom fire apparatus based in Holden, Louisiana. Prior to the purchase, Ferrara was E-ONE's primary competitor in the southern United States. When it was acquired, Ferrara employed more than 450 people and boasted an annual revenue of $140 million. Dan Peters, president of the fire division within REV Group, noted that "the addition of Ferrara to the REV Fire Group enable[d] a number of new growth opportunities including expansion of our reach nationwide and adding new geographical regions and key accounts."

58.    Although REV Group already had a powerful market position at this point, it

17

steadily marched forward with consolidation efforts. In 2020, REV Group acquired Spartan Emergency Response, Spartan Fire Apparatus and Chassis, Smeal Fire Apparatus, and Ladder Tower Company. These acquisitions secured REV Group's hold on the Midwest and Mid-Atlantic regions, cementing it as the dominant fire truck manufacturer in the United States.

59.     In contrast to the healthy competition that previously existed between the smaller and midsized fire truck manufacturers, REV Group made it clear that "negative" competition among its subsidiaries would not be tolerated.

60.     Furthermore, during a 2021 investor presentation, REV Group representatives referred to it as "an industry consolidator." The presentation detailed a strategy calling for REV Group subsidiaries to "converge on common designs that can be shared across brands" and to use the Spartan Metro Star chassis/cab as the "platform" for their offerings. The investor presentation further called for the elimination of geographic overlaps between the marketing of its different fire truck brands and dealers. As a result, REV Group ensured that its larger fire department customers would deal directly with corporate-level staff rather than individual brand representatives, reflecting a "center-led" approach whereby REV Group itself now dictates the management and execution of "margin improvement actions" across its subsidiaries.

61.    During its period of steady consolidation and centralization, REV Group CEO Timothy Sullivan boasted to analysts that REV Group was on track to get all acquired companies that were operating at a 4 to 5 percent profit margin "above that 10 percent level." To achieve this, it would consolidate and suppress competition, or as Sullivan stated, "you bring them into the fold, you got to give them the religion, and they've got it now." In other words, REV Group would secure a 10% profit margin across all portfolio companies by vertically integrating the fire truck industry and colluding with REV Group's direct market competitors.



*Image 2: Rev Group's Role in Consolidation of the Fire Truck Industry*

### 2.    Oshkosh

62.    Following a period of significant acquisition by REV Group, Oshkosh followed suit and began making acquisitions of its own. In 2021, Oshkosh's primary North American subsidiary, Pierce Manufacturing, announced that it had acquired manufacturer Boise Mobile Equipment ("BME"). BME's unique product portfolio allowed Pierce to expand its reach to West Coast markets. In 2022, Oshkosh acquired Canadian fire truck manufacturer Maxi-Metal Inc. in

19

a move that "broaden[ed] collaboration and expand[ed] sales and distribution capabilities within Pierce's North American dealer network." These expansions gave Oshkosh control over a full quarter of the United States fire truck market.

63.    In addition to purchasing third-party manufacturers, Oshkosh, similar to REV Group, took steps to eliminate competition among its subsidiaries by consolidating U.S. brands and reducing geographic overlap between its dealers.

64.    For example, in 2018, Pierce dealer MacQueen Emergency Group acquired Schuhmacher Fire Equipment. MacQueen was already the authorized dealer for Minnesota, Nebraska, South Dakota, and North Dakota; through its acquisition of Schumacher, it expanded its territory to Missouri, thereby consolidating MacQueen's control in the Midwest market.

65.    In January 2019, Pierce dealer Siddons-Martin Emergency Group acquired Superior Equipment, expanding Pierce's territory throughout the Southwest including Texas, Louisiana, New Mexico, Utah, and Nevada.

66.    Later that year in November 2019, Pierce dealer Allegiance Fire and Rescue acquired Minuteman Fire and Rescue, expanding Pierce's territory over most of New England, encompassing Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.

67.    In September 2023, Pierce dealer Firematic Supply Co. Inc acquired Churchville Fire Equipment, consolidating Pierce's control over Connecticut and New York.

68.    In June 2025, Pierce dealer Reliant Fire Apparatus acquired Halt Fire, Inc., thereby consolidating Reliant's "exclusive Pierce territory" to include Michigan in addition to its existing territories in Wisconsin and Iowa.

69.    These consolidations, which have largely eliminated geographic overlaps and given Pierce dealers exclusive control across vast territories, have reduced or eliminated competition

20

among Pierce subsidiaries who, in an otherwise diverse market, would be in competition with one another.

### 3.    Rosenbauer

70.    In response to REV Group's and Oshkosh's efforts to consolidate the fire trucks market, in June 2022, Rosenbauer International finalized its acquisition of the remaining 25 percent minority stake in Rosenbauer America from General Safety Equipment Corporation.

71.    In March 2023, Rosenbauer America announced that IKON Fire, LLC would join its dealer network which cemented Rosenbauer America's presence in Colorado and Wyoming.

72.    Similar to REV Group and Oshkosh's elimination of geographic overlap among its dealers, Rosenbauer dealers are assigned non-overlapping territories, which reduces competition among its dealers.

### C.    The Fire Apparatus Manufacturer's Association

73.    Not only have Manufacturer Defendants consolidated control over the market and suppressed competition between their own brands, they have also sought to cooperate rather than compete with one another. Manufacturer Defendants are direct competitors and should be operating as such; instead, they have taken to working together, thus establishing an anticompetitive framework for the entire industry.

74.    Cooperation among the Manufacturer Defendants has gone beyond an abstract desire for those in the fire truck industry to succeed overall. Rather, their desire to cooperate has manifested in an unlawful scheme to suppress the supply and raise the price of fire trucks in the United States, which they were largely able to accomplish through their membership in FAMA.

75.    Among FAMA's members are E-ONE, Ferrara, KME, Spartan, Pierce, and Rosenbauer, which together represent all three Manufacturer Defendants. FAMA colludes with

the Manufacturer Defendants to further the conspiracy by facilitating the exchange of sensitive business information among certain FAMA members in a give-to-get information scheme.

### 1. Data & Research Committee

76. According to FAMA, access to competitor data (as provided by FAMA) is "one of the most valuable reasons to join the organization." FAMA has a committee exclusively dedicated to effectuating the exchange of data and information among its members. Originally called the "Statistics Committee," it underwent a transformation in 2023 adopting its current name, the Data & Research Committee, and shifting from a largely paper-based data collection and dissemination system to a fully electronic system utilizing the FAMA website.

77. According to its bylaws, the mission of the Data & Research Committee is "to strengthen FAMA member companies by providing actionable data for strategic business planning." The committee collects and distributes data to its members on a quarterly basis for the purpose of, "assist[ing] them in making business decisions." FAMA describes this data as "invaluable" to its members.

78. The bylaws for the Data & Research committee also state, likely as a means of protection, that the data collected by FAMA should be of "past transactions or activities." However, in an industry where the price-term is set years before delivery is made and payment tendered, the lines become blurred as to what constitutes a past transaction, muddying the waters as to what type of transactional data Manufacturer Defendants are exchanging with one another.

79. The Data & Research Committee maintains a digital portal that participating FAMA members use to upload their sensitive data. Once all data has been uploaded, it is forwarded to a FAMA Board-approved accounting firm that compiles the data into a report. The report is sent to the chairperson of the Data & Research committee for publication on a secure, "members-only"

section of the FAMA website. FAMA imposes strict limits on who can become a member in the first place,[1] but it places even further restrictions on who has access to the quarterly reports; only FAMA members that provide their own data to FAMA and promise to keep the information confidential are granted access to the quarterly reports, effectively creating a give-to-get information scheme.

80.     Since 2021, the Data & Research Committee has been led by employees of the Manufacturer Defendants. John Schultz, the current Vice Chair of the Committee, works as a Vice President for Pierce—the primary subsidiary for Defendant Oshkosh. For the last four years, Shultz has served as chairperson of the Data & Research Committee. Prior to this, the Committee was chaired by Mike Schoenberger, Director of Dealer Development for Defendant Rosenbauer. The same trend can be observed with FAMA's Board of Directors; since 2009, the following Manufacturer Defendants' employees have sat on the FAMA Board of Directors: Harold Boer, Rosenbauer America, LLC; John E. Sztykiel, Spartan Motors, Inc.; Mike Power, Pierce Manufacturing, Inc.; Phil Gerace, KME Fire Apparatus; Mike Schoenberger, Rosenbauer America, LLC; Michael Moore, Pierce Manufacturing, Inc.; John Slawson, Spartan Emergency Response; Jeromie Johnston, Pierce Manufacturing, Inc.; Bert McCutcheon, Ferrara Fire Apparatus, Inc.; and Gary Pacilio, E-ONE, Inc.

