# EXHIBIT M

18TH JUDICIAL DISTRICT COURT

PARISH OF IBERVILLE

STATE OF LOUISIANA

CITY OF PLAQUEMINE, LOUISIANA,
A municipal governmental entity
INDIVIDUALLY AND ON BEHALF OF
ALL OTHER SIMILARLY SITUATED
(Plaintiff)

V.

OSHKOSH CORPORATION, PIERCE
MANUFACTURING, INC., REV GROUP, INC,
ROSENBAUER AMERICA, LLC, AND FIRE
APPARATUS MANUFACTURERS ASSOCIATION
(Defendants)

No. **84877**                                                                                    DIV: "  **B**  "

---

## PETITION

The petition of the City of Plaquemine, Louisiana, a municipal governmental entity represented herein by its duly authorized Mayor, J.B. Barker, and against the Defendants seeking, inter alia, an injunction requiring Defendants to cease their anti-competitive practices, as well as restitution, disgorgement, and civil penalties for the full extent authorized by law for the following, to wit:

1.

Fire truck prices have doubled in the last ten years. A fire truck that cost $500,000.00 in the mid-2010s now costs $1 million. More specialized trucks that formerly cost $900,000.00 now cost more than $2 million. Inflation alone does not explain these price increases, which have squeezed governmental budgets and prevented communities from replacing their old rigs. At the same time, wait times for new fire trucks have ballooned from 18 months in to the mid-2010s to up to more than four years today.

2.

As a result of high prices and long order backlogs, fire trucks that should have been retired after 15 or 20 years are now celebrating their 30th "birthdays" on the front lines. These aging trucks break down more frequently and are more difficult to repair than new trucks, leaving gaps in communities' fire protection systems and putting the public in danger. These gaps can have deadly consequences when fires break out and no fire trucks are available to respond. And even communities that have been able to purchase new fire trucks have had to redirect funds from other priorities to cover the price increases.

3.

Three fire truck manufactures— REV Group, Inc ("REV Group"), OshKosh Corporation ("Oshkosh"), and Rosenbauer America, LLC ("Rosenbauer") (collectively "Manufacturer Defendants") – are responsible for increasing fire truck prices and perpetuating lengthy backlogs. Together these three manufacturers control between 70 and 80 percent of the U.S. fire truck market, and they have unlawfully conspired to use their collective market power to suppress the fire truck supply and raise prices.

4.

The Manufacturer Defendants have perpetuated their conspiracy in part through the Fire Apparatus Manufacturers' Association ("FAMA"). The Manufacturer Defendants, along with most other fire truck manufacturers in the country, submit sensitive, non-public economic data to FAMA. FAMA sends the data to an outside consulting company, which compiles the data into reports for FAMA, then distributes to its members. FAMA also provides a forum for Manufacturer Defendants to communicate with each other directly during yearly members-only meetings.

5.

The economic data Manufactures obtain from FAMA is not the type of information that competitors would provide each other in a normal, competitive market. The Manufacturer Defendants use the sensitive economic data FAMA shares with them to coordinate price increases and suppress production. They also use FAMA to monitor their co-conspirators to ensure continued adherence to the conspiracy.

6.

None of the FAMA reports are available to anyone other than the Manufacturers themselves. As a result, buyers in the market, including Plaintiff and Class members, operate at a disadvantage. By limiting data access, FAMA reports create an information asymmetry that benefits the Manufacturer Defendants at buyers' expense. This information exchange is particularly likely to have anticompetitive effects because so few sellers control the fire truck market.

7.

Thanks to their conspiracy, Manufacturer Defendants have been able to increase their margins by several percentage points and boost total profits, all without concern that their competitors will try to steal market share. Nor are Manufacturer Defendants phased by potential new entrants, because high barriers to entry prevent new competitors from coming into the market.

8.

As a result of each Defendant's unlawful conduct, Plaintiff and Class members paid artificially inflated prices for fire trucks during the class period. Such prices exceeded the amount they would have paid if the price for fire trucks had been determined by a competitive market. Thus, Defendants' conduct injured Plaintiff and Class members.

9.

The Plaintiff, City of Plaquemine ("Plaquemine"), individually and on behalf of all others similarly situated in Louisiana, challenges Defendants conspiracy. Plaintiff brings this Complaint, alleging violations under both a per se or, in the alternative, rule of reason standard, under federal and state anti trust laws.

10.

The City of Plaquemine, Louisiana is a city of approximately 8,000 people located on the west bank of the Mississippi River in Iberville Parish, Louisiana.

11.

Plaquemine has purchased multiple fire trucks over the years from Manufacturing Defendants for its fire department and since 2016, among those are a Pierce Custom Pumper , 4PIBAAFF7RB026644, on August 26, 2024 for a price of $618,182.56 from Siddons- Martin Emergency Group, LLC of Harvey, Louisiana (Invoice #39686).

12.

The Defendant REV Group is incorporated in Delaware and is headquartered in Brookfield, Wisconsin.

13

REV Group manufactures firetrucks in multiple brand names, including E-1 Inc, Kovatch Mobile Equipment Corporation, Ferrara Fire Apparatus, Spartan Emergency Response and Spartan Fire Apparatus and Chassis, Smeal Fire Apparatus, and Ladder Tower Company. 113 dealers nationwide sell fire trucks from these brands across all 50 states. Additionally, REV Group sells Spartan cabs and Chassis to approximately 40 smaller builders. Ferrara Fire Apparatus is domiciled in Louisiana.

14.

REV Group currently operates manufacturing plants in Ocala, Florida, Hamburg, New York, Nesquehoning, Pennsylvania, Ephrata, Pennsylvania, Brandon, South Dakota, Charlotte, Michigan, Snyder, Nebraska, and Holden, Louisiana.

15.

Of the roughly $3 billion in annual fire truck sales in the United States, REV Group captures approximately $1 billion, or at least 33% of the total. In 2024, REV Group's full year net income was $257.6 million.

16.

Defendant Oshkosh Corporation is incorporated in Wisconsin and is head quartered in Oshkosh, Wisconsin.

17.

Oshkosh sells its products in more than 150 countries under a variety of brand names, including JLG Industries, Inc., JerrDan LLc, Hinowa S.p.A. AUSACORP S.L., Oshkosh AeroTech, McNeilus Companies, Inc., Oshkosh Commercial Products, LLC, Iowa Mold Tooling Co., Inc., Maxi-Metal, Inc., Kewaunee Fabriacations, LLC, Oshkosh Defense, LLC, and Pratt & Miller Engineering & Fabrications, LLC.

18.

