# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| UNIFIED GOVERNMENT OF WYANDOTTE COUNTY AND KANSAS CITY, KANSAS <br><br> PLAINTIFF, <br><br> v. <br><br> REV GROUP, INC.; OSHKOSH CORPORATION; PIERCE MANUFACTURING, INC.; ROSENBAUER AMERICA, LLC; ROSENBAUER SOUTH DAKOTA, LLC; ROSENBAUER MINNESOTA, LLC <br><br> DEFENDANTS. | **COMPLAINT – CLASS ACTION** <br><br> **JURY TRIAL DEMANDED** <br><br> Case No. _____ |

**TABLE OF CONTENTS**

<u>Page</u>

I.      INTRODUCTION .................................................................................................. 8

II.     PARTIES ............................................................................................................... 5

        A.      Plaintiff ...................................................................................................... 5

        B.      Defendants ................................................................................................. 6

        C.      Agents and Co-Conspirators .................................................................... 9

III.    JURISDICTION AND VENUE ............................................................................ 9

IV.     BACKGROUND ................................................................................................. 11

        A.      The Fire Apparatus Manufacturing Industry Before Defendants'
                Unlawful Conduct:  A Small Business Industry Dedicated to
                Serving the Public's Needs .................................................................... 11

        B.      Through Serial Acquisitions, REV Group and Pierce Consolidate
                the Fire Apparatus Marketplace ............................................................ 12

                1.      Private equity enters the market and forms REV Group ......... 12

                2.      REV Group embarks on a campaign of serial acquisitions..... 14

                3.      Oshkosh and Pierce follow REV Group's Lead and Make
                        Their Own Acquisitions .......................................................... 19

        C.      As Part of its Serial Acquisitions, REV Group Acquired a
                Monopoly in the Market for Specialty Cab Chassis That
                Substantially Lessened Competition in the Downstream Market for
                Fire Apparatus ........................................................................................ 21

        D.      As They Consolidate the Industry, Defendants Restrain
                Competition Among Brands and Dealerships.......................................... 25

        E.      Consolidation Has Allowed Defendants to Utilize Backlogs as a
                Profit-Driver and to Increase Shareholder Value at the Expense of
                Firefighters and the Public...................................................................... 28

                1.      The growth of backlogs............................................................ 28

                2.      Defendants promote growing backlogs as an investment
                        narrative................................................................................... 29

3.      REV Group curtails cab chassis production and permanently
        closes two manufacturing plants it acquired ........................................... 31

4.      Defendants increase prices and implement "floating price"
        clauses to maximize profits. ..................................................................... 34

F.      Defendants Substituted Collusion for Competition............................................. 36

1.      Defendants publicly signal price strategies............................................. 36

2.      A trade association provided a forum to collude and
        confidentially share sensitive and proprietary business
        information ................................................................................................ 37

G.      Evidence of Conspiracy....................................................................................... 40

1.      The conspiracy is economically plausible and Defendants
        engaged in parallel conduct that is inconsistent with
        independent competitive behavior. .......................................................... 40

2.      Numerous plus factors exist .................................................................... 40

H.      Defendants' Consolidation, Backlog Maintenance, and Collusion
        Have Had Their Desired Effect............................................................................ 42

1.      Plaintiff and Class members have paid supracompetitive
        prices for Fire Apparatus......................................................................... 43

2.      Plaintiff and Class members have been unable to get
        necessary repairs...................................................................................... 44

3.      Plaintiff and Class members have been unable to timely
        replace older vehicles............................................................................... 45

4.      Plaintiff and Class members have been less capable of
        responding to disasters ............................................................................ 47

5.      Plaintiff and Class members have been forced to redirect
        essential municipal funds towards purchasing Fire
        Apparatus.................................................................................................. 48

I.      The Anticompetitive Acquisitions and Defendants' Conduct
        Substantially Lessened Competition ................................................................... 49

V.    MARKET POWER AND MARKET DEFINITION ....................................................... 49

A.      Relevant Market................................................................................................... 49

B.      Product Market.................................................................................................... 50

C.    Geographic Market ................................................................................. 53

D.    Market Power ......................................................................................... 53

VI.    ANTITRUST INJURY AND CLASS ACTION ALLEGATIONS ............................. 53

A.    Antitrust Injury ...................................................................................... 53

B.    Class Action Allegations ........................................................................ 54

VII.    PLAINTIFF'S CLAIMS ARE TIMELY ................................................................. 56

VIII.    CLAIMS FOR RELIEF ........................................................................................ 57

FIRST CLAIM FOR RELIEF Violations of Section 7 of the
Clayton Act (Against REV Group) ........................................................... 57

SECOND CLAIM FOR RELIEF Conspiracy in Restraint of
Trade in Violation of Section 1 of the Sherman Act
(Against All Defendants) ......................................................................... 58

THIRD CLAIM FOR RELIEF Violations of State Antitrust
and Consumer Protection Statutes (Against all Defendants) ................... 59

ALABAMA ANTITRUST STATUTE (ON BEHALF OF DAMAGES CLASS
MEMBERS THAT PURCHASED FIRE APPARATUS IN ALABAMA) .................... 59

ALASKA ANTITRUST STATUTE (ON BEHALF OF DAMAGES CLASS
MEMBERS THAT PURCHASED FIRE APPARATUS IN ALASKA) ....................... 60

ARIZONA UNIFORM STATE ANTITRUST ACT (ON BEHALF OF
DAMAGES CLASS MEMBERS THAT PURCHASED FIRE
APPARATUS IN ARIZONA) ................................................................................. 60

ARKANSAS DECEPTIVE TRADE PRACTICES ACT (ON BEHALF OF
DAMAGES CLASS MEMBERS THAT PURCHASED FIRE
APPARATUS IN ARKANSAS) .............................................................................. 61

CALIFORNIA CARTWRIGHT ACT (ON BEHALF OF DAMAGES CLASS
MEMBERS THAT PURCHASED FIRE APPARATUS IN
CALIFORNIA) ...................................................................................................... 61

CALIFORNIA UNFAIR COMPETITION LAW (ON BEHALF OF DAMAGES
CLASS MEMBERS THAT PURCHASED FIRE APPARATUS IN
CALIFORNIA) ...................................................................................................... 62

COLORADO ANTITRUST ACT (ON BEHALF OF DAMAGES CLASS
MEMBERS THAT PURCHASED FIRE APPARATUS IN COLORADO) ................. 63

COLORADO CONSUMER PROTECTION ACT (ON BEHALF OF DAMAGES
CLASS MEMBERS THAT PURCHASED FIRE TRUCKS IN
COLORADO) ................................................................................................. 63

CONNECTICUT ANTITRUST ACT (ON BEHALF OF DAMAGES CLASS
MEMBERS THAT PURCHASED FIRE APPARATUS IN
CONNECTICUT) ........................................................................................... 64

DISTRICT OF COLUMBIA ANTITRUST ACT (ON BEHALF OF DAMAGES
CLASS MEMBERS THAT PURCHASED FIRE APPARATUS IN THE
DISTRICT OF COLUMBIA) ......................................................................... 65

FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (ON
BEHALF OF DAMAGES CLASS MEMBERS THAT PURCHASED
FIRE APPARATUS IN FLORIDA) ............................................................... 65

HAWAII ANTITRUST LAW (ON BEHALF OF DAMAGES CLASS
MEMBERS THAT PURCHASED FIRE APPARATUS IN HAWAII) .......... 66

ILLINOIS ANTITRUST ACT (ON BEHALF OF DAMAGES CLASS
MEMBERS THAT PURCHASED FIRE APPARATUS IN ILLINOIS) ........ 66

ILLINOIS CONSUMER FRAUD & DECEPTIVE BUSINESS PRACTICES ACT
(ON BEHALF OF STATE LAW CLASS MEMBERS THAT
PURCHASED FIRE APPARATUS IN ILLINOIS) ....................................... 67

IOWA COMPETITION LAW (ON BEHALF OF DAMAGES CLASS
MEMBERS THAT PURCHASED FIRE APPARATUS IN IOWA) ............... 67

KANSAS RESTRAINT OF TRADE ACT (ON BEHALF OF DAMAGES CLASS
MEMBERS THAT PURCHASED FIRE APPARATUS IN KANSAS) .......... 68

MAINE MONOPOLIES AND PROFITEERING LAW (ON BEHALF OF
DAMAGES CLASS MEMBERS THAT PURCHASED FIRE
APPARATUS IN MAINE) .............................................................................. 68

MARYLAND ANTITRUST ACT (ON BEHALF OF DAMAGES CLASS
MEMBERS THAT PURCHASED FIRE APPARATUS IN MARYLAND) ..... 69

MARYLAND CONSUMER PROTECTION ACT (ON BEHALF OF DAMAGES
CLASS MEMBERS THAT PURCHASED FIRE APPARATUS IN
MARYLAND) .................................................................................................. 69

MASSACHUSETTS CONSUMER PROTECTION ACT (ON BEHALF OF
STATE LAW CLASS MEMBERS THAT PURCHASED FIRE
APPARATUS IN MASSACHUSETTS) ......................................................... 70

MICHIGAN ANTITRUST REFORM ACT (ON BEHALF OF DAMAGES
        CLASS MEMBERS THAT PURCHASED FIRE APPARATUS IN
        MICHIGAN) ........................................................................................................ 71

MICHIGAN CONSUMER PROTECTION ACT (ON BEHALF OF DAMAGES
        CLASS MEMBERS THAT PURCHASED FIRE APPARATUS IN
        MICHIGAN) ........................................................................................................ 71

MINNESOTA ANTITRUST LAW (ON BEHALF OF DAMAGES CLASS
        MEMBERS THAT PURCHASED FIRE APPARATUS IN MINNESOTA) ................ 72

MINNESOTA PREVENTION OF CONSUMER FRAUD ACT (ON BEHALF OF
        DAMAGES CLASS MEMBERS THAT PURCHASED FIRE
        APPARATUS IN MINNESOTA) .......................................................................... 72

MISSISSIPPI ANTITRUST LAW (ON BEHALF OF DAMAGES CLASS
        MEMBERS THAT PURCHASED FIRE APPARATUS IN MISSISSIPPI) ................. 73

MONTANA UNFAIR TRADE PRACTICES ACT (ON BEHALF OF
        DAMAGES CLASS MEMBERS THAT PURCHASED FIRE
        APPARATUS IN MONTANA) ............................................................................. 73

NEBRASKA JUNKIN ACT (ON BEHALF OF DAMAGES CLASS MEMBERS
        THAT PURCHASED FIRE APPARATUS IN NEBRASKA) ...................................... 74

NEBRASKA CONSUMER PROTECTION ACT (ON BEHALF OF DAMAGES
        CLASS MEMBERS THAT PURCHASED FIRE TRUCKS IN
        NEBRASKA) ...................................................................................................... 74

NEVADA UNFAIR TRADE PRACTICES ACT (ON BEHALF OF DAMAGES
        CLASS MEMBERS THAT PURCHASED FIRE APPARATUS IN
        NEVADA) ........................................................................................................... 75

NEVADA DECEPTIVE TRADE PRACTICES ACT (ON BEHALF OF
        DAMAGES CLASS MEMBERS THAT PURCHASED FIRE
        APPARATUS IN NEVADA) ................................................................................ 75

NEW HAMPSHIRE ANTITRUST LAW (ON BEHALF OF DAMAGES CLASS
        MEMBERS THAT PURCHASED FIRE APPARATUS IN NEW
        HAMPSHIRE) .................................................................................................... 76

NEW HAMPSHIRE CONSUMER PROTECTION ACT (ON BEHALF OF
        DAMAGES CLASS MEMBERS THAT PURCHASED FIRE
        APPARATUS IN NEW HAMPSHIRE) ................................................................. 77

NEW JERSEY ANTITRUST ACT (ON BEHALF OF DAMAGES CLASS
        MEMBERS THAT PURCHASED FIRE APPARATUS IN NEW
        JERSEY) ............................................................................................................ 77

NEW MEXICO ANTITRUST ACT (ON BEHALF OF DAMAGES CLASS MEMBERS THAT PURCHASED FIRE APPARATUS IN NEW MEXICO) ............................................................................................... 78

NEW MEXICO UNFAIR TRADE PRACTICES ACT (ON BEHALF OF DAMAGES CLASS MEMBERS THAT PURCHASED FIRE APPARATUS IN NEW MEXICO) .............................................................. 78

NEW YORK DONNELLY ACT (ON BEHALF OF DAMAGES CLASS MEMBERS THAT PURCHASED FIRE APPARATUS IN NEW YORK) .................. 79

NEW YORK DECEPTIVE PRACTICES ACT (ON BEHALF OF DAMAGES CLASS MEMBERS THAT PURCHASED FIRE APPARATUS IN NEW YORK) ..................................................................................... 79

NORTH CAROLINA ANTITRUST LAW (ON BEHALF OF DAMAGES CLASS MEMBERS THAT PURCHASED FIRE APPARATUS IN NORTH CAROLINA) ............................................................................ 80

NORTH DAKOTA UNIFORM STATE ANTITRUST ACT (ON BEHALF OF DAMAGES CLASS MEMBERS THAT PURCHASED FIRE APPARATUS IN NORTH DAKOTA) .......................................................... 80

NORTH DAKOTA UNFAIR TRADE PRACTICES ACT (ON BEHALF OF DAMAGES CLASS MEMBERS THAT PURCHASED FIRE APPARATUS IN NORTH DAKOTA) .......................................................... 81

OREGON ANTITRUST LAW (ON BEHALF OF DAMAGES CLASS MEMBERS THAT PURCHASED FIRE APPARATUS IN OREGON) ........................ 82

OREGON UNLAWFUL TRADE PRACTICES ACT (ON BEHALF OF DAMAGES CLASS MEMBERS THAT PURCHASED FIRE APPARATUS IN OREGON) ................................................................................. 82

RHODE ISLAND ANTITRUST ACT (ON BEHALF OF DAMAGES CLASS MEMBERS WHO PURCHASED FIRE APPARATUS IN RHODE ISLAND) ................................................................................. 83

SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT (ON BEHALF OF DAMAGES CLASS MEMBERS WHO PURCHASED FIRE APPARATUS IN SOUTH CAROLINA) .................................................... 83

SOUTH DAKOTA ANTITRUST LAW (ON BEHALF OF DAMAGES CLASS MEMBERS THAT PURCHASED FIRE APPARATUS IN SOUTH DAKOTA) ................................................................................. 84

SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER
 PROTECTION ACT (ON BEHALF OF DAMAGES CLASS MEMBERS
 THAT PURCHASED FIRE APPARATUS IN SOUTH DAKOTA) ............................ 84

TENNESSEE TRADE PRACTICE ACT (ON BEHALF OF DAMAGES CLASS
 MEMBERS THAT PURCHASED FIRE APPARATUS IN TENNESSEE) .................. 85

UTAH ANTITRUST ACT (ON BEHALF OF DAMAGES CLASS MEMBERS
 THAT PURCHASED FIRE APPARATUS IN UTAH) ................................................. 86

VERMONT CONSUMER FRAUD ACT (ON BEHALF OF DAMAGES CLASS
 MEMBERS THAT PURCHASED FIRE APPARATUS IN VERMONT) .................... 86

WEST VIRGINIA ANTITRUST ACT (ON BEHALF OF DAMAGES CLASS
 MEMBERS THAT PURCHASED FIRE APPARATUS IN WEST
 VIRGINIA) ................................................................................................................. 87

WISCONSIN ANTITRUST ACT (ON BEHALF OF DAMAGES CLASS
 MEMBERS THAT PURCHASED FIRE APPARATUS IN WISCONSIN) .................. 87

 FOURTH CLAIM FOR RELIEF Unjust Enrichment
 (Against all Defendants) All States, District of Columbia
 and U.S. Territories ............................................................................. 88

DEMAND FOR JUDGMENT ................................................................................................. 91

JURY DEMAND ..................................................................................................................... 91

## I.    INTRODUCTION

1.    This case is about our nation's first responders and the people they protect. It's about the clash between the drive for corporate profits, led by firms that prioritize the bottom line above public safety, and the importance of the competitive process to American consumers. It is about an "unacceptable situation" in the market for Fire Apparatus[1] equipment that "is having a serious

---

[1] The terms "Fire Apparatus" and "Fire Trucks" are used interchangeably throughout this Complaint to refer to vehicles specifically designed, manufactured, and used for fire suppression, rescue, and fire prevention activities. Fire apparatus encompass various types of vehicles – such as pumpers, aerials, and rescue units – each serving different operational functions. While colloquial usage varies, the industry also employs a standardized classification system, detailed below, that categorizes vehicles based on their intended design and use. In addition, there are specialized and custom fire apparatus that may not fit within the standard classifications.

negative impact on the health, safety, welfare, and security of our firefighters, on our community, and on most communities in America."[2] It's about an "epic fire apparatus crisis."[3]

2.      Over the past decade, Defendants have embarked on a quest to acquire and consolidate independent makers of Fire Apparatus and collude to reduce competition. Defendant REV Group, Inc. ("REV Group") led the charge. While owned and operated by a New York private equity firm, it rolled up several significant independents and, in the process, obtained a monopoly in the market for custom Fire Apparatus cab chassis, the single largest cost component in the production of Fire Apparatus.[4] REV Group's owners deployed a business strategy to restrict supply to promote long wait times, known as "backlogs," for the delivery of Fire Apparatus. These delays, which stretched from a year when the conduct began to more than four years as of last year, allowed REV Group to artificially increase prices and prop up REV Group's stock price at the expense of municipalities like the Unified Government of Wyandotte County and Kansas City, Kansas ("Plaintiff") which need safe and reliable Fire Apparatus.

3.      When hauled before a Congressional Committee in September to answer for its role in the crisis, REV Group admitted that backlogs were "bad." But before Congress stepped in to shine a spotlight on this egregious conduct, REV Group consistently gloated about the benefits of its extensive backlog. In 2018, REV Group's CEO Tim Sullivan told investors: "We like backlog,

---

[2] Testimony for the Record Prepared by Dennis L. Rubin, Fire Chief Kansas City Kansas Fire Department before the Homeland Security and Governmental Affairs Committee, Wednesday, Sept. 10, 2025, "Sounding the Alarm: America's Fire Apparatus Crisis", https://www.hsgac.senate.gov/wp-content/uploads/Rubin-Testimony.pdf ("Rubin Testimony").

[3] Rubin Testimony at 2.

[4] *See, e.g.*, REV Group, Inc., Vehicles for Life, Jefferies Industrial Conference, SEEKING ALPHA (Aug. 9, 2017), https://seekingalpha.com/article/4097458-rev-group-revg-presents-at-jefferies-13th-annual-industrials-conference-slideshow (last visited Jan. 26, 2026) (pie chart showing chassis as at least 25% of the cost of a Fire Apparatus).

*we love backlog*."[5]  And a few years later, when demand started growing and REV Group's backlogs started lengthening, REV Group actually shut down one-third of its capacity.

4.      Today, there are just three dominant manufacturers of Fire Apparatus: REV Group; Defendant Oshkosh Corporation ("Oshkosh") and its subsidiary Pierce Manufacturing, Inc. ("Pierce"); and Defendant Rosenbauer America, LLC ("Rosenbauer"). During the past decade these three Defendants have worked together to maintain backlogs, share proprietary data, and grow their market shares only at the expense of independent producers, not each other. As a result, today these manufacturers control between 70 and 80 percent of the Fire Apparatus market in the United States, and they continue to entrench their dominance through exclusionary conduct.

5.      Defendants coordinate their sales activity directly, and indirectly through a trade group known as the Fire Apparatus Manufacturers' Association ("FAMA"). FAMA collects data from Defendants and other Fire Apparatus producers regarding their sales and orders and redistributes that data exclusively to the contributing members. FAMA will not make that data available to municipalities or other purchasers. FAMA also hosts regular meetings where Defendants meet in person to exchange and discuss confidential information. And Defendants have publicly signaled both their pricing intentions and understanding that they will (a) pursue the same pricing strategies and (b) not ramp up production to reduce backlogs or take market share from each other.

6.      Defendants also have unilaterally imposed "floating" price clauses that allow them to increase prices from the date of order to account for increased costs incurred during the extended

---

[5] REV Group, Inc. Q2 2018 Earnings Call Transcript, SEEKING ALPHA (June 7, 2018), https://seekingalpha.com/article/4180201-rev-group-revg-ceo-tim-sullivan-on-q2-2018-results-earnings-call-transcript (last visited Jan. 26, 2026) (emphasis added).

wait time for new Fire Apparatus.[6] For Defendants, this is a financial win-win. As REV Group's then CEO, Tim Sullivan, stated in 2017, "my entire career has always been about making money" and "[y]ou should know that at REV, it's all about making money."[7]

7.      The consequences of Defendants' actions have been as severe as they were predictable. Fire Apparatus prices have skyrocketed. Delays for new equipment and parts have grown and grown. These backlogs force fire departments to rely on aging vehicles that are prone to more frequent and more serious breakdowns requiring costly repairs, and then Defendants fail to provide parts in a timely manner.

