**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATON**

| | |
|---|---|
| IN RE: FIRE APPARATUS<br>ANTITRUST LITIGATION | MDL No. 3179 |

**INTERESTED PARTY RESPONSE TO MOTION TO TRANSFER BY PLAINTIFFS
PEOPLE OF THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES, AND
CONSOLIDATED FIRE PROTECTION DISTRICT OF LOS ANGELES COUNTY**

Pursuant to Rule 6.2(e) of the Rules of Procedure for the United States Judicial Panel on

Multidistrict Litigation, Plaintiffs in the action *The People of the State of California, acting by*

*and through the Los Angeles County Counsel; County of Los Angeles; and Consolidated Fire*

*Protection District of Los Angeles County v. REV Group, Inc., et al.*, Case No. 2:26-cv-01468

(C.D. Cal.) respectfully submit this Interested Party Response to Defendants' Motion to Transfer

and Centralize Related Actions for Consolidated Pretrial Proceedings (ECF No. 1).

**TABLE OF CONTENTS**

I.     Introduction.................................................................................................................. 1

II.    The Panel Should Not Consolidate the California Action with the Other Cases................ 3

III.   In the Alternative, the Panel Should Transfer the Cases to the Honorable Judge Anne Hwang in the Central District of California, Western Division................................................. 11

    A.     California and Los Angeles Represent a Disproportional Share of Fire Apparatus Purchases Relative to Other States and to the Named Plaintiffs in the Other Actions ......... 11

    B.     Los Angeles Is as Convenient or More Convenient than the Other Districts Suggested for Transfer......................................................................................................................... 15

    C.     The Central District of California, Western Division, and Judge Anne Hwang Are a Capable Forum and Judge to Handle an MDL of These Cases ........................................... 16

IV.    Conclusion ................................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abbott Labs, Inc., Similac Prods. Liab. Litig.*,
    763 F. Supp. 2d 1376 (J.P.M.L. 2011)........................................................................ 8

*In re Allen Compound Bow Pat. Litig.*
    446 F. Supp. 248 (J.P.M.L. 1978) .............................................................................. 8

*In re Axon Enter., Inc., Body-Worn Camera & Digit. Evidence Mgmt. Sys. Antitrust Litig.*,
    776 F. Supp. 3d 1344 (J.P.M.L. 2025) ...................................................................... 9

*In re Belviq (Lorcaserin HCl) Prods. Liab. Litig.*,
    555 F. Supp. 3d 1369 (J.P.M.L. 2021) ...................................................................... 6

*In re Best Buy Co., Inc., Cal. Song-Beverly Credit Card Act Litig.*,
    804 F. Supp. 2d 1376 (J.P.M.L. 2011)...................................................................... 10

*In re Blue Cross Blue Shield Antitrust Litig.*,
    908 F. Supp. 2d 1373 (J.P.M.L. 2012) ...................................................................... 5

*In re Coll. Athlete Comp. Antitrust Litig.*,
    730 F. Supp. 3d 1378 (J.P.M.L. 2024) ...................................................................... 10

*In re Concrete Pipe*,
    302 F. Supp. 244 (J.P.M.L. 1969) .............................................................................. 9

*In re Electrolux Dryer Prods. Liab. Litig.*,
    978 F. Supp. 2d 1376  (J.P.M.L. 2013) ...................................................................... 6

*In re FDIC Cal. Prop. Tax Penalties Litig.*,
    1999 U.S. Dist. LEXIS 188  (J.P.M.L. Jan. 6 1999) .................................................. 13

*In re Gasoline Lessee Dealers Antitrust Litig.*,
    479 F. Supp. 578 (J.P.M.L. 1979) ....................................................................... 6, 7, 8

*In re Gov't Auto Fleet Sales*,
    328 F. Supp. 218 (J.P.M.L. 1971) .............................................................................. 15

*In re Kauffman Mut. Fund Actions*,
    337 F. Supp. 1337 (J.P.M.L. 1972) ............................................................................ 17

*In re Multidistrict Private Civ. Treble Damage Antitrust Litig. Involving Admission Tickets*,
    302 F. Supp. 1339 (J.P.M.L. 1969) ............................................................................ 13

*In re Pacquiao-Mayweather Boxing Match Pay-Per-View Litig.*,
122 F. Supp. 3d 1372 (J.P.M.L. 2015) ................................................................ 16

*In re Petroleum Prods. Antitrust Litig.*,
419 F. Supp. 712 (J.P.M.L. 1976) ...................................................................... 14

*In re Sears, Roebuck & Co. Emp. Pracs. Litig.*,
487 F. Supp. 1362 (J.P.M.L. 1980) ...................................................................... 6

*In re Uber Techs, Inc., Passenger Sexual Assault Litig.*,
712 F. Supp. 3d 1394 (J.P.M.L. 2024) .................................................................. 6

*Kachuck Enters. v. Mission Produce, Inc.*,
2026 U.S. Dist. LEXIS 13017 (C.D. Cal. Jan. 22, 2026) ...................................... 18

*T-Mobile United States, Inc. v. WCO Spectrum LLC*,
2025 U.S. Dist. LEXIS 230041 (C.D. Cal. Oct. 31, 2025)..................................... 18

**Statutes**

28 U.S.C. § 1407(a) ...................................................................................... passim

**Other Authorities**

*2024 Dispatch Statistics*, County of Los Angeles Fire Department,
https://fire.lacounty.gov/2024-dispatch-statistics/ (last visited Feb. 26, 2026) ........................ 13

*About Us*, County of Los Angeles Fire Department,
https://fire.lacounty.gov/about-us-
2/#:~:text=The%20Los%20Angeles%20County%20Fire%20Department's%20mission,
paramedic%20transport%2C%20hoist%20rescues%2C%20and%20wildland
%20firefighting (last visited Feb. 23, 2026) ............................................................ 12

Administrative Office of the U.S. Courts,
Federal Court Management Statistics – Profiles (Dec. 31, 2025),
https://www.uscourts.gov/data-news/reports/statistical-reports/federal-court-management-
statistics/federal-court-management-statistics-december-2025 ................................ 17

*How States Can Build Disaster-Ready Budgets*, Pew Research Center
(May 1, 2025), https://www.pew.org/en/research-and-analysis/issue-briefs/2025/04/how-
states-can-build-disaster-ready-budgets.................................................................. 12