81.     Manufacturer Defendants' employees' exercise of leadership roles in FAMA

---

[1] To become a member of FAMA, an entity must "be engaged in the manufacture of firefighting or fire protection apparatus" or "manufacture components or products which are incorporated by the manufacturer as a permanent part of the completed fire apparatus…such as a chassis, fire pumps, fire hoses, hose reels, ladders, aerial devices, apparatus valves and other water control appliances." Notably, under this definition, municipal fire departments such as Plaintiff and Class Members are *not* eligible to join FAMA. Therefore, such entities—the consumers of fire trucks—are denied access to the data that Manufacturer Defendants routinely exchange amongst themselves and other industry players.

23

facilitates the exchange of pricing and production data between Manufacturer Defendants and FAMA which promotes and furthers anticompetitive behavior.

### 2. FAMA Spring and Fall Meetings

82. In addition to providing economic data to their members, FAMA also organizes twice-yearly meetings, in the spring and the fall, to "provide a forum [for members] to share information." FAMA's member-exclusive events allow horizontal competitors to discuss shared financial interest regarding fire trucks without the presence of consumers. FAMA advertises these "networking" events as one of the primary reasons to join FAMA.

83. At these meetings, attendees – including direct competitors – listen to presentations that include economic forecasts regarding the fire truck manufacturing market. Attendees also engage in "purchasing roundtables" and FAMA members-only meetings and discussion groups. These various closed-door meetings allow Defendants to exchange competitively sensitive information and strategies to further their conspiracy to reduce supply and raise the price of fire trucks in the United States.

84. In addition to the statistical reports and twice-yearly in-person meetings, FAMA communicates with its members on a regular basis via emails, its website, and the extensive FAMA newsletter which is published quarterly and provides another avenue for communication and coordination among Manufacturer Defendants.

85. The FAMA newsletter provides another avenue for Manufacturer Defendants to collaborate. FAMA's newsletter serves as a data pipeline from consumers to sellers, issues surveys to its members, and provides information on industry topics important to sellers such as key industry trends or strategies to increase profits.

86. Some of FAMA's members have been a part of the organization for decades,

fostering a certain sense of insularity, allegiance, and closeness to the group which is evident in its newsletter.

87.    The exchange of information among Manufacturer Defendants as facilitated by FAMA had the intended effect of reducing pricing and production delivery competition in the United States fire truck market. In a competitive market, sellers must compete to win customers through price and delivery time. The information exchange between Manufacturer Defendants has suppressed competition by removing the veil of ignorance between direct competitors regarding price, supply, demand, inventory, and other key factors. When sellers that are in direct competition for the same customers exchange strategic plans rather than compete, comfort replaces uncertainty and there is no incentive for sellers to lower prices or compete in other aspects—this is precisely the type of competition Defendants successfully sought to thwart through their conspiracy which resulted in harm to Plaintiff and Class Members.

25













*Image 3: Top 10 Reasons to Join FAMA as found on the "Why Join" tab on FAMA Website*

**D.    Defendants' Successful Suppression of the Supply of Fire trucks**

**1.    The backlog of fire trucks quadrupled during the Class Period.**

83.    Defendants' conspiracy to exchange nonpublic, competitively sensitive information regarding the fire truck industry has had the intended effect of suppressing the supply of fire trucks in the United States.

84.    In 2008, the fire truck industry was booming with nearly 6,000 new fire trucks sold annually in North America. By 2009, however, the effects of the Great Recession were felt by municipalities across the county. Tighter annual budgets meant that fire truck sales had decreased by more than 40% by 2011. As the economy stabilized, fire truck orders began to recover, too. By 2018, the fire truck industry was considered "healthy" with 4,000 to 5,000 orders per year.

26

85.    In 2020, the COVID-19 pandemic struck, and many municipalities received stimulus funds which they promptly allocated towards updating their fire truck fleets. As a result, fire truck orders surged and by 2022 orders had reached 45 percent above average levels. Unfortunately, the Manufacturer Defendants' production of fire trucks did not keep pace, and despite the increase in demand, the number of fire trucks shipped to customers in 2022 was 9 percent below the average for the prior decade. Manufacturer Defendants' slow production times has resulted in an extensive backlog of fire truck orders in the United States which continues to increase and remains unaddressed by Manufacturer Defendants.

86.    Before 2020, REV Group had a backlog of roughly $1 billion worth of fire department orders. In 2023, REV Group reported a $3.6 billion backlog, which was a 41 percent increase over 2022. By October 2024, REV Group's backlog had increased again, up to $4.4 billion.



*Image 4: Comparison of fire apparatus orders before and after COVID-19 pandemic based on FAMA data*

87.    Oshkosh and Rosenbauer have reported similar backlogs. Oshkosh's backlog of fire

truck orders quadrupled from 2019 to 2023, when it reported approximately $4 billion in orders placed but not fulfilled. As of 2024 year-end, Rosenbauer reported approximately $2.66 billion in orders placed but not fulfilled which had increased to $2.73 billion by the beginning of 2025.

88.     Because of order backlogs, municipalities have had to wait increasingly long periods of time to receive their fire trucks. Those impacted by these backlogs have publicly vented their frustrations. In an online forum for fire truck purchasers, one user reported that "lead times for delivery from date the order is placed to final inspection has gone from 10-12 months to greater than 2 years in many cases and in some cases approaching 3 years." Another user lamented that they had purchased fire trucks from Rosenbauer "in the past two years" and "none have been delivered." A third was told by Pierce that 48 months "is the going time for any new orders" for a "very cookie cutter rescue body."

89.     Not only has there been a backlog for new fire trucks, but the time it takes to receive a replacement part has also ballooned. Gil Carpenter, a fire chief in Arkansas, said that historically, when he needed a replacement part, his contact from Ferrara would ship him the part the next day. But in 2024, when one of his department's vehicles needed parts, it took more than 10 months to receive the replacement parts. This delay left his department without one of its fire trucks for nearly a year. Similarly, according to Mr. Carpenter, suppliers who were once responsive have grown more distant and focused on profits.

90.     Manufacturer Defendants have used the increase in orders as a pretext for explaining the delays. But on September 10, 2025, the U.S. Senate Homeland Security and Governmental Affairs Subcommittee on Disaster Management held a hearing on this very topic —the price and backlog crisis facing U.S. fire departments. During the hearing, entitled "Sounding the Alarm: America's Fire Apparatus Crisis," Senator Josh Hawley responded to REV

28

Group's pretextual excuses stating: "If that were the truth, you wouldn't have shut down production lines, you wouldn't have allowed the backlog to get to where it has, you wouldn't be boasting about it on earning calls, and you wouldn't be compensating your CEO when your customers are getting stiffed."

91.     Alexander Yaggy, a former investor in the REV Group's stock, called out the entire industry when he asked, "How can you have a $4 billion backlog and not spend any money to support it. It's reflective of an uncompetitive market." Mr. Yaggy's conclusion is correct. In a normal competitive market, an increase in demand is typically met with an increase in manufacturing capacity. But Manufacturer Defendants are not behaving as expected in a typical market because they have conspired to suppress the supply and raise the price of fire trucks.

> **2.      Despite increasing demand, Manufacturer Defendants decided against increasing their manufacturing capacity.**

92.     Despite their ever-increasing backlog of orders, Manufacturer Defendants have taken virtually zero steps to expand their manufacturing capacity. REV Group currently spends just 1% of its revenue on upgrading its buildings and facilities.

93.     Not only have Manufacturer Defendants failed to add manufacturing capacity, in some cases they have in fact closed existing plants. In 2021, REV group announced that it would stop production at two KME plants in early 2022. The first plant—located in Nesquehoning, Pennsylvania—once defined the town, employing over 350 workers; it was closed with a six-month warning. The second plant was located in Roanoke, Virginia. By closing these two plants, REV group cut its manufacturing footprint by roughly one third.

94.     During the Senate Subcommittee Hearing, President of REV Specialty Group Mike Virnig admitted to the challenges following the acquisition of KME. These challenges resulted in consolidating manufacturing operations, and with consolidation came "Reduced production of

29

KME trucks and resulting delayed deliveries." These delays were felt by real departments at the receiving end.

95.     The industry, however, views these backlogs as an indicator of something different altogether, going so far as to label them as indicators of the market. According to REV Group's Fiscal Year 2023 Annual Report, its business model is distinguished by its "variable cost structure, low required levels of maintenance capital expenditures as a percentage of net sales, structural ability to drive attractive levels of return on invested capital and *strong revenue visibility in certain product categories with longer backlogs*."

96.     Despite the ever-expanding backlogs and the resulting frustration amongst buyers, Manufacturer Defendants seem unconcerned that customers will cancel their orders or that a competitor might steal their business. During a 2023 conference call, REV Group CEO Mark Skonieczny said that the company did not expect order fulfillment delays to cause cancellations. He also stated, "I don't think [the backlog is] impacting our market share." In other words, Manufacturer Defendants are not worried that any other Defendant will build more manufacturing capacity and steal buyers away because of Manufacturer Defendants' joint agreement to suppress supply. In fact, instead of posing a risk to its market share, REV Group views its backlog as valuable to its shareholders as it gives the company "strong visibility into future net sales."