Oshkosh's leading North American brand is Pierce Manufacturing, Inc. Pierce is incorporated in Delaware and is headquartered in Appleton, Wisconsin. It produces custom and commercial pumpers, aerials, rescue trucks, wildland trucks, mini pumpers, and other fire apparatus in its manufacturing facilities in Appleton, Wisconsin and Brandenton, Florida. Pierce has 26 dealers across California, Colorado, Florida, Kansas, Massachusetts, Minnesota, Mississippi, New Jersey, New York, Oregon, Pennsylvania, South Carolina, Texas, Virginia, and Wisconsin. Together, this dealer network sells fire trucks to customers in all 50 states.

19.

Oshkosh, including through Pierce, captures around $750 million in annual fire truck sales in the United States, or at least 25% of the total. OshKosh's reported 2024 fourth quarter net income was $153.1 million. Pierce has an annual revenue of approximately $1 billion.

20.

Rosenbauer America LLC is a wholly owned subsidiary of Rosenbauer International AG, a publicly traded company based in Austria and listen on the Vienna Stock Exchange. Rosenbauer is incorporated in Delaware and headquartered in Lyons, South Dakota.

21.

Rosenbauer has production facilities in Lyons, South Dakota; Wyoming, Minnesota; and Fremont, Nebraska. Rosenbauer produces custom and commercial pumpers, heavy rescue, tenders, mini pumpers, and light rescues, aerial ladders and platforms, and electric fire trucks. Rosenbauer has 24 dealers across Alabama, Arizona, California, Colorado, Florida, Georgia, Idaho, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, South Dakota, Texas, Utah, Washington, and West Virginia. Together, these dealers sell fire trucks to customers in all 50 states.

22.

Rosenbauer captures approximately $307 million in United States fire apparatus sales annually, or at least 10% of the market.

23.

The Fire Apparatus Manufactures' Association ("FAMA") is a not-for-profit trade association for fire apparatus manufactures, located in Ocala, Florida. As of May 2025, FAMA had 55 manufacture members, including REV Group subsidiaries E-One, Ferrara, KME, and Spartan; Oshkosh subsidiary Pierce, and Rosenbauer. John Schultz, the Vice president and General Manager of Pumper Products at Pierce, is FAMA's vice-chair.

24.

FAMA acted as a co-conspirator of the fire truck manufacturers by facilitating the exchange of confidential, proprietary, and competitively sensitive data among the other Defendants.

25.

The City of Plaquemine, Plaintiff, herein has purchased fire trucks from, inter alia, Pierce as recently as August, 2024.

26.

The modern fire truck manufacturing industry boomed in the post war decades of the 1950s and 1960s. Small midsized firetruck manufacturers— typically family owned operations— appear in

every region of the country to produce emergency vehicles suitable to the needs of local fire departments. The industry was competitively diversified across at least two dozen companies. Competition among the smaller firms keep fire trucks mid cost, and the existence of a large number of manufactured ensured redundant manufacturing capacity to meet demand. By 2008, these companies sold over 5,000 new fire trucks in the United States and Italy.

27.

For decades the fire truck industry enjoyed relatively stable prices and ample production capacity. The few exceptions, the annual cost increase for new trucks prior to 2008 was around 3%.

28.

Starting in 2008, the Great Recession decimated municipal budgets, which in turn caused a drop off in demand for new firetrucks. By 2011 the market for new firetruck sales had fallen more than 40% from its peak, from 5,000 a year to around 3,000 a year. Many independent firetruck manufacturers folded during this period. The demand for firetrucks did not fully rebound until the mid 2010s.

29.

Capitalizing on the economic turbulence of the Great Recession, a mid sized private equity firm, American Industrial Partners ("AIP"), purchased the fire apparatus manufacturing E-ONE in 2008. E-ONE builds a full line of fire fighting vehicles, from brush trucks and pumpers to aircraft rescue and firefighting vehicles. E-ONE was the first fire truck manufacturer in AIP's portfolio.

30.

As demand for fire trucks returned in the mid-2010s, AIP turned its attention to commondeering the firetruck industry. AIP created Rev Group (originally Allied Specialty Vehicles) in 2015 from the merger of several companies, including E-ONE.

31.

In 2016, REV Group purchased Kovatch Mobile Equipment Corporation ("KME"). Headquartered in Nesquehoning, Pennsylvania, KME operates in Pennsylvania, Virginia, New York, and California. It produces a broad array of fire apparatus, including pumpers, aerials, and tankers.

32.

In April 2017, REV Group purchased Ferrara Fire Apparatus, Inc ("Ferrara") based in Holden, Louisiana. The Ferrara product portfolio included custom chassis pumpers, aerials, and industrial apparatus. At the time, Ferrara had more than 450 employees and annual revenue of approximately $140 million. Prior to the purchase , Ferrara has been E-ONE's direct competitor in the southern United States.

33.

Dan Peters, President of the fire division within REV Group, noted that "the addition of Ferrara to the REV Fire Group enabled a number of new growth opportunities including expansion of our reach nationwide and adding new geographical regions and key accounts." Timothy Sullivan, REV Group's CEO, confirmed that "Ferrara will immediately contribute strategic value by expanding the REV Fire Group national footprint, dealer sales network, service and after-market parts revenue as well as enhancing our robust line of custom chassis and aerial products for multiple market segments. The Ferrara purchase cemented REV Group's position as a dominant firetruck manufacturer.

34.

Not satisfied with control over E-ONE, KME, and Ferrara— each prominent fire apparatus brand in its own right— REV Group purchased Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively "Spartan"), Smeal Fire Apparatus ("Smeal"), and Ladder Tower Company ("Ladder Tower") in 2020. These brands had a significant presence in the Midwest market. The acquisitions solidified REV Group's position as the top fire truck manufacturer in the United States.

36.

REV Group used its market power to tamp down competition in the industry, Although REV Group executives initially made a show of preserving the independence of the company's subsidiary manufactures and their dealers, they simultaneously warned that aggressive or "negative" competition among subsidiaries would not be tolerated.

37.

By 2021, REV Group stopped even pretending to support subsidiary independence. A REV Group investor presentation referred to REV Group as "an industry consolidator." That same presentation highlighted a strategy that called for REV Group's subsidiaries to "converge on

common designs that can be shared across brands," and to use Spartan's Metro Star chassis/cab as the "platform: for their offerings. REV Group also ensures its larger fire department customers deal directly with corporate-level staff rather than individual brand representatives. The investor presentation further called for the elimination of geographic overlaps between the marketing of its different fire-truck brands and dealers. REV Group's fire apparatus operations are now "center-led," with REV Group dictating and managing the execution of "margin improvement actions" across its subsidiaries.

38.

REV Group explained to shareholders that its goal was to double the fire apparatus companies' profitability. Timothy Sullivan, REV Group's CEO, told analysts that the companies REV Group had profit margins 4 to 5 percent, and that REV Group was on a path "to get all of them above that 10 percent level." Sullivan further explained: "You bring them into the fold, you got to give them the religion, and they've got it now."