8.      Like every other municipality in the nation, Plaintiff has felt the effects of Defendants' conduct. For example, in the summer of 2023, its fire department was without five of its fifteen pumper trucks that were in need of significant repairs and was stuck with extended delays in obtaining repair parts. Other municipalities have had similar experiences. When wildfires raged through Los Angeles in January 2025, dozens of the Los Angeles Fire Department's ("LAFD") Fire Apparatus sat idle and out of service due to age and a lack of repair parts. LAFD firefighters reported for work only to be told "We didn't have a spot for them," according to LAFD firefighter Chuong Ho.[8]

9.      For Plaintiff and everyone else, the backlogs and price increases amount to a problem that not only hurts taxpayers but literally imperils their lives. This would be a problem in

---

[6] Letter from Kansas State Rep. Lynn Melton to U.S. Sen. Josh Hawley, dated September 4, 2025; Letter from Chad A. Russell, President, Kansas State Ass'n of Fire Chiefs to the Honorable Members of the Kansas Congressional Delegation, dated July 29, 2025, https://www.hsgac.senate.gov/wp-content/uploads/Rubin-Testimony.pdf.

[7] REV Group, Inc. Q4 2017 Earnings Call Transcript, SEEKING ALPHA (Dec. 20, 2017), https://seekingalpha.com/article/4133124-revs-revg-ceo-tim-sullivan-on-q4-2017-results-earnings-call-transcript (last visited Jan. 26, 2026).

[8] Mike Baker, Maureen Farrell and Serge F. Kovaleski, *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. Times, Feb. 17, 2025, https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html (last visited Jan. 26, 2026) ("Baker, Farrell & Kovaleski").

any market, but it is especially burdensome on municipalities dealing with taxpayer dollars and capital improvement budgets that are often locked in years in advance. Municipalities and governments have no practical choice but to pay these extortionate surcharges. As Edward Kelly, general president of the International Association of Firefighters ("IAFF"), stated succinctly, "At the end of the day, absent competition, monopoly capitalism is a shakedown."[9]

10.     Plaintiff brings this action to remedy that shakedown. It seeks damages that will transfer ill-gotten gains from Defendants back to the counties and municipalities from which Defendants took those desperately needed funds and will deter Defendants from engaging in any further misconduct. And Plaintiff seeks injunctive relief that will restore free and fair competition to the nation's Fire Apparatus market.

## II.     PARTIES

### A.     Plaintiff

11.     Plaintiff the Unified Government of Wyandotte County and Kansas City, Kansas ("Unified Government" or "Plaintiff") is a consolidated city and county government located on the eastern border of the State of Kansas. Wyandotte County is home to the cities of Kansas City, Bonner Springs, and Edwardsville. Kansas City is the third largest city in Kansas with approximately 153,345 residents.

12.     The Kansas City Kansas Fire Department ("KCKFD") is the fire protection arm of the Unified Government. It has 80 vehicles in its fleet and operates 18 fire stations. The KCKFD serves as the primary protector of approximately 128 square miles of response area, providing emergency services to the citizens of Kansas City, Kansas, as well as multifuel tank farms, manufacturing plants, and other high-risk facilities. The KCKFD is designed to be an all-hazards

---

[9] Baker, Farrell & Kovaleski, *supra* note 8.

fire department capable of handling nearly every type of emergency — medical, fire, rescue, or hazardous materials incident. The KCKFD responded to approximately 37,000 incidents in 2025, or just over 100 incidents every day, and has an ever-increasing workload of about 4% each year.

13.    The Unified Government has purchased multiple Fire Apparatus from Defendants during the relevant period. For example, in January 2022, the Unified Government purchased a Pierce Pumper from Pierce authorized dealer Conrad Fire Equipment for a base price of $530,667 and a final purchase price of $702,694. That vehicle was finally delivered to the KCKFD in February 2024 after a 25-month wait. And in February 2023, the Unified Government purchased a Pierce Pumper from Pierce authorized dealer Conrad Fire Equipment for a base price of $671,796 and a final purchase price of $857,500. That vehicle was delivered in July 2025 after a 29-month wait.

14.    Because of Defendants' conduct, Plaintiff has experienced lengthy wait times and paid artificially-inflated prices for Fire Apparatus. Plaintiff has suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

B.    Defendants

15.    Defendants are the corporate entities that make up the three largest Fire Apparatus manufacturers in the United States.

16.    REV Group is a Delaware corporation with its principal place of business in Brookfield, Wisconsin.[10] REV Group designs, manufactures, and distributes specialty vehicles, including Fire Apparatus, throughout the United States. REV Group's wholly owned companies are leading designers and manufacturers of specialty vehicles and related aftermarket parts and

---

[10] REV GROUP, INC. SEC FORM 10K (Oct. 31, 2023), https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/rev-annual-report-2023.pdf.

6

services, which serve a diversified customer base, primarily in the United States, through two segments: Specialty Vehicles and Recreational Vehicles.[11] The Specialty Vehicles segment provides customized vehicle solutions to meet essential needs for public services, including Fire Apparatus.[12] REV Group's Fire Apparatus brands include: E-ONE, Ferrara, KME, and Spartan Emergency Response (which owns brands Smeal, Spartan Fire Chassis and Ladder Tower) (collectively, the "REV Fire Group.").[13] Each of these brands operated independently before REV Group acquired them.

17.    REV Group currently is the largest manufacturer of Fire Apparatus in the United States. It controls approximately 36.5 percent of the national Fire Apparatus market, or $1.24 billion out of total Fire Apparatus sales of $3.4 billion in 2025.[14]

18.    Oshkosh is a Wisconsin corporation with its principal place of business in Oshkosh, Wisconsin. Oshkosh is a global industrial technology company focused on innovating purpose-built vehicles and equipment. It has a "portfolio of leading brands connected under one unified business."[15] Oshkosh owns and operates Wisconsin-based Pierce, through which Oshkosh operates its Fire Apparatus business.

19.    Pierce is a Wisconsin corporation with its principal place of business in Appleton, Wisconsin. It describes itself as "the leading North American manufacturer of custom Fire Apparatus."[16] Pierce primarily serves domestic municipal customers, but also sells Fire Apparatus

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] Oliwier Samorajski, *Fire Truck Manufacturing in the US – Market Research Report (2015-2030)*, IBISWORLD.COM (Apr. 2025), https://www.ibisworld.com/united-states/industry/fire-truck-manufacturing/5645/ (last visited Jan. 26, 2026).

[15] *Our story*, OSHKOSHCORP.COM, http://oshkoshcorp.com/story (last visited Jan. 28, 2026).

[16] *Id.*

to the Department of Defense, airports, universities, and large industrial companies, as well as in international markets. Pierce distributes its products through both a corporate sales force for factory-direct sales and a network of dealerships nationwide.

20.    Pierce is currently the second largest Fire Apparatus manufacturer in the United States. It controls approximately 25 percent of the national Fire Apparatus market, or just under $897 million out of total Fire Apparatus sales of $3.4 billion in 2025.[17]

21.    Defendant Rosenbauer America, LLC ("Rosenbauer America") is a Delaware limited liability company with its principal place of business in Lyons, South Dakota. It is the holding company for its North American business and operational subsidiaries, Defendants Rosenbauer South Dakota, LLC and Rosenbauer Minnesota, LLC.

22.    Rosenbauer South Dakota, LLC ("Rosenbauer SD") is a Delaware limited liability company with its principal place of business in Lyons, South Dakota. It is a wholly owned subsidiary of Rosenbauer America. Rosenbauer SD manufacturers Fire Apparatus for sale in the United States including aerials, pumpers, pumpers-tankers/tenders, and special service vehicles.

23.    Rosenbauer Minnesota, LLC ("Rosenbauer MN") is a Delaware limited liability company with its principal place of business in Wyoming, Minnesota. It is a wholly owned subsidiary of Rosenbauer America. Rosenbauer MN manufactures Fire Apparatus for sale in the United States including wildland and brush apparatus, aerials, pumpers, pumpers-tankers/tenders, ARFF vehicles, special service vehicles, and electric/alternative fuel apparatus.

---

[17] Oliwier Samorajski, *Fire Truck Manufacturing in the US – Market Research Report (2015-2030)*, IBISWORLD.COM (Apr. 2025), https://www.ibisworld.com/united-states/industry/fire-truck-manufacturing/5645/ (last visited Jan. 26, 2026).

24.    Defendants Rosenbauer America, Rosenbauer SD, and Rosenbauer MN are collectively referred to as "Rosenbauer." Rosenbauer distributes its products through both a corporate sales force for factory direct sales and a network of dealerships nationwide.

25.    Rosenbauer is currently the third largest Fire Apparatus manufacturer in the United States. It controls approximately 10 percent of the national Fire Apparatus market.

C.    Agents and Co-Conspirators

26.    The term "Defendants" as used in this Complaint refers to and encompasses each Defendant and its successors, parent companies, subsidiaries, affiliates, employees, agents, officers, and directors.

27.    The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

28.    Various persons and/or firms not named as Defendants participated as co-conspirators in the violations alleged, and performed acts and made statements in furtherance of the conspiracy. Plaintiffs reserve the right to name some or all of these persons as defendants at a later date.

III.    **JURISDICTION AND VENUE**

29.    Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, equitable relief, costs of suit, and reasonable attorneys' fees for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; Section 7 of the Clayton Act, 15 U.S.C. § 18; and the antitrust and consumer protection laws of the various states as set forth below. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Section 16 of the Clayton Act, 15 U.S.C. § 26. This Court also has original jurisdiction pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000,

9

exclusive of interests and costs, and in which some members of the proposed Class are citizens of a state different from some Defendants.

30.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as the state law claims are so related as to form part of the same case or controversy. Such supplemental or pendant jurisdiction will also avoid unnecessary duplication and multiplicity of actions and should be exercised in the interests of judicial economy, convenience, and fairness.

31.     This Court has personal jurisdiction over each Defendant under Section 12 of the Clayton Act, 15 U.S.C. § 22, because each Defendant (a) transacted business throughout the United States, including in this district; and/or (b) sold, manufactured, shipped and/or delivered Fire Apparatus throughout the United States, including in this District; and/or (c) has substantial contacts with the United States, including in this District.

32.     The Court also has personal jurisdiction over each of the Defendants because they purposefully directed their business activity toward, and had substantial contacts with, this jurisdiction. Defendants purposefully placed Fire Apparatus into the stream of commerce throughout the United States, including in this District. Defendants purposefully availed themselves of this state's laws and protections. Plaintiff's claims for relief arise from and relate to illegal acts committed by Defendants within this jurisdiction because, within this jurisdiction, Plaintiff and other members of the class they purport to represent paid unlawfully inflated prices for Fire Apparatus and suffered antitrust injury as a result. The Court also has jurisdiction based on Defendants' minimum contacts with the United States as a whole.

33.     Venue is appropriate within this district under Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. §§ 1391(b), (c), and (d). Defendants transact business

within this district, have agents and can be found in this district, and the relevant interstate trade and commerce is carried out, in substantial part, in this district. Defendants' conduct has been directed at, and has had the intended effect of, causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

## IV.    BACKGROUND

A.    The Fire Apparatus Manufacturing Industry Before Defendants' Unlawful Conduct: A Small Business Industry Dedicated to Serving the Public's Needs

34.    The modern Fire Apparatus manufacturing industry boomed in the 1950s and 1960s. Small and midsized Fire Apparatus manufacturers — typically private, family-owned operations — blossomed in every region of the country. The industry was soon diversified across dozens of firms and competition flourished. Fire departments throughout the United States, from large city agencies to volunteer brigades in rural communities, were able to turn to a variety of local and regional manufacturers for their Fire Apparatus needs, and obtain units tailored to the specific needs of their communities at prices they could afford.

35.    Free and fair competition among these small and midsized Fire Apparatus manufacturers ensured that industry capacity kept up with steady demand. Indeed, with so many Fire Apparatus manufacturers competing for orders to keep their plants utilized, fire departments could even mix-and-match the major components of a Fire Apparatus — such as the cab (the area where firefighters sit), the chassis (the basic operating motor vehicle), and the body (the rear compartment that holds the firefighting equipment) — from different manufacturers to obtain the best features at the lowest price. Each of these components was typically custom-built for each fire department, and their manufacturers had to coordinate with each other to integrate them into the finished apparatus. Nevertheless, by the 2000s, these companies sold 5,000-6,000 new Fire

Apparatus in the United States every year and generally delivered them within 7-12 months.[18] Today, annual demand is in the same range.

36. In contrast to recent years, however, competitive conditions back then kept costs stable. Manufacturers priced their products to attract sales. Margins were in the single digits (3%-4%).[19] Annual price increases for new Fire Apparatus were reported to be around 3%.[20]

37. Then, a private equity firm took an interest in the Fire Apparatus industry.

B. Through Serial Acquisitions, REV Group and Pierce Consolidate the Fire Apparatus Marketplace

### 1. Private equity enters the market and forms REV Group

38. In 2008, a midsize private-equity firm named American Industrial Partners ("AIP") acquired Florida-based E-ONE, Inc., the third largest Fire Apparatus maker in the country after Pierce and Rosenbauer, with sales of 600 Fire Apparatus per year.[21]

39. As a general matter, a private equity firm is an investment company that pools "a little bit of its own money, a little bit of investors' money, and a whole lot of borrowed money to buy companies," and then "tries to impose operational or financial changes with the ambition of

---

[18] Paul C. Darley, *The Fire Apparatus Market Is Coming Back . . . Just Look at the Data*, FAMA.ORG (Dec. 4, 2015), https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data/ (last visited Jan. 26, 2026).

[19] Testimony for the Record Prepared by Mike Virnig at 5 n.6, President, REV Specialty Vehicles Group before the Homeland Security and Governmental Affairs Committee, Wednesday, Sept. 10, 2025, "Sounding the Alarm: America's Fire Apparatus Crisis", https://www.hsgac.senate.gov/wp-content/uploads/Virnig-Testimony.pdf ("Virnig Testimony").

[20] Tom Shand & Michael Wilbur, *The Apparatus Architect: The Apparatus Industry: A Year in Review*, FIREHOUSE.COM (Mar. 6, 2023), https://www.firehouse.com/apparatus/article/21293905/the-firefighting-apparatus-industry-a-year-in-review (last visited Jan. 26, 2026).

[21] *E-ONE and ALF and Business-Speak*, FIREAPPARATUSMAGAZINE.COM (Aug. 1, 2008), https://www.fireapparatusmagazine.com/fire-apparatus/e-one-and-alf-and-business-speak/ (last visited Jan. 26, 2026); *see also* Baker, Farrell & Kovaleski, *supra* note 8.

selling [the companies] for a profit a few years later."[22] While industry spokespeople often claim that private equity firms seek to make the companies they buy "more efficient," according to the Justice Department Antitrust Division's former Special Counsel on Private Equity Brendan Ballou, the industry has actually "metastasized into a job-killing, business-destroying, community-crushing machine the likes of which we haven't seen since the money trusts of the nineteenth century."[23] And while some "liken private equity firms to vultures picking the bones of dying companies," Mr. Ballou's book, *Plunder: Private Equity's Plan to Pillage America*, shows that "many private equity firms now target healthy companies" with leveraged buyouts and then extract value from them through exorbitant management fees and dividend distributions — "leaving them gutted, unproductive, or even bankrupt."[24]

40.     New York-based AIP was founded in 1989. It made "equity investments in mid-sized industrial companies" to apply "the firm's systematic approach to implementing strategic and operational improvements."[25]

---

[22] Lynn Parramore, *Private Equity is Out of Control and Looting America. This Prosecutor Says We Can Fix It.*, INSTITUTE FOR NEW ECONOMIC THINKING (May 2, 2023), https://www.ineteconomics.org/perspectives/blog/private-equity-is-out-of-control-and-looting-america-this-prosecutor-says-we-can-fix-it (last visited Jan. 28, 2026).

[23] *Id.*

[24] *Id.*; *see also* Alex Blasdel, *Slash and burn: is private equity out of control?*, THE GUARDIAN (Oct. 10, 2024), https://www.theguardian.com/business/2024/oct/10/slash-and-burn-is-private-equity-out-of-control (last visited Jan. 28, 2026):

> Whether acquiring a bakery that makes chocolate chip cookies or the nursing home where your grandmother is living out her days, private equity relies on the same basic business model: the leveraged buyout. These transactions — which account for roughly three out of every four dollars of all private equity deals — are frequently compared to house flipping: you buy a business using a ton of debt, or leverage, the way you buy a house with a mortgage; then you try to sell it for a tidy profit after you replace the carpets (or, better still, the market goes up). Unlike buying a house, however, the debt isn't the responsibility of the buyer; it sits on the balance sheet of the acquired company. As strange as it sounds, it's sort of like the company is forced to take out a loan to buy itself.

[25] *American Industrial Partners Completes Acquisition of Fleetwood Motorized Recreational Vehicles Business, Including the Goldshield Fiberglas Supply Business*, AMERICANINDUSTRIAL.COM (JUL. 17, 2009), https://americanindustrial.com/american-industrial-partners-completes-acquisition-of-fleetwood-motorized-recreational-vehicles-business-including-the-goldshield-fiberglas-supply-business/ (last visited Jan. 26, 2026).

41.    At the time of its E-ONE acquisition, AIP had formed American Industrial Partners Capital Fund IV, LP ("Fund IV"), a fund backed by more than $405 million in committed capital, to roll up manufacturers in the specialty vehicle sector. In August 2010, Fund IV formed Allied Specialty Vehicles, Inc. ("ASV"), as a "market leader" in three segments: Fire & Emergency, Recreational Vehicles, and Bus & Industrial.[26] ASV combined four AIP portfolio companies, including E-ONE.[27] ASV changed its name to REV Group in November 2015.

42.    In January 2017, AIP took REV Group public. Afterward, AIP maintained control over all REV Group operating decisions and who would serve on REV Group's board. Over the next six years, AIP would use this control to extract approximately $340 million in stock buybacks and dividends for the benefit of itself and other shareholders. As the country's Fire Apparatus crisis deepened from 2020 to 2024, REV Group's stock price tripled. In late 2024, AIP finally sold most of its shares in REV Group after directing the company to issue a special dividend of $180 million, nearly $80 million of which went directly to AIP and its investors.[28]

### 2.    REV Group embarks on a campaign of serial acquisitions

43.    From 2016 through 2020, REV Group acquired three significant companies in the Fire Apparatus market, all at prices below the threshold levels established by the Hart-Scott Rodino ("HSR") Act for mandatory merger review by the Department of Justice and Federal Trade Commission. In the private equity context, this is known as the "stealth merger" approach to a "roll

---

[26] *American Industrial Partners Announces the Formation of Allied Specialty Vehicles, Inc., a Leading Manufacturer of Specialty Vehicles in North America*, AMERICANINDUSTRIAL.COM (Aug. 24, 2010), https://americanindustrial.com/american-industrial-partners-announces-the-formation-of-allied-specialty-vehicles-inc-a-leading-manufacturer-of-specialty-vehicles-in-north-america/ (last visited Jan. 26, 2026).

[27] *Id.*

[28] Iain Hoey, *REV Group announces strategic reorganization and special cash dividend*, FIRE & SAFETY J. (Jan. 30, 2024), https://fireandsafetyjournalamericas.com/rev-group-announces-strategic-reorganization-and-special-cash-dividend/ (last visited Jan. 26, 2026).

up" exit strategy.[29] Under this strategy, a private equity firm acquires many small horizontal competitors below the HSR threshold to evade antitrust scrutiny, rapidly abuses the resulting market power to raise prices, lower quality, depress labor costs, or create other harms, and then sells its stake in the consolidated firm at multiples of its initial value.[30]

44.    In April 2016, REV Group acquired Kovatch Mobile Equipment Corporation ("KME"), a company founded in 1946 with significant operations in Pennsylvania, Virginia, New York, and California.[31] KME had an "extensive independent dealer network" and produced a broad array of Fire Apparatus, including pumpers, aerials, and tankers.[32] REV Group reportedly paid just under $40 million for KME.[33] In REV Group's acquisition announcement, it promised that KME's primary manufacturing operations would remain in Nesquehoning, PA, and that the other KME facilities in Roanoke, VA, Ontario, CA, Albany, NY, and Rockaway, NJ, would "continue to be an integral part of REV Group's operations."[34]

45.    In April 2017, REV Group acquired Ferrara Fire Apparatus, a "leading custom Fire Apparatus and rescue vehicle manufacturer that engineers and manufactures vehicles for municipal

---

[29] See Federal Trade Commission, Statement of Commissioner Rohit Chopra Regarding Private Equity Roll-Ups and the Hart-Scott-Rodino Annual Report to Congress, Commission File No. P110014 (July 8, 2020), https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/statement-commissioner-rohit-chopra-regarding-private-equity-roll-ups-hart-scott-rodino-annual.

[30] See Leah Samuel & Kate M. Conlow, *Private Equity and Antitrust*, 22 Berkeley Bus. L. J. 136, 154-61 (2025).

[31] *KME Fire Apparatus Sold to REV Group*, FIREHOUSE.COM (Apr. 22, 2016), https://www.firehouse.com/apparatus/press-release/12193362/fire-apparatus-manufacturer-kme-kovtachpumpers-aerials-heavy-rescue-fire-apparatus-builder-kme-fire-apparatus-sold-to-revgroup (last visited Jan. 26, 2026).