*Hwang, Anne*, Federal Judicial Center (last visited Feb. 23, 2026),
https://www.fjc.gov/history/judges/hwang-anne ...................................................... 20

Josh Goodman, "State Budget Stress Intensifies in 2026 as Federal Aid Fades,"
Governing (Jan. 26, 2026), https://www.governing.com/finance/state-budget-
stress-intensifies-in-2026-as-federal-aid-fades........................................................ 12

*The Fire Apparatus Industry: An Update (Report V3)*,
  Fire Apparatus Manufacturers' Association (Mar. 2020), https://www.fama.org/wp-
  content/uploads/2020/06/1592318495_5ee8da1fc8b1e.pdf ...................................................... 11

*The Fire Apparatus Industry: An Update (Report V4)*,
  Fire Apparatus Manufacturers' Association (Apr. 2021), https://www.fama.org/wp-
  content/uploads/2021/04/1619117458_6081c5920c940.pdf ..................................................... 11

*Wildland Fire Statistics*, National Fire Protection Association, https://www.nfpa.org/education-
  and-research/research/nfpa-research/fire-statistical-reports/wildland-fire-statistics  (last visited
  Feb. 23, 2026) ............................................................................................................................ 14

Yue Stella Yu, "California is Still in the Red with Another Big Budget Deficit
  Projected for Next Year," Cal Matters (Nov. 19, 2025),
  https://calmatters.org/politics/2025/11/california-budget-lao-forecast/ ................................... 12

## I.    Introduction

The People of the State of California, County of Los Angeles, and Consolidated Fire Protection District of Los Angeles County ("Plaintiffs"), who filed an antitrust lawsuit against certain defendants in the Central District of California on February 12, 2026 (the "California Action"[1]), take no position on centralization of all of the other actions that are the subject of Defendants' Motion to Transfer, but oppose consolidation of the California Action with those other cases. If the Panel is nonetheless inclined to consolidate all of the actions despite Plaintiffs' opposition, it should transfer them to Judge Hwang in the Central District of California, Western Division for pretrial proceedings.

The California Action does not share the same common factual core of alleged anticompetitive conduct with the other actions. Unlike every other case, the California Action does not allege a horizontal conspiracy among REV Group, Inc., Oshkosh Corporation, and Rosenbauer America, LLC entities, coordinated through the Fire Apparatus Manufacturers' Association ("FAMA"), to fix fire apparatus prices and reduce output. Instead, the California Action omits FAMA and Rosenbauer entities as defendants entirely, uniquely names Boise Mobile Equipment, Inc. and BME Fire Trucks LLC (the "BME Defendants"), and centers on mergers and acquisitions carried out by (1) REV Group and AIP, LLC entities, (2) Oshkosh entities, and (3) the BME Defendants that substantially lessened competition and tended to create monopolies in numerous relevant fire apparatus and custom chassis markets. It also uniquely concerns Defendant Pierce Manufacturing Inc.'s exclusive dealing agreements with its replacement parts dealers, which have restricted customers' ability to purchase parts from

---

[1] *See* ECF No. 52, Ex. A (Complaint, *People of the State of California, et al. v. REV Group, Inc., et al.*, Case No. 26-cv-01468 (C.D. Cal. Feb. 12, 2026), ECF No. 1) (hereinafter, "California Action Complaint").

1

competing manufacturers. And unlike all of the other cases, the California Action is not a class action.

The differences between the alleged anticompetitive conduct—and law prohibiting that conduct—in the California Action and those at issue in the other actions dwarf any common issues. As a result, centralizing all the actions before a single judge—far from creating efficiencies—would complicate case proceedings and jeopardize the just and expeditious enforcement of the California Action. Indeed, Plaintiffs in the California Action seek to move with urgency towards their ultimate requested relief—an order requiring Defendants to make such divestitures and reversals of their unlawful acquisitions and combinations, as well as additional equitable relief, as are necessary to restore competition to the relevant markets. Until Plaintiffs in the California Action secure this relief, they—and fire departments, cities, and counties throughout the country—will continue to pay exorbitant prices and suffer egregious delivery delays for the critical apparatuses they need to protect their communities. Any necessary coordination between the California Action and the other actions can be accomplished through formal and informal mechanisms short of Section 1407 transfer.

However, if the Panel is inclined to centralize the California Action with the other actions, Plaintiffs submit that the Central District of California, Western Division—where the California Action is pending—is the appropriate transferee district, and Judge Hwang, who is currently presiding over the California Action, is the appropriate transferee judge. The volume of California's apparatus purchases far exceeds those of other states, and Los Angeles County appears to have purchased orders of magnitude more fire trucks in recent years than any of the named plaintiffs in the other actions. California, and Los Angeles County, uniquely face a heightened wildfire threat, which in part drives their outsized volumes of purchases.

Moreover, the Central District of California in Los Angeles is just as convenient as, if not more so than, the other proposed MDL venues. It is accessible through the largest international airport on the West Coast (LAX) in addition to several smaller regional airports. Another plaintiff (the City of Arcadia) is also located there, and several counsel for plaintiffs and defendants are located in the Western United States. This Panel routinely entrusts the Central District of California with MDLs. And while Judge Hwang is a relatively new judge to the federal bench, she served several years as a state-court judge, is highly accomplished and well regarded, and has accumulated experience with antitrust cases.

## II.    The Panel Should Not Consolidate the California Action with the Other Cases

The California Action Plaintiffs take no position on whether the other cases subject to this proceeding should be centralized, but submit that the California Action should not be consolidated with them for pretrial proceedings.

The California Action and the other actions do not share the same common factual core. The other actions overwhelmingly focus on and allege a conspiracy among REV Group entities, Oshkosh entities, and Rosenbauer entities to fix the prices of fire apparatuses, reduce output, and otherwise share information, in violation of Sherman Act Section 1 and analogous state laws. They allege that FAMA served as the "hub" of this horizontal, hub-and-spoke conspiracy among these three corporate families. They pursue a "*per se*" theory of liability, meaning if they succeed in proving the existence of the conspiracy, harm to competition generally is presumed and need not be shown. This conspiracy is the core, common factual thread across all of the other actions. As Defendants put it, the other actions "all raise many common questions of fact because they all allege the same conspiracies against the same core Defendants based on virtually identical allegations about Defendants' conduct." ECF No. 1-1 at 1.