97.     Oshkosh has a similar attitude towards this backlog, viewing it favorably. In a 2020 earnings call, when it was reported that Pierce had a "record backlog of more than $1.3 billion," Oshkosh replied that "it puts us in a strong position and provides visibility well into 2021." As the backlog continued increasing, reaching as high as $5.67 billion in 2024, Oshkosh viewed this favorably remarking it provides "strong visibility over horizon."

98.     The industry takes advantage of their customers' extensive protocol to get the sign

off on these large purchases—they won't cancel orders unless circumstances are extreme. During a 2023 investor call, the CEO of REV Group admitted that the company did not anticipate cancellations from these backlogs because of the *nature of the orders*. Municipalities "earmark" funds for these orders which REV Group receives a deposit for, thus the money is already set aside for these orders and is unlikely to be cancelled. He stated, "[t]hat money is allocated to those units, so we feel good about that." This suggests that once the municipality accepts the offer, rarely do they go back on it in this industry, giving manufacturers confidence in the transaction even when the customer is taken advantage of.

99.    Senator Josh Hawley criticized Virnig, President of REV Specialty Vehicle Group, on the company's approach of paying dividends to investors and doing stock buybacks rather than investing in addressing the multi-billion-dollar backlog. He went so far as to express that "[a]nother word for this would be a heist."

**E.    Defendants' Successful Inflation of Fire Truck Prices in the United States**

100.    The Defendants' agreement to artificially raise the price of fire trucks had the desired effect. Consumers have paid artificially inflated prices for fire trucks, and Manufacturer Defendants' revenues have soared.

**1.    Fire truck prices have doubled during the Class Period.**

101.    With the surge in demand and anticompetitively restrained production, the cost of fire trucks has skyrocketed. In the mid-2010s, the average engine truck cost $300,000-$500,000. Today that price has surpassed more than $1 million. Ladder trucks used to cost between $750,000-$900,000 and now can be as high as $2 million.

102.    Mini pumper trucks have also experienced unprecedented price increases. On an online forum regarding the price of fire trucks, one user commented the following in April 2025:

> My department was looking into replacing our 30 year old second due engine with a quick attack mini pumper which would work great for our service area. It's basically a Ford F350 crew cab with a pump, tank, and box on it. When we first priced it 2 years ago, the price tag was $350k. We didn't get the grant so we priced it again the following year to try for the grant again and the price shot up to $500K in just a years time. A small rural department simply doesn't have the money to purchase the trucks at these prices.

103.    Another user commented:

> The department I volunteer is s smaller department in Iowa. We run about 225 calls. We recently signed a contract for a new engine that won't get delivered until 2029. The cost of that truck was 1.2 million. We ordered a new engine in 2016, which is basically a twin to our newly ordered truck. Cost on it was $450,000 and took 16 months to get.

104.    An industry leader commented that the industry has "reached a new level of price psychology. Today relationships start a half million dollars, and 10 years ago that was a remote concept." Many municipalities are unable to justify the exorbitant costs it takes to purchase a new fire truck and cannot keep up.

105.    The below graphic shows how Carpentersville, IL has been affected by the cost of fire trucks in the past 5 decades. As demonstrated below, as prices increase, municipalities must

32

keep fire trucks in service longer which poses risks to firefighters and the citizens they protect.



*Image 5: Town of Carpentersville, IL Fire Truck purchases*

106.   In one particularly dire situation, a 2024 audit revealed that the city of Atlanta, Georgia was using pick-up trucks to fight fires when one-third of their fleet was out of service. This eventually led to City Council's approval of $18 million in funds for the purchase of eleven new vehicles.

107.   Nonetheless, this blasé attitude towards what these municipalities characterize as "large sums of money" puts governing bodies between a rock and a hard place. During the aforementioned Senate Subcommittee Hearing, Battalion Chief for the Garden City Fire Department, Adam Patterson, explained:

> The major problems that aren't being talked about are the financial strains that we are seeing and experiencing in communities, especially rural ones like ours. Governing bodies are put in spots where they have to make a choice on approving the purchase of a new apparatus, while having to

33

> explain to our community members that we are going to purchase an apparatus that is well over $750,000 but it will not be delivered to service them or their family for anywhere up to five years from the approved purchase date.

Not only does this erode a community's confidence in their public safety infrastructure, but it also makes clear where Manufacturer Defendants' priorities lie when it comes to providing municipalities with the means to keep their communities safe, and how seriously the Manufacturer Defendants' take this responsibility.

108.    Customers are suffering and will continue to suffer from inflated prices and lengthy waiting times. Many municipalities are faced with a tough decision: either purchase a new fire truck at an unreasonable cost with an unknown delivery date or purchase a used fire truck for between $50,000 and $200,000. This decision becomes more dangerous the older the used truck is. Furthermore, this scenario pits municipalities against one another to find and purchase used trucks that are in suitable condition rather than manufacturers competing with each other to provide the best price and delivery time to customers.

109.    Customers have nowhere to turn to find relief from these prices—seeking out competitors to obtain a better deal on a fire truck is futile. As one industry executive observed, "there are now times when all vendors at a bid table, each with a 'different' product, are all owned and managed by the same parent company. How is that competitive for the purchaser?" Fire departments across the country have little choice but to pay the exorbitant prices Manufacturer Defendants are charging for their fire trucks.

### 2.    Manufacturer Defendants used "floating prices" to increase their profits during the class period.

110.    As if inflated prices weren't enough, Manufacturer Defendants have also imposed "floating price" clauses in their contracts which allow Manufacturer Defendants to increase the

34

final price of the truck after it goes into production. In other words, Manufacturer Defendants maintain the ability to increase their prices even years after a fire department initially orders a truck. Manufacturer Defendants point to their significant backlog and the difficulty in projecting material costs over a years-long lead time as justification for these clauses which naturally result in additional cost to customers. Mike Fusco, President of Rosenbauer America, has admitted that his company imposes "surcharges that might occur during the build times."

111.    Edward Kelly, General President of the International Association of Firefighters (IAFF), refers to floating prices as "the real crime" because the backlogs are created artificially by these companies. Kelly explained during the Senate Subcommittee Hearing that "'floating prices' ha[ve] added even more instability to apparatus procurement by allowing manufacturers to arbitrarily raise prices of a vehicle before delivery…Floating prices are even more troubling when considering that the very backlogs created by consolidation are being then used to justify these mid-contract hikes." Further, for some municipalities, fire truck "spending must compete with other important and necessary municipal expenditures."

112.    At the Senate Subcommittee Hearing, Jason Shivers, the chair of the Emergency Vehicle Management Section of the International Association of Fire Chiefs, testified that "in some cases, fire departments are being asked to pay deposits for vehicles and then have to pay unbudgeted additional costs over the time period for construction and delivery of the apparatus."

113.    Real stories of these floating prices are shared throughout the industry. A fire department in Massachusetts ordered a fire truck in 2022. By 2023, it had not reached production, so the department ordered another two fire trucks. Once the second order was placed, the manufacturer automatically added $150,000 to the truck ordered in 2022 so it would match the price of the trucks ordered in 2023. The manufacturer indicated he would not deliver the trucks if

35

the department did not agree to the price increase. The fire chief stated he felt, "compelled to pay this increase out of fear that the process to get apparatus would take too long and we would not be able to provide service to our community." In another instance, a fire department in Indiana was faced with more than a $100,000 price increase for the same pumper truck after a seven-month delay. And in yet a third example, the Loveland Fire Rescue Authority in Colorado experienced a surcharge of $29,000 on a pending order.

### 3.    Manufacturer Defendants' revenues soared.

114.    With few exceptions during the COVID-19 pandemic years, overall revenues for fire truck manufacturers in the United States, including Manufacturer Defendants, have increased significantly since 2015.

115.    According to a REV Group "Investor & Analyst Day" presentation in April 2021, the 2021 fiscal year had the highest revenues, strongest free cash flows, and rising profit margins, all while the company had *record* backlogs. Then in July 2021, REV Group announced that it had "[e]xceeded consensus earnings estimates for five consecutive quarters. In 2024, REV Group boasted that its fire truck profits had increased by an "exceptional 8.9%."

116.    Oshkosh has experienced similar growth. In a 2025 Investor Day presentation, Oshkosh bragged that its adjusted operating margins had grown from 4.8% to 10.5% from 2022 to 2024. The company went further to share that they had met their "key 2022 Investor Day targets one year early." Its revenue also increased from $8.3 billion in 2022 to $10.7 billion in 2024, a compound annual growth of 14%.



*Image 6: Comparison of Oshkosh Investor Day 2025 with Investor Day 2022*

117.    In the same presentation, Oshkosh made projections that by 2028, its adjusted operating margins would continue to increase about 12-14% with a revenue of $13-14 billion.



*Image 7: Oshkosh 2028 Financial Targets Reported at Investor Day 2025*

118.    Manufacturer Defendants' have profited handsomely from their price increases, and their profits only continue to increase despite ludicrous backlogs resulting in harm to

37

municipalities across the country.