39.

Oshkosh responded to REV Group's roll-up by making acquisitions of its own. In 2021, Oshkosh's primary North American subsidiary, Pierce, announced that it had acquired Boise Mobile Equipment ("BME"). BME's product portfolio, which allowed Pierce to expand its reach and focus to West Coast markets, included fire apparatus like the Model 34, Tactical Tender, and Type 6 Xtreme. In 2022, Oshkosh acquired Maxi-Metal, Inc., a leading designer and manufacturer of custom fire trucks. Subsequent to these acquisitions, Oshkosh controlled a full quarter of the U.S. fire truck market.

40.

In addition to purchasing third-party manufacturers, Oshkosh also embarked on a strategy of consolidating the U.S. brands already within its purview, reducing geographic overlap between its dealers. In July 2018, Pierce subsidiary MacQueen Emergency Group ("MacQueen") acquired Schuhmacher Fire Equipment. The acquisition consolidated MacQueen's control over the upper Midwest, including Minnesota, Nebraska, South Dakota, North Dakota, and 109 Missouri counties.

41.

In January 2019, Pierce dealer Siddons-Martin Emergency Group ("Allegiance") acquired Superior Equipment, consolidating control over the American Southwest. Siddons' territory now includes Texas, Louisiana, New Mexico, Utah, and Nevada.

42.

In November 2019, Pierce dealer Firematic Supply Co. Inc. ("Firematic") acquired Churchville Fire Equipment. The acquisition consolidated Firematic's control over Connecticut and New York.

43.

Most recently, on June 12, 2025, Pierce dealer Reliant Fire Apparatus brand ("Reliant") acquired Halt Fire, Inc., thereby consolidating Reliant's "exclusive Pierce territory" to include Michigan, in addition to its existing territories in Wisconsin and Iowa. Pierce noted that Reliant would "align Michigan operations with its existing territories" to "ensure a consistent and reliable customer experience."

44.

These consolidations, which have largely eliminated geographic overlaps and given Pierce dealers exclusive control across vast territories, have reduced or eliminated competition among Pierce subsidiaries.

45.

Rosenbauer International A.G., seeing REV Group's and Oshkosh's consolidation efforts, finalized its acquisition of the remaining 25 percent minority stake in Rosenbauer American from General Safety Equipment Corporation in June 2022.

46.

In March 2023, Rosenbauer announced that IKON Fire, LLC would join its dealer network for apparatus sales in Colorado and Wyoming.

47.

Rosenbauer's dealers are assigned non-overlapping territories, reducing interdealer competition.

48.

While rolling up independent fire truck manufacturers and tamping down competition between their own brands, Manufacturer Defendants have also sought to cooperate rather than compete, with one another.

49.

For example, REV Group's Vice President of Sales in the Fire Group, Mike Virnig, states: "What I won't tolerate is negative selling. I won't tolerate it with our competitors, and I won't tolerate it within the group. If I even get a hint or see anything like a dealer taking a shot at another dealer, we step in and say, 'Stop it.'"

50.

REV Group company executives have also told analysts that the company would substantially raise its profit margins and that other companies were doing the same.

51.

Industry insider Jerry Haplin, the co-owner and vice president of sales and marketing for C.E.T. Fire Pumps, noted in 2022 that "people in the fire service industry are talking amongst themselves" and are looking "to bolster opportunities through partnerships and other alliances." He also predicted "cooperation between like businesses to gain an edge in the marketplace."

52.

E-ONE, Ferrara, KME, Spartan, Pierce, and Rosenbauer, which together represent all three Manufacturer Defendants, are members of FAMA. FAMA colludes with the Manufacturing Defendants to enable an information exchange through statistical reports and by organizing twice-yearly in-person meetings.

53.

FAMA described access to competitors' data as "one of the most valuable reasons" for companies to join the organization. FAMA has an entire committee, the Data & Research Committee, dedicated to enabling this data exchange. FAMA described the Data & Research Committee's mission as helping to "strengthen FAMA member companies by providing actionable data," including economic data, "for strategic business planning." The Committee is tasked with "collecting and distributing data regarding apparatus sales and orders" and distributing it on at least a quarterly basis. FAMA described this "detailed data" as "invaluable" to members "for their internal business purposes."

54.

The Data and Research Committee maintains a digital data portal through which apparatus manufactures enter economic data. That data sent to an accounting firm, which complies the data and returns it to the Data & Research Committee. The Committee then uploads the data onto the FAMA website.

55.

Not just anyone can access this data, however. "FAMA does not release this information to the public." Instead, the data is uploaded into a secure portion of the FAMA website that FAMA describes as a "members-only section." "Only those companies that participate in the statistical studies and members are privy to these reports."

56.

FAMA imposes strict limits on who can become a member, and consequently, who has access to these reports. To join FAMA, an entity must (a) be "engaged in the manufacture of fire fighting or fire protection apparatus, including rescue vehicles," or (b) "manufacture components or products which are incorporated by the manufacturer as a payment part of the completed fire apparatus... such as chassis, fire pumps, fire hoses, hose reels, ladders, aerial devices, apparatus vales and other water control appliances." Notably, fire departments, municipalities, and other buyers of fire apparatus are not eligible to join FAMA under this definition. Such entities— apparatus manufactures' customers— are denied access to the data that manufactures exchange among themselves.

57.

Even among its members, FAMA further restricts data access to those companies that provide their own data, in a give-data-to-get-data scheme. FAMA states data access "may be denied" to any company "that was given the opportunity to participate in the program but refused." Data may also be denied to any company "that does not agree in advance of participation to keep the results confidential."

58.

In addition to providing economic data to their members, FAMA also organizes twice-yearly meetings, in the spring and the fall, to "provide a forum [for members] to share information."

59.

At these meetings, attendees, including direct competitors, listen to presentations that include economic forecasts regarding the fire truck manufacturing market.

60.

Attendees also engage in "purchasing roundtables" and FAMA members-only meetings and discussion groups.

61.

Manufacturer Defendants had ample time and opportunity to exchange sensitive information and coordinate supply restrictions and price hikes at these meetings. FAMA advertises these "networking" events as one of the reasons to join FAMA.

62.

In addition to the statistical and twice-yearly in-person meetings, FAMA "communicates with its members on a regular basis via emails, its website and an extensive FAMA newsletter." These missives offered another avenue for communication and coordination among Manufacturer Defendants.

63.

Demand for fire trucks picked up in the mid-2010s as the economy rebounded after the Great Recession, increasing steadily until approximately 2020. Between 2020 and 2022, the number of fire truck orders spiked as municipal coffers became flushed with COVID relief funds. Since about 2022, order activity has hovered between 5,500 and 6,500 fire related trucks per year.