[32] *Id*.

[33] *REV Group, Inc. completed the acquisition of Kovatch Mobile Equipment Corporation.*, MARKETSCREENER.COM (Apr. 21, 2016), https://www.marketscreener.com/quote/stock/REV-GROUP-INC-33385196/news/REV-Group-Inc-completed-the-acquisition-of-Kovatch-Mobile-Equipment-Corporation-38028519/ (last visited Jan. 26, 2026).

[34] *REV Group Acquires Kovatch Mobile Equipment*, INVESTORS.REVGROUP.COM (Apr. 11, 2016), https://investors.revgroup.com/investor-releases/2016/11-04-2016 (last visited Jan. 26, 2026).

and industrial customers."[35] REV Group reportedly paid $100 million in cash to acquire Ferrara, a company with more than 450 employees and a reported annual revenue of approximately $140 million.[36] Prior to the purchase, Ferrara had been E-ONE's direct competitor in, at least, the southern United States.[37]

46.     The Ferrara purchase solidified REV Group's dominance in the Fire Apparatus manufacturing industry. Dan Peters, President of the fire division within REV Group at the time, observed that "the addition of Ferrara to the REV Fire Group enable[d] a number of new growth opportunities including expansion of our reach nationwide and adding new geographical regions and key accounts."[38] Timothy Sullivan, then REV Group's CEO, confirmed that "Ferrara will immediately contribute strategic value by expanding the REV Fire Group's national footprint, dealer sales network, service and after-market parts revenue as well as enhancing our robust line of custom chassis and aerial products for multiple market segments."[39]

47.     In February 2020, REV Group acquired Spartan Emergency Response, a "leading designer, manufacturer and distributor of custom emergency response vehicles, cabs and chassis for the emergency response market, and its brands," for approximately $55 million in cash.[40] The

---

[35] *REV Group Acquires Ferrara Fire Apparatus, Inc*., INVESTORS.REVGROUP.COM (Apr. 25, 2017), https://investors.revgroup.com/investor-releases/2017/04-25-2017-182251523 (last visited Jan. 26, 2026).

[36] *Id*.

[37] Chris McLoone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fireapparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Jan. 26, 2026).

[38] *REV Group Acquires Ferrara Fire Apparatus, Inc*., FIREAPPARATUSMAGAZINE.COM (Apr. 25, 2017), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-ferrara-fire-appartus/ (last visited Jan. 26, 2026).

[39] *Id*.

[40] Chris McLoone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fireapparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Jan. 26, 2026); *Rev Group, Inc. Completes Acquisition of Spartan Emergency Response*, INVESTORS.REVGROUP.COM (Feb. 3, 2020), https://investors.revgroup.com/investor-releases/2020/02-03-2020-135942281 (last visited Jan. 26, 2026).

16

acquisition included all Spartan Emergency Response brands, Spartan Fire Apparatus and Chassis, Smeal Fire Apparatus, Ladder Tower (LCT) (which makes ladder truck components), and UST (collectively, "Spartan").[41] In statements to industry press, REV Group stated that the "newly combined business will further solidify F&E as a top-two North American fire apparatus manufacturer . . ."[42] Its statements to investors were more blunt. In a February 2020 presentation, REV Group executives told shareholders that acquiring Spartan would solidify its "leading position in North American Fire Apparatus."[43] Sullivan described Spartan as a "top North American fire apparatus manufacturer of scale with a well-recognized, innovative and broad product offering, long-standing relationships with dealers and municipal customers, and a growing installed base of over 6,000 vehicles."[44] In a presentation, REV Group wrote that the acquired entity operated "six production sites with well-invested operations and meaningful available capacity for continued growth opportunities."[45]

48.    Each of these acquisitions eliminated a substantial head-to-head competitor for REV Group, reducing the competitive restraints it faced and substantially increasing its control over the country's Fire Apparatus manufacturing base. Shortly after its acquisition of KME and Ferrara in

---

[41] *Rev Group, Inc. Completes Acquisition of Spartan Emergency Response*, INVESTORS.REVGROUP.COM (Feb. 3, 2020), https://investors.revgroup.com/investor-releases/2020/02-03-2020-135942281 (last visited Jan. 26, 2026).

[42] Chris McLoone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fireapparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Jan. 26, 2026); *Rev Group, Inc. Completes Acquisition of Spartan Emergency Response*, INVESTORS.REVGROUP.COM (Feb. 3, 2020), https://investors.revgroup.com/investor-releases/2020/02-03-2020-135942281 (last visited Jan. 26, 2026).

[43] *REV Group, Inc. Acquires Spartan Motors Emergency Response*, REV GROUP, INC. (Feb. 3, 2020), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/spartan-er-acquisition-final.pdf.

[44] Chris McLoone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fireapparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Jan. 26, 2026).

[45] *REV Group, Inc. Acquires Spartan Motors Emergency Response*, REV GROUP, INC. (Feb. 3, 2020), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/spartan-er-acquisition-final.pdf (last visited Jan. 26, 2026).

2017, REV Group reported that it was the second largest manufacturer of Fire Apparatus in North America and controlled an estimated 44% of combined fire and ambulance sales in North America.[46] Following its acquisition of Spartan in 2020, REV Group reported that it had become "the largest manufacturer of fire and emergency vehicles in the United States."[47] By 2021, REV Group was openly touting its role as "an industry consolidator" in investor presentations and bragging that centralizing control over the formerly competing manufacturers was enabling it to "drive margin improvement actions."[48]

49.    Indeed, REV Group told shareholders that it expected not only to *increase* the profit margins of its subsidiaries, but to *double* them within a few years. While REV Group was pursuing its serial acquisitions, Sullivan told analysts that, while the manufacturers REV Group acquired historically operated at 4-5 percent profit margins, REV Group expected to "get all of them above that 10 percent level."[49] Sullivan further explained: "You bring them into the fold, you got to give them the religion, and they've got it now."[50]

50.    As a result of its serial acquisitions, REV Group controls at least 36% of the national Fire Apparatus market by volume, according to independent researchers,[51] and "about 40% of the fire truck business," according to the President of REV Group's Specialty Vehicles Division Mike

---

[46] *2017 Annual Report*, REV GROUP at 4, https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/rev-annual-report-2017.pdf.

[47] *REV Group, Inc. Presentation*, REV GROUP at 5 (July 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf; *see also* REV GROUP, INC. SEC FORM 10-K (Oct. 31, 2020), https://annual-statements.com/company/rev-group-inc/annual-report-2020-form-10k-96077.

[48] *Investor & Analyst Day*, REV GROUP at 6, 35 (April 15, 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-investor-day-v18.pdf.

[49] Baker, Farrell & Kovaleski, *supra* note 8.

[50] *Id*.

[51] Oliwier Samorajski, *Fire Truck Manufacturing in the US – Market Research Report (2015-2030)*, IBISWORLD.COM (Apr. 2025), https://www.ibisworld.com/united-states/industry/fire-truck-manufacturing/5645/ (last visited Jan. 26, 2026).

Virnig in an April 2024 interview.[52] REV Group reported earnings of $1.24 billion in 2025 in the domestic Fire Apparatus market, with a profit margin in the mid-double-digits (14.3%).[53] REV Group's Adjusted EBITDA for its Specialty Vehicles division — the best measure of REV Group's "operating fundamentals," according to REV Group management's SEC reports[54] — has soared even more dramatically in recent years, increasing by $92.5 million (or 149.2%) from 2023 to 2024, and by an additional $89.7 million (or 65.5%) from 2024 to 2025. At the end of this past year, REV Group boasted in its annual report to shareholders that the total return on $100 invested in REV Group on October 31, 2020, had exceeded $800 — more than double the return delivered by peer specialty vehicle manufacturers.[55] The reason is obvious: as every stock analyst knows, monopolists attract investors and improve share prices.[56]

### 3. Oshkosh and Pierce Follow REV Group's Lead and Make Their Own Acquisitions

51.     Following REV Group's lead, in 2021 Pierce began making its own acquisitions. In September 2021, Oshkosh, through Pierce, acquired a 25% ownership interest in BME Fire Trucks LLC ("Boise Mobile" or "BME"). This gave Pierce access to BME's product portfolio of wildland

---

[52] *The Future of Firetrucks*, YOUTUBE.COM (Apr. 15, 2024), https://www.youtube.com/watch?v=GPcacmetIX4&t=1s (last visited Jan. 26, 2026).

[53] Oliwier Samorajski, *Fire Truck Manufacturing in the US – Market Research Report (2015-2030)*, IBISWORLD.COM (Apr. 2025), https://www.ibisworld.com/united-states/industry/fire-truck-manufacturing/5645/ (last visited Jan. 26, 2026).

[54] REV GROUP, INC. SEC FORM 10-K (Oct. 31, 2025), https://otp.tools.investis.com/clients/us/rev_group/SEC/sec-show.aspx?FilingId=18986732&Cik=0001687221&Type=PDF&hasPdf=1.

[55] *Id.*

[56] *See, e.g.*, *The Power of One: Investing in Monopoly Stocks*, THEMESETFS (June 20, 2025), https://themesetfs.com/insights/the-power-of-one-investing-in-monopoly-stocks (last visited Jan. 26, 2026); *REV Group's Specialty Vehicle Strength Fuels Margin Growth*, SEEKING ALPHA (Aug. 12, 2024), https://seekingalpha.com/article/4713675-rev-group-speciality-vehicle-strength-fuels-margin-growth (last visited Jan. 26, 2026) (noting that REV Group's "Specialty Vehicles segment offers an attractive business for a number of reasons. Firstly, these brands tend to command local monopolies in their respective market . . ." and "REV Group has benefited from reduced competition, allowing greater control over pricing, and improved pricing power").

firefighting equipment and expanded its reach into the West Coast and Mountain West regions.[57] BME's product portfolio included Fire Apparatus like the Model 34, Tactical Tender, and Type 6 Xtreme.[58] This acquisition allowed Pierce to eliminate BME's innovative factory-direct distribution model and transition BME to a traditional dealer-based distribution network under Pierce's control, curbing BME's independence as a rival to Pierce and reducing Pierce's incentive to compete aggressively in the niche submarket for wildland Fire Apparatus.

52.    In June 2022, Oshkosh acquired Maxi-Métal, a Canadian Fire Apparatus manufacturer and leading designer of custom Fire Apparatus that until then had sold into the United States through a strategic partnership with Pierce.[59] Maxi-Métal was one of the top three largest Fire Apparatus manufacturers in Canada. It already had an established relationship with Pierce enabling it to sell into the United States. Growing backlogs in the U.S. market offered a lucrative opportunity for Maxi-Métal (which could produce its own specialty cab chassis). By acquiring this potential market entrant, Pierce eliminated the risk that Maxi-Métal would inject more competition into the U.S. market for Fire Apparatus. In its press releasing announcing the acquisition, Oshkosh stated that it expected to grow Maxi-Métal in Canada going forward, not the United States, despite the growing backlogs in the U.S. market.

53.    These acquisitions substantially lessened competition in the market for Fire Apparatus and the niche market for wildland-capable Fire Apparatus. They allowed Pierce to enter

---

[57] *Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment*, INVESTORS.OSHKOSHCORP.COM (Sept. 16, 2021), https://www.investors.oshkoshcorp.com/news/piercemanufacturing-completes-ownership-interest-in-boise-mobile-equipment/16c54803-9007-4e9e-82f2-e6253396d4e0/ (last visited Jan. 26, 2026).

[58] *Id*.; *see also Pierce Completes Ownership Interest in BME*, FIREHOUSE.COM (Sept. 16, 2021), https://www.firehouse.com/apparatus/press-release/21238596/pierce-manufacturing-custom-fire-truckbuilder-pumpers-ladders-quints-rescues-puc-enforcer-pierce-completes-ownership-interest-in-bme (last visited Jan. 26, 2026).

[59] *Oshkosh Corporation Acquires Maxi-Métal, Inc*., INVESTORS.OSHKOSHCORP.COM (Jun. 13, 2022), https://www.investors.oshkoshcorp.com/news/oshkosh-corporation-acquires-maxi-metal-inc/c5afbb77-38ec-4497-a391-f4f56b88d127/ (last visited Jan. 26, 2026).

and expand into these concentrated markets by merger when it was objectively capable of entering and expanding into them through internal growth, eliminating potential competition that would have resulted in greater investment in new Fire Apparatus production capacity in a time of shortage and, ultimately, lower Fire Apparatus prices. In the case of Maxi-Métal, Pierce's acquisition also eliminated an actual and perceived potential entrant into the domestic Fire Apparatus market.

54. Right now, firefighters across the West are enduring severe equipment shortages while battling more frequent, more intense, and larger wildland fires than ever before. Internal expansion into the wildland Fire Apparatus submarket by Pierce would have expanded production capacity for the specialized Fire Apparatus they need and lowered their cost. As wildfires continue to burn millions of acres across the country, these procompetitive benefits to firefighters going into brutal conditions to protect life and property would have certainly been far more than *de minimis*. Instead, Pierce chose to take over what likely would have been its biggest competitor for wildland Fire Apparatus sales — eliminating potential competition that would have eased the burdens faced by wildland firefighters and that the antitrust laws were designed to nurture and protect.

C. As Part of its Serial Acquisitions, REV Group Acquired a Monopoly in the Market for Specialty Cab Chassis That Substantially Lessened Competition in the Downstream Market for Fire Apparatus

55. After closing its acquisition of Spartan in 2020, REV Group announced that one the benefits of the transaction was that it enabled REV Group to "[e]xpan[d] into the core vertical of fire apparatus chassis and cabs."[60]

56. A Fire Apparatus unit consists of three major components: (a) the chassis; (b) the cab; and (c) the body. The chassis is the structure on which the rest of the Fire Apparatus

---

[60] *REV Group, Inc. Acquires Spartan Motors Emergency Response*, REV GROUP, INC. (Feb. 3, 2020), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/spartan-er-acquisition-final.pdf.

21

components are mounted. It consists of the frame, the engine, the transmission system, the steering system, the braking system, and other structural and mechanical parts essential to operating the vehicle. The cab is the front cabin where firefighters sit and from which the driver controls the Fire Apparatus. Finally, the body is the rear firefighting structure of the Fire Apparatus. The composition of the body varies with the type of Fire Apparatus, but generally includes formed or extruded compartments fitted with a variety of fire suppression equipment (fire pumps, auxiliary pumps, foaming systems, and associated equipment, etc.), rescue equipment (ladders, winches, and associated equipment), water tanks and other tools designed to serve the unit's firefighting mission.

57.     The cab and chassis components of Fire Apparatus are typically built by a single manufacturer as a combined unit called a cab chassis. Two types of cab chassis may be used in building Fire Apparatus: (a) specialty cab chassis; and (b) commercial cab chassis. Specialty cab chassis (often referred to as "custom cab chassis" in the industry) are designed specifically for fire service; they are built to comply with National Fire Protection Association ("NFPA") standards from the ground up and can be customized to meet the purchasing fire department's needs. Commercial cab chassis are standardized units designed and built for use in freight trucks and other vocational vehicles, and they cannot be customized for specific fire-department needs.[61] Because specialty cab chassis can be tailored to meet a fire department's specifications and needs, they account for an estimated 60 percent of annual purchases by fire departments.[62]

58.     Before Defendants consolidated the industry, some manufacturers produced all three Fire Apparatus components in-house, but most Fire Apparatus manufacturers produced only the

---

[61] Bill Adams, *Custom Chassis Models and Styles*, FIREAPPARATUSMAGAZINE.COM (Mar. 2, 2023), https://www.fireapparatusmagazine.com/fire-apparatus/custom-chassis-models-and-styles/ (last visited Jan. 26, 2026).

[62] *The Apparatus Architect: The Decision—Commercial vs. Custom*, FIREHOUSE.COM (Mar. 1, 2020), https://www.firehouse.com/apparatus/article/21121832/the-apparatus-architect-the-decisioncommercial-vs-custom (last visited Jan. 26, 2026).

body in-house and subcontracted the rest to third-party suppliers. These suppliers included a number of fire-specialized cab chassis manufacturers, including Spartan from the 1970s until it expanded into body manufacturing through an acquisition in 1997. They also included the vertically integrated Fire Apparatus manufacturers, most of which were willing to supply specialty cab chassis to smaller Fire Apparatus manufacturers because they had excess capacity.

59.    As Defendants consolidated the Fire Apparatus market, however, the competitive dynamics changed. By 2020, Spartan was the last manufacturer selling specialty cab chassis to independent Fire Apparatus manufacturers on a regular basis, giving it an estimated 90% share of this market.[63]

60.    By acquiring Spartan, REV Group also acquired this monopoly over the market for specialty cab chassis, forcing the vast majority of independent Fire Apparatus manufacturers to rely on REV Group for this critical input they need to produce their own Fire Apparatus.[64] Very few non-Defendant manufacturers produce their own specialty cab chassis because doing so is cost-prohibitive for small manufacturers. As of 2024, only three of the estimated 41 non-Defendant Fire Apparatus manufacturers in operation made their own specialty cab chassis. And, as a result of the exceptional backlogs and output restrictions alleged in this Complaint, no Fire Apparatus manufacturer who makes their own specialty cab chassis has an incentive to divert any of its cab chassis production to rivals who would undercut their own Fire Apparatus sales.[65]

---

[63] Upon information and belief, only HME-Ahrens Fox occasionally sold specialty cab chassis alongside Spartan at the time, and still does today.

[64] In 2021, REV Group reported that it sells its Spartan line of custom cab chassis to 36 Original Equipment Manufacturers of fire engines. REV GROUP, INC. SEC FORM 10-K (Oct. 31, 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/revg-annual-report-2021.pdf.

[65] *What a Competitive Strategy Analyst Thinks About the Fire Apparatus Industry*, FULD & COMPANY, https://www.fuld.com/what-a-competitive-strategy-analyst-thinks-about-the-fire-apparatus-industry/#:~:text=Stay%20ahead%20of%20your%20competition%20through (last visited Jan. 26, 2026).

61.    At the time of REV Group's acquisition, Spartan effectively conditioned its willingness to sell specialty cab chassis on the buyer's agreement not to make, or plan to make, its own specialty cab chassis. For example, in 2013, Spartan cut off Rosenbauer immediately after Rosenbauer announced plans to begin manufacturing its own cab chassis for limited types of procurements, even though Rosenbauer accounted for around 50 percent of Spartan chassis sales and was one of Spartan's oldest customers.[66] REV Group has embraced and continued to implement this condition. Notably, the Spartan executive who first implemented this policy in 2012 and participated in the Rosenbauer cut-off in 2013 was none other than Mike Virnig, who ultimately joined REV Group in 2018, advocated for and helped execute its acquisition of Spartan in 2020, and shortly thereafter was appointed the President of REV Group's fire division.

62.    The acquisition of Spartan's specialty chassis monopoly has given REV Group the power to impose cost increases on rival Fire Apparatus suppliers and otherwise limit the ability of those suppliers to compete on price. It has also given REV Group the power to restrain independent, non-integrated Fire Apparatus manufacturers from expanding their output in response to rising prices and growing industry backlogs.

63.    The anticompetitive effects of REV Group's specialty cab chassis monopoly are amplified by the proliferation of so-called "single manufacturer" clauses in requests for bids or proposals on Fire Apparatus procurements. Generally, these clauses state that the cab, body, and chassis of the requested Fire Apparatus must be manufactured by one firm, or by separate divisions of one firm, and prohibit the use of subcontractors for the manufacturing of the cab, chassis, or

---

[66] In 2014, Rosenbauer filed a lawsuit against Spartan arising, in whole or in part, from these events. *See generally* Compl., *Rosenbauer America, LLC et al. v. Spartan Motor Chassis, Inc. et al.*, No. 14-4075 (D.S.D. May 9, 2014); *see also Was Spartan ERV A Good Move for Spartan?*, FORUMS.FIREHOUSE.COM (Oct. 21, 2013), https://forums.firehouse.com/forum/emergency-vehicles-operation/apparatus-innovation/113972-was-spartan-erv-a-good-move-for-spartan (last visited Jan. 26, 2026).

body.[67] Such clauses prevent the vast majority of non-Defendant manufacturers (who cannot produce their own cab chassis) from competing for a large number of Fire Apparatus procurements. As this limits the economic incentives of non-Defendant manufacturers to scale up production, it results in higher prices and reduced supply for all Fire Apparatus purchasers.

64.    Ultimately, the challenged acquisitions unlawfully conferred upon REV Group the power to increase rival Fire Apparatus manufacturers' cost of production through its specialty cab chassis monopoly and even preclude those rivals from building and selling Fire Apparatus in the first place, to the detriment of competition and consumers. But for its acquisition by REV Group, Spartan would have remained a strong, committed source of supply, with the ability and incentive to meet the demands of non-Defendant Fire Apparatus manufacturers that have had strong economic incentives over the past five years to take advantage of massive backlogs to increase their own market share. However, when REV Group acquired Spartan, it ceased production of cab chassis at its three other subsidiaries (KME, E-ONE, and Ferrara) and absorbed Spartan's capacity internally. This alone had the effect of substantially lessening competition in the downstream market for Fire Apparatus.