By contrast, the California Action does not name FAMA or any Rosenbauer entity at all,

and it does not allege that REV Group entities conspired with any Oshkosh entity or any Rosenbauer entity, nor any conspiracy between any Oshkosh entity and any Rosenbauer entity. *See* ECF No. 52, Ex. A (California Action Complaint). Instead, the California Action alleges that REV Group entities[2] and AIP entities,[3] Oshkosh entities,[4] and the BME Defendants (which are not named in any other action) *each* engaged in unlawful mergers and acquisitions that substantially lessened competition in relevant markets for fire apparatuses and the chassis on which they are built. *See id.* Specifically, the AIP Defendants and REV Group rolled up nearly a dozen independent fire apparatus manufacturers under common ownership and control through their acquisitions of E-ONE, Inc., Ferrara entities, Spartan Emergency Response entities, and Kovatch Mobile Equipment Corp. entities; Oshkosh Corporation acquired Maxi-Métal, Inc.; and Oshkosh subsidiary Pierce acquired an ownership interest in and entered into a "partnership" with its competitors, the BME Defendants. *See id.* ¶¶ 200-225. The California Action alleges that these mergers and acquisitions violated Clayton Act Section 7, Sherman Act Section 2, and the California Unfair Competition Law ("UCL"). *See id.* ¶¶ 334-389, 398-405, 443-457.[5]

---

[2] Specifically, the "REV Group Defendants," which refer to REV Group, Inc.; E-ONE, Inc.; Kovatch Mobile Equipment Corp.; KME Global, LLC; KME Holdings, LLC; KME RE Holdings LLC; Ferrara Fire Apparatus, Inc.; FFA Holdco, Inc.; FFA Acquisition Co., Inc.; Ferrara Fire Apparatus Holding Company, Inc.; Spartan Fire, LLC; Smeal SFA, LLC; Smeal LTC, LLC; Smeal Holding, LLC; and Detroit Truck Manufacturing, LLC.

[3] Specifically, the "AIP Defendants," which refer to AIP, LLC; American Industrial Partners Capital Fund IV LP; American Industrial Partners Capital Fund IV (Parallel), LP; AIP/CHC Holdings, LLC; AIP CF IV, LLC; and AIP/CHC Investors, LLC.

[4] Specifically, the "Oshkosh Defendants," which refer to Oshkosh Corporation; Pierce Manufacturing Inc.; and Maxi-Métal, Inc.

[5] The California Action also alleges that Pierce's acquisition of and combination with the BME Defendants (again, who are not named in any other lawsuit) also constitute a contract, combination, or conspiracy in restraint of trade in violation of Sherman Act Section 1 as well as the California Cartwright Act and California UCL. *See id.* ¶¶ 390-397, 406-415. This Pierce-BME combination—which is an agreement to eliminate competition between two previously

4

Even further removed from the other actions, the California Action also alleges that Pierce works with its parts dealers to restrict customers' ability to purchase replacement parts, harming competition in relevant markets for replacement parts for Pierce apparatuses. *See id.* ¶¶ 281-317. Plaintiffs allege this conduct violates Sherman Act Section 2, Clayton Act Section 3, the California Cartwright Act, and the California UCL. *See id.* ¶¶ 416-442.

None of the other actions invokes any conduct by Pierce in the replacement parts markets and none asserts any claims based on that conduct. None of the other actions alleges a Sherman Act Section 2 attempted monopolization or conspiracy to monopolize claim. And only a handful allege a Clayton Act Section 7 (albeit entitled "Restraint of Trade") claim and/or name AIP entities. But all of those complaints also allege—and primarily focus on—the same alleged hub-and-spoke conspiracy among REV Group, Oshkosh, and Rosenbauer entities and FAMA that every other plaintiff except the California Action alleges. It is the common factual thread of that alleged conspiratorial conduct across all of the other actions that is the basis for Defendants' Motion to Transfer. *See* ECF No. 1-1 at 1 ("[T]he Related Actions all raise many common questions of fact because they all allege the same conspiracies against the same core Defendants based on virtually identical allegations about Defendants' conduct."). The California Action simply does not "arise from [that same] common factual core." *In re Blue Cross Blue Shield Antitrust Litig.*, 908 F. Supp. 2d 1373, 1375 (J.P.M.L. 2012).

The California Action also alleges additional markets not at issue in the other actions. In addition to an overall U.S. fire apparatus market, the California Action alleges U.S. markets for

---

competing, independent economic actors—is entirely distinct from the Sherman Act Section 1 conspiracy claim alleged in all of the other cases, which is based on an alleged price-fixing and output-reduction agreement between REV Group entities, Oshkosh entities, and Rosenbauer entities.

custom pumpers, custom aerials, custom quints, and wildland fire apparatuses—as well as a U.S. market for custom chassis on which custom fire apparatuses are built. *See* ECF No. 52, Ex. A (California Action Complaint) ¶¶ 124-186. As discussed, it also alleges relevant markets for replacement parts for Pierce apparatuses, which none of the other actions alleges. *See id.* ¶¶ 288-295.

While predominance of common issues is not the Section 1407 standard, "[t]he Panel has found in certain instances that, where [as here] numerous individualized issues overwhelmed any common factual issues, efficiency would not be served by centralization." *In re Uber Techs, Inc., Passenger Sexual Assault Litig.*, 712 F. Supp. 3d 1394, 1399 (J.P.M.L. 2024); *see also In re Sears, Roebuck & Co. Emp. Pracs. Litig.*, 487 F. Supp. 1362, 1364 (J.P.M.L. 1980) ("Individual rather than common factual questions predominate regarding the liability aspects of the five actions before us."); *In re Electrolux Dryer Prods. Liab. Litig.,* 978 F. Supp. 2d 1376, 1377 (J.P.M.L. 2013) ("[I]ndividualized facts concerning the circumstances of each fire, including installation, repair, and maintenance, will predominate over the common factual issues alleged by plaintiffs."); *In re Belviq (Lorcaserin HCI) Prods. Liab. Litig.*, 555 F. Supp. 3d 1369, 1370 (J.P.M.L. 2021) ("The record before us indicates that individualized factual issues concerning causation will predominate and diminish the potential to achieve significant efficiencies in an MDL").