119.    In a 2025 earnings call, REV Group announced that due to their strong financial performance, they had "made the decision to repurchase approximately, 2,900,000.0 shares of our common stock for $88,000,000 within the quarter." In the Senate Subcommittee Hearing, Senator Hawley speaking of REV Group put it plainly: "Your profits have grown five times over the last five years to 250 million dollars, but nobody can get their equipment."

### F.    Harm to Plaintiff and Other Communities Across the Country

120.    The Defendants' successful conspiracy to suppress the supply and raise the price of fire trucks in the United States has resulted in harm to Plaintiff and other communities across the country. Manufacturer Defendants initially reduced competition in the market by steadily consolidating the industry through vertical integration and mandated reduction in competition among their competing subsidiary brands. Competition in the industry was further violated by Manufacturer Defendants' information exchange through their membership with Defendant FAMA. Manufacturer Defendants used strategic pricing information obtained through FAMA to reduce the uncertainty that they *should* have faced from not knowing what their competitors were doing in the market. This knowledge of competitor strategy corrupted what *should* have been each organization's independent decisions about price and sales strategy.

#### 1.    Plaintiff and other Class Members have overpaid for fire trucks as a result of Defendants' conspiracy and anticompetitive behavior.

118.    The cumulative effect of Defendants' conspiracy is exorbitantly higher prices for consumers. If fire trucks had increased only at the rate of inflation, pumper trucks would cost approximately $680,000 (compared to $1 million), and ladder trucks would cost approximately $1.2 million (compared to $2 million). This means municipalities across the country are paying roughly 47 percent (or $320,000) more for pumpers and 66 percent (or $800,00) more for ladder

trucks in 2025 than would be expected based on inflationary costs alone. Even accounting for issues facing the fire truck market in terms of supply chain and labor shortage challenges, these price increases are far beyond what would be expected in a competitive market.

### 2. Inflated prices and extensive backlogs have prevented municipalities from replacing their old fire trucks, compromising their fleets.

119. As fire trucks age, they become more prone to frequent and serious breakdowns, leading to more costly repairs and prolonged downtime. The National Fire Protection Association recommends that fire trucks should be moved from the front lines to the reserve fleet after 15 years and removed from service completely at the 20- or 25- year mark. Yet skyrocketing prices and longer delivery times have made it difficult for municipalities to replace aging fire trucks in a timely manner. In many cases, fire departments are operating trucks that have exceeded their service life because buying new trucks is prohibitively expensive.

120. Mike Kennedy, fire chief for Plaintiff Ann Arbor, recently observed that "the price of fire trucks has become bonkers," revealing "almost a monopoly market" such that their next truck will cost $2.4 million and take four years to deliver. A similar fire truck would have cost roughly $1 million in 2013, a price tag that has more than doubled in 12 years. Kennedy explained that his department has two spare trucks that are 15 years old and that "his department aims to respond to a call in six minutes or less'" but that "without enough trucks, they'd have to send one from another part of the city, which could make response times longer." Increasing response times put not only members of the community at risk, but also the firefighters themselves.

121. Response times are not all that has been compromised. Decreased public safety at the hands of old trucks has also become an issue. In Chicago, the Englewood neighborhood was forced to work without a truck in October 2024 when the only rig allocated to their station was out of service. Another of the Chicago Fire Department's trucks lost a tire while driving back

39

from a drill, causing damage to two nearby vehicles. The truck was 20 years old, which is well past the recommended age limit for fire trucks.

122.   These older fleets have become commonplace for many departments in the U.S. The City of Augusta, Maine continues to operate two fire trucks that are 30 years old. Augusta continues to operate these trucks largely due to the price increases and delays that are inevitable when ordering a new truck.

123.   The City of La Crosse, Wisconsin continues to operate a fire truck that is almost 20 years old. The city hoped to purchase a new fire truck, however the $1 million price tag and long wait time were misaligned with the city's needs and abilities.

124.   In an effort to make light of and also call attention to a dire situation faced by many departments, the Chicago Fire Department threw a 30th birthday party for one of its trucks in January 2025. This truck was older than many firefighters in the department.

125.   Auditors in Atlanta, Georgia found that more than a third of the city's aging firefighting fleet was out of commission. Houston, Texas, and Seattle have reported similar struggles with their fleets.

126.   Because fire trucks are highly specialized, updating them is essential to ensure the trucks are fully outfitted to their geographical region's idiosyncrasies. According to testimony given by IAFF General President Edward Kelly, at the Senate Subcommittee Hearing, 17 of San Francisco's 34 ladder trucks are more than 20 years old. Two of them are over 30 years old. Due to the city's characteristically hilly streets, these older rigs are more prone to stalling, thus forcing firefighters to take alternate, lengthier routes to avoid those hills. This increases response time and the likelihood of a more precarious situation once the firefighters do arrive at the scene.

127.   The city of Pittsburgh is currently grappling with how to replace their aging fleet.

Pittsburgh's fire bureau shared, "in an ideal situation, fire trucks would be used for 7 years at the maximum, then spend 3 years in the reserve backup fleet before being retired. A more realistic, 'achievable' approach would be to have trucks operating for 10 years and then no more than 5 on the reserve fleet." However, this timeline is unachievable due to delays and prices. The next best option would be repairing the current fleets but even that is a challenge because an older vehicle means replacement parts are harder to come by. Leaders are facing pressure to solve the "aging fleet" problem. Robert Brooks, president of the Pennsylvania Professional Firefighters Association, shared his experience with pricing: "Twenty years ago, I started fighting fires, and a ladder truck was about $800,000. Now it's in the $2 million range. An engine, a pumper that was somewhere around $400,000 to $500,000 is now $1 million to $1.2 million." Altogether, the city of Pittsburgh would have to put aside $20 million a year to replace the whole fleet. Pete McDevitt, City Council Budget Director, guesses it would take more than 10 years to replace everything. Even upon approval of these high prices, there is still the issue of delays. Some of the orders wouldn't be delivered for 2-4 years, which would prolong the cycle to half a decade.

128.    Another variable fire departments must consider is the point at which, in the face of such significant delays, public safety demands that a used truck be purchased while waiting for a new one to be delivered. The City of Quincy, Massachusetts was faced with this dilemma and had no other option. The Facebook page "Friends of Quincy Firefighters IAFF Local 792" shared with its followers that "The City of Quincy has 3 new engine Trucks and 2 new ladder Trucks on back order due to Corporate America putting making money over Public Safety. 1 of the engines and 1 ladder have been on order since 2022 with no delivery date in sight for either." It is only due to the Mayor and City Council approving funds to purchase used spare apparatuses for immediate use in the meantime that the city can continue to have faith in their public safety

infrastructure. However, used fleets are limited and so are local city budgets—this makeshift solution is certainly finite.

### 3.    Compromised fire truck fleets are less able to respond to disasters.

129.    Firefighters and communities alike rely on fully functioning fire trucks to respond to emergencies safely and efficiently. In a particularly extreme example, one of the Chicago Fire Department's trucks stalled on its way to rescuing people from a deadly fire—the spare aerial platform had to be shut off and restarted to get the tower ladder to work. To make matters worse, the Snorkel Squad Rig was already out of commission, otherwise responders would have used that one instead. Four people tragically died in that fire. In emergency situations, a mere few minutes' delay can mean the difference between life and death. The most terrifying aspect of this incident is that the fire truck involved is still in service, more than two years after the incident.

130.    Other communities have faced similar difficulties. Jesse M. Flax, the fire chief in Camden, New Jersey, said that fire truck manufacturing delays and rising prices were "creating greater risk for the public and fire fighters." During a 2024 house fire in Camden, crews were slowed in their response by mechanical trouble on a truck that caused its hose to go limp. A resident died in the blaze.

131.    Firefighters throughout the U.S. face different emergencies in a multitude of climates. In dry areas where wildfires are at an increased risk, an inadequate supply of fire trucks for firefighters can mean extreme devastation. The city of Los Angeles suffered paramount destruction in January 2025 when wildfires tore through the Pacific Palisades community. While the city aims to have 90% of its fleet ready for deployment at any time, in the past few years it has averaged 78%. According to Los Angeles Fire Chief Kristin Crowley, at the time of those January fires about 100 fire vehicles were out of service. Among these vehicles were about 40

42

engines and 10 ladder trucks. Chuong Ho, a firefighter and union leader working during the fires, reported the city was forced to order fewer rigs than planned due to soaring costs. It is no secret that this region is prone to wildfires, thus it becomes imperative that fire departments there are outfitted with proper means of fighting them.

132.    In the Senate Subcommittee Hearing, Kelly described just how dangerous this situation has gotten for some departments:

> Chief Rubin [Fire Chief of the Kansas City Fire Department] testified earlier, in his city, they had to put, because they did not have enough apparatus on hand to staff the firehouses, they were putting firefighters out basically on pickup trucks like painting crews with ground ladders. Now if you're trapped in the third or fourth floor, you're jumping.