64.

Manufacture Defendants' production has not kept pace with this increased demand. Particularly within the last few years, order backlogs have ballooned. For example, REV Group reported a record $3.6 billion backlog in late 2023, a 41% increase over 2022. REV Group's backlog increased again in 2024. As of last October, REV Group has a $4.4 billion backlog on fire and emergency vehicle orders in the United States.

65.

Oshkosh and Rosenbauer have reported similarly mammoth backlogs. Oshkosh's backlog of fire truck orders quadrupled from 2019 to 2023; it recently reported some $4 billion in orders placed but not fulfilled. And Rosenbauer announced an approximately $2.67 billion backlog at the end of 2024.

66.

Increased backlogs have translated in substantial delays prior to delivery of new fire trucks. Wait times in some areas have more than quadrupled, from one year to 4.5 years. An individual going by the username "Capttomio" complained in an online forum in January 2023 that "lead times for delivery from date the order is placed to final inspection has gone from 10-12 months to greater than 2 years in many cases and in some cases approaching 3 years." Another user noted that a REV

Group dealer "added 15 months to the delivery time" for a fire truck. A third reported an estimated delivery time of 48 months from a Pierce dealer for "a very cookie cutter" truck "without any interior customization." And yet another described a 435 day waiting period for a single component of a Rosenbauer truck, with full wait times up to 3 years.

67.

As another example, Sue Finkam, the Mayor of Carmel, Indiana, said her city was growing and needed to add more fire stations. But as matter stand now, the city expects to be able to acquire land, design a fire station, construct the building, hire firefighters and train them, while still waiting for the station's fire engines to be delivered.

68.

While the rate of order fulfillment has ticked up again in recent years, that increase has not been nearly enough to dent the serious backlog.

69.

In addition to delays for new fire trucks, delays have also increased for replacement part orders. Gil Carpenter, a fire chief in Benton, Arkansas, explained that prior to REV Group rolling up Ferrara, he would call a contact named Charlie whenever he needed a Ferrara replacement part. Charlie would ship him the part the next day. But in 2024, when one of the department's vehicles needed new parts, delivery was delayed for more than 10 months. Mr. Carpenter's fire department was left without one of its eight trucks for nearly a year.

70.

These backlogs cannot be explained by supply chain disruptions in the wake of the COVID-19 pandemic or other geopolitical events of the early 2020s. Although supply chain issues plagued industries across the United States in 2021 and 2022, the Federal Reserve Bank of New York's Global Supply Chain Pressure Index returned to baseline by early 2023, hitting its lowest point on record in May 2023.

71.

Under typical market conditions, such a significant surge in demand would be met with a corresponding increase in manufacturing capacity. But no such manufacturing capacity increase has materialized. REV Group has recently spent only a small portion of its revenue— about 1 percent— on upgrading its buildings and equipment. Alexander Yaggy, a former investor in REV Group's stock, called this minimal investment in the face of significant industry backlogs "reflective of an

uncompetitive market." And neither Oshkosh nor Rosenbauer have attempted to meet this surge in demand or capture market share by ramping up their production.

72.

In a press release, REV Group states that orders currently in progress at the two KME facilities would be transferred to other REV Group manufacturing plants. The process, unsurprisingly, resulted in additional, substantial delays, Matthew R. Timerman, a fire chief whose department had ordered a $1.2 million ladder truck from REV Group slated to be complete at the KME Pennsylvania plant, discovered the truck would instead be assembled at three different manufacturing sites, resulting in additional delays. Eventually, Mr. Timerman received his truck more than four years after his department first placed the order.

73.

Despite these record-setting backlogs, the Manufacture Defendants appear unconcerned that their customers might cancel orders or that a competitor might steal their business. Mark Skonieczny, REV Group's current chief executive, explained during a 2023 conference call that the company did not expect the delays to cause cancellations because once a city sets aside the money, it is "earmarked" and REV Group gets a deposit. "That money is allocated to those units, so we feel good about that." Skonieczny further commented, "I don't think it's impacting our market share." According to REV Group's SEC report, the company considers its backlog to enhance its value to shareholders by giving the company "strong visibility into future net sales."

74.

Unsurprisingly, given growing demand and flat or declining supply, the cost of fire trucks has soared. In the mid-2010s, a standard pumper truck cost approximately $300,000.00 to $500,000.00. Within the last few years, prices have increased to an average of $1 million per pumper truck. Similarly, ladder trucks that cost $750,000.00 to $900,000.00 in the mid-2010s cost upward of $2 million today. An industry leader commented that the industry has "reached a new level of price psychology. Today, relationships start at a half million dollars, and 10 years ago that was a remote concept.

75.

Nor is seeking out competition a viable option for customers looking to get a better deal on fire apparatus. As one industry executive has observed, "there are now times when all vendors at a bid table, each with a 'different' product, are all owned and managed by the same parent company. How is that competitive for the purchaser?" Fire departments across the country have little

alternative than to pay the exorbitant prices Manufacturer Defendants are charging for their fire trucks.

76.

On top of already high base prices for new fire trucks, REV Group, Oshkosh, and Rosenbauer have relied on the significant industry backlog to justify imposing "floating prices" on their customers. Using the purported difficulty of projecting material costs over a years-long lead time as an excuse, Manufacturer Defendants have added price clauses to their contracts that allow Manufacturers Defendants to increase the final price of a fire truck after it goes into production. Due to production delays, this means Manufacturer Defendants can increase their prices years after a fire department initially orders a truck. Mark Fusco, the president of Rosenbauer America, has conceded that his company imposes "surcharges that might occur during the build times" on Rosenbauer customers.

77.

One fire department in Massachusetts ordered a fire truck in 2022 and then added two more trucks to their original order in 2023. After the second order, a fire truck manufacturer increased the price of the truck ordered in 2022 by $150,000.00 to match the price of the trucks ordered in 2023. The manufacturer threatened not to deliver the truck ordered in 2022 unless the fire department agreed to the price increase. The fire chief felt "compelled to pay this increase out of fear that the process to get apparatus would take too long and we would not be able to provide service to our community."

78.

As another example, a fire department in Indiana was hit with more than $100,000.00 price increase for the same pumper truck after a 7-month delay. And in yet a third example, the Loveland Fire Rescue Authority in Colorado experienced a surcharge of $29,000.00 on a pending order.

79.

In June 2025, Oshkosh stated that its adjusted operating margins had grown from 4.8% to 10.5% from 2022 to 2024, delivering on "key 2022 Investor Day targets one year early."

80.