D.    <u>As They Consolidate the Industry, Defendants Restrain Competition Among Brands and Dealerships</u>

65.    As they consumed independent manufacturers, REV Group and Pierce also implemented strategies to restrict competition among the dealerships that sold Fire Apparatus, repair services, and replacement parts.

66.    Early in 2021, a REV Group investor presentation identified strategies it had used to eliminate competition between its ambulance brands and their dealer networks — "platforming"

---

[67] *See Making Apparatus Specs Clear, Concise, and Consistent*, FIREENGINEERING.COM (June 1, 2009), https://www.fireengineering.com/fire-apparatus/making-apparatus-specs-clear-concise-and-consistent/ (last visited Jan. 26, 2026) (providing a model RFP).

and "channel management." REV Group indicated it planned to apply those strategies to the market for Fire Apparatus.

67. The platforming strategy focused on eliminating competition among its subsidiary brands. Although REV Group publicly insisted that its subsidiary brands were independent and expected to compete against each other despite their common ownership,[68] REV Group management internally directed its subsidiaries to use Spartan cab chassis as the "platform" for all their offerings going forward and "[c]onverge on common designs that can be shared across brands for items not visible … to the customer."[69] In other words, as Virnig would admit nearly four years later, the subsidiaries were allowed to retain their brand logos and some of the bells and whistles that "make [each] brand what it is," but they had to "become one under the hood."[70] This policy eliminated divergent designs and components from the offerings of its subsidiaries, so REV Group was able to continue preying on the goodwill that firefighters had for its legacy brands while eliminating competition among them on the factors that mattered — the cost and quality of production.

68. This anticompetitive scheme did not just undermine competition among brands within REV Group; it also gave REV Group unfair advantages over independent rivals. As Virnig

---

[68] For example, in 2020, Mike Virnig, REV Group's vice president of sales, stated that that the goal and philosophy of the REV Fire Group was to "leave the brands alone and let them be successful on their own, competing in the marketplace that we compete in today." Chris McLoone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fireapparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Jan. 26, 2026). He characterized his role at REV Group as being something of neutral intermediary among the brands, stating: "I want my directors and regional managers to fight for their brands, and I am the referee when I need to be." *Id.* But he also acknowledged that "[w]hat I won't tolerate is negative selling. I won't tolerate it with our competitors, and I won't tolerate it within the group. If I even get a hint or see anything like a dealer taking a shot at another dealer, we step in and say, 'Stop it.'" *Id.*

[69] Chris McLoone, *Seven in One: It's About the Dealers*, FIREAPPARATUSMAGAZINE.COM (Mar. 1, 2024), https://www.fireapparatusmagazine.com/fire-apparatus/seven-in-one-its-about-the-dealers/ (last visited Jan. 26, 2026).

[70] *Id.*

stated in 2024, "We get multiple bites at the apple as REV." He explained, "When you're one brand, and you lose that relationship, you're out. You get one bite at the apple, and you're done. So, the company has opportunities to put products in front of people through multiple dealers where it doesn't necessarily lose the share."[71] In other words, by synchronizing its various subsidiaries' offerings "under the hood" while purporting to maintain their independence and difference in public, REV Group has been able to exploit the simulation of competition to win orders from fire departments that, in fact, were looking for alternatives to REV Group's offerings.

69.    REV Group's second strategy, "channel management," focused on dampening competition among its dealerships. As part of that strategy, REV Group restructured dealer territories to eliminate certain overlaps and set up a Dealer Advisory Council for dealers to coordinate — with each other and with REV Group management — where overlaps remain.

70.    Pierce and Rosenbauer have joined REV Group in this strategy: Pierce has assigned exclusive territories to its dealers to eliminate intra-brand competition entirely. Rosenbauer's dealers have also been assigned non-overlapping territories.

71.    By streamlining the dealer market with non-overlapping geographic territories for the sale of new Fire Apparatus, repair services, or aftermarket OEM parts, REV Group and Pierce have eliminated the downstream competitive pressures that might interfere with their exercise of market power and gained comprehensive control over their products and the pricing of those products throughout the Fire Apparatus lifespan.

72.    These restraints on competition among dealers have exerted harmful effects not only on the market for new Fire Apparatus, but also on the availability of "aftermarket" services and equipment, including repairs and replacement parts, that are necessary to keep a Fire Apparatus

---

[71] *Id.*

running. Defendants typically require that Fire Apparatus and equipment be repaired using OEM parts.[72] Defendants do not make those parts. They simply purchase them and re-sell them, which raises costs and imposes delays. If the assigned dealer cannot timely provide an OEM part, the purchaser of the Fire Apparatus has no alternatives to which they can turn for competitive service. They must simply make do with equipment that is not fully prepared for its intended use, which imperils the firefighters using that equipment and the people they seek to protect.

73. For example, Gil Carpenter, fire chief in Benton, Arkansas, explained that before REV Group acquired Ferrara, he could simply call a contact named Charlie whenever he needed a Ferrara replacement part, and the part would arrive the next day. In 2024, however, when one of the department's vehicles required new parts, delivery was delayed for more than ten months, leaving the department without one of its eight trucks for nearly a year.[73] "It's a nightmare," he said. [74]

E. Consolidation Has Allowed Defendants to Utilize Backlogs as a Profit-Driver and to Increase Shareholder Value at the Expense of Firefighters and the Public

1. The growth of backlogs

74. According to one recent estimate provided by REV Group's Mike Virnig, pre-consolidation backlogs were in the range of seven to ten months for pumpers and 12-15 months for aerials.[75] As REV Group and Pierce acquired competitors, those backlogs increased exponentially. Between 2019 and 2023, Oshkosh's reported backlogs quadrupled to a reported $4 billion in orders

---

[72] *See, e.g.*, E-One, AFT Chassis Operations & Services Manual at 1.2 (Jan. 2024), https://e-one.com/wp-content/uploads/2024/02/E-One-AFTChassis-Manual-24-01-01.pdf.

[73] Baker, Farrell & Kovaleski, *supra* note 8; *see also REV Group Fire Division Launches New E-Commerce Website for Fire Truck Aftermarket Parts Sales and Service*, FIREAPPARATUSMAGAZINE.COM (July 29, 2019), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-fire-division-launches-new-ecommerce-website-for-fire-truck-aftermarket-parts-sales-and-se (last visited Jan. 26, 2026).

[74] Baker, Farrell & Kovaleski, *supra* note 8; *see also REV Group Fire Division Launches New E-Commerce Website for Fire Truck Aftermarket Parts Sales and Service*, FIREAPPARATUSMAGAZINE.COM (July 29, 2019), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-fire-division-launches-new-ecommerce-website-for-fire-truck-aftermarket-parts-sales-and-se (last visited Jan. 26, 2026).

[75] Baker, Farrell & Kovaleski, *supra* note 8.

that had been placed but not fulfilled.[76] REV Group's reported backlog at the beginning of 2025 was as long as five years. Rosenbauer announced a backlog of roughly $2.67 billion in orders at the end of 2024.[77]

### 2. Defendants promote growing backlogs as an investment narrative

75.    One investment company wrote that "a consolidated industry and consistent demand" placed REV Group in a strong position for future profitability but "an even bigger driver of margin expansion and future profitability is the large backlog in specialty vehicles."[78] A January 2018 REV Group investor presentation stated that backlogs were "very strong" in the Fire Apparatus market, with 43% of Fire Apparatus in service being 15 years or older and noting expected growth in state and local tax revenues to support "essential needs" vehicles.[79]

76.    In REV Group's First Quarter Earnings call for 2018, Sullivan told analysts "We are where we want to be. We're right on track with our internal plan. We've got the highest backlog this company's seen in our short life. And all of our end markets remain very strong very, very steady very strong with nothing really we think is going to deter those as we move through 2018. We're on track for our plan." In the Second Quarter Earnings call he said, "We like backlog, we love backlog. We like long backlogs that are out for months.[80] In 2019, Sullivan again cited "a

---

[76] *Id.*

[77] Christian Sandherr, *Rosenbauer International AG: Solid start into the year // record high order backlog*, NuWays AG (May 15, 2025), https://www.nuways-ag.com/company/rosenbauer-international-ag/research/solid-start-into-the-year-record-high-order-backlog (last visited Jan. 26, 2026) ("Q1 sales grew by 16.8% yoy to € 264m (eNuW: € 265m) thanks to the company's strong order backlog of € 2.28bn at the end of FY24").

[78] *REV Group's Specialty Vehicle Strength Fuels Margin Growth*, Seeking Alpha (Aug. 12, 2024), https://seekingalpha.com/article/4713675-rev-group-speciality-vehicle-strength-fuels-margin-growth (last visited Jan. 26, 2026).

[79] *Analyst and Investor Day*, REV Group at 21 (Jan. 16, 2018), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-investor-day-presentation-2018.pdf.

[80] REV Group, Inc. Q2 2018 Earnings Call Transcript, Seeking Alpha (June 7, 2018), https://seekingalpha.com/article/4180201-rev-group-revg-ceo-tim-sullivan-on-q2-2018-results-earnings-call-transcript (last visited Jan. 26, 2026).

record backlog level" as "an encouraging sign."[81] In December 2024, CEO Mark Skonieczny stated on an earnings call: "Our record high $4.2 billion specialty vehicles backlog provides a rare level of demand certainty and production planning visibility setting us apart from industrial manufacturing peers who face greater variability in their order pipelines."[82] Three months later, after the Los Angeles wildfires, Skonieczny touted an increased backlog of $4.5 billion and REV Group's "manufacturing discipline" that "maximize[d] returns while delivering high-quality products that meet customer expectations."[83]

77.     Stock analysts viewed REV Group's backlogs as "underscoring the positive future outlook for this segment and a continuing growth in backlog supporting pricing power."[84] And in a 2024 investor presentation, REV Group claimed that its backlogs have improved its pricing power and would lead to profit margins between 14% and 16% by 2027.[85] In other words, REV Group has, and continues to have, strong economic incentives to maintain the unacceptable backlog that plagues everyone but REV Group, and its investors, and Defendants.[86]

---

[81] REV Group, Inc. Q1 2019 Earnings Call Transcript, SEEKING ALPHA (Mar. 7, 2019), https://seekingalpha.com/article/4247103-rev-group-revg-ceo-tim-sullivan-on-q1-2019-results-earnings-call-transcript (last visited Jan. 26, 2026).

[82] REV Group, Inc. Q4 2024 Earnings Call Transcript, SEEKING ALPHA (Dec. 11, 2024), https://seekingalpha.com/article/4743661-rev-group-inc-revg-q4-2024-earnings-call-transcript (last visited Jan. 26, 2026).

[83] REV Group, Inc. Q1 2025 Earnings Call Transcript, SEEKING ALPHA (March 5, 2025), https://seekingalpha.com/article/4764997-rev-group-inc-revg-q1-2025-earnings-call-transcript (last visited Jan. 26, 2026).

[84] REV Group: Growing Margins And Profits, SEEKING ALPHA (Feb. 12, 2025), https://seekingalpha.com/article/4757305-rev-group-growing-margins-and-profits (last visited Jan. 26, 2026).

[85] Investor Presentation, REV GROUP at 11-14 (Dec. 11, 2024), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/revg-investor-day-presentation.pdf.

[86] REV Group's Specialty Vehicle Strength Fuels Margin Growth, SEEKING ALPHA (Aug. 12, 2024), https://seekingalpha.com/article/4713675-rev-group-speciality-vehicle-strength-fuels-margin-growth (last visited Jan. 26, 2026).

78.     Similarly, in January 2020, Oshkosh boasted of "an all-time high backlog," describing its Fire & Emergency division as having posted "a solid quarter."[87] And in a 2025 Investor Day presentation, Oshkosh announced that it expected to further increase profit margins to record levels through "pricing realization from backlog."[88]

### 3. REV Group curtails cab chassis production and permanently closes two manufacturing plants it acquired

79.     Reflecting the elimination of competition from the Fire Apparatus market, Defendants have not only declined to increase production capacity in the face of extreme backlogs, but REV Group has actually *closed* existing production capacity — exacerbating the country's Fire Apparatus shortage for profit.

80.     When REV Group acquired Spartan in 2020, each of its other Fire Apparatus subsidiaries — E-ONE, KME, and Ferrara — manufactured all the specialty cab chassis used in its Fire Apparatus production. Within months of acquiring Spartan, however, REV Group directed its pre-existing subsidiaries to curtail their production of their own specialty cab chassis and start obtaining their specialty cab chassis needs from Spartan. By April 2021, REV Group was bragging to investors that it had successfully turned Spartan's specialty cab chassis into the "platform" for all of its subsidiary's Fire Apparatus offerings.[89] By cutting its pre-existing cab chassis capacity and absorbing Spartan's in this way, REV Group throttled the availability of chassis to the vast majority of non-Defendant Fire Apparatus manufacturers who had until then depended on Spartan for this critical input.

---

[87] Oshkosh Corp. Q1 2020 Earnings Call Transcript, SEEKING ALPHA (Jan. 29, 2020), https://seekingalpha.com/article/4319880-oshkosh-corporation-osk-ceo-wilson-jones-on-q1-2020-results-earnings-call-transcript (last visited Jan. 26, 2026).

[88] *Investor Day*, OSHKOSH CORP. at 87 (June 5, 2025), https://online.flippingbook.com/view/29819025/.

[89] *Investor & Analyst Day*, REV GROUP at 27-32 (April 15, 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-investor-day-v18.pdf.

81.     Confident that independent manufacturers' ability to expand their Fire Apparatus output and take market share had been neutralized, in September 2021 REV Group announced that it would be closing its KME Fire Apparatus production facilities in Pennsylvania and Virginia.[90] When those plants closed in 2022, REV Group eliminated roughly one third of its manufacturing capabilities.[91]



82.     In announcing the closures, REV Group stated that orders currently being processed at the two shuttered KME facilities would be shifted to other REV Group manufacturing plants. The result? More backlogs. For one fire department, a $1.2 million ladder truck was shifted from production at the KME Pennsylvania plant to assembly at three different manufacturing sites, leading to substantial delays. That fire truck was eventually completed more than four years after the order was placed.

---

[90]     Chris Reber, *KME Plant to Close in April 2022*, TIMES NEWS ONLINE, (Sept. 11, 2021), https://www.tnonline.com/20210911/kme-plant-to-close-in-april-2022 (last visited Month XX, 2025); Kurt Bresswein, *388 jobs affected in Carbon County firetruck plant closure*, LEHIGHVALLEYLIVE.COM (Sep. 22, 2021), https://www.lehighvalleylive.com/business/2021/09/388-jobs-affected-in-carbon-county-firetruck-plant-closure.html (last visited Month XX, 2025).

[91] Baker, Farrell & Kovaleski, *supra* note 8.

83.    Shortly after announcing the shutdown of the two KME plants in 2021, REV Group announced an 81,500 square foot expansion of its Holden, Louisiana Ferrara facility, to be completed in June 2023. However, REV Group has yet to announce the completion of this expansion (or even the groundbreaking), and by REV Group's own reporting in SEC Form 10-K annual reports, the square footage of the Holden facility has remained unchanged from 2021 to 2024.

84.    Decreasing output in the face of increased demand should have concerned REV Group that a competitor might swoop in and steal its business. But in the consolidated and collusive Fire Apparatus market, no such concern has arisen. In a 2023 investors' call, Skonieczny said that he did not believe its record delays were "impacting our market share."[92] Since 2020, REV Group has spent around 1 percent of net sales in its Fire & Emergency Vehicles segment — barely enough (if that) to keep its production assets from deteriorating — on capital expenditures.[93] Meanwhile, REV Group has converted more than $400 million into free cash flow and returned more than $500 million to shareholders in the form of stock buybacks and dividends.[94] Neither Oshkosh nor Rosenbauer have sought to take advantage of REV Group's production-throttling strategy. Despite

---

[92] Eman Abu-Khaled, *REV Group takes steps to normalcy after supply-chain setbacks*, TRAILER BODY BUILDERS (Mar. 22, 2023), https://www.trailer-bodybuilders.com/truckbodies/article/21262503/rev-group-takes-steps-to-normalcy-after-supply-chain-setbacks (last visited Jan. 26, 2026).

[93] *See* REV GROUP, INC. SEC FORM 10-K (Oct. 31, 2022), https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/revg-2022-annual-report.pdf (providing net sales and capital expenditures data in the Fire & Emergency Vehicles segment from 2022); REV GROUP, INC. SEC FORM 10-K (Oct. 31, 2023); REV GROUP, INC. SEC FORM 10-K (Oct. 31, 2023), https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/rev-annual-report-2023.pdf (same for 2023); REV GROUP, INC. SEC FORM 10-K (Oct. 31, 2024) https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/rev-annual-report-2024.pdf (same for 2024); REV GROUP, INC. SEC FORM 10-K (Oct. 31, 2025), https://otp.tools.investis.com/clients/us/rev_group/SEC/sec-show.aspx?FilingId=18986732&Cik=0001687221&Type=PDF&hasPdf=1 (same for 2025).

[94] These figures are only for 2020 through June 2024 (with a projection for the rest of 2024). *See REV Group, Inc. June 12, 2024 Presentation*, REV GROUP at 13, https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-ideas-conference-2024.pdf. To Plaintiff's knowledge, REV Group has not completed information about its free cash flow, stock buybacks, and dividends in 2025.

having the means to do so, both have failed to meaningfully increase output or invest in new production capacity.[95]

85.     As Alexander Yaggy, a former REV Group stock investor, has observed, such minimal investment in the face of significant backlogs is *reflective of an uncompetitive market*."[96]

### 4.  Defendants increase prices and implement "floating price" clauses to maximize profits.

86.     In the mid-2010s, a standard pumper truck cost approximately $300,000 to $500,000.[97] Since 2020, prices have increased to an average of $1 million per pumper truck.[98] Similarly, ladder trucks that cost $750,000 to $900,000 in the mid-2010s cost more than $2 million today.[99]

87.     When Sullivan admitted REV Group's "love" of backlogs, he acknowledged that those backlogs came with a cost in that REV Group lacked the ability to adjust pricing to account for increased costs during that delay. Sullivan noted that some contracts foreclosed REV Group from increasing prices after the order was placed which "puts us in a bind. So . . . . We are putting adjustment provisions in those contracts, so we can react to material cost increases. We have it in some. But quite frankly, the percentage isn't good enough, and it really depends on the industry. So we will be — continue to work to make sure that that base has covered as we go forward."[100]

---

[95] Baker, Farrell & Kovaleski, *supra* note 8.

[96] *Id*. (emphasis added).

[97] Chris Godfrey, *An Evaluation of Fire Apparatus Usage and Operating Cost for Green Township Fire & EMS* at 9 (Aug. 2, 2013), http://www.ohiofirechiefs.com/aws/OFCA/asset_manager/get_file/77188.

[98] *Id*.

[99] *Id*.; *see also* Jody Godoy, *As fire truck prices hit $2 million, US firefighters demand an antitrust probe*, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/fire-truck-prices-hit-2-million-us-firefighters-demand-an-antitrust-probe-2025-05-13 (last visited Jan. 26, 2026).

[100] REV Group, Inc. Q2 2018 Earnings Call Transcript, SEEKING ALPHA (June 7, 2018), https://seekingalpha.com/article/4180201-rev-group-revg-ceo-tim-sullivan-on-q2-2018-results-earnings-call-transcript (last visited Jan. 26, 2026).

88.    And, in fact, Defendants have since exploited their market power to justify imposing such "floating prices" on customers. Using the purported difficulty of projecting material costs over increased lead times, Defendants have insisted on price increases and/or added price clauses to contracts that allow them to increase the final price of a Fire Apparatus after it goes into production.[101] Rosenbauer's president, Mark Fusco, has acknowledged that the company applies "surcharges that might occur during the build times."[102]

89.    For example, one fire department in Massachusetts reportedly ordered a Fire Apparatus in 2022 and then ordered two more trucks in 2023. After the 2023 order, the manufacturer increased the price of the truck ordered in 2022 by $150,000 to match the price of the trucks ordered in 2023. The manufacturer threatened not to deliver the truck ordered in 2022 unless the fire department agreed to the price increase. The fire chief felt "compelled to pay this increase out of fear that the process to get apparatus would take too long and we would not be able to provide service to our community."[103] As another example, a fire department in Indiana was hit with a more than $100,000 price increase for the same pumper truck after a 7-month delay.[104] And the Loveland Fire Rescue Authority in Colorado experienced a surcharge of $29,000 on a pending order.[105]

---

[101] Press Release, Sen. Jim Banks, *Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing* (Apr. 15, 2025), https://www.banks.senate.gov/news/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing/.

[102] Ed Ballam, *2022 Was Good for Fire Service Industry; 2023 Is Uncertain*, FireApparatusMagazine.com (Dec. 20, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain/ (last visited Jan. 26, 2026).

[103] Press Release, Sen. Jim Banks, *Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing* (Apr. 15, 2025), https://www.banks.senate.gov/news/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing/.

[104] *Id.*

[105] CSFC Members' Perspective, *"Floating" Prices & Lengthy Delivery Times for Fire Apparatus* at 1 (Aug. 25, 2022), https://static1.squarespace.com/static/5ea64a6b9614427b0ff93e6d/t/63080a517f782438bdd6f98e/1661471313934/Floating+Prices+Lenghty+Delivery+Time+for+Fire+Apparatus+Aug+25+2022%5B42%5D.pdf.