Here, individualized issues would overwhelm any common ones were the Panel to centralize the California mergers-and-acquisitions and Pierce-parts action with the hub-and-spoke conspiracy actions, poorly serving the efficiency goals of centralization. This presents a situation analogous to that which the Panel confronted in *In re Gasoline Lessee Dealers Antitrust Litig.*, 479 F. Supp. 578 (J.P.M.L. 1979). There, "[t]he essence of plaintiffs' claim in the

6

Pennsylvania actions is 'that all (fifteen) defendants [including Mobil] conspired (on a nationwide basis) to impose tie-in arrangements on each dealer and that without the agreement of all, none could do so successfully.' . . . In the Missouri actions, however, the entire claim is that a single defendant, Mobil, imposed a tie-in on Mobil dealers in a relatively limited geographic area to compel the purchase of gasoline and several other diverse products." *Id.* at 580. Mobil sought centralization of all of these cases on the grounds that "all actions share a number of significant factual questions concerning Mobil's marketing relationship with operators of Mobil service stations, and that discovery and other pretrial proceedings in each of the actions before us will focus on whether Mobil, through an 'express contractual tie-in,' illegally tied the sale of gasoline to the leasing of service stations," and that "the vertical-horizontal conspiracy distinction represents merely a difference in overall legal stratagems as applied to a common nexus of facts." *Id.* The Panel disagreed and declined to centralize the two sets of cases, holding, "[w]hile we recognize that the Missouri and the Pennsylvania actions share some questions of fact . . . , the record before us reveals critical factual and legal disparities between those actions. The vertical-horizontal conspiracy distinction acknowledged by all parties before us is not only a difference in legal theories, but also entails a tremendous, overriding difference in scope." *Id.*

The Panel could just as easily have been speaking of the California Action and the other cases under consideration for centralization here. The plaintiffs in the other actions will primarily seek discovery of communications among the defendants named in those actions, including through FAMA, in order to prove a *per se* illegal horizontal price-fixing and output-reducing conspiracy among the REV Group, Oshkosh, and Rosenbauer entities. Meanwhile, the California Action Plaintiffs will seek discovery of, *inter alia*, the changes in market shares and concentration levels resulting from several different mergers in order to prove a presumption that

7

the mergers substantially lessened competition; whether Maxi-Métal, Inc. was poised to expand its operations in the U.S. market; whether REV Group's acquisition of Spartan Emergency Response enabled it to raise the input costs of and discipline rivals; whether the acquisitions entrenched the California Action defendants' dominance and transformed these once competitive markets into oligopolistic ones, thus enabling the defendants and, ultimately, the entire industry to raise prices and otherwise worsen terms; whether Pierce's vertical agreements with parts dealers not to sell competing manufacturers' parts have substantially foreclosed competition in the relevant markets for replacement parts; and so on. *See* ECF No. 52, Ex. A (California Action Complaint) ¶¶ 226-280, 307-317.

As in *In re Gasoline Lessee Dealers*, "[i]f transfer were ordered, . . . discovery and other pretrial proceedings concerning the common factual questions would clearly be dwarfed by matters of no interest to [one set of] plaintiffs, and of only minimal interest to [defendants] in the context of th[os]e . . . actions." 479 F. Supp. at 580. It follows that centralization of the California Action with the other actions would not "promote the . . . efficient conduct of such actions." 28 U.S.C. § 1407(a); *see also In re Allen Compound Bow Pat. Litig.* 446 F. Supp. 248, 250 (J.P.M.L. 1978) ("recogniz[ing] the existence of common questions of fact" but nevertheless determining that "transfer will not further the purposes of Section 1407" and accordingly denying transfer); *In re Abbott Labs, Inc., Similac Prods. Liab. Litig.*, 763 F. Supp. 2d 1376, 1377 (J.P.M.L. 2011) (denying transfer where, "[a]lthough plaintiffs are correct that some factual overlap exists among the present actions, the proponents of centralization have failed to convince us that any shared factual questions in these actions are sufficiently complex and/or numerous to justify Section 1407 transfer at this time").

In addition to the absence of a common factual core, the California Action, unlike each of

8

the other actions, does not "seek to represent overlapping classes." ECF No. 1-1 at 1. The California Action is not a class action at all. The Panel has previously denied transfer in such circumstances. *See, e.g.*, *In re Axon Enter., Inc., Body-Worn Camera & Digit. Evidence Mgmt. Sys. Antitrust Litig.*, 776 F. Supp. 3d 1344, 1345 (J.P.M.L. 2025) ("[T]he actions present significant differences that likely will diminish the potential efficiencies from centralizing these two cases. For example, the *Township of Howell* action is a putative nationwide class action on behalf of purchasers of Axon BWC systems, which likely will involve class certification discovery and motions irrelevant to *GovGPT*, an individual competitor action.").

Relatedly, and even more importantly, centralization of the California Action with the other actions would not "promote the *just* . . . conduct of such actions." 28 U.S.C. § 1407(a) (emphasis added). As Judge Weigel observed, whether transfer would "unjustly delay or deny any party's right to provisional remedies such as injunctive relief" should be a core factor for the Panel's consideration of potential transfers. *In re Concrete Pipe*, 302 F. Supp. 244, 256 (J.P.M.L. 1969) (Weigel, J., concurring). The People of the State of California, County of Los Angeles, and Consolidated Fire Protection District of Los Angeles County are concerned that being centralized with a number of class actions—even putting aside that they arise from a fundamentally different core of factual allegations and legal claims—will substantially slow down the California Action, regardless of the judge or district. The California Action Plaintiffs do not need discovery into whether the claims of all purchasers of fire apparatuses can be proven with common evidence. They do not need the time required for an economic expert to devise a model for classwide injury, economic impact, and damages. Plaintiffs are suffering from inflated prices and delivery delays, and their ongoing need to purchase large numbers of additional vehicles to replenish their fleet and ensure the continued protection of the People will never abate absent court intervention.

9

They desperately and urgently seek strong injunctive relief, in the form of divestitures and other court orders that will break Defendants' massive conglomerates up, restore some semblance of competition to the relevant markets, unclog the delivery delays plaguing the industry, and bring prices down and quality up. They do not have the luxury of time to accommodate slowdowns in a case schedule resulting from being consolidated with over a dozen class actions—class actions that may not seek to achieve the structural breakup of the defendants named in the California Action that is so crucially needed.