133.    Some municipalities have been forced to cancel or postpone the training of new firefighters, further endangering their communities. On March 26, 2025, Fire Chief Jeffrey Happ of the Columbus Fire Division sent out a directive informing his division that a training scheduled for March 27th would be cancelled because mission-critical fire trucks could no longer be used for training due to the shortage, and any training cadets miss would have to made up on the job once they graduate. Steven Stein, President of Columbus Fire Fighters IAFF Local 67, responded that the reality of having to choose between adequately training cadets or removing a critical fire truck from service to the community is "unacceptable." In 2023, the city ordered a new tiller ladder truck from Defendant Manufacturer Pierce Manufacturing for $2.3 million. In 2012, this type of truck cost the city $938,395. However, the truck is not expected until the end of 2027 or early 2028 so the division must continue to use its current truck, three years past its life expectancy. With insufficient training for the division's new firefighters, there is nothing stopping new talent from applying elsewhere.

134.    Some cities have finally had enough. In April 2025, the San Diego County Board of

Supervisors voted to pursue legal challenges to what they described as a corporate monopoly of fire trucks and firefighting equipment. The Board unanimously voted to explore legal action, citing soaring prices and the substantial increase in wait-times to deliver the fire trucks, noting the increased consolidation of the market into the hands of just a few companies. In particular, the Board emphasized that the crisis facing California was not being caused by wildfires, but by a supply chain "taken over by corporate consolidation and greed."

## V.   ANTITRUST INJURY & DAMAGES

135.   Defendants' anticompetitive conduct has had the following effects, among others:

    a)   Price competition in Fire trucks has been restrained or eliminated;

    b)   Prices for Fire trucks sold by the Manufacturer Defendants and their divisions, subsidiaries, affiliates, or co-conspirators, in turn, have been raised, fixed, maintained, or stabilized at artificially high, noncompetitive levels throughout the United States;

    c)   Purchasers of Fire trucks have been deprived of free and open competition; and

    d)   Purchasers of Fire trucks have paid artificially inflated prices.

136.   The purpose of Defendants' and their co-conspirators' conduct is to raise, fix, maintain, or stabilize the price of fire trucks and, as a direct and foreseeable result, Plaintiff and Class Members have paid supracompetitive prices for fire trucks during the Class Period.

137.   By reason of the alleged violations of the antitrust laws, Plaintiff and Class Members have sustained injury in their business or property, having paid higher prices for fire trucks than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, they have suffered damages.

138.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VI.    CLASS ACTION ALLEGATIONS

139.    Plaintiff brings this action individually and as a class action under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), seeking injunctive relief pursuant to federal law, and damages and other relief pursuant to state law on behalf of members of the following Classes:

> Nationwide Class: All persons, fire departments, municipalities, and entities who indirectly purchased fire trucks produced by one of the Manufacturer Defendants or any of their co-conspirators in the United States at any time from January 1, 2016 until the present.

> State Law Subclasses: All persons, fire departments, municipalities, and entities who indirectly purchased fire trucks produced by one of the Manufacturer Defendants or any of their co-conspirators in Arizona, California, Colorado, Connecticut, the District of Columbia, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and/or Wisconsin at any time from January 1, 2016, until the present.

140.    Specifically excluded from these Classes are Defendants; their officers, directors, or employees; any entity in which a Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of a Defendant; any federal, state, or local government entities; any judicial officers presiding over this action and members of their immediate family and staff; and any juror assigned to this action.

141.    Plaintiff reserves the right to amend this Class definition, including, without limitation, the Class Period.

142.    **Class Identity**: The above-defined Class Members are readily identifiable from information and records in the possession of Defendants.

45

143. **Numerosity**: Plaintiff does not know the exact number of Class Members because such information is presently in the exclusive control of the Defendants. Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of Class Members geographically dispersed throughout the United States, such that joinder of all Class Members would be impracticable.

144. **Typicality**: Plaintiff's claims are typical of the claims of the members of the Classes because Plaintiff purchased a fire truck from one or more of the Manufacturer Defendants and was damaged by the same common course of wrongful conduct.

145. **Common Questions Predominate**: There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class Members, including but not limited to:

a.  Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to raise, fix, maintain, or stabilize prices of fire trucks sold in interstate commerce in the United States in violation of federal and state antitrust laws;

b.  Whether Defendants agreed to unreasonably restrain trade in violation of federal and state antitrust laws;

c.  The identity of the participants in the alleged conspiracy;

d.  The scope and duration of the alleged conspiracy;

e.  The acts performed by Defendants and their co-conspirators in furtherance of the alleged conspiracy;

f.  The effect of Defendants' alleged conspiracy on the prices of fire trucks sold in the United States during the Class Period;

46

g.      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and other members of the Classes;

h.      Whether Plaintiff and other members of the Classes are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief;

i.      The appropriate class-wide measure of damages; and

j.      Whether the statute of limitations was tolled or whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the Classes.

146.    **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Classes in that Plaintiff's interests are aligned with, and not antagonistic to, those of other members of the Classes and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Classes.

147.    **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the Classes is impracticable and Class Members do not have interests in individually controlling the prosecution of separate actions. Prosecution as a class action will eliminate the possibility of duplicative litigation. The damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Classes to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and the establishment of incompatible standards of conduct for

47

Defendants and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

148.    **Injunctive Relief**: Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

## VII.    FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

149.    Plaintiff and Class Members had neither actual nor constructive knowledge of the facts constituting their claim for relief. Defendants engaged in a secret conspiracy by communicating competitively sensitive information to one another through FAMA quarterly reports that are unavailable to the public. Manufacturer Defendants also attended members-only discussions during FAMA meetings, allowing them to surreptitiously communicate without evidence of a paper trail. Because the public had no access to either the FAMA reports or the FAMA members-only meetings, there was no reason for Plaintiff to suspect that Defendants were engaged in an unlawful anticompetitive conspiracy.

150.    Due to the intentionally covert nature of Defendants' conspiracy, Plaintiff and any other reasonable person or entity under the same circumstances would not be alerted to investigate the legitimacy of Manufacturer Defendants' prices.

151.    Therefore, Plaintiff did not and could not have discovered through the exercise of reasonable diligence the existence of Defendants' conspiracy until shortly before filing this Complaint and no earlier than the September 2025 hearing of the Senate Homeland Security and Governmental Affairs Subcommittee on Disaster Management.

152.    Throughout the relevant time period, Defendants effectively, affirmatively, and

fraudulently concealed their unlawful conduct and conspiracy from Plaintiff and Class Members.

## VIII.    CONTINUING VIOLATION

154.    Throughout the relevant time period, Defendants continuously engaged in overt acts that perpetuated their conspiracy. For example, Manufacturer Defendants routinely exchanged sensitive business information with one another and subsequently inflated their fire truck prices in accordance with the information exchange and in furtherance of their conspiracy. Manufacturer Defendants also continuously sold fire trucks at artificially inflated prices throughout the relevant time period. Each fire truck sale made by Manufacturer Defendants at an artificially inflated price constituted a new injury and cause of action and restarted the running of the statutory period regardless of whether Plaintiff was aware of Defendants' conspiracy at an earlier point in time.

## IX.    CLAIM FOR RELIEF

### COUNT 1
### Violation of Section 1 of the Sherman Act
### Conspiracy to Restrain Production 15 U.S.C. § 1
### (On behalf of Nationwide Class for Injunctive Relief)

155.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

156.    Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination, or conspiracy in the unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for fire trucks in the United States to supracompetitive levels, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

49

157. The contract, combination, or conspiracy alleged herein has had the following effects, among others: (a) Price competition in the sale of fire trucks has been restrained, suppressed, and/or eliminated in the United States; (b) Prices for fire trucks sold by the Manufacturer or Retailer Defendants have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States; (c) Production of fire trucks has been restrained at artificially low levels; and (d) Those who purchased fire trucks from the Manufacturer or Retailer Defendants or their co-conspirators have been deprived of the benefits of free and open competition.

158. Plaintiff and Nationwide Class members have been injured and will continue to be injured in their businesses and property by paying more for fire trucks purchased from the Manufacturer Defendants and their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

159. Plaintiff and Nationwide Class Members seek a permanent injunction enjoining Defendants from ever again entering into similar agreements in violation of Section 1 of the Sherman Act and other appropriate equitable relief.

**COUNT 2**
**Violation of Section 1 of the Sherman Act**
**Exchange of Competitively Sensitive Information 15 U.S.C. § 1**
**(On behalf of Nationwide Class for Injunctive Relief)**

160. Plaintiff reincorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

161. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or

stabilize prices for fire trucks in the United States to supracompetitive levels, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

162.    In furtherance of this scheme, Defendants and co-conspirators have agreed between and among themselves to exchange competitively sensitive information such as prices, output, supplies, costs, and purchasing and sales strategies.

163.    Defendants' information exchange has had the intended anti-competitive effects, including inter alia: (a) raising, fixing, maintaining, or stabilizing prices of fire trucks at an artificially high level; and (b) eliminating or suppressing, to a substantial degree, competition among the Manufacturer Defendants for sales of fire trucks.