Oshkosh anticipates its adjusted operating margins will grow to 12 or 14 percent by 2028, with revenue of $12-14 billion. According to the company, that revenue growth will be "supported by strong backlog" and prices increases.

81.

With a few exceptions during the pandemic years, overall revenues for fire truck manufactures in the U.S., including Manufacturer Defendants, have increased significantly since 2015.

82.

One tool that courts use to assess the competitive effects of concerted action is defining the relevant market. The relevant market is the zone of competition among agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). Here, the product market is all fire trucks, and the geographic market is the United States.

83.

This case concerns fire trucks as recognized by the National Fire Protection Association("NFPA") Standard 1900 regarding automotive fire apparatus and the National Wildfire Coordinating Group Standards for Wildland Fire Resource Typing (together, the "Standards"). These standards classify fire trucks within the United States into seven types, all of which are at issue in this case:

TYPE 1 fire trucks are often referred to as an engine company, engine pumper, or structural firefighting truck. This is the most common type of fire truck in use today. Urban, suburban, and rural fire departments all rely in Type 1 fire trucks. Type 1 fire trucks carry all required NFPA firefighting equipment and support both structural firefighting equipment and initial emergency medial services. Every Type 1 fire truck is required to have a pump with a minimum tank size of 300 gallons and to be equipped with 2.5- and 1.5- inch hoses of varying lengths. These trucks must also include a full complement of ground ladders, nozzles, forcible entry equipment, rear access and egress, and some level of first aid equipment. They are designed to carry four firefighters.

TYPE 2 fire trucks carry all required NFPA firefighting equipment and support both structural firefighting and initial emergency medical services. They are most commonly used in urban and suburban settings. They typically carry three to four firefighters.

TYPE 3 fire trucks are often referred to as a wildland fire truck or brush truck. They are typically used in rural and wildland settings. NFPA standards require a Type 3 engine to have a minimum of a 500-gallon water tank and a pump capable of a minimum of 150 US gallons per minute at a pressure of 250 pounds per square inch. Many Type 3 fire engines also feature an auxiliary pump in addition to the main water pump. The auxiliary pump can be powered by a

separate diesel engine that is connected to the pump. This pump-and-role technique means that a truck operator can drive the truck while crew members man the pump and hoses, allowing firefighters to follow along as forest fires and brush fires move with the weather, and to create fire lines, wetting down areas ahead of an advancing wildfire. Type 3 Fire Engines must be equipped to carry at least three passengers.

TYPE 4 fire trucks, like Type 3 trucks, are often used in wildland firefighting. Compared to Type 3 trucks, Type 4 trucks have a larger water tank and reduced hose capacity requirements. Type 4 fire trucks must have a 750-gallon water tank that offers 50 gallons per minute of water transfer at a pressure of 100 pounds per square inch. Type 4 trucks must be equipped to carry at least two people.

TYPE 5,6 and 7 fire trucks are often grouped together because they feature many of the same design qualities. These vehicles are typically pick-up truck-based with 4-wheel drive on a medium GVWR of 19,500 pounds, and Type 7 trucks have a maximum GVWR of 14,000 pounds. Types 5,6, and 7 trucks typically carry a 300-gallon water tank and a small booster pump with a minimum capacity of 50 gallons per minute. They must be equipped to carry two firefighters.

84.

Some trucks are specially equipped to conform to additional standards. For example, NFPA Chapter 5 describes the requirement for a truck to be considered a Pumper Fire Apparatus, NFPA Chapter 9 describes the requirements for a Quint Fire Apparatus, NFPA Chapter 11 describes the requirements for a Mobile Foam Fire Apparatus, and NFPA Chapter 19 describes the requirements for Aerial Fire Apparatus (which include trucks equipped with aerial ladders, elevating platforms or towers, and water tower devices). These specialty trucks are also included in the relevant product market.

85.

As described above, all three Manufacturer Defendants sell fire trucks to fire departments across the 50 states. The relevant market is the United States.

86.

As a result of industry roll-ups from the mid-2010s through today, the overwhelming majority of the fire trucks industry's sales and capacity are now concentrated among three dominant manufactures: REV Group, Oshkosh, and Rosenbauer. As described above, REV Group captures around $1 billion of annual fire truck sales made in the United States, Oshkosh captures about $750

million, and Rosenbauer captures around $307 million. In combination, these three companies capture between 70 and 80 percent of the national market.

87.

Fire trucks are expensive, made-to-order specialty equipment. End-users can specify nearly every aspect of the apparatus they order, from the size of the motor, to the placement of emergency lights, to the location of equipment storage compartments.

88.

This demand for customization stems from the diversity of the customer base. According to the U.S. Fire Administration, there are approximately 30,000 fire departments in the United States, ranging from large urban departments to small rural agencies. Among these departments, 68 percent have a single fire station, 17 percent have two stations, and 15 percent have three or more stations. In total, there are approximately 52,000 fire stations across the country. Each fire department, and sometimes each fire station, has their own specific set of requirements. As Kent Tyler, president of REV Group's Fire Group put it, "these are fully custom trucks, and they don't just happen overnight." What's more, fire departments buy new trucks infrequently, on average every 10 to 15 years. Only about 10,000 fire trucks are manufactured each year.

89.

Given this backdrop, breaking into the fire truck industry is challenging. The cost of producing fire trucks, combined with the long lead times, means that only well-funded established corporations have much better chance of sustaining themselves through the initial investment period. The large capital outlays required limit market entry, as it can be difficult for a firm to raise the required funds.

90.

The specialized nature of the fire truck market is an additional barrier to entry. The niche engineering expertise needed to meet NFPA standards and fire departments' demands is largely confined to current manufacturers. The effort required to develop the necessary expertise is another deterrent to would-be competitors.

91.

If the price of fire trucks has increased only at the rate of inflation between 2015 and 2025, pumper trucks would cost approximately $680,000.00 (rather than the cost of $1 million), and ladder trucks cost approximately $1.2 million (rather than $2 million). Municipalities across the country are

therefore paying approximately 47 percent (or $320,000.00) more for pumpers and 66 percent (or $800,000.00) more for ladder trucks in 2025 than would be expected based on inflationary costs alone.

92.

As fire vehicles age, they become prone to more frequent and serious breakdowns, leading to more costly repairs and prolonged downtime. The National Fire Protection Association recommends that apparatus should be moved from the frontlines to the reserve fleet after 15 years and removed from service completely at the 20- or 25- year mark.

93.

Skyrocketing prices and longer delivery times have made it difficult for municipalities to replace aging vehicles in their fire departments' fleets in a timely manner. In many cases, fire departments are operating using trucks and have exceeded their service life because buying new trucks is prohibitively expensive. According to the president of the International Association of Fire Fighters, Edward Kelly, cities and towns across the country are facing a crisis where demand for new fire trucks has outstripped availability and funding.