F.    Defendants Substituted Collusion for Competition

90.    Collusion is more likely to occur and to be effective in concentrated markets. Here, Defendants have taken advantage of their growing control of the Fire Apparatus market since 2017 to coordinate with each other and restrict competition among them.

### 1.  Defendants publicly signal price strategies

91.    Price signaling describes generally public communications by a firm designed to indicate to its competitors its present or future pricing intentions. As reported by the New York Times, around the time of REV Group's public offering in 2017, REV Group executives "told analysts that they would substantially raise profit margins and that other companies were doing the same."[106] Shortly thereafter, Oshkosh CEO, Wilson Jones, told investors that the consolidation occurring in the market "will help drive better discipline from a pricing standpoint in the market."[107] Early the following year, Sullivan noted, "[p]rices go up every year," and REV Group was "very pleased with the discipline[] within the fire and emergency markets."[108] Days before the start of 2019, he commented that "we are going to be kind of even up with our competitors across the board" and "all of us have been at least the large fire brass manufacturers have been doing fine we all have big backlogs and we're all taking a little bit of share from more of the smaller regional players."[109] Approximately a year later, John Pfeifer, Oshkosh's then President and COO, explained, "[O]n the pricing front, we've maintained a positive price/cost equation for the year. We're very

---

[106] Baker, Farrell & Kovaleski, *supra* note 8.

[107] Oshkosh Corp. Q2 2017 Earnings Call Transcript, SEEKING ALPHA (Apr. 26, 2017), https://seekingalpha.com/article/4065631-oshkosh-osk-q2-2017-results-earnings-call-transcript (last visited Jan. 26, 2026).

[108] REV Group, Inc. Q1 2018 Earnings Call Transcript, SEEKING ALPHA (Mar. 8, 2018), https://seekingalpha.com/article/4154909-rev-groups-revg-ceo-tim-sullivan-on-q1-2018-results-earnings-call-transcript (last visited Jan. 26, 2026).

[109] REV Group, Inc. Q4 2018 Earnings Call Transcript, SEEKING ALPHA (Dec. 20, 2018), https://seekingalpha.com/article/4229537-rev-group-revg-ceo-tim-sullivan-on-q4-2018-results-earnings-call-transcript (last visited Jan. 26, 2026).

careful and very disciplined in how we manage our pricing. We are the market leader and we'll stay disciplined."[110]

92.     The co-owner of one independent Fire Apparatus manufacturer, Jerry Halpin, stated in 2022 that "From a business-to-business point of view . . . people in the fire service industry are talking amongst themselves, looking for competitive edges to bolster opportunities through partnerships and other alliances." Halpin said he did not expect big mergers or acquisitions in 2023, "but there will be cooperation between like businesses to gain an edge in the marketplace."[111]

### 2. A trade association provided a forum to collude and confidentially share sensitive and proprietary business information

93.     Established in 1946 by a small group of manufacturers, the Fire Truck Manufacturers' Association ("FAMA") was created to pool industry ideas on new technology and improve safety standards within the fire service industry.[112] FAMA arose during a time when dozens of Fire Apparatus producers populated the landscape.

94.     Today, FAMA's "mission" is to "maximize profits of FAMA member companies."[113] It holds regular meetings every year, including in-person meetings at resort locations where Defendants meet and socialize. The stated purpose of FAMA's bi-annual meetings is to "provide a

---

[110] Oshkosh Corp. Q4 2020 Earnings Call Transcript, SEEKING ALPHA (Oct. 29, 2020), https://seekingalpha.com/article/4382859-oshkosh-corp-osk-ceo-wilson-jones-on-q4-2020-results-earnings-call-transcript (last visited Jan. 26, 2026).

[111] Ed Ballam, *2022 Was Good for Fire Service Industry; 2023 is Uncertain*, FIREAPPARATUSMAGAZINE.COM (Dec. 20, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain/ (last visited Jan. 26, 2026).

[112] *Our History*, FAMA.ORG, https://www.fama.org/history/ (last visited Jan. 26, 2026).

[113] FAMA Spring Membership Business Meeting Minutes at 2 (Feb. 28–Mar. 1, 2022), https://www.fama.org/wp-content/uploads/2023/02/1677348633_63fa4f190edd4.pdf.

forum [for members] to share information" and network with each other.[114] Attendees also participate in purchasing roundtables, FAMA-member-only meetings, and discussion groups.

95.     Outside of the bi-annual meetings, FAMA "communicates with its members on a regular basis via emails, its website and an extensive FAMA newsletter," offering additional opportunities for Defendants to communicate and coordinate.[115]

96.     According to FAMA, access to competitors' data is "one of the most valuable reasons" for companies to join the organization.[116] FAMA promotes "industry statistics" as the number one reason to join FAMA.[117]

97.     By 2016, FAMA had established two committees to collect and distribute Defendants' data: (1) the Education Survey Committee, and (2) the Statistics Committee. The Education Survey Committee's mission was "to help strengthen the FAMA member companies by providing valuable data" through an Industry Outlook Survey and Member Outlook Surveys.[118] The objective of the Statistics Committee was to provide valuable statistical data to the member companies."[119] These two committees were merged in 2023 and renamed the Data & Research Committee to "facilitate the collection of more actionable data for the business planning needs of member companies." As the dominant players in the market, Defendants played a central role in

---

[114] *Join FAMA and See What's In It For You*, FAMA at 2, https://www.fama.org/wp-content/uploads/2015/07/Top_10_reasons_to_join_FAMA_lowres.pdf.

[115] *Id*.

[116] Paul C. Darley, *The Fire Apparatus Market is Coming Back . . . Just Look at the Data*, FAMA.ORG (Dec. 4, 2015), https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data/ (last visited Jan. 26, 2026).

[117] *Join FAMA and See What's In It For You*, FAMA at 2, https://www.fama.org/wp-content/uploads/2015/07/Top_10_reasons_to_join_FAMA_lowres.pdf.

[118] *Education-Surveys Committee*, FAMA.ORG, https://web.archive.org/web/20220521230134/https://www.fama.org/about-fama/committees/education/ (last visited Jan. 26, 2026).

[119] *Statistics Committee*, FAMA.ORG, https://web.archive.org/web/20220521225937/https://www.fama.org/about-fama/committees/statistics/ (last visited Jan. 26, 2026).

FAMA's data committees. For example, during the relevant period, KME served as co-chair of the technical committee, and Rosenbauer and Pierce served as co-chairs of the Data & Research Committee.

98.     The data shared in FAMA surveys and reports are not publicly known because FAMA restricts distribution to contributing members. FAMA describes the data as useful in "strategic business planning." Further, FAMA states that it includes "economic data, fire market trends, and apparatus sales and order statistics."[120] The "comprehensive" data are collected and redistributed on a quarterly basis.[121] The Data & Research Committee maintained a secure portal for contributing members to submit data on orders and deliveries. Those data were synthesized and redistributed back to the contributing members via the portal.[122]

99.     Once logged into the portal, members could access FAMA's "interactive" data and perform detailed searches of orders by date, vehicle class, axles, and apparatus type.[123] Members can then export those to incorporate into their own business planning.

100.     Only contributing members may access the data. The data may not be shared with anyone other than contributing members. No one, not the municipalities and not the fire departments who purchase Fire Apparatus, may otherwise access the data.

---

[120] *Data & Research Committee*, FAMA.ORG, https://www.fama.org/data-research-committee/ (last visited Jan. 26, 2026).

[121] *FAMA Releases Fire Apparatus Industry Update*, FIREENGINEERING.COM (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update/ (last visited Jan. 26, 2026).

[122] *Data & Research Committee*, FAMA.ORG, https://www.fama.org/data-research-committee/ (last visited Jan. 26, 2026).

[123] *2022 Spring Meeting Presentation*, FAMA at 116, https://www.fama.org/wp-content/uploads/2022/03/1646772096_6227bf80d4238.pdf.

G.    Evidence of Conspiracy

1. **The conspiracy is economically plausible and Defendants engaged in parallel conduct that is inconsistent with independent competitive behavior.**

101.    Defendants were able to achieve through collusion what they could not have achieved had they acted independently. Defendants were able to maintain long backlogs without increasing supply, to increase prices at exorbitant rates, and to demand floating-price clauses to compensate them for the costs associated with those backlogs. Absent collusion, Defendants would have competed to gain sales and market share.

102.    Defendants each maintained significant backlogs without taking meaningful action to reduce them. "Sacrific[ing] profitable production" makes little sense "absent coordination and agreement" among the producers and, thus, constitutes important circumstantial evidence of conspiracy.[124] And each implemented regular price increases in line with the other Defendants.

2. **Numerous plus factors exist**

103.    "Plus factors are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, which are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action."[125]

104.    Defendants operated in a highly concentrated market, one that became more so as a result of acquisitions during the relevant time frame. Market concentration is an important factor to examine because markets with fewer firms are more susceptible to cartelization — a smaller group of competitors is better able to solve the coordination and trust problems that can prevent cartel

---

[124] Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. U. L. Rev. 1581, 1617 (2021), https://scholarlycommons.law.northwestern.edu/nulr/vol115/iss6/2.

[125] William E. Kovacic, Robert C. Marshall, Leslie M. Marx, Halbert L White, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 393 (2011), https://repository.law.umich.edu/mlr/vol110/iss3/1.

formation or destabilize an existing cartel.[126] Defendants exchanged highly confidential and proprietary data. Such exchanges of information are routinely viewed by economists as evidence of a price-fixing conspiracy.[127]

105.    Defendants' pattern of price increases and increased backlogs are not adequately explained by market factors. Sales and profit measures increased during the relevant period and Defendants passed on a significant amount of increased materials costs to consumers without suffering a competitive disadvantage as a result. On information and belief, Defendants' purported reasons for price increases and backlogs were false and pretextual.[128]

106.    The economics literature recognizes that markets are more susceptible to collusion where there are barriers to entry.[129] Here, Fire Apparatus manufacturing requires substantial capital investment to produce specialized material, equipment, and engineering. Fire apparatus must comply with NFPA standards, safety certifications, and costly performance testing. Developing quality control systems takes a lot of bandwidth and significant financial commitment. Fire Apparatus are typically built to custom specifications. In addition, REV Group controls the market for specialty cab chassis, an integral part of Fire Apparatus which helps deter new entrants.

107.    In addition, demand in the Fire Apparatus market is inelastic. When demand is inelastic, sellers with market power can charge higher prices without losing significant sales. This

---

[126] Christopher Leslie, *How to Hide a Price-Fixing Conspiracy: Denial, Deception, and Destruction of Evidence*, 2021 U. Ill. L. Rev. 1199, 1208 (2021), https://illinoislawreview.org/print/vol-2021-no-4/how-to-hide-a-price-fixing-conspiracy/.

[127] *Id*.

[128] *See, e.g.*, Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. U. L. Rev. 1581, 1611 (2021), https://scholarlycommons.law.northwestern.edu/nulr/vol115/iss6/2 ("Evidence of pretextual explanations for price increases or output restrictions, 'if believed by a jury, would disprove the likelihood of independent action' by an alleged conspirator." (quoting *In re Blood Reagents Antitrust Litig*., 266 F. Supp. 3d 750, 774 (E.D. Pa. 2017)).

[129] *See, e.g.*, Massimo Motta, *Competition Policy Theory and Practice* (New York Cambridge University Press, 2004), at 143–44.

market characteristic encourages collusion because rivals can collectively raise price profitably. Judges have recognized inelastic demand as a plus factor.[130] A municipality simply does not have the choice to ignore its need to protect its populace.

108.    "Communication is a central part of the operation of a cartel."[131] Defendants belonged to, and participated in the activities of, several trade associations. These activities provided a forum for Defendants to form and implement their unlawful agreements.[132] Defendants monitored their agreements through public statements mentioned above and by exchanging competitively sensitive information. This is a classic form of cartel monitoring.[133]

H.    Defendants' Consolidation, Backlog Maintenance, and Collusion Have Had Their Desired Effect

109.    Defendants' profits have soared. In July 2021, REV Group announced that it had "[e]xceeded consensus earnings estimates for five consecutive quarters."[134] In 2024, REV Group's profit margins increased to 8.9 percent for the fire truck division.[135] For REV Group, all has gone according to plan. As early as 2018, REV Group was gloating to investors about its role as one of the Fire Apparatus industry's "most active acquirers in the past decade," and as a "consolidator

---

[130] *See, e.g.,* Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. U. L. Rev. 1581, 1590-91 (2021), https://scholarlycommons.law.northwestern.edu/nulr/vol115/iss6/2.

[131] William E. Kovacic, Robert C. Marshall, Leslie M. Marx, Halbert L White, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 423 (2011), https://repository.law.umich.edu/mlr/vol110/iss3/1.

[132] The economics literature emphasizes the role of communication in cartels and, in particular, the central role that trade associations can play in the functioning of effective cartels. *See, e.g.,* Joseph E. Harrington Jr., *How do cartels operate?*, Foundations and Trends in Microeconomics 2, no. 1 (2006): 1–105; Robert C. Marshall and Leslie M. Marx, *Economics of Collusion: Cartels and Bidding Rings*, (Cambridge, Massachusetts: The MIT Press, 2012), at 133–35; *Spotlight on Trade Associations*, FEDERAL TRADE COMMISSION, https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/dealings-competitors/spotlight-trade-associations (last visited Jan. 26, 2026).

[133] *See* Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. U. L. Rev. 1581, 1597-99 (2021), https://scholarlycommons.law.northwestern.edu/nulr/vol115/iss6/2.

[134] *REV Group, Inc. Presentation*, REV GROUP at 4 (July 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf (last visited Jan. 26, 2026).

[135] Baker, Farrell & Kovaleski, *supra* note 8.

disrupting the specialty vehicle industry."[136] For REV Group, the goal has now been realized: "industry consolidation," "geographic expansion," and "vertical integration."[137]

110. In June 2025, Oshkosh announced that its adjusted operating margins had grown from 4.8% to 10.5% from 2022 to 2024, delivering on "key 2022 Investor Day targets one year early."[138] Meanwhile, REV Group's stock price soared and, along with it, the pay packages of its executives. Oshkosh predicted in June 2025 an additional 12 to 14 percent increase by 2028, with $13-14 billion in revenue.[139] According to the company, that revenue growth will be "supported by strong backlog" and price increases.[140]

### 1. Plaintiff and Class members have paid supracompetitive prices for Fire Apparatus

111. As a result of Defendants' anticompetitive acquisitions and agreements, Plaintiff and other Class members have overpaid for Fire Apparatus. They have, as alleged, suffered other consequences, such as an impaired ability to fight fires, imperiling both the brave firefighters on the front lines and those they seek to protect.

112. Defendants' consolidation of manufacturers and dealers directly led to a substantial increase in the cost to purchase Fire Apparatus. If Fire Apparatus prices had increased at the rate of inflation between 2015 and 2025, pumper trucks would cost approximately $680,000 (rather than the current cost of $1 million), and ladder trucks would cost approximately $1.2 million (rather than

---

[136] *Analyst and Investor Day*, REV GROUP at 36 (Jan. 16, 2018), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-investor-day-presentation-2018.pdf.

[137] *Id.*

[138] *Investor Day*, OSHKOSH CORP. at 83 (June 5, 2025), https://online.flippingbook.com/view/29819025/3 (last visited Jan. 26, 2026).

[139] *Id*. at 86,

[140] *Id*. at 87.

$2 million).[141] Municipalities across the country are therefore paying approximately 47 percent (or $320,000) more for pumpers and 66 percent (or $800,000) more for ladder trucks in 2025 than would be expected based on inflationary costs alone.

113.    There are approximately 5,000 new Fire Apparatus sold in the United States every year.[142] About 75% of those are pumpers.[143] Since 2018, Fire Apparatus purchasers have paid a combined total of approximately $56.25 billion for new Fire Apparatus[144] — $19.8 billion more than expected based on increased inflation.[145]

114.    Even accounting for supply chain and labor shortage challenges, these increases are far beyond what would be expected in a competitive market.

### 2.  Plaintiff and Class members have been unable to get necessary repairs

115.    As a result of Defendants' anticompetitive acquisitions and agreements, Plaintiff and other class members have encountered significant difficulties in getting necessary repairs for their fire truck fleets. Faced with a consolidated market and limited purchasing options due to exclusionary dealer and brand acquisitions, cities are struggling to maintain the Fire Apparatus they can barely afford to begin with.

---

[141] Calculated assuming a pumper cost $500,000 and a ladder truck cost $900,000 in 2015.

[142] Jeffrey Bonior, *Get to Know Sutphen, Which Has Been Making Fire Engines in the United States Since 1890*, SUTPHEN.COM (Mar. 12, 2021), https://www.sutphen.com/get-to-know-sutphen-which-has-been-making-fire-engines-in-the-united-states-since-1890/ (last visited Jan. 26, 2026).

[143] Alan M. Petrillo, *What's the Right Size Pump for Your Apparatus and How Does It Affect the Design?*, FIREAPPARATUSMAGAZINE.COM (Sept. 27, 2023), https://www.fireapparatusmagazine.com/fire-apparatus/pumpers/whats-the-right-size-pump-for-your-apparatus-and-how-does-it-affect-the-design/ (last visited Jan. 26, 2026).

[144] Calculated as ((3,750 pumper trucks per year * 9 years *$1 million) + (1,250 ladder trucks per year * 9 years * $2 million)).

[145] Cost based on inflation alone ($36.45 billion) calculated as ((3,750 pumper trucks per year * 9 years *$680,000) + (1,250 ladder trucks per year * 9 years * $1.2 million)).

116.    Plaintiff, for example, was without five of its fifteen pumpers in the summer of 2023 due to an extended delay in obtaining original OEM repair parts. Plaintiff conducted a three-week search to find Fire Apparatus parts on resale or on loan from other departments. Ultimately, Plaintiff was able to acquire three rural Fire Apparatus, but those were ill-equipped for an urban environment.[146] They were simply better than nothing.

117.    Other municipalities are facing similar challenges with obtaining repairs. The fire chief in Benton, Arkansas, used to call a personal contact at Ferrera whenever he needed a replacement part, and that part would be shipped to him the next day, before Ferrera was acquired by REV Group. In 2024, when a Benton fire department vehicle needed new parts, delivery was delayed for more than 10 months and the fleet was left without one of its eight trucks for nearly a year. According to the Benton fire chief, getting replacement parts is now "a nightmare."[147]

118.    In Los Angeles, the city's fire department aims to have 90 percent of its fleet ready for deployment at any given time, but maintenance limitations have brought that average down significantly in recent years, including in January 2025 when the devastating Palisades fires occurred.[148]

### 3. Plaintiff and Class members have been unable to timely replace older vehicles

119.    Skyrocketing prices and lengthy delivery times have forced fire departments to operate trucks well beyond their recommended retirement age. As IAFF President Edward Kelly

---

[146] Rubin Testimony at 3-4.

[147] Baker, Farrell & Kovaleski, *supra* note 8.

[148] *Id*.

observed, cities and towns nationwide are facing a crisis where demand for new Fire Apparatus has outstripped availability and funding.[149]

120.    Additional examples abound. In January 2025, the Chicago fire department threw a mock thirtieth birthday celebration for one of its trucks, which was older than many firefighters on the force.[150] Auditors in Atlanta found that more than a third of the city's aging firefighting fleet was out of commission.[151] Houston and Seattle have reported similar struggles.[152] And in Los Angeles, union officials have reported that rising prices for replacement vehicles forced the department to order fewer new rigs than it had planned.[153]

121.    Smaller municipalities have faced comparable difficulties.[154] For example, the city of Evanston, Illinois had to persuade a dealer to sell a demonstration vehicle to accelerate delivery of a $2.3 million new truck to only "12 to 14 months" to replace an 18-year-old reserve truck with

---

[149] Testimony for the Record Prepared by Edward A. Kelly at 6-8, General President International Association of Fire Fighters, before the Homeland Security and Governmental Affairs Committee, Wednesday, Sept. 10, 2025, "Sounding the Alarm: America's Fire Apparatus Crisis", https://www.hsgac.senate.gov/subcommittees/dmdcc/hearings/sounding-the-alarm-americas-fire-apparatus-crisis/kelly-testimony/; *see also* Jody Godoy, *As Fire Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe*, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/fire-truck-prices-hit-2-million-us-firefighters-demand-an-antitrust-probe-2025-05-13 (last visited Jan. 26, 2026).

[150] Katherine Laidlaw, *Why does a fire truck cost $2 million?*, THEHUSTLE.CO (July 18, 2025), https://thehustle.co/originals/why-does-a-fire-truck-cost-2-million (last visited Jan. 26, 2026).

[151] Baker, Farrell & Kovaleski, *supra* note 8.

[152] Christy Grimes, *Houston Fire Department Navigating Supply Chain Hurdles with Fleet Replacements*, GOV'T FLEET (Sept. 11, 2023), https://www.government-fleet.com/10206016/houston-fire-department-to-replace-aging-vehicles (last visited Jan. 26, 2026); David Kroman, *Seattle firetruck fleet deteriorating faster than repairs can keep up*, THE SEATTLE TIMES (Apr. 1, 2024), https://www.seattletimes.com/seattle-news/politics/seattle-fire-truck-fleet-deteriorating-faster-than-repairs-can-keep-up (last visited Jan. 26, 2026).