Finally, the parties and the respective courts presiding over the California Action and the other actions have a number of tools at their disposal to coordinate the actions so as to minimize the possibility of duplicative or unreasonable discovery, inconvenience to the defendants, and inconsistent judgments, without the need to centralize all of these cases in one place. For example, the parties may request that discovery completed in the California Action and relevant to any of the other cases be made applicable to those cases, or vice versa. The parties can stipulate that any discovery relevant to more than one action may be used in all the actions. The parties can also coordinate on depositions so as to prevent unnecessary duplicative depositions. Any party can seek an order directing the parties to coordinate their pretrial efforts. Indeed, the Panel "ha[s] emphasized that 'centralization under Section 1407 should be the last solution after considered review of all other options.'" *In re Coll. Athlete Comp. Antitrust Litig.*, 730 F. Supp. 3d 1378, 1379 (J.P.M.L. 2024) (quoting *In re Best Buy Co., Inc., Cal. Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1378 (J.P.M.L. 2011)). "[V]oluntary cooperation and coordination among the parties and the involved courts to avoid duplicative discovery or inconsistent rulings" are capable of achieving the primary objectives of Section 1407, without derailing the California Action. *Id.*

**III.    In the Alternative, the Panel Should Transfer the Cases to the Honorable Judge Anne Hwang in the Central District of California, Western Division**

In the alternative, if the Panel is nonetheless inclined to centralize the actions pending outside of the Central District of California with the California Action in a single district for pretrial proceedings, it should do so before Judge Anne Hwang of the U.S. District Court for the Central District of California, who is already presiding over the California Action.

### A.    *California and Los Angeles Represent a Disproportional Share of Fire Apparatus Purchases Relative to Other States and to the Named Plaintiffs in the Other Actions*

First, California and Los Angeles are the state and metropolitan area arguably most affected by Defendants' conduct: the heart or situs of greatest harm. The most recent publicly available data from FAMA establishes that California averages the most purchases of fire apparatuses each year when compared to the other states whose districts have been suggested for Section 1407 transfer—and indeed anywhere else in the United States. In the context of two industry overviews, FAMA reported that from 2018 to 2020 combined, its members shipped 1,032 fire apparatus units to California. By contrast, New York and Texas (neither of which has been suggested as destinations for centralization), had deliveries of 825 and 872 units each, respectively, well behind California. Illinois received 397 units, coming in eighth, while Wisconsin received 233 units, ranking 20th.[6] In other words, California is harmed more than any other state as a result of Defendants' alleged price increases, quality deterioration, and delivery delays, because its fire departments and state and local entities are the largest collective

---

[6] *See The Fire Apparatus Industry: An Update (Report V3)* Appendix Ex. A1, Fire Apparatus Manufacturers' Association (Mar. 2020), https://www.fama.org/wp-content/uploads/2020/06/1592318495_5ee8da1fc8b1e.pdf; *The Fire Apparatus Industry: An Update (Report V4)* Appendix Ex. A1, Fire Apparatus Manufacturers' Association (Apr. 2021), https://www.fama.org/wp-content/uploads/2021/04/1619117458_6081c5920c940.pdf.

purchaser of fire apparatuses in the nation. Indeed, in part due to the defendants' alleged conduct, California—whose inflation-adjusted spending on wildfire suppression has tripled over the past two decades—faces one of the worst long-term budget deficits in the country.[7]

Specifically with respect to County of Los Angeles and Consolidated Fire Protection District of Los Angeles (the "LA County Plaintiffs"), a simple comparison across all the plaintiffs that have filed complaints to date reveals that the size of the LA County Plaintiffs' firefighting operations and the extent of their purchases far exceed those of the other plaintiffs. Los Angeles County is the most populous county in the United States, with approximately 9.8 million residents.[8] The LA County Plaintiffs are responsible for protecting the lives and property of over 4 million of those residents living in over 1 million housing units in 60 cities and all unincorporated areas of Los Angeles County.[9] This dwarfs the population size of every other named plaintiff, with populations in the single thousands, tens of thousands, or hundreds of thousands of people, with the exception of the City of Philadelphia which, even with 1.5 million people, could be doubled and still not reach the population size served by the LA County Plaintiffs. *See* Appendix 1 (detailing publicly available information and the allegations in each plaintiff's complaint about the size of its population served, extent of its firefighting operations,

---

[7] *See How States Can Build Disaster-Ready Budgets*, Pew Research Center (May 1, 2025), https://www.pew.org/en/research-and-analysis/issue-briefs/2025/04/how-states-can-build-disaster-ready-budgets; Josh Goodman, "State Budget Stress Intensifies in 2026 as Federal Aid Fades," Governing (Jan. 26, 2026), https://www.governing.com/finance/state-budget-stress-intensifies-in-2026-as-federal-aid-fades; Yue Stella Yu, "California is Still in the Red with Another Big Budget Deficit Projected for Next Year," Cal Matters (Nov. 19, 2025), https://calmatters.org/politics/2025/11/california-budget-lao-forecast/.

[8] *See* ECF No. 52, Ex. A (California Action Complaint) ¶ 23.

[9] *See About Us*, County of Los Angeles Fire Department, https://fire.lacounty.gov/about-us-2/#:~:text=The%20Los%20Angeles%20County%20Fire%20Department's%20mission,paramedic%20transport%2C%20hoist%20rescues%2C%20and%20wildland%20firefighting (last visited Feb. 23, 2026); ECF No. 52, Ex. A (California Action Complaint) ¶ 25.

and number of purchases alleged). The LA County Plaintiffs' workforce of nearly 4,800 personnel[10] answers over 400,000 calls per year[11] and maintains a fleet of over 1,600 apparatuses.[12] Since 2016, the LA County Plaintiffs have purchased over 100 fire apparatuses—including pumpers, aerials, quints, and wildland fire apparatuses—manufactured by a REV Group, Oshkosh, BME, or Rosenbauer entity—including the dozens specifically detailed in their Complaint.[13] This stands in contrast to the small volume of purchases alleged by nearly all of the other plaintiffs—in many instances only a single purchase in the past eight to ten years. *See* Appendix 1.

Given the LA County Plaintiffs' outsized purchases compared to the other named plaintiffs, and California's disproportional share of fire apparatus purchases, the Central District of California is the appropriate place for centralization. *See, e.g.*, *In re Multidistrict Private Civ. Treble Damage Antitrust Litig. Involving Admission Tickets*, 302 F. Supp. 1339, 1341 (J.P.M.L. 1969) (ordering transfer to the district in which the case that was "larger (perhaps twice as large) in amount of damages than the aggregate of the cases pending in [other districts]" was pending); *In re FDIC Cal. Prop. Tax Penalties Litig.*, 1999 U.S. Dist. LEXIS 188, at *3 (J.P.M.L. Jan. 6 1999) (ordering transfer to the district in which six actions pending there "involve[d] a larger amount of disputed tax penalties than the other 21 actions in the litigation combined"). Indeed, California's and Los Angeles's relatively larger expenditures on fire apparatuses will unfortunately only grow with time, as climate change promises greater and greater wildfire risk.