164.    Defendants' agreement, combination, and/or conspiracy to exchange competitively sensitive information violates Section 1 of the Sherman Act under either a "quick look," or "rule of reason" analysis because the exchange results in the described anticompetitive effects with no valid procompetitive justifications. Any proffered procompetitive justifications do not outweigh the anticompetitive effects and could have been reasonably achieved through means less restrictive of competition.

165.    Each defendant and co-conspirator has participated in one or more overt acts in furtherance of the information exchange.

166.    As a direct and proximate result of Defendants' contract, combination, and conspiracy to exchange competitively sensitive information, Plaintiff and Class Members have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits. Absent the conspiracy to exchange competitively sensitive information, Plaintiff and Nationwide Class Members would have paid less for fire trucks.

167.   Plaintiff and the nationwide Class Members seek a permanent injunction enjoining Defendants from ever again entering into similar agreements in violation of Section 1 of the Sherman Act and other appropriate equitable relief.

## COUNT 3
### Violation of the Arizona Uniform State Antitrust Act
### Ariz. Rev. Stat. §§ 44-1401, Et Seq.
### (With Respect to Subclass Members' Purchases in Arizona)

168.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

169.   In violation of Ariz. Rev. Stat. § 44-1402, Defendants' price-fixing agreements unreasonably restrain trade in the relevant market for fire trucks.

170.   Defendants' violations of Arizona law were flagrant and willful.

171.   The Arizona Subclass has been injured in its business or property in Arizona by Defendants' violations of Ariz. Rev. Stat. § 44-1402.

## COUNT 4
### Violation of California's Cartwright Act
### Cal. Bus. & Prof. Code § 16700, Et Seq.
### (With Respect to Subclass Members' Purchases in California)

172.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

173.   Defendants entered into unlawful price-fixing agreements that are illegal "trusts," within the meaning of Cal. Bus. & Prof. Code § 16720. These agreements constitute unreasonable restraints of trade and "combination[s] of capital, skill or acts by two or more persons" in order to: "create or carry out restrictions in trade or commerce" (§ 16720(a)); "prevent competition in [the] sale or purchase of merchandise" (§ 16720(c)); and "fix [a] standard or figure, whereby [the] price" of fire trucks "shall be…controlled or established" (§16720(d)).

174. Defendants' violations of California law were flagrant and willful.

175. The California Subclass has been injured in its business or property in California by Defendants' violations of Cal. Bus. & Prof. Code § 16720.

### COUNT 5
### Violation of California's Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200, Et Seq.
### (With Respect to Subclass Members' Purchases in California)

176. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

177. Defendants' conduct described above constitutes unfair, unlawful, or fraudulent business acts or practices as proscribed by California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq. (the "UCL").

178. Defendants' conduct is unethical, unscrupulous, against public policy, and violates fundamental rules of honesty and fair dealing.

179. Defendants' conduct is unfair because it violates Section 2 of the Sherman Act, and the strong California public policy against monopoly.

180. Defendants' conduct is unlawful, as it violates the spirit and letter of Section 2 of the Sherman Act, and California's common law prohibition on monopolies.

181. Plaintiffs and members of the Subclass lost money because they paid inflated prices for fire trucks and seek the full extent of restitution available under the UCL.

### COUNT 6
### Violation of Colorado's Antitrust Act
### Col. Rev. Stat. § 6-4-104, Et Seq.
### (With Respect to Subclass Members' Purchases in Colorado)

182. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

53

183. In violation of Colo. Rev. Stat. § 6-4-104, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

184. Defendants' violations of Colorado law were flagrant and willful.

185. The Colorado Subclass has been injured in its business or property in Colorado by Defendants' violations of Colo. Rev. Stat. § 6-4-104.

## COUNT 7
### Violation of Connecticut's Antitrust Act
### Conn. Gen. Stat. § 35-24, Et Seq.
### (With Respect to Subclass Members' Purchases in Connecticut)

186. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

187. In violation of Conn. Gen. Stat. §§ 35-26, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

188. Defendants' violations of Connecticut law were flagrant and willful.

189. The Connecticut Subclass has been injured in its business or property in Connecticut by Defendants' violations of Conn. Gen. Stat. §§ 35-26.

## COUNT 8
### Violation of the District of Columbia Antitrust Act
### D.C. Code § 28-4501, Et Seq.
### (With Respect to Subclass Members' Purchases in the District of Columbia)

190. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

191. In violation of D.C. Code §§ 28-4502, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

192. Defendants' violations of District of Columbia law were flagrant and willful.

54

193. The District of Columba Subclass has been injured in its business or property in the District of Columbia by Defendants' violations of D.C. Code §§ 28-4502.

## COUNT 9
### Violation of The Iowa Competition Law
### Iowa Code §§ 553.1, Et Seq.
### (With Respect to Subclass Members' Purchases in Iowa)

194. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

195. In violation of Iowa Code §§ 553.4, Defendants agreed not to compete. These price-fixing arrangements unreasonably restrain competition in the relevant market for fire trucks.

196. Defendants' violations of Iowa law were flagrant and willful.

197. The Iowa Subclass has been injured in its business or property in Iowa by Defendants' violations of Iowa Code §§ 553.4.

## COUNT 10
### Violation of the Kansas Restraint of Trade Act
### Kan. Stat. Ann. §§ 50-101, Et Seq.
### (With Respect to Subclass Members' Purchases in Kansas)

198. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

199. In violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Fire trucks. Defendants entered into arrangements, contracts, agreements, trust or combinations between others made with a view toward preventing or which tend to prevent full and free competition for the provision of fire trucks.

200. Defendants' violations of Kansas law were flagrant and willful.

201. The Kansas Subclass has been injured in its business or property in Kansas by Defendants' violations of Kan. Stat. Ann. §§ 50-101, *et seq.*

## COUNT 11
### Violation of Maine's Monopolies and Profiteering Law
### Me. Rev. Stat. Ann. Tit. 10, §§ 1101, Et Seq.
### (With Respect to Subclass Members' Purchases in Maine)

202. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

203. In violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

204. Defendants' violations of Maine law were flagrant and willful.

205. The Maine Subclass has been injured in its business or property in Maine by Defendants' violations of Me. Rev. Stat. Ann. Tit. 10, § 1101.

## COUNT 12
### Violation of the Maryland Antitrust Act
### Md. Code Com. Law § 11-204, Et Seq.
### (With Respect to Subclass Members' Purchases in Maryland)

206. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

207. In violation of Md. Code Com. Law § 11-204, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

208. Defendants' violations of Maryland law were flagrant and willful.

209. The Maryland Subclass has been injured in its business or property in Maryland by Defendants' violations of Md. Code Com. Law § 11-204.

## COUNT 13
### Violation of the Massachusetts Consumer Protection Act
### Mass. Gen. Laws. Ch. 93A § 1, Et Seq.
### (With Respect to Subclass Members' Purchases in Massachusetts)

210.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

211.    In violation of Mass. Gen. Laws. Ch. 93A § 2, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

212.    Defendants' violations of Massachusetts law were flagrant and willful.

213.    The Massachusetts Subclass has been injured in its business or property in Massachusetts by Defendants' violations of Mass. Gen. Laws. Ch. 93A § 2.

## COUNT 14
### Violation of the Michigan Antitrust Reform Act
### Mich. Comp. Laws Ann. §§ 445.771, Et Seq.
### (With Respect to Subclass Members' Purchases in Michigan)

214.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

215.    In violation of Mich. Comp. Laws Ann. §§ 445.772, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

216.    Defendants' violations of Michigan law were flagrant and willful.

217.    The Michigan Subclass has been injured in its business or property in Michigan by Defendants' violations of Mich. Comp. Laws Ann. §§ 445.772.

## COUNT 15
### Violation of the Minnesota Antitrust Law
### Minn. Stat. Ann. §§ 325D.49, Et Seq.

57

**(With Respect to Subclass Members' Purchases in Minnesota)**

218.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

219.    In violation of Minn. Stat. Ann. §§ 325D.51, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

220.    Defendants' violations of Minnesota law were flagrant and willful.

221.    The Minnesota Subclass has been injured in its business or property in Minnesota by Defendants' violations of Minn. Stat. Ann. §§ 325D.51.

## COUNT 16
### Violation of the Mississippi Antitrust Statute
### Miss. Code Ann. §§ 75-21-3, Et Seq.
### (With Respect to Subclass Members' Purchases in Mississippi)

222.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

223.    In violation of the Miss. Code Ann. § 75-21-1, *et seq*., Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

224.    Defendants' violations of Mississippi law were flagrant and willful.

225.    The Mississippi Subclass has been injured in its business or property in Mississippi by Defendants' violations of Miss. Code Ann. § 75-21-1, *et seq*.

## COUNT 17
### Violation of the Montana Antitrust (Unlawful Restraint of Trade) Act
### Mont. Code Ann. §§ 30-14-205, Et Seq.
### (With Respect to Subclass Members' Purchases in Montana)

58

226.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

227.    In violation of Mont. Code Ann. §§ 30-14-205, *et seq*., Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Fire trucks.