94.

For example, the city of La Crosse is currently operating a 2006 Pierce Enforcer (a quint fire apparatus), a vehicle that is nearly 20 years old. Although La Crosse has ordered a replacement for the vehicle, long expected delivery times mean La Crosse will need to rely on this outdated fire truck for several more years.

95.

Price and availability concerns also spurred the La Crosse Fire Department to change its operating plan, which previously relied on three quint apparatus and two engines, to a plan based in the cheaper configuration of two quint apparatus and three engines. In some cases, La Crosse has been shut out of the market altogether: although it recently looked at purchasing a new fire truck for its airport, the $1 million price tag and the long wait time were too much for the City, which decided to make do with its current fleet. To try to adapt to ever-increasing prices and lengthening backlogs, the La Crosse Fire Department has already begun requesting funds for a replacement truck that it will not need until 2030.

96.

Other examples of aging fleets abound. In January 2025, the Chicago fire department threw a mock thirtieth birthday celebration for one of its trucks, which was older than many firefighters on the force.

97.

In Los Angeles, the city's fire department has long aimed to have 90 percent of its fleet ready for deployment at any given time, but it has averaged only 78 percent in recent years as older trucks are pulled for maintenance. Union officials have said that rising prices for replacement vehicles have forced the department to order fewer new rigs than it has planned.

98.

Auditors in Atlanta found that more than a third of the city's aging firefighting fleet was out of commission. Houston and Seattle have reported similar struggles with their fleets.

99.

Smaller municipalities, including towns in Connecticut, Illinois, Michigan, New York, New Jersey, Pennsylvania, Texas, Kansas, and West Virginia, have faced comparable difficulties. For example, in 2024, the city of Evanston, Illinois had to persuade a dealer to sell a demonstration vehicle to accelerate delivery of a $2.3 million new truck to only "12 to 14 months" to replace an 18 year old reserve truck with "major defects… that would cost around $300,000.00 to fix." The Chief of the Ann Arbor, Michigan fire department recently observed that "the price of fire trucks has become bonkers," revealing "almost a monopoly market," such that their next truck will cost $2.4 million and take 4 years to deliver. And the fire chief of Watertown, New York, has said his department was so desperate for a new ladder truck to keep operations running that it bought one used from another city, even though that truck was already more than two decades old.

100.

High prices and long waits for fire apparatus are endangering public safety in communities across the country, particularly those facing natural disasters.

101.

Los Angelas' experience in January 2025, when two large fires raged for days and killed 29 people, is particularly poignant example of the harm communities can suffer when their fire truck fleets are reduced. More than 100 of the Los Angelas Fire Department's ("LAFD") 183 fire trucks were out of service at the time the fires broke out. Chuong Ho, a firefighter and union leader who

was among those who reported for work during the fires, said the lack of fire apparatus meant many of the firefighters who were available to help that day could not be sent on the front lines. Kristin Crowley, the LAFD fire chief, confirmed that the lack of a fully staffed fire truck fleet impeded the department's ability to respond to the fires. Had additional firefighters been able to combat the blazes, they might have been able to prevent the devastation that followed, including $350 million in damage to L.A. public facilities and the loss of homes and lives.

102.

Other communities have faced similar difficulties. Jesse M. Flax, the fire chief in Camden, New Jersey, said that fire truck manufacturing delays and rising prices were "creating greater risk for the public and firefighters." During a 2024 house fire in Camden, crews were slowed in their response by mechanical trouble on a truck that caused its hose to go limp. A resident died in that blaze. And in Castle Rock, Colorado, firefighters responded to incidents in Type 3 brush trucks, rather than in other preferred vehicles, due to a four-year delivery delay of new apparatus.

103.

In addition to problems adequately responding to disasters with diminished fleets, the rising cost of fire trick maintenance and replacement has squeezed fire departments' and municipalities' budgets, leaving them with fewer resources for other needs including recruiting and retaining firefighters. For example, cities whose fire departments are facing budget challenges, including those in Spokane, Washington and Mills, Wyoming, have had to cancel essential training and even lay off firefighters.

104.

Plaintiff has neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy until shortly before filing this Petition. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the price of fire trucks. Throughout the class period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff.

105.

Defendants concealed their conspiracy by communicating competitively sensitive information to one another through FAMA Statistical Reports that are unavailable to the public. They also attend members-only discussions during twice-annual FAMA meetings, allowing them to surreptitiously communicate and prevent the existence of written records. Because the public has no access to either the FAMA Reports or the FAMA members-only meetings, there was no reason for Plaintiff to suspect that Defendants were engaged in an unlawful anticompetitive scheme.

106.

What's more, Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Fire trucks are not exempt from antitrust regulation. Prior to the investigative articles by Basel Musharbash and journalist with the New York Times, Plaintiff reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Manufacturer Defendants' fire truck prices before these recent events.

107.

By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff has as a result of the unlawful conspiracy alleged in this Complaint.

108.

Plaintiff brings this action on behalf of itself, and as a class action under the Louisiana Code of Civil Procedure, Article 591, et seq, seeking injunctive relief, unjust enrichment, and under the consumer protection laws of the State of Louisiana on behalf of the members of the following Class:

> Louisiana Class: All local or municipal government entities or other entities with fire departments that purchased fire trucks from Manufacturer Defendants in the United States from January 1, 2016 through the present in the state of Louisiana.

109.

Specifically excluded from this Class are the Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

110.

A class action is warranted in this case because the Class members are so numerous that joinder of all members is impracticable; there are questions of law or fact common to the Classes; the claims of the representative parties are typical of the claims of the Class; and the Plaintiff named in this Complaint will fairly and adequately protect the interests of the Class.

111.

Numerosity: Class members are so numerous (including several hundred municipalities, numerous fire districts and non-governmental fire departments) that joinder of all Class members in a single proceeding would be impracticable. The disposition of the claims asserted through this class action will enhance efficiency and will benefit the parties and the Court.

112.

Commonality: Plaintiff's antitrust claims are common to all Class members, and individual complaints otherwise may result in inconsistent or varying adjudications.

113.

Typicality: Antitrust violations and harms suffered by all Class Members, are typical of the legal violation and harms suffered by all class members.

114.

Adequacy: Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the class members in that Plaintiff has no interests adverse to, or that conflict with, the Class which Plaintiff seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex class actions of this nature.

B. All requirements of Louisiana Code of Civil Procedure, Article 591, et seq, are met.

115.

In addition to satisfying the prerequisites of Louisiana Civil Code of Procedure, Article 519, et seq, this case qualifies for class action treatment because questions of law or fact common to the Class predominate over any questions affecting only individual Class members, and because a class action suit is superior to other available methods for adjudicating the controversy.

116.