[153] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (last visited Jan. 26, 2026).

[154], *North Texas fire department needs financial windfall to overcome equipment challenges*, CBS NEWS (Jan. 23, 2025), https://www.cbsnews.com/texas/news/north-texas-fire-department-needs-financial-windfall-to-overcome-equipment-challenges/ (last visited Jan. 26, 2026); Allen Clayton, *City of Clarksburg approves $3.1 million to purchase new fire trucks*, WBOY.COM (Feb. 29, 2024), https://www.wboy.com/news/harrison/city-of-clarksburg-approves-3-1-million-to-purchase-new-fire-trucks (last visited Jan. 26, 2026); Baker, Farrell & Kovaleski, *supra* note 8.

"major defects . . . that would cost around $300,000 to fix."[155] And the fire chief of Watertown, New York, has said his department was so desperate for a new ladder truck to keep operations running that it bought one used from another city, even though that truck was already more than two decades old.[156]

### 4. Plaintiff and Class members have been less capable of responding to disasters

122. As a result of Defendants' anticompetitive acquisitions and agreements, Plaintiff and other Class members' emergency response time has suffered.

123. Other communities have faced similar problems. For example, Jesse M. Flax, the fire chief in Camden, New Jersey, said that fire truck manufacturing delays and rising prices are "creating greater risk for the public and firefighters" in his community.[157] That risk was magnified in 2024, when Camden fire crews were delayed in responding to a house fire because mechanical trouble on a truck caused the fire hose to malfunction. Tragically, the resident was killed in that fire.[158] As another significant example, firefighters in Castle Rock, Colorado have been forced to respond to wildfire incidents in brush trucks instead of other preferred vehicles due to a four-year delivery delay for new Fire Apparatus.[159] And in Chicago, an aging fleet with ongoing Fire Apparatus woes led to a mechanical issue that incapacitated a tower ladder vehicle during a recent fire that killed four people.[160]

---

[155] Bill Smith, *Council OK's Fire Truck Buy*, EVANSTON NOW (Mar. 26, 2024), https://evanstonnow.com/council-oks-fire-truck-buy (last visited Jan. 26, 2026).

[156] Baker, Farrell & Kovaleski, *supra* note 8.

[157] *Id*.

[158] *Id*.

[159] Isabelle Crow, *IAFF spotlight apparatus crisis and its impact*, FIRE & SAFETY J. (June 20, 2025) https://fireandsafetyjournalamericas.com/iaff-spotlight-apparatus-crisis-and-its-impact (last visited Jan. 26, 2026).

[160] Peter Matthews, *Chicago Firefighters Union Points to Ongoing Apparatus Woes in Deadly Fire*, FIREHOUSE.COM (Aug. 1, 2025), https://www.firehouse.com/apparatus/video/55307104/chicago-firefighters-union-points-to-ongoing-apparatus-woes-in-deadly-fire (last visited Jan. 26, 2026).

124.   These problems are not just limited to fires; they also add onerous burdens to cities seeking to recover from other forms of natural disasters. In 2023, leaders of a fire department in Grant, Pennsylvania learned that even a grant of over half a million dollars from the Federal Emergency Management Agency (FEMA) was insufficient to buy a truck, and that once they raised the other half of the cost, they would face a three to four year wait for delivery.[161] Municipalities that were struck by Hurricane Helene are facing similar challenges in rebuilding their public safety capacity.[162] After Hurricane Ian ravaged the fire department of Fort Myers Beach, Florida in 2022, it had to devote $1.7 million of its FEMA funding simply to replace its ladder truck.[163]

### 5.   Plaintiff and Class members have been forced to redirect essential municipal funds towards purchasing Fire Apparatus

125.   In addition to reduced response capabilities, the rising cost of Fire Apparatus maintenance and replacement has squeezed municipal budgets, leaving fire departments and municipalities with fewer resources for other essential needs. For example, cities with fire departments facing budget challenges, including Spokane, Washington and Mills, Wyoming, have had to cancel essential training and even lay off firefighters.[164]

126.   Other municipalities have been forced to completely change how funds are allocated. In Las Cruces, New Mexico, the city "has been forced to totally rewrite its budget process

---

[161] Patrick Varine, *Despite Grant, PA Dept. Says Rising Apparatus Costs a Challenge*, FIREHOUSE.COM (Aug. 3, 2023), https://www.firehouse.com/apparatus/news/53068052/despite-fire-act-grant-export-pa-firedepartment-says-rising-fire-apparatus-costs-a-challenge (last visited Jan. 26, 2026).

[162] Jennifer Kveglis, *Davis Islands firefighters serving from trailers as rebuild stalls after Hurricane Helene*, FOX13NEWS.COM (Sept. 9, 2025), https://www.fox13news.com/news/davis-islands-firefighters-serving-from-trailers-rebuild-stalls-after-hurricane-helene (last visited Jan. 26, 2026).

[163] *Fort Myers Beach Fire Dept. loses fire truck & ambulance to Hurricane Ian, firehouse condemned*, GULF COAST NEWS (Nov. 4, 2022), hhttps://www.gulfcoastnewsnow.com/article/fort-myers-beach-fire-dept-loses-fire-truck-ambulance-to-hurricane-ian-firehouse-condemned/46750046 (last visited Jan. 26, 2026).

[164] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 2 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf.

to account for the long delivery delays, and they're now having to project funding three to four years out" for Fire Apparatus purchases.[165] Because of rising costs and increased delivery delays, the previous procurement process "just doesn't work anymore."[166]

127.    Prices of used vehicles are also going up exponentially, leading some fire departments to take chances by snapping up the lowest priced options without in-person inspections or warranties.[167]

### I.    The Anticompetitive Acquisitions and Defendants' Conduct Substantially Lessened Competition

128.    The effect of the conduct alleged above is demonstrable. REV Group's serial acquisitions significantly increased market concentration. Manufacturers that historically sought to compete against each other ceased to do so. Defendants ceased any efforts to increase market share at the expense of each other. Competition has been reduced in all respects, on price, on service, on parts, and on contract terms. REV Group's monopoly in the specialty cab chassis market helps deter competition from smaller manufacturers and new entrants.

## V.    MARKET POWER AND MARKET DEFINITION

### A.    Relevant Market

129.    Courts use the relevant antitrust market to define an area of effective competition, comprised both of a product and geographic market.[168] In this case, the relevant product market consists of all Fire Apparatus, and the relevant geographic market is the United States.

---

[165] *Outdated rigs and years-long delays: How the apparatus crisis is hitting IAFF members on the ground*, IAFF.ORG (Oct. 3, 2025), https://www.iaff.org/news/outdated-rigs-and-years-long-delays-how-the-apparatus-crisis-is-hitting-iaff-members-on-the-ground/ (last visited Jan. 26, 2026).

[166] *Id.*

[167] Mike Crowley, *City Council approves purchase of used fire truck*, YAHOO NEWS (Dec. 7, 2024), https://www.yahoo.com/news/city-council-approves-purchase-used-045900099.html (last visited Jan. 26, 2026).

[168] 2023 Merger Guidelines § 4.3, https://www.justice.gov/atr/merger-guidelines/tools/market-definition.

B.   Product Market

130.   The relevant product market is all Fire Apparatus as defined and recognized by the NFPA Standard 1900 and the National Wildfire Coordinating Group.[169] These agencies classify Fire Apparatus within the United States into seven types.[170]

> i.   **Type 1** Fire Apparatus are the standard engine pumper (also known as structural firefighting truck or engine company). These trucks are used in urban, suburban, and rural areas of the United States. Type 1 Fire Apparatus are built for versatility, housing an onboard water tank (around 400 – 500 gallons) and capable of connecting to external hydrants for sustained water supply. Every type 1 Fire Apparatus is required to have a pump with a minimum tank size of 300 gallons and to be equipped with 2.5 and 1.5 - inch hoses of varying lengths. Type 1 engines carry up to four firefighters, ladders for high-tech operations, self-contained breathing apparatus (SCBA), chainsaws, EMS gears, advanced life support (ALS), and cutting tools. These trucks have capacity for heavy fire suppression and quick deployment, with pumps delivering around 1,000 GPM at 150 PSI or higher.

> ii.   **Type 2** Fire Apparatus mirror the Type 1 in layout and equipment but is designed for suburban or smaller municipal departments where maneuverability is critical. It is slightly more compact yet still carries a comparable water load and pump capacity. These trucks can typically hold

---

[169] *Types of Fire Trucks: An Overview and Comparison*, PIERCEMFG.COM (Nov. 14, 2023), https://www.piercemfg.com/pierce/blog/types-of-fire-trucks (last visited Jan. 26, 2026).

[170] *Id*.

three to four crew members. Type 2 engines perform first-response suppression before larger engines arrive. They include many of the same structural tools as Type 1 trucks - chainsaws, hoses, ladders and SCBA's – but with less storage and slightly reduced pumper power.

iii.    **Type 3** Fire Apparatus are wildland-capable apparatus. These trucks are built with four-wheel drive and a Gross Vehicle Weight Rating (GVWR)[171] above 26,000 pounds, it is optimized for off-road conditions and the pump-and-roll technique where water is spayed while driving. It carries at least 500 gallons of water and pumps 150 GPM at 250 PSI, supporting three or more firefighters. These trucks have the ability to handle both wildland fires and urban perimeters.

iv.    **Type 4** Fire Apparatus are similar to Type 3 but are built for greater water storage with less pump power. This truck carries a 750-gallon tank, which is larger than Type 3 but pumps only 50 GPM at 100 PSI. These trucks are typically staffed by two firefighters. Type 4 trucks do not have off-road capabilities and are ideal for longer wildland operations where refilling opportunities are limited.

v.    **Type 5, 6, and 7** Fire Apparatus are often grouped together because they feature many of the same quality designs. These trucks are typically pick-up based and built for agility in wildland, suburban, or transitional zones. All share four-wheel drive and compact configurations but differ by size, pump rate and tank capacity.

---

[171] GVWR is the maximum weight a vehicle is designed to carry when fully loaded.

1. Type 5 – Heavier with the largest tank and pump of the three; often deployed as the lead wildland truck.

2. Type 6 – Mid-weight, typically around 19,500lbs GVWR, prioritizing mobility while still offering adequate water supply for brush and small structure fires.

3. Type 7 – This type is the lightest, used mainly for mop-up or patrol operations after the main suppression phase.

vi.  **Specialty Trucks:**

1. The **Pierce Volterra Electric Truck** has a hybrid-electric design, combining zero-emission operation with traditional engine power for reliability. It uses an integrated electric drive system to operate silently and reduce fuel usage yet can switch to diesel back up during long incidents. This truck highlights improved torque, lower emissions, and enhanced control for urban departments focused on sustaining efficiency. This truck also has standard pumper features, water tanks, ladders and SCBAs. The Volterra is one of the first commercially deployed electric Fire Apparatus in the United States.

2. Other specialty trucks include: Pumper Fire Apparatus, Quint Fire Apparatus, Mobile Foam Apparatus, and Aerial Fire Apparatus.[172]

---

[172] *Types of Aerial Fire Trucks: NFPA Classification Overview*, PIERCEMFG.COM (Nov. 8, 2022), https://www.piercemfg.com/pierce/blog/types-of-aerial-fire-truck (last visited Jan. 26, 2026).

3.    These specialty trucks are also included in the relevant product market.

### C.    Geographic Market

131.    The relevant geographic market is the United States. Defendants sell Fire Apparatus to municipalities and fire departments throughout the United States.

### D.    Market Power

132.    As described above, REV Group has substantial market power and has increased that market power as a result of its serial acquisitions.

## VI.    ANTITRUST INJURY AND CLASS ACTION ALLEGATIONS

### A.    Antitrust Injury

133.    Defendants' anticompetitive conduct has had, and continues to have, the following effects, among others:

- Competition in the Fire Apparatus market has been substantially lessened;

- Fire Apparatus prices in the Fire Apparatus market have increased to levels far exceeding those that would prevail absent Defendants' anticompetitive acquisitions and agreements;

- Plaintiff and other Class members have been deprived of choice in the Fire Apparatus market;

- Plaintiff and other Class members have experienced substantial delays in acquiring and repairing Fire Apparatus;

- Plaintiff and other Class members have paid increased prices for new Fire Apparatus; and

- Plaintiff and other Class members have paid increased prices for parts and repairs.

134. By reason of the alleged violations of the antitrust laws, Plaintiff and other Class members have been substantially harmed by Defendants' anticompetitive acquisitions and agreements. This is an injury of the type that the antitrust laws were meant to punish and prevent.

B.    Class Action Allegations

135. Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class").

> All persons and entities in the United States, that, during the period during January 1, 2018 until such time as the anticompetitive conduct alleged herein creases (the "Class Period"), purchased, not for resale, one or more Fire Apparatus in the United States.

136. Plaintiffs also bring this action on behalf of itself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws as well as common law unjust enrichment on behalf of the following class (the "Damages Class"):

> All persons and entities in the Indirect Purchaser States[173] that, during the Class Period, purchased, not for resale, one or more of Fire Apparatus.

137. Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, and federal governmental entities and instrumentalities of the federal government.

138. While Plaintiff does not know the exact number of members of the class, Plaintiff believes the proposed class includes thousands of members.

139. Common questions of law and fact exist as to all members of the Class. Such questions of law and fact common to the Class include, but are not limited to:

---

[173] The Indirect Purchaser States are the states listed in the Fourth and Fifth Claims for Relief.

54

a. Whether REV Group's serial acquisitions violated Section 7 of the Clayton Act;

b. In the alternative, whether REV Group's acquisition of Spartan violated Section 7 of the Clayton Act.

c. The effect of the REV Group's violation of Section 7 on competition in the market for Fire Apparatus;

d. The scope of the Relevant Market

e. Whether Defendants engaged in a combination or conspiracy in violation of federal and state law.

f. The identity of the participants of the alleged conspiracy;

g. The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

h. Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the class they seek to represent;

i. The effect of the alleged conspiracy;

j. Whether Plaintiff had any reason to know or suspect the conspiracy, and means to discover the conspiracy;

k. The appropriate class-wide measure of damages for the proposed class.

a. Plaintiff's claims are typical of the claims of members of the proposed class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the proposed class are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Fire Apparatus as direct, substantial, and reasonably foreseeable consequences of Defendants' conspiracy.

b. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests coincide with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

c.      The questions of law and fact common to members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

d.      Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism substantially outweigh any difficulties that may arise in the management of this class action.

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VII.   PLAINTIFF'S CLAIMS ARE TIMELY

140.    As shown above, Defendants secretly exchanged data through FAMA, met in and around FAMA meetings that are not open to the public, and offered facially plausible pretextual explanations for price increases and increasing backlogs. While Plaintiff has known of the dysfunction in the Fire Apparatus market, the causes only truly came into focus after the Los Angeles wildfires and scrutiny on the Fire Apparatus industry that followed. When REV Group acquired competitors, it insisted that it would preserve competition among and between them and asserted that the combination would lead to improved efficiency. Even when REV Group extolled backlogs as a profit driver, it asserted that it would increase capacity to shrink those backlogs. When REV Group shuttered 30% of its capacity in 2022, it claimed that it would make up for that loss through improvements in existing facilities.

141.    It was all untrue. REV Group never had any intention of reducing the backlogs. Nor did Oshkosh or Rosenbauer. Defendants could restrict capacity secure in the knowledge that none of them would seek to capitalize on that restriction through its own capacity increases.

142.    Claims for these antitrust violations accrue each time a victim pays a supracompetitive price and/or suffers some form of financial damage proximately caused by Defendants' antitrust violations. Such claims have accrued with each sale and with each payment of a surcharge imposed by the Defendant. And such claims will continue to accrue until the effects of Defendants' conduct cease to be felt.

## VIII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violations of Section 7 of the Clayton Act
### (Against REV Group)
(On behalf of Nationwide Class for Injunctive Relief)

143.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

144.    REV Group's serial acquisitions have in the aggregate substantially lessened competition in the markets for Fire Apparatus and specialty cab chassis in the United States. The anticompetitive effects of the serial acquisitions are continuing.

145.    In the alternative, REV Group's acquisition of Spartan substantially lessened competition in the markets for Fire Apparatus and specialty cab chassis in the United States. The anticompetitive effects of the Spartan acquisition are continuing.

146.    Defendants' anticompetitive conduct set forth in this Complaint has thus violated Section 7 of the Clayton Act. *See* 15 U.S.C. § 18.

147.    As a result of Defendants' violation of Section 7 of the Clayton Act, Plaintiff and other Class members have suffered, and will continue to suffer antitrust injury in the form of paying supracompetitive prices for new Fire Apparatus, extended wait times to receive Fire Apparatus and

parts, purchases of used and inferior Fire Apparatus due to excessive prices and long wait times for new Fire Apparatus, and diversion of resources to meet the demands of public safety with outdated and/or inoperable Fire Apparatus.

148. Plaintiff and other Class members are threatened with further loss or damage by reason of the actual or likely lessening of competition described above and is entitled to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26 sufficient to unwind the anticompetitive effects of the Section 7 violation.

## SECOND CLAIM FOR RELIEF
### Conspiracy in Restraint of Trade in Violation of Section 1 of the Sherman Act
### (Against All Defendants)
(On behalf of Nationwide Class for Injunctive Relief)

149. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

150. From at least as early as January 1, 2018 and continuing through to the present, Defendants entered into and engaged in a continuing contract, combination or conspiracy to unreasonably restrain trade or commerce in violation of Section 1 of the Sherman Act.

151. The contract, combination or conspiracy consisted of an unlawful agreement among Defendants to (1) fix, raise, stabilize, or maintain the prices they charged for Fire Apparatus sold in the United States at artificially high levels, (2) restrict the manufacturing capacity and output of Fire Apparatus sold in the United States; and (3) exchange competitively sensitive and confidential information, causing anticompetitive effects with no sufficient procompetitive justifications.

152. Defendants' anticompetitive conduct resulted in, *inter alia*, the following effects: (1) Competition among Defendants in the Fire Apparatus market has been restrained or eliminated; (2) Prices for Fire Apparatus have been fixed, stabilized, maintained or increased at artificially high levels; and (3) Plaintiff and Class members have been deprived of the benefits of free and open competition between and among Defendants.

153.   This conduct is a *per se* violation of Sherman Act §1 and is also unlawful under either a quick look or rule of reason analysis because the agreement is anticompetitive with no valid procompetitive justifications. Even if there were valid procompetitive justifications for the conduct, those reasonably could have been achieved through less restrictive means.

154.   Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for Fire Apparatus throughout the United States.

155.   Plaintiff and Class members were injured as a direct and proximate result of Defendants' conduct in that they paid more for Fire Apparatus and service than they would have absent the unlawful conduct and they were deprived of the benefits of free and fair competition on the merits.

156.   Plaintiff and other Class members have suffered damages due to Defendants' unlawful conduct.

## THIRD CLAIM FOR RELIEF
### Violations of State Antitrust and Consumer Protection Statutes
### (Against all Defendants)
(On behalf of the Damages Class)

157.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

158.   During the Relevant Period, Defendants engaged in a continuing contract, combination, or conspiracy in the market for Fire Apparatus which led to an unreasonable restraint of trade and commerce in violation of various state antitrust and consumer protection statutes set forth below.

### Alabama Antitrust Statute
### (On Behalf of Damages Class Members that Purchased Fire Apparatus in Alabama)

159.   Defendants have violated Alabama Code § 8-10-1 *et seq.* with respect to purchases of Fire Apparatus in Alabama by Class members. Defendants' unlawful conduct substantially affected Alabama commerce and had the following effects: (1) Fire Apparatus price competition

was restrained or eliminated within Alabama; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in Alabama were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available under Alabama Code § 8-10-1, *et seq.*

## Alaska Antitrust Statute
### (On Behalf of Damages Class Members that Purchased Fire Apparatus in Alaska)

160.    Defendants have violated Alaska Code § 45.50.562, *et seq.* with respect to purchases of Fire Apparatus in Alaska by Class members. Defendants' unlawful conduct substantially affected Alaska commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within Alaska; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in Alaska were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available under Alaska Code § 45.50.562, *et seq.*

## Arizona Uniform State Antitrust Act
### (On Behalf of Damages Class Members that Purchased Fire Apparatus in Arizona)

161.    Defendants have violated Arizona Revised Statutes § 44-1401, *et seq.* with respect to purchases of Fire Apparatus in Arizona by Class members. Defendants' unlawful conduct substantially affected Arizona commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within Arizona; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in Arizona were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq.*

**Arkansas Deceptive Trade Practices Act**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in Arkansas)**

162.    Defendants have engaged in deceptive and unconscionable acts or practices in violation of Ark. Code Ann. § 4-88-101, *et seq.* with respect to purchases of Fire Apparatus in Arkansas by Class members. During the Class Period, Defendants knowingly agreed to, and did in fact, act in restraint of trade or commence by affecting, fixing, controlling, and/or maintaining at supra-competitive levels the prices at which Fire Apparatus were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Class members. The aforementioned conduct by Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Ark. Code Ann. § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) Fire Apparatus price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Fire Apparatus prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) purchasers were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available under Ark. Code Ann. § 4-88-113(f).