---

[10] *Id.*

[11] *See 2024 Dispatch Statistics,* County of Los Angeles Fire Department, https://fire.lacounty.gov/2024-dispatch-statistics/ (last visited Feb. 26, 2026).

[12] ECF No. 52, Ex. A (California Action Complaint) ¶ 26.

[13] ECF No. 52, Ex. A (California Action Complaint) ¶¶ 320-331.

According to the National Fire Protection Association, in the last 25 years, 15 out of 18 of the costliest fires nationally have occurred in California, which experienced a total dollar loss across those fires (expressed in 2024 dollars) of nearly $85 billion, including an estimated $42 billion from the January 2025 Eaton and Palisades fires and the 2018 Woolsey Fire, which all took place in Los Angeles County.[14]

Not only is fire apparatus purchasing in California and within Los Angeles enormous and not only does it promise only to grow over time, but both the state and the metropolitan area purchase a wide *variety* of fire apparatuses to protect people, animals, and structures everywhere from dense downtown urban areas, to coastal cities and rural communities, to parkland and mountainous areas. In other words, purchases in California and within Los Angeles—including those of the LA County Plaintiffs in the California Action—run the topographical gamut and represent nearly the full scope and breadth of the relevant markets for fire apparatuses alleged in every case under consideration for Section 1407 transfer—from typical "pumpers," or engines, to aerials and quints, to wildland fire apparatuses. This is distinguished from, for example, the City of Chicago in the Northern District of Illinois, where most purchases are expected to be tailored to fighting fires in a dense, flat urban environment. It is therefore fitting to place the situs of any MDL in Los Angeles, California—where the full scope of defendants' conduct and its effects on the full range of fire apparatuses have been and will continue to be felt. *Cf. In re Petroleum Prods. Antitrust Litig.*, 419 F. Supp. 712, 719 (J.P.M.L. 1976) (transferring to Central District of California in part because "of all the states involved in this litigation, California is clearly dominant in terms of crude oil production, refining facilities and petroleum product

---

[14] *Wildland Fire Statistics*, National Fire Protection Association, https://www.nfpa.org/education-and-research/research/nfpa-research/fire-statistical-reports/wildland-fire-statistics  (last visited Feb. 23, 2026).

14

consumption").

### B.  Los Angeles Is as Convenient or More Convenient than the Other Districts Suggested for Transfer

Even if Los Angeles were not the logical center of gravity for this litigation for the reasons discussed above, it would still be an appropriate forum because Los Angeles is extremely convenient for the parties and the witnesses.

Defendants argue that the Northern District of Illinois would be a convenient transferee district because the parties, the witnesses, the evidence, and the parties' counsel are spread throughout the United States, and therefore a central location with "the most connected airport in the United States"—Chicago's O'Hare International Airport—that is "proximate to many of the parties" is "the appropriate transferee district." ECF No. 1-1 at 16. However, not a single Defendant is headquartered in that district and not a single named plaintiff is based in that district. *Cf. In re Gov't Auto Fleet Sales*, 328 F. Supp. 218, 219-220 (J.P.M.L. 1971) ("The fact that none of these actions (or any tag-along cases that we are aware of) were filed in the Eastern District of Michigan and that none of plaintiffs' counsel have offices in Detroit would cause the plaintiffs substantial inconvenience if pretrial proceedings were held in that District.").

In contrast, four plaintiffs—the People of the State of California, acting by and through the Los Angeles County Counsel, the County of Los Angeles, the Consolidated Fire Protection District of Los Angeles County, and the City of Arcadia—are located in the Central District of California. In addition, Los Angeles is just as proximate to some of the parties as Chicago is to others, including Defendants Boise Mobile Equipment, Inc. and BME Fire Trucks LLC (based in Boise, Idaho). Moreover, in addition to counsel in the California Action and City of Arcadia's counsel, numerous parties have at least one counsel based in the West, for whom Los Angeles is more proximate and convenient than Chicago:

15

- The *La Crosse* plaintiffs' counsel (Seattle, Washington);

- The *City of Philadelphia* plaintiffs' counsel (San Diego, California);

- The *City of Revere* plaintiffs' counsel (San Francisco, California);

- The *Unified Government of Wyandotte County and Kansas City, Kansas* plaintiffs' counsel (San Diego, California); and

- Defendants Oshkosh Corporation, Pierce Manufacturing, Inc., and Maxi-Métal, Inc.'s counsel (San Francisco, California).

Adding to its convenience, Los Angeles has one of the most connected airports in the country—the Los Angeles International Airport (LAX), which is the largest international airport on the West Coast. According to Wikipedia, LAX "serves as a hub, focus city, or operating base for more passenger airlines than any other airport in the United States." Beyond LAX, several other airports serve the Los Angeles region, including the Hollywood Burbank Airport (a 20-30-minute drive to the courthouse in downtown Los Angeles), the John Wayne Airport in Orange County, and the Long Beach, Ontario, and San Bernardino airports. *Cf. In re Pacquiao-Mayweather Boxing Match Pay-Per-View Litig.*, 122 F. Supp. 3d 1372, 1374 (J.P.M.L. 2015) (affirming that the Central District of California "presents a convenient and accessible forum with the necessary judicial resources and expertise").

### C.   *The Central District of California, Western Division, and Judge Anne Hwang Are a Capable Forum and Judge to Handle an MDL of These Cases*

The Central District of California, Western Division, is an appropriate forum before which to centralize these cases for pretrial proceedings. Indeed, the Panel has centralized

16

numerous MDLs in this district.[15] It is clear this district is capable of efficiently managing an MDL. At the same time, the Central District of California has a relatively lighter load of MDLs relative to other districts, including the Northern District of Illinois. Assigning these cases to the Central District of California would enable a more even distribution of MDL workload by giving the cases to a relatively under-allocated district. The Central District of California also has a strong track record of advancing cases to their conclusion. According to the most recent Federal Court Management Statistics, the median time from filing to disposition and from filing to trial is the third shortest and 10th shortest, respectively, in the Central District of California.[16] In contrast, the Northern District of Illinois ranks 19th and 44th, respectively, for the same metrics.[17] *Cf. In re Kauffman Mut. Fund Actions*, 337 F. Supp. 1337, 1340 (J.P.M.L. 1972) (highlighting short "median interval from issue to trial" as justification for choice of transferee forum).