228.    Defendants' violations of Montana law were flagrant and willful.

229.    The Montana Subclass has been injured in its business or property in Montana by Defendants' violations of Mont. Code Ann. §§ 30-14-205, *et seq*.

### COUNT 18
### Violation of the Nebraska Junkin Act
### Neb. Code Ann. §§ 59-801, Et Seq.
### (With Respect to Subclass Members' Purchases in Nebraska)

230.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

231.    In violation of Neb. Code Ann. § 59-801, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

232.    Defendants' violations of Nebraska law were flagrant and willful.

233.    The Nebraska Subclass has been injured in its business or property in Nebraska by Defendants' violations of Neb. Code Ann. § 59-801.

### COUNT 19
### Violation of the Nevada Unfair Trade Practices Act
### Nev. Rev. Stat. Ann. §§ 598A.010, Et Seq.
### (With Respect to Subclass Members' Purchases in Mississippi)

234.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

59

235.    In violation of Nev. Rev. Stat. Ann. § 598.060, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

236.    Defendants' violations of Nevada law were flagrant and willful.

237.    The Nevada Subclass has been injured in its business or property in Nevada by Defendants' violations of Nev. Rev. Stat. Ann. § 598.060.

### COUNT 20
### Violation of the New Jersey Antitrust Act
### N.J. Stat. Ann. § 56:9-3, Et Seq.
### (With Respect to Subclass Members' Purchases in New Jersey)

238.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

239.    In violation of N.J. Stat. Ann. § 56.9-3, *et seq.*, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

240.    Defendants' violations of New Jersey law were flagrant and willful.

241.    The New Jersey Subclass has been injured in its business or property in New Jersey by Defendants' violations of N.J. Stat. Ann. § 56.9-3, *et seq*.

### COUNT 21
### Violation of the New Mexico Antitrust Act
### N.M. Stat. Ann. §§ 57-1-1, Et Seq.
### (With Respect to Subclass Members' Purchases in New Mexico)

242.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

60

243. In violation of N.M. Stat. Ann. § 57-1-1, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

244. Defendants' violations of New Mexico law were flagrant and willful.

245. The New Mexico Subclass has been injured in its business or property in New Mexico by Defendants' violations of N.M. Stat. Ann. § 57-1-1.

**COUNT 22**
**Violation of the New York Donnelly Act**
**N.Y. Gen. Bus. Law §§ 340, Et Seq.**
**(With Respect to Subclass Members' Purchases in New York)**

246. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

247. In violation of N.Y. Gen. Bus. Law § 340, Defendants agreed not to compete. Defendants entered into contracts, agreements, arrangements, or combinations that have unreasonably restrained competition in New York. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

248. Defendants' violations of New York law were flagrant and willful.

249. The New York Subclass has been injured in its business or property in New York by Defendants' violations of N.Y. Gen. Bus. Law § 340.

**COUNT 23**
**Violation of Chapter 75 of North Carolina's General Statutes**
**N.C. Gen. Stat. Ann. §§ 75-1, Et Seq.**
**(With Respect to Subclass Members' Purchases in North Carolina)**

250. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

61

251. In violation of N.C. Gen. Stat. Ann. § 75-1, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

252. Defendants' violations of North Carolina law were flagrant and willful.

253. The North Carolina Subclass has been injured in its business or property in North Carolina by Defendants' violations of N.C. Gen. Stat. Ann. § 75-1.

## COUNT 24
### Violation of the North Dakota Uniform State Antitrust Act
### N.D. Cent. Code §§ 51-08.1-01, Et Seq.
### (With Respect to Subclass Members' Purchases in North Dakota)

254. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

255. In violation of N.D. Cent. Code § 51-08.1-02, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

256. Defendants' violations of North Dakota law were flagrant and willful.

257. The North Dakota Subclass has been injured in its business or property in North Dakota by Defendants' violations of N.D. Cent. Code § 51-08.1-02.

## COUNT 25
### Violation of the Oregon Antitrust Act
### Or. Rev. Stat. §§ 646.705, Et Seq.
### (With Respect to Subclass Members' Purchase in Oregon)

258. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

259. In violation of Or. Rev. Stat. § 646.725, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

260. Defendants' violations of Oregon law were flagrant and willful.

261. The Oregon Subclass has been injured in its business or property in Oregon by Defendants' violations of Or. Rev. Stat. § 646.725.

## COUNT 26
### Violation of the Rhode Island Antitrust Act
### R.I. Gen. Laws §§ 6-36-1, Et Seq.
### (With Respect to Subclass Members' Purchases in Rhode Island)

262. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

263. In violation of R.I. Gen. Laws § 6-36-4, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

264. Defendants' violations of Rhode Island law were flagrant and willful.

265. The Rhode Island Subclass has been injured in its business or property in Rhode Island by Defendants' violations of R.I. Gen. Laws § 6-36-4.

## COUNT 27
### Violation of the South Carolina Unfair Trade Practices Act
### S.C. Code Ann. §§ 39-5-10, Et Seq.
### (With Respect to Subclass Members' Purchases in South Carolina)

266. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

267. In violation of S.C. Code Ann. § 39-5-10, *et seq.*, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

268. Defendants' violations of South Carolina law were flagrant and willful.

63

269.    The South Carolina Subclass has been injured in its business or property in South Carolina by Defendants' violations of S.C. Code Ann. § 39-5-10, *et seq.*

## COUNT 28
### Violation of South the South Dakota Antitrust Statute
### S.D. Codified Laws §§ 37-1-3.1, Et Seq.
### (With Respect to Subclass Members' Purchases in South Dakota)

270.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

271.    In violation of S.D. Codified Laws §§ 37-1-3.1, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

272.    Defendants' violations of South Dakota law were flagrant and willful.

273.    The South Dakota Subclass has been injured in its business or property in South Dakota by Defendants' violations of S.D. Codified Laws §§ 37-1-3.1.

## COUNT 29
### Violation of Tennessee's Trade Practices Act
### Tenn. Code Ann. §§ 47-25-101, Et Seq.
### (With Respect to Subclass Members' Purchases in Tennessee)

274.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

275.    In violation of the Tenn. Code Ann. § 47-25-101, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

276.    Defendants' violations of Tennessee law were flagrant and willful.

277. The Tennessee Subclass has been injured in its business or property in Tennessee by Defendants' violations of Tenn. Code Ann. § 47-25-101.

## COUNT 30
### Violation of the Utah Antitrust Act
### Utah Code Ann. §§ 76-10-3101, Et Seq.
### (With Respect to Subclass Members' Purchases in Utah)

278. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

279. In violation of Utah Code Ann. § 76-10-3104, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

280. Defendants' violations of Utah law were flagrant and willful.

281. The Utah Subclass has been injured in its business or property in Utah by Defendants' violations of Utah Code Ann. § 76-10-3104.

## COUNT 31
### Violation of the Vermont Consumer Fraud Act
### Vt. Stat. Ann. Tit. 9, §§ 2451, Et Seq.
### (With Respect to Subclass Members' Purchases in Vermont)

282. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

283. In violation of Vt. Stat. Ann. Tit. 9, §§ 2453, 2465, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

284. Defendants' violations of Vermont law were flagrant and willful.

285. The Vermont Subclass has been injured in its business or property in Vermont by Defendants' violations of Vt. Stat. Ann. Tit. 9, §§ 2453, 2465.

## COUNT 32
### Violation of the West Virginia Antitrust Act
### W.V.a. Code §§ 47-18-1, Et Seq.
### (With Respect to Subclass Members' Purchases in West Virginia)

286. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

287. In violation of W.Va. Code § 47-18-3, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

288. Defendants' violations of West Virginia law were flagrant and willful.

289. The West Virginia Subclass has been injured in its business or property in West Virginia by Defendants' violations of W.Va. Code § 47-18-3.

## COUNT 33
### Violation of the Wisconsin Antitrust Act
### Wis. Stat. §§ 133.01, Et Seq.
### (With Respect to Subclass Members' Purchases in Wisconsin)

290. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

291. In violation of Wis. Stat. § 133.03, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for fire trucks.

292. Defendants' violations of Wisconsin law were flagrant and willful.

293. The Wisconsin Subclass has been injured in its business or property in Wisconsin by Defendants violations of Wis. Stat. § 133.03.

## X.    REQUEST FOR RELIEF

66

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully request judgment against Defendants, as follows:

A.     That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes, once certified:

B.     That the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act and state antitrust and common law;

C.     That Plaintiff and the State Law Class recover damages to the maximum extent allowed under state antitrust law, and that a joint and several judgment in their favor be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.     That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner, continuing, maintaining, or renewing the contract, combination or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.     That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintain, or renewing the sharing of highly

67

sensitive competitive information that permits individual identification of a company's information;

F.    For instances where contracts for fire trucks have been executed but the trucks have not yet been delivered, that the terms within those contracts be equitably reformed to address and remedy Defendants' anticompetitive conduct;

G.    That Plaintiff and State Law Class Members be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.    That Plaintiff and State Law Class Members recover their costs of suit, including reasonable attorneys' fees, and costs as provided by law; and

I.    That Plaintiff and the State Law Class Members have such and other further relief as the case may require and the Court may deem just and proper.