Predominance: Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, but are not limited to:

Whether Defendants engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of fire trucks sold in interstate commerce in the United States;

The duration of the conspiracy alleged herein and the acts performed by Defendants in furtherance of the conspiracy;

Whether the alleged conspiracy violated the antitrust laws of the United States and Louisiana;

Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the Plaintiff and other Class members;

The effect of Defendants' alleged conspiracy on the prices of fire trucks sold in the United States during the class period;

Whether Plaintiff and other Class members are entitled to, among other things, injunctive relief and if so, the nature and extent if such injunctive relief; and

The appropriate Class-wide measure of damages.

117.

Superiority: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. It would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct, both for Class members themselves and for the court system. Individualized litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the courts. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

ANTI TRUST INJURY

118.

Defendants' anticompetitive conduct had the following effects, among others:

Price competition has been restrained or eliminated with respect to fire trucks;

The prices of fire trucks have been fixed, raised, stabilized, or maintained at artificially inflated levels;

Plaintiff and other Class members have been deprived of free and open competition; and

Plaintiff and other Class members have paid artificially inflated prices for fire trucks, causing substantial harm to Plaintiff and other Class members.

119.

The purpose of Defendants' conspiratorial conduct was to raise, fix, or maintain the price of fire trucks. As a direct and foreseeable result, Plaintiff and other Class members paid supra-competitive prices for fire trucks during the class period.

120.

By reason of the alleged violations of the antitrust laws, Plaintiff and other Class members have been injured because they paid higher prices for fire trucks than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy. This is an injury of the type that the antitrust laws were meant to punish and prevent.

CLAIMS FOR RELIEF

First Claim for Relief: Violation of Section 1 of the Sherman Act, 15 U.S.C. §1, for conspiracy to restrain production (on behalf of the Louisiana Class for injunctive and equitable relief)

121.

CLAIMS FOR RELIEF

First Claim for Relief: Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, for conspiracy to restrain production (on behalf of the Louisiana Class for injunctive and equitable relief)

Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

122.

Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016 and continuing through the present, Defendants entered into a continuing agreement, understanding, and conspiracy on restraint of trade artificially to fix, raise, and stabilize price of fire trucks in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. §1)

123.

In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants achieved the following conspiratorial outcomes:

Fixing, raising, and stabilizing the price of fire trucks; and

Allocating among themselves and collusively reducing the production of fire trucks.

124.

The combination and conspiracy alleged herein has had the following effects, among others:

Price competition has been restrained or eliminated with respect to fire trucks;

The production of fire trucks has been restrained at artificially low levels;

The price of fire trucks has been fixed, raised, stabilized, or maintained at artificially inflated levels;

Plaintiff and other Class members have been deprived of free and open competition; and

Plaintiff and other Class members have paid artificially inflated prices for fire trucks, causing substantial harm to Plaintiff and other Class members.

125.

Plaintiff and other Class members have been injured and will continue to be injured by paying more for fire trucks from Manufacturer Defendants than they would have paid and will pay in the absence of the combination and conspiracy.

126.

Plaintiff and other Class members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

SECOND CLAIM FOR RELIEF: VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1, FOR CONSPIRACY TO EXHANGE COMPETITIVE INFORMATION (ON BEHALF OF THE NATIONWIDE CLASS FOR INJUNCTIVE AND EQUITABLE RELIEF)

127.

Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

128.

Beginning at a time currently unknown to Plaintiff and Louisiana class members, but at least as early as January 1, 2016 and continuing through the present, Defendants entered into a

continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operation. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, U.S.C. § 1.

129.

The relevant product market is fire trucks as recognized by NFPA Standard 1900 regarding automotive fire apparatus and the National Wildfire Coordinating Group Standards for Wildland Fire Resource Typing. The relevant geographic market is the United States.

130.

Manufacturer Defendants possess market powers in the relevant market. Manufacturer Defendants control between 70 and 80 percent of the relevant market. Manufacturer Defendants' collective market power includes the power to artificially inflate the price Plaintiff and other members of the Nationwide Class pay for fire trucks above competitive levels.

131.

An increase in the price of fire trucks could be imposed collectively by Manufacturer Defendants without losing customers. The fire truck market is a unique product market.

132.

The information regularly exchanged by Defendants pursuant to the agreement has consisted of detailed, competitively sensitive and non-public economic information. The information exchanges included the exchange through FAMA Statistical Reports and FAMA meetings.

133.

Manufacturer Defendant's regular information exchanges through FAMA reflected concerted action between competitors in the market for fire trucks.

134.

Each Manufacturer Defendant furnished competitively sensitive information to other Manufacturer Defendants through FAMA with the understanding that it would be reciprocated. FAMA enforced this understanding by requiring Manufacturer Defendants to share data in order to receive comparable data.

135.

The agreement to regularly exchange detailed and non-public economic information about their companies suppressed competition between Manufacturer Defendants.

136.

When defendants that are competing for the same consumers exchange competitive information, it reduces the incentives to compete on price. Accordingly, Manufacturer Defendants used the data obtained though FAMA to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the fire truck marker. This strategic information was a material factor in Manufacturer Defenfants' decisions to inflate the prices that Plaintiff and other members of the Louisiana Class paid for fire trucks during the class period.

137.

Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive purpose.

138.

The information-exchange agreement has had the effect of (1) reducing and suppressing competition among Manufacturer Defendants in the market for fire trucks in the Unites States, and (2) inflating the prices for fire trucks during the class period.

139.

As a result of the unlawful agreement alleged herein to exchange information, Plaintiff and the other Class members have been injured in their business or property by paying artificially inflated prices for fire trucks during the class period.

THIRD CLAIM FOR RELIEF COURTS AND REVISED STATUTES 51:121, ET SEQ:
VIOLATION OF LOUISIANA STATE ANTITRUST LAW

140.

Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

141.

Louisiana state antitrust law aims to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition; La.R.S. 51:121, et seq.

142.

Plaintiff purchased fire trucks within Louisiana during the class period. But for Defendants' conduct set forth herein, the price of those fire trucks would have been lower in an amount to be determined at trial.

143.

Defendants contracted, combined or conspired to restrain or monopolize trade or commerce in the market for fire trucks, in violation of La.R.S. 51: 121 et seq.

144.

Plaintiff and members of the Louisiana Class were injured with respect to purchases of fire trucks in Louisiana and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interests, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief

FORTH CLAIM FOR RELIEF: UNJUST ENRICHMENT (ON BEHALF OF THE LOUISIANA CLASS)

145.

Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

146.

As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits from the sale of fire trucks.

147.

Under legal principles of unjust enrichment, Defendants should not be permitted to retain the benefit conferred on them by overpayments by Plaintiff and members of the Louisiana class.

REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class of all other Louisiana entities so similarly situated, respectfully request judgment against Defendants as follows:

A. The Court determine that this action may be maintained as a class action under Article 591 of the Louisiana Code of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as

provided by the Louisiana Code of Civil Procedure, Article 591, et seq, be given to the Class, once certified;

B. The unlawful conduct, conspiracy or combination alleged herein by adjudged and decreed in violation of Section 1 of the Sherman Act, Louisiana Revised Statute 51: 1121, et seq, and listed state antitrust statutes and antitrust principles;

C. Plaintiff and the Class recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgment in favor of Plaintiff and the other class members be entered against Defendants in an amount to be trebled to the extent such laws permit;

D. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having similar purpose or effect;

E. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that is withheld from the public;

F. Plaintiff and Class members be awarded pre-and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G. Plaintiff and Class members recover their cost of suit, including reasonable attorneys' fees, and expert witness fees as provided by law; and

H. Plaintiff and Class members have such other and further relief as the case may require and the Court may deem just and proper.

Plaintiff demands a trial by civil jury of all issues so triable.

Dated December 30, 2025.

Respectfully submitted:

Patrick W. Pendley

Patrick W. Pendley, LA Bar No. 10421
PENDLEY, BAUDIN & COFFIN, LLP
P. O. Drawer 71
24110 Eden St.
Plaquemine, Louisiana 70765
Email: pwpendley@pbclawfirm.com
Phone: 225/687-6396
Fax: 225/687-6398

Don Barrett (MS Bar No. _____)
Barrett Law Group, P.A.
404 Court Square North
Lexington, Mississippi 39095-0927
Email: donbarrettpa@gmail.com
Phone: 662-834-9168
Fax: 662-834-2628

Counsel for Plaintiff and the proposed class.

Serve information attached.

Service information for Defendants:

Oshkosh Corporation

Oshkosh Defense, LLC
Corporation Service System
450 Laurel Street, 8th Floor
Baton Rouge, LA 70801

Pierce Manufacturing, Inc

Pierce Manufacturing, Inc
Corporation Service Systems
450 Laurel Street, 8th Floor
Baton Rouge, LA 70801

REV Group, Inc

REV Group, Inc
CT Corporation Systems
3867 Plaza Tower Drive
Baton Rouge, LA 70816

Rosenbauer America, LLC

Rosenbauer America, LLC
Long Arm Service
100 Third Street
Lyons, SD 57041

Fire Apparatus Manufacturers Association

Fire Apparatus Manufacturers Association
Long Arm Service
1300 Sumner Avenue
Cleveland, OH 44115-2851

Iberville Parish Clerk of Court  C-84877
Filed Dec 30, 2025 2:09 PM    B
Shaquonia Grevious
Deputy Clerk of Court

**John "JB" Barker, Mayor**
23640 Railroad Ave.
Plaquemine, LA 70765-0675
225.687.3116
plaquemine.org


City of **Plaquemine**

**Roxane M. Richard**
City Clerk/Tax Collector
23640 Railroad Avenue
P.O. Box 675
Plaquemine, LA 70765-0675
225.687.3661

## CERTIFICATE

I, Roxane M. Richard, hereby certify that I am the duly qualified City Clerk of the City of Plaquemine, Parish of Iberville, State of Louisiana.

I further certify that the attached is a true copy of the resolution adopted by the City of Plaquemine, through its Mayor and Board of Selectmen in a Special Meeting, on the 12th day of November, 2025.

IN FAITH WHEREOF, witness my official signature and the impress of the official seal of the City of Plaquemine, Parish of Iberville, State of Louisiana, on this 19th day of November, 2025.

CITY OF PLAQUEMINE

*Roxane M Richard*
Roxane M. Richard
City Clerk

(Seal)

BOARD OF SELECTMEN: Michael Carlin, District 2, Mayor Pro-Tem;  Brent Barbier, District 1;  Wanda B. Jones, District 3;  Thomas D. "Tommy" LeBlanc, District 4;  Shannon P. Courtade, District 5;  Natasha S. Johnson, District 6

In accordance with the Americans with Disabilities Act, if you need special assistance, please contact the City Clerk at 225.687.3661 describing the assistance that is necessary. We are an equal opportunity employer.

Selectman Brent Barbier moved, seconded by Selectman Thomas D. LeBlanc:

## RESOLUTION

WHEREAS, the City of Plaquemine purchased a Pierce Custom Pumper (firetruck) on August 26, 2024 at a total cost of $618,182.56 from Siddons-Martin Emergency Group, LLC;

WHEREAS, the City of Plaquemine has learned that it may have been overcharged for the purchase of the foregoing Pierce Custom Pumper truck;

WHEREAS, the Mayor and Board of Selectmen of the City of Plaquemine desire to investigate whether it was overcharged in the purchase of the foregoing described fire truck;

WHEREAS, Patrick W. Pendley of Pendley, Baudin & Coffin, LLP and Don Barrett of Barrett Law Office have agreed to represent the Mayor and City of Plaquemine in the investigation of the pricing of the foregoing described firetruck;

WHEREAS, the said law firms will represent the Mayor and Board of Selectmen on a contingent fee basis and advance all necessary costs to prosecute such an investigation through litigation;

WHEREAS, several other municipalities in the United States have already instituted litigation seeking to determine if fire truck purchase prices were excessive;

WHEREAS, the City of Plaquemine is being requested to serve as a litigation class representative on behalf of all other entities in Louisiana who have purchased fire trucks since January 1, 2016;

WHEREAS, the Mayor and the Board of Selectmen of the City of Plaquemine desire to undertake such interrogation/litigation.

NOW, BE IS RESOLVED, that: The Mayor of the City of Plaquemine, JB Barker, be and he is authorized to execute a legal services agreement between Patrick W. Pendley of Pendley, Baudin & Coffin, LLP and Don Barrett of Barrett Law Office to investigate the pricing of the fire truck purchased by the City of Plaquemine on August 26, 2024 from Siddons-Martin Emergency Group, LLC;

FURTHER, that said agreement provides for a contingent fee agreement with counsel such that counsel will only receive a Court approved fee, if the litigation is successful and money is recovered for the City of Plaquemine, as well as the similarly situated parties in Louisiana and that the law firms shall advance all costs of the litigation, to be reimbursed only upon a successful resolution of the litigation.

The foregoing was adopted by the following vote:

Yeas: Brent Barbier, Michael K. Carlin, Sr., Wanda B. Jones and Thomas D. LeBlanc
Nays: Shannon P. Courtade and Natasha S. Johnson
Absent: None

Iberville Parish Clerk of Court  C-84877
Filed Dec 30, 2025 2:09 PM        B
Shaquonia Grevious
Deputy Clerk of Court