**California Cartwright Act**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in California)**

163.    Defendants have violated California Bus. & Prof. Code § 16700, *et seq.* with respect to purchases of Fire Apparatus in California by Class members. Defendants' unlawful conduct substantially affected California commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within California; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in California were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available under California Bus. & Prof. Code § 16700, *et seq.*

## California Unfair Competition Law
### (On Behalf of Damages Class Members that Purchased Fire Apparatus in California)

164.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.* with respect to purchases of Fire Apparatus in California by Class members. During the Class Period, Defendants marketed, sold, or distributed Fire Apparatus in California, and committed and continue to commit acts of unfair competition by engaging in the acts and practices specified above. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the following: (1) violations of Section 1 of the Sherman Antitrust Act, set forth above; (2) violations of the Cartwright Act, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether in violation of the Cartwright Act, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent within the meaning of Section 17200. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Class members to pay supra-competitive and artificially inflated prices for Fire Apparatus sold in California. Class members suffered injury in fact and lost money or property as a result of such unfair competition. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiff and Class members seek all available relief pursuant to Cal. Bus. & Prof. Code § 17200, *et seq.*

**Colorado Antitrust Act**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in Colorado)**

165.    Defendants have violated Colo. Rev. Stat. § 6-4-101, *et seq.* with respect to purchases of Fire Apparatus in Colorado by Class members. Defendants' unlawful conduct substantially affected Colorado commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within Colorado; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in Colorado were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available under Colo. Rev. Stat. § 6-4-101, *et seq.*

**Colorado Consumer Protection Act**
**(On Behalf of Damages Class Members that Purchased Fire Trucks in Colorado)**

166.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.* with respect to purchases of Fire Apparatus in Colorado by Class members. During the Class Period, Defendants marketed, sold, or distributed Fire Apparatus in Colorado, and committed and continue to commit acts of unfair competition by engaging in the acts and practices specified above. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices including, but not limited to, the following: (1) violations of Section 1 of the Sherman Antitrust Act, set forth above; (2) violations of the Colorado Antitrust Act, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether in violation of the Colorado Antitrust Act, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent within the meaning of Colo. Rev. Stat. §

6-1-101, *et seq*. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Class members to pay supra-competitive and artificially inflated prices for Fire Apparatus sold in Colorado. Class members suffered injury in fact and lost money or property as a result of such unfair competition. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiff and Class members seek all available relief pursuant to Colo. Rev. Stat. § 6-1-101, *et seq*.

**Connecticut Antitrust Act**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in Connecticut)**

167.    Defendants have violated Conn. Gen. Stat. Ann. § 35-24, *et seq*. with respect to purchases of Fire Apparatus in Connecticut by Class members. Defendants' unlawful conduct substantially affected Connecticut commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within Connecticut; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in Connecticut were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available under Conn. Gen. Stat. Ann. § 35-24, *et seq*.

**Delaware Antitrust Act**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in the Delaware)**

168.    Defendants have violated Del. Code Ann. tit. 6, § 2101, *et seq*. with respect to purchases of Fire Apparatus in Delaware by Class members. Defendants' unlawful conduct substantially affected Connecticut commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within Delaware; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in Delaware were deprived of free and

64

open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire

Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available under Del.

Code Ann. tit. 6, § 2101, *et seq*.

### District of Columbia Antitrust Act
### (On Behalf of Damages Class Members that Purchased Fire Apparatus in the District of Columbia)

169. Defendants have violated District of Columbia Code § 28-4501, *et seq*. with respect

to purchases of Fire Apparatus in the District of Columbia by Class members. Defendants' unlawful

conduct substantially affected District of Columbia commerce and had the following effects: (1)

Fire Apparatus price competition was restrained or eliminated within the District of Columbia; (2)

Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in

the District of Columbia were deprived of free and open competition; and (4) Class members paid

supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Class members seek

all forms of relief including treble damages under District of Columbia Code § 28-4508.

### Florida Deceptive and Unfair Trade Practices Act
### (On Behalf of Damages Class Members that Purchased Fire Apparatus in Florida)

170. Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of Florida Deceptive and Unfair Trade Practices Act, Fla.

Stat. § 501.201, *et seq.* with respect to purchases of Fire Apparatus in Florida by Class members.

During the Class Period, Defendants marketed, sold, or distributed Fire Apparatus in Florida, and

committed and continue to commit acts of unfair competition by engaging in the acts and practices

specified above. The acts, omissions, misrepresentations, practices and non-disclosures of

Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct

of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices

within the meaning of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et*

*seq.* The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Class members to pay supra-competitive and artificially inflated prices for Fire Apparatus sold in Florida. Class members suffered injury in fact and lost money or property as a result of such unfair competition. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiff and Class members seek all forms of relief available under Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*

### Hawaii Antitrust Law
### (On Behalf of Damages Class Members that Purchased Fire Apparatus in Hawaii)

171. Defendants have violated Hawaii Revised Statutes § 480-4 with respect to purchases of Fire Apparatus in Hawaii by Class members. Defendants' unlawful conduct substantially affected Hawaii commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within Hawaii; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in the Hawaii were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available, including treble damages, under Hawaii Revised Statutes § 480-13.

### Illinois Antitrust Act
### (On Behalf of Damages Class Members that Purchased Fire Apparatus in Illinois)

172. Defendants have violated Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/1-11 with respect to purchases of Fire apparatus in Illinois by Class members. Defendants' unlawful conduct substantially affected Illinois commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within Illinois; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in Illinois were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire

66

Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief including treble damages under 740 Ill. Comp. Stat. Ann. 10/1, *et. seq.*

### Illinois Consumer Fraud & Deceptive Business Practices Act
### (On Behalf of State Law Class Members that Purchased Fire Apparatus in Illinois)

173.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Illinois Consumer Fraud and Deceptive Business Practices Act, Ill. Comp. Stat. Ann. § 505/1, *et seq.* with respect to purchases of Fire Apparatus in Illinois by Class members. During the Class Period, Defendants marketed, sold, or distributed Fire Apparatus in Illinois, and committed and continue to commit acts of unfair competition by engaging in the acts and practices specified above. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Illinois Consumer Fraud and Deceptive Business Practices Act, Ill. Comp. Stat. Ann. § 505/1, *et seq.* The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Class members Class to pay supra-competitive and artificially inflated prices for Fire Apparatus sold in Illinois. Class members suffered injury in fact and lost money or property as a result of such unfair competition. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiff and Class members seek all forms of relief, under 815 Ill. Comp. Stat. Ann. § 505/1, *et. seq.*

### Iowa Competition Law
### (On Behalf of Damages Class Members that Purchased Fire Apparatus in Iowa)

174.    Defendants have violated Iowa Code § 553.1, *et seq.* with respect to purchases of Fire Apparatus in Iowa by Class members. Defendants' unlawful conduct substantially affected Iowa commerce and had the following effects: (1) Fire Apparatus price competition was restrained

67

or eliminated within Iowa; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in Iowa were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available under Iowa Code § 553.12.

## Kansas Restraint of Trade Act
### (On Behalf of Damages Class Members that Purchased Fire Apparatus in Kansas)

175.    Defendants have violated Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-101, *et seq*. with respect to purchases of Fire Apparatus in Kansas by Plaintiff and Class members. Defendants' unlawful conduct substantially affected Kansas commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within Kansas; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in Kansas were deprived of free and open competition; and (4) Plaintiff and Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief including treble damages under Kan. Stat. Ann. § 50-161.

## Maine Monopolies and Profiteering Law
### (On Behalf of Damages Class Members that Purchased Fire Apparatus in Maine)

176.    Defendants have violated Maine Antitrust Statute, Me. Rev. Stat. Ann. tit. 10, § 1101, *et seq*. with respect to purchases of Fire Apparatus in Maine by Class members. Defendants' unlawful conduct substantially affected Maine commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within Maine; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in Maine were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief including treble damages under Me. Rev. Stat. Ann. tit. 10, § 1101, *et seq*.

68

**Maryland Antitrust Act**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in Maryland)**

177. Defendants have violated the Maryland Antitrust Act, Md. Code Ann., Com. Law § 11-201, *et seq.* with respect to purchases of Fire Apparatus in Maryland by Class members. Defendants' unlawful conduct substantially affected Maryland commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within Maryland; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in Maryland were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief including treble damages under Md. Code Ann., Com. Law § 11-201, *et seq.*

**Maryland Consumer Protection Act**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in Maryland)**

178. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101, *et. seq.* with respect to purchases of Fire Apparatus in Maryland by Class members. During the Class Period, Defendants marketed, sold, or distributed Fire Apparatus in Maryland, and committed and continue to commit acts of unfair competition by engaging in the acts and practices specified above. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101, *et. seq.* The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Class members to pay supra-competitive and artificially inflated prices for Fire Apparatus sold in Maryland. Class members suffered injury

in fact and lost money or property as a result of such unfair competition. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiff and Class members seek all forms of relief, under Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101, *et. seq.*

**Massachusetts Consumer Protection Act**
**(On Behalf of State Law Class Members that Purchased Fire Apparatus in Massachusetts)**

179. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ann. Ch. 93A § 1, *et. seq.* with respect to purchases of Fire Apparatus in Massachusetts by Class members. During the Class Period, Defendants marketed, sold, or distributed Fire Apparatus in Massachusetts, and committed and continue to commit acts of unfair competition by engaging in the acts and practices specified above. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ann. Ch. 93A § 1, *et. seq.* The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Class members to pay supra-competitive and artificially inflated prices for Fire Apparatus sold in Massachusetts. Class members suffered injury in fact and lost money or property as a result of such unfair competition. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiff and Class members seek all forms of relief under Mass. Gen. Laws Ann. Ch. 93A § 1, *et. seq.*

70

**Michigan Antitrust Reform Act**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in Michigan)**

180.    Defendants have violated Michigan Antitrust Reform Act, Michigan Comp. Laws. Ann. § 445.771, *et seq.* with respect to purchases of Fire Apparatus in Michigan by Class members. Defendants' unlawful conduct substantially affected Michigan commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within Michigan; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in Michigan were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available, including treble damages, under Mich. Comp. Laws Ann. § 445.778.

**Michigan Consumer Protection Act**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in Michigan)**

181.    Defendants have engaged in unfair, unconscionable, and deceptive acts or practices in violation of the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, *et seq.* with respect to purchases of Fire Apparatus in Michigan by Class members. During the Class Period, Defendants marketed, sold, or distributed Fire Apparatus in Michigan, and committed and continue to commit acts of unfair competition by engaging in the acts and practices specified above. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, *et seq.* The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Class members to pay supra-competitive and artificially inflated prices for Fire Apparatus sold in Michigan. Class members suffered injury in fact and lost money or property as a

71

result of such unfair competition. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiff and Class members seek all forms of relief available under Mich. Comp. Laws Ann. § 445.901, *et seq.*

**Minnesota Antitrust Law**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in Minnesota)**

182. Defendants have violated Minnesota Antitrust Law, Minn. Stat. § 325D.49, *et seq*. with respect to purchases of Fire Apparatus in Minnesota by Class members. Defendants' unlawful conduct substantially affected Minnesota commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within Minnesota; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in Minnesota were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief including treble damages under Minn. Stat. § 325D.57.

**Minnesota Prevention of Consumer Fraud Act**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in Minnesota)**

183. Defendants have engaged in deceptive acts or practices in violation of Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq.* with respect to purchases of Fire Apparatus in Minnesota by Class members. During the Class Period, Defendants marketed, sold, or distributed Fire Apparatus in Minnesota, and committed and continue to commit acts of unfair competition by engaging in the acts and practices specified above. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq.* The unlawful and unfair business

72

practices of Defendants, and each of them, as described above, have caused and continue to cause Class members to pay supra-competitive and artificially inflated prices for Fire Apparatus sold in Minnesota. Class members suffered injury in fact and lost money or property as a result of such unfair competition. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiff and Class members seek all forms of relief available under Minn. Stat. § 8.31.

**Mississippi Antitrust Law**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in Mississippi)**

184.    Defendants have violated Mississippi Antitrust Statute, Miss. Code Ann. § 75-21-1, *et seq.* with respect to purchases of Fire Apparatus in Mississippi by Class members. Defendants' unlawful conduct substantially affected Mississippi commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within Mississippi; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in Mississippi were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available under Mississippi Code Ann. § 75-21-9.

**Montana Unfair Trade Practices Act**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in Montana)**

185.    Defendants have engaged in deceptive acts or practices in violation of Montana Unfair Trade Practices Act, Mont. Code § 30-14-201, *et seq.* and § 30-14-201, *et seq.* with respect to purchases of Fire Apparatus in Montana by Class members. During the Class Period, Defendants marketed, sold, or distributed Fire Apparatus in Montana, and committed and continue to commit acts of unfair competition by engaging in the acts and practices specified above. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by

73

means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the

Montana Unfair Trade Practices and Consumer Protection Act. The unlawful and unfair business

practices of Defendants, and each of them, as described above, have caused and continue to cause

Class members to pay supra-competitive and artificially inflated prices for Fire Apparatus sold in

Montana. Class members suffered injury in fact and lost money or property as a result of such unfair

competition. As alleged in this Complaint, Defendants have been unjustly enriched as a result of

their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiff and Class

members seek all forms of relief available under Mont. Code § 30-14-201, *et seq.*

### Nebraska Junkin Act
### (On Behalf of Damages Class Members that Purchased Fire Apparatus in Nebraska)

186.    Defendants have violated Nebraska Junkin Act, Neb. Rev. Stat. § 59-801, *et seq.*

with respect to purchases of Fire Apparatus in Nebraska by Class members. Defendants' unlawful

conduct substantially affected Nebraska commerce and had the following effects: (1) Fire

Apparatus price competition was restrained or eliminated within Nebraska; (2) Fire Apparatus

prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in Nebraska were

deprived of free and open competition; and (4) Class members paid supra-competitive, artificially

inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief

available under Neb. Rev. Stat. § 59-801, *et seq.*

### Nebraska Consumer Protection Act
### (On Behalf of Damages Class Members that Purchased Fire Trucks in Nebraska)

187.    Defendants have engaged in unfair methods of competition and unfair or deceptive

acts or practices in the conduct of trade or commence in violation of Nebraska Consumer Protection

Act, Neb. Rev. Stat. § 59-1601, *et seq.* with respect to purchases of Fire Apparatus in Nebraska by

Class members. During the Class Period, Defendants marketed, sold, or distributed Fire Apparatus

in Nebraska, and committed and continue to commit acts of unfair competition by engaging in the

acts and practices specified above. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the Nebraska Consumer Protection Act, Neb. Rev. Stat.§ 59-1601, *et seq.* The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Class members to pay supra-competitive and artificially inflated prices for Fire Apparatus sold in Nebraska. Class members suffered injury in fact and lost money or property as a result of such unfair competition. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiff and Class members seek all forms of relief available under Neb. Rev. Stat.§ 59-1601, *et seq.*

## Nevada Unfair Trade Practices Act
### (On Behalf of Damages Class Members that Purchased Fire Apparatus in Nevada)

188. Defendants have violated Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010, *et seq.* with respect to purchases of Fire Apparatus in Nevada by Class members. Defendants' unlawful conduct substantially affected Nevada commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within Nevada; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in Nevada were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief including treble damages under Nev. Rev. Stat. § 598A.210.

## Nevada Deceptive Trade Practices Act
### (On Behalf of Damages Class Members that Purchased Fire Apparatus in Nevada)

189. Defendants have engaged in deceptive trade practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.* with respect to purchases of Fire

Apparatus in Nevada by Class members. During the Class Period, Defendants marketed, sold, or distributed Fire Apparatus in Nevada, and committed and continue to commit acts of unfair competition by engaging in the acts and practices specified above. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.* The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Class members to pay supra-competitive and artificially inflated prices for Fire Apparatus sold in Nevada. Class members suffered injury in fact and lost money or property as a result of such unfair competition. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiff and Class members seek all forms of relief available under Nev. Rev. Stat. § 598.0993.

**New Hampshire Antitrust Law**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in New Hampshire)**

190.    Defendants have violated New Hampshire Antitrust Statute, N.H. Rev. Stat., tit. XXXI, § 356:1, *et seq.* with respect to purchases of Fire Apparatus in New Hampshire by Class members. Defendants' unlawful conduct substantially affected New Hampshire commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within New Hampshire; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in New Hampshire were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available, including treble damages, under New Hampshire Rev. Stat. § 356:11.

76

**New Hampshire Consumer Protection Act**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in New Hampshire)**

191. Defendants have engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commence in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. tit. XXXI § 358-A, *et seq.* with respect to purchases of Fire Apparatus in New Hampshire by Class members. During the Class Period, Defendants marketed, sold, or distributed Fire Apparatus in New Hampshire, and committed and continue to commit acts of unfair competition by engaging in the acts and practices specified above. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. tit. XXXI § 358-A, *et seq.* The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Class members to pay supra-competitive and artificially inflated prices for Fire Apparatus sold in New Hampshire. Class members suffered injury in fact and lost money or property as a result of such unfair competition. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiff and Class members seek all forms of relief available under N.H. Rev. Stat. Ann. tit. XXXI, §§ 358-A:10 and 358-A:10-a.

**New Jersey Antitrust Act**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in New Jersey)**

192. Defendants have violated N.J. Stat. Ann. § 56:9-1, *et seq.* with respect to purchases of Fire Apparatus in New Jersey by Class members. Defendants' unlawful conduct substantially affected New Jersey commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within New Jersey; (2) Fire Apparatus prices were raised, fixed, and

stabilized at artificially high levels; (3) purchasers in New Jersey were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available, including treble damages, under N.J. Stat. Ann. § 56:9-1, *et seq.*

## New Mexico Antitrust Act
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in New Mexico)**

193. Defendants have violated New Mexico Antitrust Act, N.M. Stat. Ann. § 57-1-1, *et seq.* with respect to purchases of Fire Apparatus in New Mexico by Class members. Defendants' unlawful conduct substantially affected New Mexico commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within New Mexico; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in New Mexico were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief including treble damages under N.M. Stat. Ann. § 57-1-3(A).

## New Mexico Unfair Trade Practices Act
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in New Mexico)**

194. Defendants have engaged in unfair or deceptive trade practices and unconscionable trade practices in violation of the New Mexico Unfair Trade Practices Act, N.M. Stat. Ann. § 57-12-1, *et seq.* with respect to purchases of Fire Apparatus in New Mexico by Class members. During the Class Period, Defendants marketed, sold, or distributed Fire Apparatus in New Mexico, and committed and continue to commit acts of unfair competition by engaging in the acts and practices specified above. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the New Mexico Unfair Trade Practices Act, N.M. Stat. Ann. § 57-12-1, *et*

*seq.* The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Class members to pay supra-competitive and artificially inflated prices for Fire Apparatus sold in New Mexico. Class members suffered injury in fact and lost money or property as a result of such unfair competition. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiff and Class members seek all forms of relief available under N.M. Stat. Ann. § 57-12-10.

## New York Donnelly Act
### (On Behalf of Damages Class Members that Purchased Fire Apparatus in New York)

195.    Defendants have violated New York Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.* with respect to purchases of Fire Apparatus in New York by Class members. Defendants' unlawful conduct substantially affected New York commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within New York; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in New York were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief including treble damages under New York Gen. Bus. Law § 340, *et seq.*

## New York Deceptive Practices Act
### (On Behalf of Damages Class Members that Purchased Fire Apparatus in New York)

196.    Defendants have engaged in deceptive acts or practices in violation of New York Gen. Bus. Law § 349, *et seq.* with respect to purchases of Fire Apparatus in New York by Class members. During the Class Period, Defendants marketed, sold, or distributed Fire Apparatus in New York, and committed and continue to commit acts of unfair competition by engaging in the acts and practices specified above. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing

79

course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the New York Gen. Bus. Law § 349, *et seq.* The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Class members to pay supra-competitive and artificially inflated prices for Fire Apparatus sold in New York. Class members suffered injury in fact and lost money or property as a result of such unfair competition. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiff and the Class seek all forms of relief available under N.Y. Gen. Bus. Law § 349(h).

## North Carolina Antitrust Law
### (On Behalf of Damages Class Members that Purchased Fire Apparatus in North Carolina)

197. Defendants have violated North Carolina General Statutes, N.C. Gen. Stat. § 75-1, *et seq.* with respect to purchases of Fire Apparatus in North Carolina by Class members. Defendants' unlawful conduct substantially affected North Carolina commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within North Carolina; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in North Carolina were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-16.

## North Dakota Uniform State Antitrust Act
### (On Behalf of Damages Class Members that Purchased Fire Apparatus in North Dakota)

198. Defendants have violated North Dakota Uniform State Antitrust Act, N.D. Cent. Code § 51-08.1-01, *et seq.* with respect to purchases of Fire Apparatus in North Dakota by Class members. Defendants' unlawful conduct substantially affected North Dakota commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within

North Dakota; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in North Dakota were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available, including treble damages, under North Dakota Cent. Code § 51-08.1-08.