Within the Central District of California, the Honorable Anne Hwang, who is already presiding over the California Action, is the appropriate transferee judge. Judge Hwang has served as a judge for over seven years, first for the Los Angeles County Superior Court. In 2024, her nomination to serve on the Central District of California was confirmed by the Senate.[18] Judge

---

[15] *See In Re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation* (MDL No. 2151); *In Re Ford Motor Co. DPS6 PowerShift Transmission Products Liability Litigation* (MDL No. 2814); *In Re ZF-TRW Airbag Control Units Products Liability Litigation* (MDL No. 2905); *In Re Kia Hyundai Vehicle Theft Marketing, Sales Practices, and Products Liability Litigation* (MDL No. 3052); and *In Re TikTok, Inc., Minor Privacy Litigation* (MDL No. 3144).

[16] Administrative Office of the U.S. Courts, Federal Court Management Statistics – Profiles (Dec. 31, 2025), https://www.uscourts.gov/data-news/reports/statistical-reports/federal-court-management-statistics/federal-court-management-statistics-december-2025.

[17] *Id.*

[18] *Hwang, Anne*, Federal Judicial Center (last visited Feb. 23, 2026), https://www.fjc.gov/history/judges/hwang-anne.

Hwang has handled multiple antitrust or unfair competition cases. *See, e.g.*, *T-Mobile United States, Inc. v. WCO Spectrum LLC*, 2025 U.S. Dist. LEXIS 230041 (C.D. Cal. Oct. 31, 2025); *Kachuck Enters. v. Mission Produce, Inc.*, 2026 U.S. Dist. LEXIS 13017 (C.D. Cal. Jan. 22, 2026). And her experience for over 10 years as a Deputy and then Supervising Deputy Federal Public Defender and then Trial Chief Deputy—and for two years before that as a civil litigator in private practice—renders her fluent and experienced in motion and pretrial practice and procedure. Appointing Judge Hwang to preside over the MDL would broaden the bench of judges with MDL experience and give the opportunity to preside over an MDL to a relatively new but accomplished and well-regarded judge who previously handled multiple antitrust or unfair competition cases.

## IV.    Conclusion

For the foregoing reasons, the California Action should not be centralized with the other actions that are the subject of Defendants' Motion to Transfer. But if the Panel is inclined to centralize the actions, including the California Action, in a single judicial district for pretrial proceedings, it should transfer the cases to the Central District of California, Western Division, before the Honorable Anne Hwang.

Dated: February 26, 2026                                    Respectfully Submitted,

                                                                         /s/ Catherine S. Simonsen

John P. Fiske                                                   Catherine S. Simonsen
Lindsay Stevens                                              Thomas G. Mattes
**BARON & BUDD, P.C.**                           **SIMONSEN SUSSMAN LLP**
11440 West Bernardo Court,                          418 Bamboo Lane
Suite 265                                                         Suite C-18
San Diego, CA 92127                                     Los Angeles, CA 90012
Tel: (858) 251-7424                                        Tel: (917) 747-5196
Fax: (214) 523-6600                                       Fax: (913) 262-0058
jfiske@baronbudd.com                                  catherine@simonsensussman.com
lstevens@baronbudd.com                              thomas.mattes@simonsensussman.com

18

Nicolas A. Stebinger
Victoria R. Sims
**SIMONSEN SUSSMAN LLP**
1629 K Street NW, Suite 300
Washington, DC 20006
Tel: (202) 384-3130
Fax: (913) 262-0058
nicolas@simonsensussman.com
victoria.sims@simonsensussman.com

Shaoul Sussman
Nico Gurian
Paul M. Goodrich
**SIMONSEN SUSSMAN LLP**
307 West 38th Street, 16th Floor
New York, NY 10018
Tel: (646) 693-3929
Fax: (913) 262-0058
shaoul@simonsensussman.com
nico.gurian@simonsensussman.com
paul.goodrich@simonsensussman.com


*Counsel for Plaintiffs People of the State of California, County of Los Angeles, and Consolidated Fire Protection District of Los Angeles County*

19

**Appendix 1**

| | |
|---|---|
| City of Ann Arbor, Michigan | The City of Ann Arbor, Michigan, with a population of approximately 121,000 residents, alleges its fire department responded to 11,911 service calls in 2024. Class Action Complaint, *City of Ann Arbor v. Oshkosh Corp., et al.*, No. 1:25-cv-01973 (E.D. Wis. Dec. 16, 2025), ECF No. 1 ¶ 12. The City alleges it purchased two Pierce (Oshkosh) apparatuses in 2022 and 2025 and an E-ONE (REV Group) apparatus in 2023. *Id.* ¶¶ 36-37. |
| City of Arcadia, California | The City of Arcadia, California, with a population of 54,472 residents, alleges that "[to] date, the Department responded to more than 5,900 calls for service," Class Action Complaint, *City of Arcadia v. Am. Indus. Partners, LLC, et al.*, No. 1:25-cv-02005 (E.D. Wis. Dec. 22, 2025), ECF No. 1 ¶ 17, and it purchased "at least one fire truck or apparatus directly or indirectly from Defendants and/or their co-conspirators during the Class Period." *Id.* ¶ 12. |
| City of Augusta, Maine | The City of Augusta, Maine, with a population of 18,899 residents, alleges that it has purchased two Ferrara (REV Group) apparatuses since 2016. Class Action Complaint, *City of Augusta v. Oshkosh Corp., et al.*, No. 1:25-cv-01543 (E.D. Wis. Oct. 7, 2025), ECF No. 1 ¶¶ 14-15. |
| City of Chelsea, Massachusetts | The City of Chelsea, Massachusetts, with a population of approximately 60,000 residents, alleges its fire department of "approximately 106 firefighters" responds to "approximately 10,000 incidents annually." Class Action Complaint, *City of Chelsea v. Fire Apparatus Mfrs. Ass'n, et al.*, No. 1:25-cv-13643 (D. Mass. Dec. 2, 2025), ECF No. 1 ¶ 10. The City alleges it has "purchased several fire apparatuses directly from Pierce [Oshkosh]," including three between 2017 and 2018. *Id.* ¶ 11. |
| Commack Fire District | The Commack Fire District, which serves a population of approximately 36,536 residents in the Hamlet of Commack, NY,[19] alleges that it has purchased five Pierce (Oshkosh) apparatuses since 2018. Class Action Complaint, *Commack Fire District v. Oshkosh Corp., et al.*, No. 1:25-cv-02013 (E.D. Wis. Dec. 22, 2025), ECF No. 1 ¶¶ 17-19. |
| City of LaCrosse, Wisconsin | The City of LaCrosse, Wisconsin, with a population of 52,680 residents, alleges it "has purchased multiple fire trucks from Manufacturer defendants," including two Pierce (Oshkosh) apparatuses, one Spartan (REV Group) apparatus, and one Rosenbauer apparatus. Class Action Complaint, *City of LaCrosse v. Oshkosh Corp., et al.*, No. 1:25-cv-01252 (E.D. Wis. Aug. 20, 2025), ECF No. 1 ¶¶ 10-11. |
| City of Liberty, Missouri | The City of Liberty, Missouri, with a population of approximately 31,245 residents,[20] alleges it has purchased or contracted to purchase five Pierce (Oshkosh) pumpers since 2015. Class Action Complaint, *City of Liberty, Mo.* |

---

[19] *QuickFacts: Commack CDP, New York*, U.S. Census Bureau (last visited Feb. 23, 2026), https://www.census.gov/quickfacts/fact/table/commackcdpnewyork/PST045224.

[20] *QuickFacts: Liberty city, Missouri*, U.S. Census Bureau (last visited Feb. 23, 2026), https://www.census.gov/quickfacts/fact/table/libertycitymissouri/BZA115223.

| | |
|---|---|
| | *v. Oshkosh Corp., et al.*, No. 1:25-cv-02002 (E.D. Wis. Dec. 19, 2025), ECF No. 1 ¶¶ 15-16. |
| City of Milwaukee, Wisconsin | The City of Milwaukee, Wisconsin, with a population of "nearly 600,000 residents," alleges that its fire department, with "31 Engines, 8 Trucks," and "around 800 firefighters," responded to "more than 4,600 fire calls for service alone" in 2025. Class Action Complaint, *City of Milwaukee v. Oshkosh Corp., et al.*, No. 1:26-cv-00271 (E.D. Wis. Feb. 18, 2026), ECF No. 1 ¶¶ 18-21. The City alleges it has purchased 15 Pierce (Oshkosh) apparatuses and eight E-ONE (REV Group) apparatuses between 2014 and 2025. *Id.* ¶¶ 22-35. |
| The Newstead Fire Company, Inc. | The Newstead Fire Company, Inc., which "services the Town of Newstead, New York (population 8,689) and surrounding areas," alleges that it purchased one "E-ONE Heavy Rescue Fire Truck directly from [REV Group] during the Class Period." Class Action Complaint, *Newstead Fire Co., Inc. v. Oshkosh Corp., et al.*, No. 1:25-cv-01693 (E.D. Wis. Oct. 31, 2025), ECF No. 1 ¶¶ 14-15. |
| City of Onalaska, Wisconsin | The City of Onalaska, Wisconsin, with a population of approximately 19,898 residents,[21] alleges that it has purchased three Pierce (Oshkosh) apparatuses since 2018. Class Action Complaint, *City of Onalaska v. Oshkosh Corp., et al.*, No. 1:25-cv-01717 (E.D. Wis. Nov. 4, 2025), ECF No. 1 ¶¶ 18-20. |
| City of Philadelphia, Pennsylvania | The City of Philadelphia, Pennsylvania, with a population of approximately 1.5 million residents, alleges that it has purchased "approximately 59 pumper trucks and 31 ladder trucks directly from KME [REV Group], Spartan [REV Group], and/or Pierce [Oshkosh]" from 2016 to the present. Class Action Complaint, *City of Philadelphia v. Oshkosh Corp., et al.*, No. 1:25-cv-01801 (E.D. Wis. Nov. 14, 2025), ECF No. 1 ¶¶ 9-10. |
| City of Revere, Massachusetts | The City of Revere, Massachusetts, with a population of approximately 62,000 residents, alleges its fire department "respond[s] to approximately 12,000 incidents annually." Class Action Complaint, *City of Revere v. AIP, LLC, et al.*, No. 1:25-cv-13462 (D. Mass. Nov. 19, 2025), ECF No. 1 ¶ 12. The City alleges it purchased two E-ONE (REV Group) custom pumpers in April 2021 and a new custom ladder truck from KME (REV Group) in November 2018. *Id.* ¶ 13. |
| Borough of Roseland, New Jersey | The Borough of Roseland, New Jersey, with a population of approximately 6,000 residents, alleges its fire department, made up of "approximately 40 volunteer firefighters," purchased one Pierce apparatus in 2017. Class Action Complaint, *Borough of Roseland v. Fire Apparatus Mfrs. Ass'n, et al.*, No. 2:25-cv-18312 (D. N.J. Dec. 9, 2025), ECF No. 1 ¶¶ 10-11. |
| Unified Government | The Unified Government of Wyandotte County and Kansas City, Kansas, which serves a population of approximately 169,418 residents,[22] alleges its |

---

[21] *QuickFacts: Onalaska city, Wisconsin*, U.S. Census Bureau (last visited Feb. 23, 2026), https://www.census.gov/quickfacts/fact/table/onalaskacitywisconsin,lacrossecountywisconsin,WI,US/PST045216.

[22] *QuickFacts: Wyandotte County, Kansas*, U.S. Census Bureau (last visited Feb. 23, 2026), https://www.census.gov/quickfacts/fact/table/wyandottecountykansas/PST045224.

| of Wyandotte County and Kansas City, Kansas | fire department has "80 vehicles in its fleet" and "responded to approximately 37,000 incidents in 2025." Complaint – Class Action, *Unified Government of Wyandotte County and Kansas City, Kansas v. REV Group, Inc., et al.*, No. 2:26-cv-02057 (D. Kan. Jan. 29, 2026), ECF No. 1 ¶¶ 11-12. The Unified Government alleges its fire department purchased two Pierce (Oshkosh) apparatuses between 2022 and 2023. *Id.* ¶ 13. |