## XI.    DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of State Law Class Members, hereby requests a jury trial pursuant to Federal Rule of Civil Procedure 38(b) on any and all claims so triable.

Dated:                                          Respectfully submitted,

                                                **ADEMI & FRUCHTER LLP**

                                                /s/ John D. Blythin
                                                Guri Ademi
                                                Shpetim Ademi
                                                John D. Blythin
                                                3620 E. Layton Avenue
                                                Cudahy, WI 53110
                                                Telephone: (414) 482-8000
                                                Facsimile: (414) 482-8001
                                                jblythin@ademilaw.com

                                                Paul F. Novak (admission forthcoming)
                                                Milena Lai (admission forthcoming)

68

Casey Thal Verville (admission forthcoming)
**WEITZ & LUXENBERG P.C.**
Fisher Building
3011 West Grand Blvd., 24th Floor
Detroit, MI 48202
Phone: (313) 800-4170
Fax: (646) 293-7992
pnovak@weitzlux.com
mlai@weitzlux.com
cverville@weitzlux.com

69

ATTYOPEN,CONSOLIDATED

# United States District Court
## Eastern District of Wisconsin (Green Bay)
## CIVIL DOCKET FOR CASE #: 1:25-cv-01973-BBC

City of Ann Arbor v. Oshkosh Corporation et al
Assigned to: Judge Byron B Conway
Lead case: 1:25-cv-01252-BBC
Member case: (View Member Case)
related Cases:  1:25-cv-01252-BBC
                1:25-cv-02005-BBC
Cause: 15:1 Antitrust Litigation

Date Filed: 12/16/2025
Jury Demand: Plaintiff
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

### Plaintiff

**City of Ann Arbor**
*individually and on behalf of all others*
*similarly situated*

represented by **Casey T Verville**
Weitz & Luxenberg PC - Detroit Office
3011 E Grand Blvd - Ste 24th Fl
Detroit, MI 48202
231-366-3107
Email: cverville@weitzlux.com
*ATTORNEY TO BE NOTICED*

**Milena M Lai**
3011 W Grand Blvd - 24th Fl
Detroit, MI 48202
231-366-3106
Email: mlai@weitzlux.com
*ATTORNEY TO BE NOTICED*

**Paul F Novak**
Weitz & Luxenberg PC
Fisher Building
3011 W Grand Blvd - Ste 24th Fl
Detroit, MI 48202
313-800-4170
Email: pnovak@weitzlux.com
*ATTORNEY TO BE NOTICED*

**John D Blythin**
Ademi & Fruchter LLP
3620 E Layton Ave
Cudahy, WI 53110
414-482-8000
Email: jblythin@ademilaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Oshkosh Corporation**

**Defendant**

**Pierce Manufacturing Inc**

**Defendant**

**REV Group Inc**

**Defendant**

**Rosenbauer America LLC**

**Defendant**

| | | |
|---|---|---|
| **Fire Apparatus Manufacturers Association** | represented by | **Andrew M Scarpace**<br>Wilson Elser Moskowitz Edelman & Dicker<br>555 E Wells St - Ste 1730<br>Milwaukee, WI 53202<br>414-292-3014<br>Email: andrew.scarpace@wilsonelser.com<br>*ATTORNEY TO BE NOTICED* |
| | | **John P Loringer**<br>Wilson Elser Moskowitz Edelman & Dicker<br>555 E Wells St - Ste 1730<br>Milwaukee, WI 53202<br>414-292-3019<br>Fax: 414-276-8819<br>Email: John.loringer@wilsonelser.com<br>*ATTORNEY TO BE NOTICED* |
| | | **Marcella Spoto**<br>Wilson Elser Moskowitz Edelman & Dicker LLP<br>555 E Wells St - Ste 1730<br>Milwaukee, WI 53202<br>414-276-8816<br>Fax: 414-276-8819<br>Email: marcella.spoto@wilsonelser.com<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 12/16/2025 | 1 | COMPLAINT with Jury Demand; against All Defendants by City of Ann Arbor. ( Filing Fee PAID $405 receipt number AWIEDC-5120224) (Attachments: # 1 Civil Cover Sheet, # 2 Summons on Defendant Oshkosh, # 3 Summons on Defendant Pierce, # 4 Summons on Defendant REV Group, # 5 Summons on Defendant Rosenbauer, # 6 Summons on Defendant FAMA)(Blythin, John) (Civil Cover Sheet 1 replaced with completed form on 12/16/2025) (sap). |
| 12/16/2025 | 2 | DISCLOSURE Statement by City of Ann Arbor. (Blythin, John) |
| 12/16/2025 | | NOTICE Regarding assignment of this matter to Judge Byron B Conway; Consent/refusal forms for Magistrate Judge Joseph to be filed within 21 days; the consent/refusal form is |

| | | available here. (sap) |
|---|---|---|
| 12/17/2025 | | Summons Issued as to All Defendants. (kwf) |
| 12/30/2025 | 3 | ORDER GRANTING INDIRECT PURCHASER PLAINTIFFS' MOTION TO CONSOLIDATE AND TO APPOINT CO-LEAD CLASS COUNSEL, signed by Judge Byron B Conway on 12/29/2025. Pending resolution of the defendants' motion to consolidate, the court merely creates two consolidated actions In re: Direct Purchaser Fire Apparatus Antitrust Litigation, already consolidated under case number 25-cv-1543; and this action, In re: Indirect Purchaser Fire Apparatus Antitrust Litigation, which is now consolidated under case number 25 cv-1252. The Indirect Purchaser Antitrust Actions (25-cv-1252, 25-cv-1717, 25-cv-1973, 25-cv-2005, and 25-cv-2013) are consolidated under the lead case, 25-cv-01252. Any later filed actions related to the Indirect Purchaser Antitrust Actions will be subject to consolidation with the Indirect Purchaser Antitrust Actions. Further, the Court appoints Interim Class Counsel to act on behalf of the putative indirect purchaser class. All future filings re Indirect Purchaser Antitrust Actions should be filed in the lead case. (cc: all counsel)(mav) |
| 12/31/2025 | 4 | NOTICE of Appearance by Marcella Spoto on behalf of Fire Apparatus Manufacturers Association. Attorney(s) appearing: Marcella Spoto (Spoto, Marcella) |
| 12/31/2025 | 5 | DISCLOSURE Statement by Fire Apparatus Manufacturers Association. (Spoto, Marcella) |
| 12/31/2025 | 6 | NOTICE of Appearance by Andrew M Scarpace on behalf of Fire Apparatus Manufacturers Association. Attorney(s) appearing: Andrew Scarpace (Scarpace, Andrew) |
| 12/31/2025 | 7 | NOTICE of Appearance by John P Loringer on behalf of Fire Apparatus Manufacturers Association. Attorney(s) appearing: John P. Loringer (Loringer, John) |
| 01/06/2026 | 8 | NOTICE of Appearance by Paul F Novak on behalf of City of Ann Arbor. Attorney(s) appearing: Paul F. Novak (Novak, Paul) |
| 01/07/2026 | 9 | NOTICE of Appearance by Casey T Verville on behalf of City of Ann Arbor. Attorney(s) appearing: Casey Verville (Verville, Casey) |
| 01/07/2026 | 10 | NOTICE of Appearance by Milena M Lai on behalf of City of Ann Arbor. Attorney(s) appearing: Milena Lai (Lai, Milena) |
| 01/07/2026 | 11 | WAIVER OF SERVICE Returned Executed by Oshkosh Corporation - Waiver sent on 12/23/2025. (Blythin, John) |
| 01/07/2026 | 12 | WAIVER OF SERVICE Returned Executed by Pierce Manufacturing Inc - Waiver sent on 12/23/2025. (Blythin, John) |
| 01/07/2026 | 13 | WAIVER OF SERVICE Returned Executed by REV Group Inc - Waiver sent on 12/23/2025. (Blythin, John) |
| 01/07/2026 | 14 | WAIVER OF SERVICE Returned Executed by Rosenbauer America LLC - Waiver sent on 12/23/2025. (Blythin, John) |
| 01/07/2026 | 15 | WAIVER OF SERVICE Returned Executed by Fire Apparatus Manufacturers Association - Waiver sent on 12/30/2025. (Blythin, John) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/15/2026 11:12:31 | | |
| **PACER Login:** | jbdocketing2023 | **Client Code:** | 57492-10017 |

| Description: | Docket Report | Search Criteria: | 1:25-cv-01973-BBC |
|---|---|---|---|
| Billable Pages: | 3 | Cost: | 0.30 |

Case MDL No. 3179    Document 1-13    Filed 01/15/26    Page 79 of 79

| Description: | Docket Report | Search Criteria: | 1:25-cv-01973-BBC |
|---|---|---|---|
| Billable Pages: | 3 | Cost: | 0.30 |