**North Dakota Unfair Trade Practices Act**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in North Dakota)**

199.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unfair Trade Practices Act, N.D. Cent. Code § 51-10-01, *et seq.* with respect to purchases of Fire Apparatus in North Dakota by Class members. During the Class Period, Defendants marketed, sold, or distributed Fire Apparatus in North Dakota, and committed and continue to commit acts of unfair competition by engaging in the acts and practices specified above. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of N.D. Cent. Code § 51-10-01, *et seq.* The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Class members to pay supra-competitive and artificially inflated prices for Fire Apparatus sold in North Dakota. Class members suffered injury in fact and lost money or property as a result of such unfair competition. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiff and Class members seek all forms of relief under N.D. Cent. Code § 51-10-01, *et seq.*

81

**Oregon Antitrust Law**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in Oregon)**

200.    Defendants have violated Oregon Antitrust Law, Or. Rev. Stat. § 646.705, *et seq.* with respect to purchases of Fire Apparatus in Oregon by Class members. Defendants' unlawful conduct substantially affected Oregon commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within Oregon; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in Oregon were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available, including treble damages, under Oregon Rev. Stat. § 646.780.

**Oregon Unlawful Trade Practices Act**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in Oregon)**

201.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Oregon Unfair Trade Practices Act, Or. Rev. Stat. § 646.605, *et seq.* with respect to purchases of Fire Apparatus in Oregon by Class members. During the Class Period, Defendants marketed, sold, or distributed Fire Apparatus in Oregon, and committed and continue to commit acts of unfair competition by engaging in the acts and practices specified above. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Or. Rev. Stat. § 646.605, *et seq.* The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Class members to pay supra-competitive and artificially inflated prices for Fire Apparatus sold in Oregon. Class members suffered injury in fact and lost money or property as a result of such unfair competition. As alleged in this Complaint, Defendants have been unjustly enriched as a result of

their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiff and Class members seek all forms of relief under Or. Rev. Stat. § 646.605, *et seq.*

## Rhode Island Antitrust Act
### (On Behalf of Damages Class Members who Purchased Fire Apparatus in Rhode Island)

202.    Defendants have violated Rhode Island Antitrust Act, R.I. Gen. Laws § 6-36-1, *et seq.* with respect to purchases of Fire Apparatus in Rhode Island by Class members. Defendants' unlawful conduct substantially affected Rhode Island commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within Rhode Island; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in Rhode Island were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available, including treble damages, under R.I. Gen. Laws § 6-36-11.

## South Carolina Unfair Trade Practices Act
### (On Behalf of Damages Class Members who Purchased Fire Apparatus in South Carolina)

203.    Defendants have engaged in unfair methods of competition or unfair, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.* with respect to purchases of Fire Apparatus in South Carolina by Class members. During the Class Period, Defendants marketed, sold, or distributed Fire Apparatus in South Carolina, and committed and continue to commit acts of unfair competition by engaging in the acts and practices specified above. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of S.C. Code Ann. § 39-5-10, *et seq.* The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Class

83

members to pay supra-competitive and artificially inflated prices for Fire Apparatus sold in South Carolina. Class members suffered injury in fact and lost money or property as a result of such unfair competition. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiff and Class members seek all forms of relief, including treble damages under S.C. Code Ann. § 39-5-140.

**South Dakota Antitrust Law**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in South Dakota)**

204. Defendants have violated South Dakota Antitrust Statute, S.D. Codified Laws § 37-1-1, *et seq.* with respect to purchases of Fire Apparatus in South Dakota by Class members. Defendants' unlawful conduct substantially affected South Dakota commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within South Dakota; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in South Dakota were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available, including treble damages, under South Dakota Codified Laws § 37-1-24.

**South Dakota Deceptive Trade Practices and Consumer Protection Act**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in South Dakota)**

205. Defendants have engaged in deceptive act or practices in violation of South Dakota Deceptive Trade Practices and Consumer Protection Act, S.D. Codified Laws § 37-24, *et seq.* with respect to purchases of Fire Apparatus in South Dakota by Class members. During the Class Period, Defendants marketed, sold, or distributed Fire Apparatus in South Dakota, and committed and continue to commit acts of unfair competition by engaging in the acts and practices specified above. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition

84

by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of S.D. Codified Laws § 37-24, *et seq.* The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Class members to pay supra-competitive and artificially inflated prices for Fire Apparatus sold in South Dakota. Class members suffered injury in fact and lost money or property as a result of such unfair competition. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiff and Class members seek all forms of relief under S.D. Codified Laws § 37-24-31.

**Tennessee Trade Practice Act**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in Tennessee)**

206. Defendants have violated the Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101, *et seq.* with respect to purchases of Fire Apparatus in Tennessee by Class members. During the Class Period, Defendants marketed, sold, or distributed Fire Apparatus in Tennessee, and committed and continue to commit acts of unfair competition by engaging in the acts and practices specified above. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Tenn. Code Ann. § 47-25-101, *et seq.* The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Class members to pay supra-competitive and artificially inflated prices for Fire Apparatus sold in Tennessee. Class members suffered injury in fact and lost money or property as a result of such unfair competition. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiff and Class members seek all forms of relief available under Tenn. Code Ann. § 47-25-106.

85

**Utah Antitrust Act**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in Utah)**

207.     Defendants have violated Utah Antitrust Act, Utah Code Ann. § 76-16-501, *et seq.*
with respect to purchases of Fire Apparatus in Utah by Class members. Defendants' unlawful
conduct substantially affected Utah commerce and had the following effects: (1) Fire Apparatus
price competition was restrained or eliminated within Utah; (2) Fire Apparatus prices were raised,
fixed, and stabilized at artificially high levels; (3) purchasers in Utah were deprived of free and
open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire
Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available, including
treble damages, under Utah Code Ann. § 76-16-511.

**Vermont Consumer Fraud Act**
**(On Behalf of Damages Class Members that Purchased Fire Apparatus in Vermont)**

208.     Defendants have engaged in unfair methods of competition or unfair or deceptive
acts or practices in violation of Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, § 2451, *et seq.*
with respect to purchases of Fire Apparatus in Vermont by Class members. During the Class Period,
Defendants marketed, sold, or distributed Fire Apparatus in Vermont, and committed and continue
to commit acts of unfair competition by engaging in the acts and practices specified above. The
acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein,
constituted a common, continuous, and continuing course of conduct of unfair competition by
means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Vt.
Stat. Ann. tit. § 2451, *et seq.* The unlawful and unfair business practices of Defendants, and each of
them, as described above, have caused and continue to cause Class members to pay supra-
competitive and artificially inflated prices for Fire Apparatus sold in Vermont. Class members
suffered injury in fact and lost money or property as a result of such unfair competition. As alleged
in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and

by Defendants' unfair competition. Accordingly, Plaintiff and Class members seek all forms of relief including treble damages under Vt. Stat. Ann. tit. 9, § 2465.

## West Virginia Antitrust Act
## (On Behalf of Damages Class Members that Purchased Fire Apparatus in West Virginia)

209. Defendants have violated West Virginia Antitrust Act, W. Va. Code § 47-18-1, *et seq.* with respect to purchases of Fire Apparatus in West Virginia by Class members. Defendants' unlawful conduct substantially affected West Virginia commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within West Virginia; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in West Virginia were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available, including treble damages, under West Virginia Code § 47-18-9.

## Wisconsin Antitrust Act
## (On Behalf of Damages Class Members that Purchased Fire Apparatus in Wisconsin)

210. Defendants have violated Wisconsin Antitrust Act, Wis. Stat. Ann. § 133.01, *et seq.* with respect to purchases of Fire Apparatus in Wisconsin by Class members. Defendants' unlawful conduct substantially affected Wisconsin commerce and had the following effects: (1) Fire Apparatus price competition was restrained or eliminated within Wisconsin; (2) Fire Apparatus prices were raised, fixed, and stabilized at artificially high levels; (3) purchasers in Wisconsin were deprived of free and open competition; and (4) Class members paid supra-competitive, artificially inflated prices for Fire Apparatus. Accordingly, Plaintiff and Class members seek all forms of relief available, including treble damages, under Wis. Stat. Ann. § 133.18.

211. Plaintiff and other Class members in each of the above states have been injured in by reason of Defendants' unlawful combinations, contracts, and agreements. Plaintiff and other

Class members have paid more for Fire Apparatus than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust and consumer protection laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

### FOURTH CLAIM FOR RELIEF
### Unjust Enrichment (Against all Defendants)
### All States, District of Columbia and U.S. Territories
(On behalf of the Damages Class for Restitution)

212. To the extent required, this claim is pleaded in the alternative to the other claims and/or causes of action in this Complaint.

213. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

214. Defendants have knowingly received significant value and benefits in the form of money (profits), and it would be unjust, unlawful, and/or morally wrong for them to retain those benefits, which were conferred unknowingly and/or unwillingly because of their conduct.

215. Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiff and other Class members.

216. Plaintiff and other Class members have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and other Class members.

217. Defendants have been enriched by revenue resulting from unlawful overcharges for Fire Apparatus while Plaintiff and other Class members have been impoverished by the overcharges they paid for fire apparatus imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' impoverishment are connected.

218.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiff other Class members, because Plaintiff and other Class members paid supra-competitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

219.    Plaintiff and other Class members did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

220.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate Fire Apparatus prices.

221.    The benefits upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Fire Apparatus are ascertainable by review of sales records.

222.    It would be futile for Plaintiff and other Class members to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiff and other Class members with respect to Defendants' Fire Apparatus sales.

223.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supra-competitive and artificially inflated prices for Fire Apparatus is a direct and proximate result of Defendants' unlawful practices.

224.    The financial benefits derived by Defendants rightfully belong to Plaintiff and other Class members, because Plaintiff and other Class members paid supra-competitive prices during the Class Period, inuring to the benefit of Defendants.

89

225.    Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred on them by overpayments by Plaintiff and other Class members.

226.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for Fire Apparatus derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

227.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiff and other Class members. Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

228.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and other Class members all unlawful or inequitable proceeds they received from their Fire Apparatus sales.

90

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff demands judgment against Defendants, as follows:

1. Awarding Plaintiff's actual, consequential, compensatory, treble, punitive, and/or other damages, in an amount to be proven at trial, including pre- and post- judgment interest at the statutory rates;

2. Entering all appropriate injunctive relief against Defendants to prohibit Defendants from continuing to engage in their unlawful conduct or in any similar and related conduct in the future, deprive Defendants of the fruits of their illegal conduct, and remedy the harms to competition and consumers caused by Defendants' conduct, including, without limitation, an order that Defendants divest sufficient assets to restore the competition that existed in the relevant product and geographic markets prior to Defendants' unlawful acquisitions;

3. Awarding Plaintiff treble damages pursuant to Section 4 of the Clayton Act and the relevant state statutes listed above.

4. Awarding Plaintiffs equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

5. Permanently enjoining Defendants pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 (a) and 26, from continuing their unlawful conduct;

6. Awarding Plaintiff its reasonable costs and expenses, including attorneys' fees; and

7. Awarding all other legal or equitable relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all claims so triable under Federal Rule of Civil Procedure Rule 38(b).

Dated: January 29, 2026

Respectfully submitted,

By:  /s/  Sean M. Sturdivan
     Sean M. Sturdivan   KS Bar No. 21286
     Jamie Powell      KS Bar No. 031062
     SANDERS WARREN & RUSSELL LLP
     11225 College Blvd, Suite 450
     Overland Park, KS 66210
     Direct: (913) 234-6137
     Telephone: (913) 234-6100
     Fax: (913) 234-6199
     s.sturdivan@swrllp.com
     j.powell@swrllp.com


     Jennifer D. Hackett
     (*pro hac vice motion forthcoming*)
     James R. Martin
     (*pro hac vice motion forthcoming*)
     Sabrina A. Nelson
     (*pro hac vice motion forthcoming*)
     Noah Wolfenstein
     (*pro hac vice motion forthcoming*)
     Desmond Sims
     (*pro hac vice motion forthcoming*)
     ZELLE LLP
     1775 Pennsylvania Avenue, NW
     Suite 375
     Washington, DC 20006
     Telephone: (202) 899-4100
     Facsimile: (612) 336-9100
     jmartin@zellelaw.com
     jhackett@zellelaw.com
     snelson@zellelaw.com
     nwolfenstein@zellelaw.com
     dsims@zellelaw.com

Basel J. Musharbash
(*pro hac vice motion forthcoming*)
Anureet Sandhu
(*pro hac vice motion forthcoming*)
Domenic Powell
(*pro hac vice motion forthcoming*)
ANTIMONOPOLY COUNSEL
500 Clarksville Street
P.O. Box 795
Paris, Texas 75461
Telephone: (903) 205-8422
Fax: (903) 347-2917
basel@antimonopoly.us
anu@antimonopoly.us
domenic@antimonopoly.us

***Attorneys for Plaintiff the Unified
Government of Wyandotte County and
Kansas City, Kansas***

Query    Reports    Utilities    Help    Log Out

MJLC3

# U.S. District Court
## DISTRICT OF KANSAS (Kansas City)
## CIVIL DOCKET FOR CASE #: 2:26-cv-02057-JWB-ADM

Unified Government of Wyandotte County and Kansas City, Kansas v. REV Group, Inc. et al
Assigned to: Chief District Judge John W. Broomes
Referred to: Magistrate Judge Angel D. Mitchell
Cause: 15:1 Antitrust Litigation

Date Filed: 01/29/2026
Jury Demand: Plaintiff
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

**Plaintiff**

**Unified Government of Wyandotte County and Kansas City, Kansas**

represented by **Anureet Sandhu**
Antimonopoly Counsel
500 Clarksville Street
PO Box 795
Paris, TX 75461
903-205-8422
Fax: 903-347-2917
Email: anu@antimonopoly.us
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Basel J. Musharbash**
Antimonopoly Counsel
500 Clarksville Street
PO Box 795
Paris, TX 75461
903-205-8422
Fax: 903-347-2917
Email: basel@antimonopoly.us
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Desmond Sims**
Zelle LLP
1775 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006
202-899-4115
Fax: 612-336-9100
Email: dsims@zellelaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Domenic Powell**

Antimonopoly Counsel
500 Clarksville Street
PO Box 795
Paris, TX 75461
903-205-8422
Fax: 903-347-2917
Email: domenic@antimonopoly.us
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James R. Martin**
Zelle LLP
1775 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006
202-899-4101
Fax: 612-336-9100
Email: jmartin@zellelaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie Nicole Powell**
Sanders Warren & Russell, LLP - OP
Compass Corporate Centre
11225 College Blvd., Suite 450
Overland Park, KS 66210
314-496-1800
Email: j.powell@swrllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Duncan Hackett**
Zelle LLP
1775 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006
202-899-4102
Fax: 612-336-9100
Email: jhackett@zellelaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Noah Wolfenstein**
Zelle LLP
1775 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006
202-899-4105
Fax: 612-336-9100
Email: nwolfenstein@zellelaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sean M. Sturdivan**
Sanders Warren & Russell, LLP - OP
Compass Corporate Centre
11225 College Blvd., Suite 450
Overland Park, KS 66210
913-234-6137
Fax: 913-234-6199
Email: s.sturdivan@swrllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**REV Group, Inc.**

**Defendant**

**Oshkosh Corporation**

**Defendant**

**Pierce Manufacturing, Inc.**

**Defendant**

**Rosenbauer America, LLC**

**Defendant**

**Rosenbauer South Dakota, LLC**

**Defendant**

**Rosenbauer Minnesota, LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/29/2026 | 1 | COMPLAINT with trial location of Kansas City (Filing fee $405, Internet Payment Receipt Number AKSDC-6886756.), filed by Unified Government of Wyandotte County and Kansas City, Kansas. (Sturdivan, Sean) (Entered: 01/29/2026) |
| 01/29/2026 | 2 | CIVIL COVER SHEET by Plaintiff Unified Government of Wyandotte County and Kansas City, Kansas. (Sturdivan, Sean) (Entered: 01/29/2026) |
| 01/29/2026 | | NOTICE OF JUDGE ASSIGNMENT: Case assigned to District Judge John W. Lungstrum and Magistrate Judge Angel D. Mitchell for all proceedings. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)<br><br>**NOTICE OF MAGISTRATE JUDGE AVAILABILITY: A United States magistrate judge is available to conduct all proceedings in this civil action if all parties voluntarily consent. Information & consent forms are available at https://www.uscourts.gov/file/459/download (jk) (Entered: 01/29/2026)** |
| 01/29/2026 | | NOTICE OF DEFICIENCY - Designation of place of trial is missing. The filing party/attorney is directed to correct the deficiency immediately. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jk) (Entered: 01/29/2026) |

| 01/29/2026 | 3 | ORDER REASSIGNING CASE: Case reassigned to Chief District Judge John W. Broomes for all further proceedings. District Judge John W. Lungstrum no longer assigned to case. Signed by District Judge John W. Lungstrum on 1/29/2026. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(md) (Entered: 01/29/2026) |
|---|---|---|
| 01/29/2026 | 4 | DESIGNATION OF PLACE OF TRIAL filed by Plaintiff Unified Government of Wyandotte County and Kansas City, Kansas - trial to be held in Kansas City. (Sturdivan, Sean) (Entered: 01/29/2026) |
| 01/30/2026 | 5 | WAIVER OF SERVICE Returned Executed by Unified Government of Wyandotte County and Kansas City, Kansas. REV Group, Inc. waiver sent on 1/30/2026, answer due 3/31/2026. (Powell, Jamie) (Entered: 01/30/2026) |
| 01/30/2026 | 6 | WAIVER OF SERVICE Returned Executed by Unified Government of Wyandotte County and Kansas City, Kansas. Pierce Manufacturing, Inc. waiver sent on 1/30/2026, answer due 3/31/2026. (Powell, Jamie) (Entered: 01/30/2026) |
| 01/30/2026 | 7 | WAIVER OF SERVICE Returned Executed by Unified Government of Wyandotte County and Kansas City, Kansas. Oshkosh Corporation waiver sent on 1/30/2026, answer due 3/31/2026. (Powell, Jamie) (Entered: 01/30/2026) |
| 02/03/2026 | 8 | MOTION for attorney Jennifer Duncan Hackett to appear pro hac vice ( Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6889589.) by Plaintiff Unified Government of Wyandotte County and Kansas City, Kansas (referred to Magistrate Judge Angel D. Mitchell) (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Sturdivan, Sean) (Entered: 02/03/2026) |
| 02/03/2026 | 9 | MOTION for attorney James R. Martin to appear pro hac vice ( Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6889602.) by Plaintiff Unified Government of Wyandotte County and Kansas City, Kansas (referred to Magistrate Judge Angel D. Mitchell) (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Sturdivan, Sean) (Entered: 02/03/2026) |
| 02/03/2026 | 10 | MOTION for attorney Basel J. Musharbash to appear pro hac vice ( Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6889613.) by Plaintiff Unified Government of Wyandotte County and Kansas City, Kansas (referred to Magistrate Judge Angel D. Mitchell) (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Sturdivan, Sean) (Entered: 02/03/2026) |
| 02/03/2026 | 11 | MOTION for attorney Sabrina A. Nelson to appear pro hac vice ( Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6889625.) by Plaintiff Unified Government of Wyandotte County and Kansas City, Kansas (referred to Magistrate Judge Angel D. Mitchell) (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Sturdivan, Sean) (Entered: 02/03/2026) |
| 02/03/2026 | 12 | MOTION for attorney Domenic Powell to appear pro hac vice ( Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6889637.) by Plaintiff Unified Government of Wyandotte County and Kansas City, Kansas (referred to Magistrate Judge Angel D. Mitchell) (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Sturdivan, Sean) (Entered: 02/03/2026) |
| 02/03/2026 | 13 | MOTION for attorney Anureet Sandhu to appear pro hac vice ( Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6889651.) by Plaintiff Unified Government of Wyandotte County and Kansas City, Kansas (referred to Magistrate Judge Angel D. Mitchell) (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Sturdivan, Sean) (Entered: 02/03/2026) |

| 02/03/2026 | 14 | MOTION for attorney Desmond Sims to appear pro hac vice ( Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6889668.) by Plaintiff Unified Government of Wyandotte County and Kansas City, Kansas (referred to Magistrate Judge Angel D. Mitchell) (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Sturdivan, Sean) (Entered: 02/03/2026) |
|---|---|---|
| 02/03/2026 | 15 | MOTION for attorney Noah Wolfenstein to appear pro hac vice ( Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6889675.) by Plaintiff Unified Government of Wyandotte County and Kansas City, Kansas (referred to Magistrate Judge Angel D. Mitchell) (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Sturdivan, Sean) (Entered: 02/03/2026) |
| 02/03/2026 | 16 | ORDER granting Motions to Appear Pro Hac Vice of 8 Jennifer Duncan Hackett, 9 James R. Martin, 10 Basel J. Musharbash, 12 Domenic Powell, 13 Anureet Sandhu, 14 Desmond Sims, and 15 Noah Wolfenstein for plaintiff Unified Government of Wyandotte County and Kansas City, Kansas pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 2/3/2026. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jsh) (Entered: 02/03/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 02/04/2026 08:35:14 | | | |
| **PACER Login:** | jbdocketing2023 | **Client Code:** | 57492-10017 |
| **Description:** | Docket Report | **Search Criteria:** | 2:26-cv-02057-JWB-ADM |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |