# Exhibit A

**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF OKLAHOMA**

|  |  |
|---|---|
| (1) CITY OF SHAWNEE, OKLAHOMA, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>      v.<br><br>(1) OSHKOSH CORPORATION;<br>(2) PIERCE MANUFACTURING, INC.;<br>(3) REV GROUP, INC.;<br>(4) ROSENBAUER AMERICA LLC; and<br>(5) FIRE APPARATUS<br>MANUFACTURERS' ASSOCIATION.<br><br>      Defendants. | CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff, City of Shawnee, Oklahoma ("Plaintiff"), brings this class action individually and on behalf of a proposed class of all Oklahoma Public Safety entities, including but not limited to, governmental entities, municipalities and subdivisions, that manage or maintain fire departments, special incorporated or chartered fire districts, and volunteer fire departments, that purchased fire trucks from the Manufacturing Defendants from January 1, 2016 until the time of trial (the "Class"), against Defendants Oshkosh Corporation, Pierce Manufacturing, Inc., REV Group, Inc., Rosenbauer America LLC, (together "Manufacturing Defendants") and Fire Apparatus Manufacturers' Association (together "Defendants") under federal and state antitrust laws for equitable and injunctive relief, as well as damages and treble damages and alleges as follows.

## NATURE OF THE CASE

1.      Manufacturing Defendants manufacture and supply Fire Trucks that are sold throughout the United States and Oklahoma. Beginning in or about January 2016, Manufacturing Defendants entered into an agreement, combination or conspiracy to limit the supply, and to fix, raise, maintain, or stabilize prices of Fire Trucks sold in the United States, including Oklahoma, at supra-competitive levels. As a result of the unlawful conduct of Defendants, Plaintiff and Class members paid artificially inflated prices for Fire Trucks and as a result have suffered antitrust injury to their business or property in violation of the federal antitrust laws.

2.      In the related Congressional investigation of collusion of the Fire Truck industry, the United States Senate Committee on Homeland Security and Government Affairs Subcommittee on Disaster Management, District of Columbia, and Census has commenced hearings on "Sounding the Alarm: America's Fire Apparatus Crisis" and a bipartisan group of lawmakers is now demanding information from the manufacturers and asking for input from fire departments.[1]

3.      Subcommittee Chair Senator Josh Hawley of Missouri said people's lives were being put in danger by prioritizing profits over supply and that the committee wanted to know whether the leading manufacturers were colluding with each other on a business model that keeps rigs in short supply. "You're stiffing your customers, and yet

---

[1] Mike Baker, *Firefighters Condemn 'Greed' as Fire Engine Prices Soar*, THE NEW YORK TIMES, https://www.nytimes.com/2025/09/10/us/fire-trucks-manufacturers-costs-congress.html?smid=url-share (last visited Sept. 13, 2025).

2

there's nothing they can do about it," Mr. Hawley told the manufacturers. "That is not a free market."[2]

4.     Significantly, the Federal Trade Commission opened an inquiry into the Fire Truck industry.

5.     Plaintiff brings this action under Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3 (the "Sherman Act"), Section 4 of the Clayton Act, 15 U.S.C. § 15 (the "Clayton Act"), the Oklahoma Antitrust Reform Act, 79 O.S. § 201, *et seq.,* and the common law, and asserts the following allegations on information and belief, except as to those paragraphs that pertain to Plaintiff, which are based upon personal knowledge.

6.     Fire truck prices have doubled in the last ten years. A Fire Truck that cost $500,000 in the mid-2010s now costs $1 million. More specialized trucks that used to cost $900,000 now cost more than $2 million. Inflation alone does not explain these price increases, which have squeezed municipal budgets and prevented communities from replacing their old rigs. At the same time, wait times for new Fire Trucks have ballooned from 18 months in the mid-2010s to more than four years today.

7.     As a result of high prices and long order backlogs, Fire Trucks that should have been retired after 15 or 20 years are now celebrating their 30th "birthdays" on the front lines. These older trucks break down more frequently and are more difficult to repair than new trucks, leaving gaps in communities' fire protection systems and putting the public in danger. These gaps can have deadly consequences when fires break out and no Fire Trucks

---

[2] *Id.*

are available to respond. Even communities that have been able to purchase new Fire Trucks have had to redirect funds from other priorities to cover the price increases.

8. Three Fire Truck manufacturers—REV Group, Inc. ("REV Group"), Oshkosh Corporation ("Oshkosh"), and Rosenbauer America LLC ("Rosenbauer") (collectively "Manufacturer Defendants")—are responsible for increasing Fire Truck prices and perpetuating lengthy backlogs. Together, these three manufacturers control between 70 and 80 percent of the U.S. Fire Truck market, and they have unlawfully conspired to use their collective market power to suppress the Fire Truck supply and raise prices.

9. The Manufacturer Defendants have perpetrated their conspiracy in part through the Fire Apparatus Manufacturers' Association ("FAMA"). The Manufacturer Defendants, along with most other Fire Truck manufacturers in the country, submit sensitive, non-public economic data to FAMA, then FAMA sends the data to an outside consulting company that compiles the data into reports that FAMA then distributes to its members. FAMA also provides a forum for Manufacturer Defendants to communicate with each other directly during yearly members-only meetings.

10. The economic data manufacturers obtain from FAMA is not the type of information that competitors would provide each other in a normal, competitive market. The Manufacturer Defendants use the sensitive economic data FAMA shares with them to coordinate price increases and suppress production. They also use FAMA to monitor their co-conspirators to ensure continued adherence to the conspiracy.

4

11. None of the FAMA reports are available to anyone other than the manufacturers themselves. As a result, buyers in the market, including Plaintiff and Class members, operate at a disadvantage. By restricting data access, FAMA reports create an information asymmetry that benefits the Manufacturer Defendants at buyers' expense. This information exchange is particularly likely to have anticompetitive effects because so few sellers control the Fire Truck market.

12. As a result of their conspiracy, Manufacturer Defendants have been able to consistently increase their margins by several percentage points and boost total profits, all without concern that their competitors will try to steal market share. Manufacturer Defendants are not troubled by potential new entrants because high barriers to entry prevent new competitors from coming into the market.

13. As a result of each Defendant's unlawful conduct, Plaintiff and Class members paid artificially inflated prices for Fire Trucks during the class period. Such prices exceeded the amount they would have paid if the price for Fire Trucks had been determined by a competitive market. Thus, Defendants' conduct injured Plaintiff and Class members.

**PARTIES**

**I.     Plaintiff**

14. The City of Shawnee is located in central Oklahoma and serves as the county seat of Pottawatomie County. Shawnee has a population of approximately 31,000 residents and serves as a regional hub for commerce, education, healthcare, and industry in the surrounding area. Additionally, Shawnee is home to Oklahoma Baptist University and other educational institutions that contribute to a dynamic and fluctuating population base.

15. Shawnee includes residential neighborhoods, commercial districts, light industrial facilities, educational institutions, healthcare facilities, and major transportation corridors. These characteristics create diverse fire protection and emergency response challenges requiring a full-service municipal fire department capable of providing fire suppression, emergency medical services, rescue operations, hazardous materials response, and fire prevention services across varied occupancies and terrain.

16. The Shawnee Fire Department is a full-service municipal fire department providing fire suppression, advanced life support emergency medical services, rescue operations, hazardous materials response, and fire prevention services. For calendar year 2025, the Shawnee Fire Department responded to 5,645 emergency calls for service, including calls for emergency medical services, structure fires, vehicle accidents with extrication, hazardous materials incidents, and other public safety emergencies.

17. The Shawnee Fire Department operates three (3) fire stations strategically located throughout Shawnee to ensure timely response to residential, commercial, and industrial areas. Also, the Shawnee Fire Department maintains and operates fire apparatuses, including fire engines and aerial apparatuses essential for structural firefighting, rescue operations, and emergency response functions.

     a. Station 1 houses one Engine Company and one Truck Company.

     b. Station 2 houses one Engine Company.

     c. Station 3 houses one Engine Company.

18. Modern fire and emergency response operations require increasingly specialized training and equipment. Shawnee Fire Department personnel are trained in:

a. Advanced/Basic life support emergency medical care,

b. Hazardous materials response,

c. Technical rescue operations,

d. Flood and Swift water rescue operations,

e. Vehicle extrication,

f. Wildland firefighting, and

g. Incident command.

19. As building construction methods evolve, vehicle technology advances, and hazardous materials incidents become more complex. Consequently, Shawnee Fire Department's reliance on properly equipped and maintained fire apparatus and specialized equipment has increased significantly.

20. Reliable fire apparatus and associated equipment are critical to ensuring firefighter safety and maintaining the Shawnee Fire Department's ability to protect life and property within the City of Shawnee.

21. The Shawnee Fire Department has purchased the following fire apparatuses:

a. A 2018 Pierce PUC Custom Pumper for $657,102.00,

b. A 2018 Pierce Ascendant 107' Aerial Ladder Truck for $997,343.00,

c. Ordered a Ford Skeeter Rescue in February 2025 for $323,867.99 (still waiting on this truck)

d. Ordered a Pierce Custom Pumper in October 2022 for $855,880.08 (The order was canceled in July 2025 for failure to meet the delivery deadline.)

7

## II.    Defendants

### A.    REV Group, Inc.

22.    REV Group, Inc. ("REV Group") is incorporated in Delaware and is headquartered in Brookfield, Wisconsin.

23.    REV Group manufactures Fire Trucks under multiple brand names, including: E-ONE, Inc. ("E-ONE"), Kovatch Mobile Equipment Corporation ("KME"), Ferrara Fire Apparatus ("Ferrara"), Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively "Spartan"), Smeal Fire Apparatus ("Smeal"), and Ladder Tower Company ("Ladder Tower").[3] Nationwide, 113 dealers sell Fire Trucks from these brands across all 50 states. Additionally, REV Group sells Spartan cabs and chassis to approximately 40 smaller builders.[4]

24.    REV Group currently operates manufacturing plants in Ocala, Florida (E-ONE apparatus); Hamburg, New York (stainless steel E-ONE products); Nesquehoning, Pennsylvania (KME apparatus); Ephrata, Pennsylvania (Ladder Tower, KME, and Ferrara apparatus); Brandon, South Dakota (Spartan Pumps); Charlotte, Michigan (Spartan cabs

---

[3] *Rev Group Invests in Its Ephrata Facility to Increase Aerial and TDA Apparatus Production,* FIREAPPARATUSMAGAZINE.com (Feb. 28, 2023), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-its-ephrata-facility-to-increase-aerial-and-tda-apparatus- production (last visited Aug. 15, 2025).

[4] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM          (July          1,          2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands (last visited Aug. 15, 2025). Brandon, South Dakota (Spartan pumpers); Charlotte, Michigan (Spartan cabs and chassis); Snyder, Nebraska (Smeal apparatus); and Holden, Louisiana (Ferrara apparatus).

and chassis); Snyder, Nebraska (Smeal apparatus); and Holden, Louisiana (Ferrara apparatus).[5]

25.    Of the roughly $3 billion in annual Fire Truck sales in the United States, REV Group captures approximately $1 billion, or at least 33% of the total.[6] In 2024, REV Group's full year net income was $257.6 million—this was achieved despite a stock buyback program of $250 million and a significant dividend to investors.[7] With respect to the fire and specialty vehicle sector, adjusted EBITDA increased $20.3 million, or 67.9%, compared to the prior year quarter."[8]

**B.    Oshkosh Corporation and Pierce Manufacturing, Inc.**

26.    Oshkosh Corporation ("Oshkosh") is incorporated in Wisconsin and is headquartered in Oshkosh, Wisconsin.[9]

27.    Oshkosh sells its products in more than 150 countries under a variety of brand names, including JLG Industries, Inc., JerrDan LLC, Hinowa S.p.A, AUSACORP S.L., Oshkosh AeroTech, McNeilus Companies, Inc., Oshkosh Commercial Products, LLC,

---

[5] *Who We Are*, REVGROUP.COM, https://revgroup.com/who-we-are (last visited Aug. 15, 2025).

[6] Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, BIG BY MATT STOLLER (Jan. 25, 2025), https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll (last visited Aug. 15, 2025) (hereinafter "Musharbash").

[7] Julie Nuernberg, *REV Group, Inc. Reports Strong Fiscal 2024 Fourth Quarter and Full Year Results*, REVGROUP.COM (Dec. 11, 2024), https://revgroup.com/rev-group-inc-reports-strong-fiscal-2024-fourth-quarter-and-full-year-results (last visited Aug. 15, 2025).

[8] *Id.*

[9] OSHKOSH CORP., FORM 10-K at 3, https://www.investors.oshkoshcorp.com/media/document/cdffc8d8-7620-48f8-9d1a-b5430d2b7d47/assets/2024_Oshkosh_Annual_Report_web.pdf (last visited Aug. 19, 2025)

Iowa Mold Tooling Co., Inc., Maxi-Metal, Inc., Kewaunee Fabrications, LLC, Oshkosh Defense, LLC, and Pratt & Miller Engineering & Fabrications, LLC.[10]

28.     Oshkosh's leading North American brand is Pierce Manufacturing, Inc. ("Pierce"). Pierce is incorporated in Delaware and is headquartered in Appleton, Wisconsin. It produces custom and commercial pumpers, aerials, rescue trucks, wildland trucks, mini pumpers, and other fire apparatuses in its manufacturing facilities in Appleton, Wisconsin and Bradenton, Florida.[11] Pierce has 26 dealers across California, Colorado, Florida, Kansas, Massachusetts, Minnesota, Mississippi, New Jersey, New York, Oregon, Pennsylvania, South Carolina, Texas, Virginia, and Wisconsin.[12] Together, this dealer network sells Fire Trucks to customers in all 50 states.

29.     Oshkosh, including through Pierce, captures around $750 million in annual Fire Truck sales in the United States, or at least 25% of the total.[13] Oshkosh's reported 2024 fourth quarter net income was $153.1 million.[14] Pierce has an annual revenue of approximately $1 billion.

---

[10] *Id.* at 6.

[11] *Pierce Manufacturing Joins Oshkosh Corporation to Showcase the Future of Electric Firefighting Technology at CES 2025*, FIREAPPARATUSMAGAZINE.com (Dec. 23, 2024), https://www.fireapparatusmagazine.com/industry-news/pierce-joins-oshkosh-to-showcase-the-future-of-electric-firefighting-technology- at-ces-2025/ (last visited Aug. 15, 2025); *Tour of Pierce Manufacturing,* Inc., R4.IEEE.ORG, https://r4.ieee.org/event/tour-of-pierce-manufacturing-inc/ (last visited Aug. 15, 2025).

[12] *Find a Dealer*, PIERCE.COM, https://www .piercemfg.com/find-a-dealer (last visited Aug. 15, 2025).

[13] Musharbash, *supra* note 10.

[14] *Oshkosh Corporation Reports 2024 Fourth Quarter and Full Year Results*, OSHKOSHCORP.COM (Jan. 30, 2025), https://investors.oshkoshcorp.com/news/oshkosh-corporation-reports-2024-fourth-quarter-and-full-year-results/f1490807-bbcf-44b4-be51-56294a3276e3 (last visited Aug. 15, 2025).

## C.    Rosenbauer America LLC

30.    Rosenbauer America LLC ("Rosenbauer") is a wholly owned subsidiary of Rosenbauer International AG ("Rosenbauer International"), a publicly traded company based in Austria and listed on the Vienna Stock Exchange.[15] Rosenbauer is incorporated in Delaware and headquartered in Lyons, South Dakota.[16]

31.    Rosenbauer has production facilities in Lyons, South Dakota; Wyoming, Minnesota; and Fremont, Nebraska. Rosenbauer produces custom and commercial pumpers, heavy rescues, tenders, mini pumpers and light rescues, aerial ladders and platforms, and electric Fire Trucks.[17] Rosenbauer has 24 dealers across Alabama, Arizona, California, Colorado, Florida, Georgia, Idaho, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, South Dakota, Texas, Utah, Washington, and West Virginia.[18] Together, these dealers sell Fire Trucks to customers in all 50 states.

---

[15] *Rosenbauer International Fully Acquires Rosenbauer America*, ROSENBAUER.COM (June 23, 2022), https://www.rosenbauer.com/en/12/rosenbauer-group/investor-relations/financial-news/financial-news-detail/nd/rosenbauer-international-uebernimmt-rosenbauer-america-vollstaendig (last visited Aug. 15, 2025).

[16] *A Single-Source Provider for the US Fire Services*, ROSENBAUER.COM, https://www. rosenbauer.com/en/de/rosenbauer-group/company/locations/sales-and-service-locations/ rosenbauer- america-llc (last visited Aug. 15, 2025).

[17] FAMA.ORG, https://https://www.fama.org/members/company_profile/?id=99ited Aug. 15, 2025).

[18] *Find a Dealer*, ROSENBAUERAMERICA.COM, https://rosenbaueramerica.com/find-a-dealer (last visited Aug. 15, 2025).

32.     Rosenbauer captures approximately $307 million in United States fire apparatus sales annually,[19] or at least 10% of the market.[20]

33.     Significantly, Rosenbauer has a history of engaging in anticompetitive conduct in its home market. In 2011, it participated in two separate conspiracies in Europe. First, the German Federal Cartel Office (Bundeskartellamt) found Rosenbauer guilty of participating in a price fixing cartel for fire apparatus and fined Rosenbauer 10.5 million Euros, which fine Rosenbauer did not contest.[21] Additionally, a Rosenbauer subsidiary admitted to participating in a ladder Fire Truck cartel in Europe as follows:

> The German competition authority, the Bundeskartellamt, has imposed a fine of €17.5 million on Iveco Magirus Brandschutztechnik for its involvement in anti-competitive agreements on the manufacture of turntable ladder firefighting machines.
>
> The authority said in a statement that Metz Aerials, the German aerial ladder subsidiary of Austria's Rosenbauer, was also part of the cartel, but has not been fined because Rosenbauer informed the Bundeskartellamt of the cartel agreement in 2010 "by way of a leniency application".
>
> The Bundeskartellamt said it had referred the sales managers and CEOs involved "to the competent public prosecutor's office for examination under criminal

---

[19] *Rosenbauer International Fully Acquires Rosenbauer America*, ROSENBAUER.COM (June 23, 2022), https://www.rosenbauer.com/en/12/rosenbauer-group/investor-relations/financial-news/financial-news-detail/nd/rosenbauer-international-uebernimmt-rosenbauer-america-vollstaendig (converted to U.S. dollars from 262.9 million euros) (last visited Aug. 15, 2025).

[20] Musharbash, *supra* note 10.

[21] SJ Berwin LLP EU & Competition, MONDAQ.COM, *German Federal Cartel Office Fines Producers Of Fire Engines €20.5m For Price Fixing An dQuota Agreements*, https://www.mondaq.com/germany/eu-law-regulatory/123096/german-federal-cartel-office-fines-producers-of-fire-engines-%E2%82%AC205m-for-price-fixing-and-quota-agreements Oct. 1, 2025).

law."

In July, Iveco Magirus Brandschutztechnik said its managing director, Mr. Roel Nizet, had resigned from the company in May at his own request.

The cartel agreement concerned the manufacture of fire engines with turntable ladders between 1998 and November 2007, of which Iveco and Rosenbauer have a combined market share of close to 100%, said the Bundeskartellamt.

The authority said that during this period the companies' sales managers met at regular intervals and divided tenders among each other on the basis of project lists.

***The authority said that to conceal the cartel agreements, the sales managers initially communicated via prepaid mobiles and since the football world championship 2006 in a 'football code' referring to cartel meetings as 'training' and to rebates in the form of match results.***[22]

## D. The Fire Apparatus Manufacturers' Association

34. The Fire Apparatus Manufacturers' Association ("FAMA") is a not-for-profit trade association for fire apparatus manufacturers, located in Greenwell Springs, Louisiana.

35. As of May 2025, FAMA had 55 manufacturer members,[23] including REV Group brands E-One, Ferrara, KME, and Spartan; Oshkosh brand Pierce; and Rosenbauer.[24]

---

[22] Murray Pollok, KHL.COM, *Iveco Magirus and Metz Aerials in German cartel ruling* https://www.khl.com/news/iveco-magirus-and-metz-aerials-in-german-cartel-ruling/1066089.article Oct. 1, 2025) (emphasis added).

[23] *FAMA Releases Fire Apparatus Industry Update*, FIREENGINEERING.COM (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update/ (last visited Aug. 15, 2025).

[24] *Members List*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/members/list (last visited Aug. 15, 2025).

13

36. John Schultz, the Vice President and General Manager of Pumper Products at Pierce,[25] is FAMA's vice-chair.[26]

37. FAMA acted as a co-conspirator of the Fire Truck manufacturers by facilitating the exchange of confidential, proprietary, and competitively sensitive data among the other Defendants.

## UNNAMED CO-CONSPIRATORS

38. Manufacturer Defendants sell Fire Trucks through a series of exclusive dealers.

39. Manufacturer Defendants' exclusive dealers have largely eliminated geographic overlaps and given manufacturer-specific dealers exclusive control over vast territories.

40. Manufacturer Defendants' exclusive dealer programs have resulted in reduced competition.

41. Although not named as parties to this Complaint, Manufacturer Defendants' dealers have enabled, abetted, and facilitated the conspiracy alleged herein.

## JURISDICTION AND VENUE

42. Plaintiff brings this action against Defendants seeking equitable and injunctive relief, as well as damages and treble damages, under Sections 4 and 16 of the

---

[25] *John Schultz*, PIERCEMFG.COM, https://www.piercemfg.com/hubfs/FDIC%202025/Bios/Bio/John%20Schultz%20-%20Pierce%20Manufacturing.pdf (last visited Aug. 15, 2025).
[26] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://https://www.fama.org/data-research-committee (last visited Aug. 15, 2025).

Clayton Act, 15 U.S.C. §§ 15 and 26, for Defendants' violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

43. This Court has jurisdiction over the subject matter of this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26; and 28 U.S.C. §§ 1331 and 1337.

44. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims in this action that they form part of the same case or controversy under Article III of the U.S. Constitution. This Court's exercise of supplemental jurisdiction over Plaintiff's state law claims will avoid unnecessary duplication and multiplicity of actions and will promote the interests of judicial economy, convenience, and fairness.

45. This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States and Oklahoma, including in this District; (b) Manufacturing Defendants manufactured, sold, shipped, and/or delivered Fire Trucks to purchasing entities throughout the United States and Oklahoma, including in this District; (c) Defendants had substantial contacts within the United States and Oklahoma, including in this District; and/or (d) Defendants engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States and Oklahoma, including in this District.

46. Defendants' activities were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate

commerce of the United States and Oklahoma.

47.     Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because multiple Defendants resided or transacted business in this District, are licensed to do business or are doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

<strong>FACTUAL ALLEGATIONS</strong>

**I.      The Fire Truck industry previously consisted of many independent sellers.**

48.     The modern Fire Truck manufacturing industry boomed in the post-war decades of the 1950s and 1960s.[27] Small and midsized Fire Truck manufacturers—typically family-owned operations—appeared in every region of the country to produce emergency vehicles tailored to the needs of local fire departments. The industry was competitively diversified across at least two dozen companies. Competition among these smaller firms kept Fire Truck prices near costs, and the existence of a large number of manufacturers ensured redundant manufacturing capacity to meet demand.[28] By 2008, these companies sold over 5,000 new Fire Trucks in the United States every year.

49.     For decades, the Fire Truck industry enjoyed relatively stable (inflation-adjusted) prices and ample production capacity. With few exceptions, the annual cost increase for new trucks prior to 2008 was around 3%.[29]

---

[27] Musharbash, *supra* note 10.
[28] *Id.*
[29] *Id.*

16

50.     In 2011, the market for new Fire Truck sales had fallen more than 40% from its peak,[30] from 5,000 a year to around 3,000 a year.[31] Many independent Fire Truck manufacturers folded during this period. Demand for Fire Trucks did not fully rebound until the mid-2010s.

## II.     REV Group, Oshkosh, and Rosenbauer start rolling up Fire Truck manufacturers

### A.     American Industrial Partners and REV Group

51.     In 2008, a midsize private-equity firm, American Industrial Partners ("AIP"), purchased the fire apparatus manufacturing company E-ONE, which builds a full line of fire fighting vehicles, from brush trucks and pumpers to aircraft rescue and firefighting vehicles.[32] E-ONE was the first Fire Truck manufacturer in AIP's portfolio.

52.     AIP then turned its attention to rolling up the Fire Truck industry. AIP created REV Group (originally Allied Specialty Vehicles) in 2015 from the merger of several companies, including E-ONE.[33]

---

[30] Paul C. Darley, *The Fire Apparatus Market is Coming Back... Just Look at the Data*, FAMA.ORG (Dec. 5, 2015), https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data/ (last visited Aug. 15, 2025).

[31] Musharbash, *supra* note 10.

[32] Chris McLoone, REV Group Invests in the Strength of Fire Apparatus Brands, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Aug. 15, 2025).

[33] Mike Baker, Maureen Farrell & Serge F. Kovaleski, *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. TIMES (Feb. 17, 2025), https://www.nytimes.com/ 2025/02/17/us/fire- engines-shortage-private-equity.html (last visited Aug. 15, 2025) (hereinafter "Baker, Farrell & Kovaleski").

53.    In 2016, REV Group purchased Kovatch Mobile Equipment Corporation ("KME").[34] Headquartered in Nesquehoning, Pennsylvania, KME operates in Pennsylvania, Virginia, New York, and California. It produces a broad array of fire apparatus, including pumpers, aerials, and tankers.[35]

54.    In April 2017, REV Group purchased Ferrara Fire Apparatus, Inc. ("Ferrara"), based in Holden, Louisiana. The Ferrara product portfolio included custom chassis pumpers, aerials, and industrial apparatus. At the time, Ferrara had more than 450 employees and annual revenue of approximately $140 million.[36] Prior to the purchase, Ferrara had been E-ONE's direct competitor in the southern United States.[37]

---

[34] *REV Group Acquires Kovatch Mobile Equipment*, REVGROUP.COM (Apr. 11, 2016), https://investors.revgroup.com/investor-releases/2016/11-04-2016 (last visited Aug. 15, 2025); Chris Mc Loone, *REBGroup Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Aug. 15, 2025); *KME Fire Apparatus Sold REV Group*, FIREHOUSE.COM (Apr. 22, 2016), https://www.firehouse.com/apparatus/press-release/12193362/fire-apparatus-manufacturer-kme-kovtach-pumpers-aerials-heavy-rescue-fire-apparatus-builder-kme-fire-apparatus-sold-to-revgroupsited Aug. 15, 2025).

[35] Chris Mc Loone, *REV Group, Inc. Acquires KME*, FIREAPPARATUSMAGAZINE.COM (Apr. 11, 2016), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-inc-acquires-kme/ (last visited Aug. 15, 2025).

[36] *REV Group Acquires Ferrara Fire Apparatus, Inc.*, FIREAPPARATUSMAGAZINE.COM (Apr. 25, 2017), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-ferrara-fire-appartus/ (last visited Aug. 15, 2025).

[37] Chris Mc Loone, *REB Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire- apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/sited Aug. 15, 2025); *REV Group Acquires Ferrara Fire Apparatus, Inc.*, REVGROUP.COM (Apr. 25, 2017, https://investors.revgroup.com/investor-releases/2017/04-25-2017-182251523 (last

18

55. Dan Peters, President of the fire division within REV Group, noted that "the addition of Ferrara to the REV Fire Group enable[d] a number of new growth opportunities including expansion of our reach nationwide and adding new geographical regions and key accounts."[38] Timothy Sullivan, REV Group's CEO, confirmed that "Ferrara will immediately contribute strategic value by expanding the REV Fire Group national footprint, dealer sales network, service and after-market parts revenue as well as enhancing our robust line of custom chassis and aerial products for multiple market segments." [39]The Ferrara purchase cemented REV Group's position as a dominant Fire Truck manufacturer.

56. Not satisfied with control over E-ONE, KME, and Ferrara—each a prominent fire apparatus brand in its own right—REV Group purchased Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively "Spartan"), Smeal Fire Apparatus ("Smeal"), and Ladder Tower Company ("Ladder Tower") in 2020[40] These brands had a significant presence in the Midwest market. The acquisitions solidified REV Group's position as the top Fire Truck manufacturer in the United States.[41]

---

visited Aug. 15, 2025).

[38] *REV Group Acquires Ferrara Fire Apparatus, Inc.*, FIREAPPARATUSMAGAZINE.COM (Apr. 25, 2017), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-ferrara-fire-appartus/ (last visited Aug. 15, 2025).

[39] *Id.*

[40] Chris Mc Loone, REB Group Invests in the Strength of Fire Apparatus Brands, FIRE APPARATUS MAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fireapparatus/ ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/sited Aug. 15, 2025); Rev Group, Inc. Completes Acquisition of Spartan Emergency Response, REVGROUP.COM (Feb. 3, 2020), https://investors.revgroup.com/investor-releases/2020/02-03-2020-135942281 (last visited Aug. 15, 2025).

[41] *Rev Group, Inc. Completes Acquisition of Spartan Emergency Response*,

57.    REV Group used its market power to reduce competition in the industry. Although REV Group executives initially made a show of preserving the independence of the company's subsidiary manufacturers and their dealers, they simultaneously warned that aggressive or "negative" competition among subsidiaries would not be tolerated.[42]

58.    By 2021, REV Group stopped even pretending to support subsidiary independence. A REV Group investor presentation referred to REV Group as "an industry consolidator."[43] That same presentation highlighted a strategy that called for REV Group's subsidiaries to "[c]onverge on common designs that can be shared across brands," and to use Spartan's Metro Star chassis/cab as the "platform" for their offerings. REV Group also ensures its larger fire department customers deal directly with corporate-level staff rather than individual brand representatives.[44] The investor presentation further called for the elimination of geographic overlaps between the marketing of its different fire-truck brands and dealers. REV Group's fire apparatus operations are now "center-led," with REV Group dictating and managing the execution of "margin improvement actions" across its

FIREAPPARATUSMAGAZINE.COM (Feb. 3, 2020), https://www.fireapparatusmagazine.com/the-fire-station/the-station-news/rev-group-inc-completes-acquisition-of-spartan-emergency-response/ (last visited Aug. 15, 2025).

[42] Musharbash, *supra* note 10.

[43] *REV Group, Inc. Presentation*, REV GROUP at 5 (July 2021),https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf .

[44] Chris McLoone, *REB Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Aug. 15, 2025). led," with REV Group dictating and managing the execution of "margin improvement actions" across its subsidiaries.

subsidiaries.[45]

59.     REV Group explained to shareholders that its goal was to double the fire apparatus companies' profitability. Timothy Sullivan, REV Group's CEO, told analysts that the companies REV Group had profit margins of 4 to 5 percent, and that REV Group was on a path "to get all of them above that 10 percent level." Sullivan further explained: "You bring them into the fold, you got to give them the religion, and they've got it now."[46]



***Image 5: Logos of fire apparatus brands consolidated by REV Group by 2020.[47]***

60.     Meanwhile, Oshkosh was making acquisitions of its own. In 2021, Oshkosh's primary North American subsidiary, Pierce, announced that it had acquired Boise Mobile Equipment ("BME").[48] BME's product portfolio, which allowed Pierce to expand its reach and focus to West Coast markets, included fire apparatus like the Model

---

[45] Musharbash, *supra* note 10.

[46] Baker, Farrell & Kovaleski, *supra* note 38.

[47] *REV Group, Inc. Presentation July 2021*, REVGROUP.COM, https://investors.revgroup .com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf (last visited Aug. 15, 2025).

[48] *Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment*, OSHKOSHCORP.COM (Sept. 16, 2021), https://https://www.investors.oshkoshcorp.com/news/pierce- manufacturing-completes-ownershipinterest- in-boise-mobile-equipment/16c54803-9007-4e9e-82f2-e6253396d4e0/ (last visited Aug. 15, 2025).

34, Tactical Tender, and Type 6 Xtreme.[49] In 2022, Oshkosh acquired Maxi-Metal, Inc.,[50] a leading designer and manufacturer of custom fire trucks. After these expansions, Oshkosh controlled a full quarter of the U.S. Fire Truck market.

61.     In 2016, Mike Schoenberger, Pierce's vice president of marketing and sales, expounded on Oshkosh and Pierce's acquisitions strategy in an interview with a trade publication. The article stated:

> Because Oshkosh Truck successfully diversified its own business through acquisitions, these will play a role in Pierce Manufacturing's growth going forward. Schoenberger stated, "Part of our growth here at Pierce is organic, but ***part of our strategy going forward is acquisitions***." The targets will be those companies that can add to Pierce Manufacturing's current orientation.

*On Fire*, Industry Today, Vol. 4, Issue 6 (July 26, 2016) (emphasis added).

62.     In addition to purchasing third-party manufacturers, Oshkosh also embarked on a strategy of consolidating the U.S. brands already within its purview, reducing geographic overlap between its dealers. In July 2018, Pierce subsidiary MacQueen Emergency Group ("MacQueen") acquired Schuhmacher Fire Equipment. The acquisition

---

[49] *Pierce Completes Ownership Interest in BME*, FIREHOUSE.COM (Sept. 16, 2021), https://www.firehouse.com/apparatus/press-release/21238596/pierce-manufacturing-custom-fire-truck-builder-pumpers-ladders-quints-rescues-puc-enforcer-pierce-completes-ownership-interest-in-bme (last visited Aug. 15, 2025); *Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment*, PIERCEMFG.COM (Sept. 16, 2021), https://www.piercemfg .com/pierce/press-release/pierce-manufacturing-completes-ownership-interest-in-boise-mobile-equipment (last visited Aug. 15, 2025).
[50] *Oshkosh Corporation Acquires   Maxi-Metal, Inc*.,OSHKOSHCORP.COM(Jun.13, 2022), https://www.investors.oshkoshcorp.com/news/oshkosh-corporation-acquires-maxi-metal-inc/c5afbb77-38ec-4497-a391-f4f56b88d127/ (last visited Aug. 15, 2025).

consolidated MacQueen's control over the upper Midwest, including Minnesota, Nebraska, South Dakota, North Dakota, and 109 Missouri counties.[51]

63. In January 2019, Pierce dealer Siddons-Martin Emergency Group ("Siddons") acquired Superior Equipment, consolidating control over the American Southwest.[52] Siddons' territory now includes Texas, Louisiana, New Mexico, Utah, and Nevada.

64. In November 2019, Pierce dealer Allegiance Fire and Rescue ("Allegiance") acquired Minuteman Fire and Rescue. The acquisition expanded Allegiance's territory to encompass most of New England, including Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.[53]

65. In September 2023, Pierce dealer Firematic Supply Co. Inc. ("Firematic") acquired Churchville Fire Equipment. The acquisition consolidated Firematic's control over Connecticut and New York.[54]

---

[51] *MacQueen Emergency Group Territory Expanded to Include 109 Missouri Counties*, PIERCEMFG.COM (July 10, 2018), https://www.piercemfg.com/pierce/press-release/macqueen-emergency-group-territory-expanded-to-include-109-missouri-counties (last visited Aug. 15, 2025).

[52] *Siddons-Martin Emergency Group Expands Territory with Acquisition of Superior Equipment*, PIERCEMFG.COM (Jan. 21, 2020), https://www.piercemfg.com/pierce/press-release/siddons-martin-emergency-group-expands-territory-with-acquisition-of-superior-equipment (last visited Aug. 15, 2025).

[53] *Minuteman Fire and Rescue Acquire by Allegiance Fire and Rescue*, ALLEGIANCEFR.COM (Nov. 19, 2019), https://allegiancefr.com/minuteman-fire-and-rescue-acquired-by-allegiance-fire-and-rescue/ (last visited Aug. 15, 2025).

[54] Pierce Dealer Firematic Supply Co. Grows Presence in Northeast with Acquisition of Churchville Fire Equipment, PIERCEMFG.COM (Sept. 1, 20123), https://www.piercemfg.com/ pierce/press- release/pierce-dealer-firematic-supply-co.-grows-presence-in-northeast-with-acquisition-of-churchville- fire-equipment (last visited Aug. 15, 2025).

66.     Most recently, on June 12, 2025, Pierce dealer Reliant Fire Apparatus brand ("Reliant") acquired Halt Fire, Inc., thereby consolidating Reliant's "exclusive Pierce territory" to include Michigan, in addition to its existing territories in Wisconsin and Iowa.[55] Pierce noted that Reliant would "align Michigan operations with its existing territories" to "ensur[e] a consistent and reliable customer experience."[56]

67.     These consolidations, which have largely eliminated geographic overlaps and given Pierce dealers exclusive control across vast territories, have reduced or eliminated competition among Pierce subsidiaries.

## B.     Rosenbauer

68.     Rosenbauer International A.G., seeing REV Group's and Oshkosh's consolidation efforts, finalized its acquisition of the remaining 25 percent minority stake in Rosenbauer American from General Safety Equipment Corporation in June 2022.[57]

69.     In March 2023, Rosenbauer announced that IKON Fire, LLC would join its dealer network for apparatus sales in Colorado and Wyoming.[58]

---

[55] *Reliant Fire Apparatus Acquires Halt Fire, Inc. Expands Pierce Dealership Territory to Include the State of Michigan*, PIERCEMFG.COM (Jun 12, 2025), https://https://www.piercemfg.com/ pierce/press-release/reliant- fire-apparatus-acquires-halt-fire-inc.-expands-pierce-dealership-territory-to-include-the-state-of-michiganisited Aug. 15, 2025).

[56] *Id.*

[57] *Rosenbauer International Fully Acquires Rosenbauer America*, ROSENBAUER.COM (June 23, 2022), https://www.rosenbauer.com/pl/fr/group/presse/wirtschaftspresse/wirtschaftspresse-detail/nd/rosenbauer-international-uebernimmt-rosenbauer-america-vollstaendigAug. 15, 2025).

[58] Rosenbauer America, *Rosenbauer Announces New Partnership with IKON Fire, LLC*, ROSENBAUERAMERICA.COM (Mar. 30, 2023), https://rosenbaueramerica.com/rosenbauer-announces-new-partnership-with-ikon-fire-

70. Rosenbauer's dealers are assigned non-overlapping territories, reducing interdealer competition.



*Image 6: Geographic territories of Rosenbauer dealers.*[59]

## C. Manufacturer Defendants seek to cooperate rather than compete

71. While rolling up independent Fire Truck manufacturers and reducing competition between their own brands, Manufacturer Defendants have also sought to cooperate, rather than compete, with one another.

72. For example, REV Group's Vice President of Sales in the Fire Group, Mike Virnig, stated: "What I won't tolerate is negative selling. I won't tolerate it with our competitors, and I won't tolerate it within the group. If I even get a hint or see anything like

---

llc/ (last visited Aug. 15, 2025).

[59] *Find a Dealer*, ROSENBAUERAMERICA.COM, https://rosenbaueramerica.com/find-a-dealer/ (last visited Aug. 15, 2025).

a dealer taking a shot at another dealer, we step in and say, 'Stop it.'"[60]

73. REV Group company executives have also told analysts that the company would substantially raise its profit margins and that other companies were doing the same.[61]

74. Industry insider Jerry Halpin, the co-owner and vice president of sales and marketing for C.E.T. Fire Pumps, noted in 2022 that "people in the fire service industry are talking amongst themselves" and are looking "to *bolster opportunities through partnerships and other alliances.*"[62] He also predicted "*cooperation between like businesses* to gain an edge in the marketplace."[63]

### III. FAMA facilitates Manufacturer Defendants' exchange of confidential information

75. E-One, Ferrara, KME, Spartan, Pierce, and Rosenbauer, which together represent all three Manufacturer Defendants, are members of FAMA.[64] FAMA colludes with the Manufacturer Defendants to enable an information exchange through statistical reports and by organizing twice-yearly in-person meetings.

---

[60] Chris McLoone, *REB Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM(July 1, 2020),https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Aug. 15, 2025) (emphasis added).

[61] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (last visited Aug. 15, 2025) (emphasis added).

[62] *2022 Was Good for Fire Service Industry; 2023 Is Uncertain*, FIREAPPARATUS MAGAZINE.COM (Dec. 120, 2022), https://https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain sited Aug. 15, 2025) (emphasis added).

[63] *Id*. (emphasis added).

[64] Members List, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/members/list (last visited Aug. 15, 2025).

a. **FAMA Statistical Reports**

76. FAMA describes access to competitors' data as "one of the most valuable reasons" for companies to join the organization. FAMA has an entire committee, the Data & Research Committee, dedicated to enabling this data exchange. FAMA describes the Data & Research Committee's mission as helping to "strengthen FAMA member companies by providing actionable data," including economic data, "for strategic business planning."[65] The Committee is tasked with "collect[ing] and distribut[ing] data regarding apparatus sales and orders" and distributing it on at least a quarterly basis.[66] FAMA describes this "detailed data"[67] as "invaluable" to members "for their internal business purposes."[68]

77. The Data & Research Committee maintains a digital data portal through which apparatus manufacturers enter economic data. That data is sent to an accounting firm, which compiles the data and returns it to the Data & Research Committee. The Committee then uploads the data onto the FAMA website.

78. Not just anyone can access this data, however. "FAMA does not release this information to the public."[69] Instead, the data is uploaded onto a secure portion of

---

[65] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://https://www.fama.org/data-research-committee (last visited Sept. 14, 2025).
[66] *Id.*
[67] Paul C. Darley, *The Fire Apparatus Market is Coming Back... Just Look at the Data*, FIRE APPARATUS MFRS. ASS'N (Dec. 4, 2015), https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data (last visited Aug. 15, 2025).
[68] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join (last visited Aug. 15, 2025).
[69] Id.

the FAMA website that FAMA describes as a "members-only section."[70] "Only those companies that participate in the statistical studies and members are privy to these reports."[71]

79. FAMA imposes strict limits on who can become a member, and consequently, who has access to these reports. To join FAMA, an entity must (a) be "engaged in the manufacture of firefighting or fire protection apparatus, including rescue vehicles," or (b) "manufacture components or products which are incorporated by the manufacturer as a permanent part of the completed fire apparatus . . . such as chassis, fire pumps, fire hoses, hose reels, ladders, aerial devices, apparatus valves and other water control appliances."[72] Notably, fire departments, municipalities, and other buyers of fire apparatus are not eligible to join FAMA under this definition. Such entities—apparatus manufacturers' customers—are denied access to the data that manufacturers exchange among themselves.

80. Even among its members, FAMA further restricts data access to those companies that provide their own data, in a give-data-to-get-data scheme. FAMA states data access "may be denied" to any company "that was given the opportunity to

---

[70] FIRE APPARATUS MFRS. ASS'N, WHY JOIN FAMA, https://www.fama.org/wp-content/ uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf (last visited Aug. 15, 2025).

[71] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join; https://www. fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data (last visited Aug. 15, 2025).

[72] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join (last visited Aug. 15, 2025).

participate in the program but refused."[73] Data may also be denied to any company "that does not agree in advance of participation to keep the results confidential."[74]



**INDUSTRY STATISTICS**

FAMA is the ONLY source for accurate fire service statistics provided quarterly and summarized at year end. Only FAMA members are privy to these reports since they are not released to the public. Members find this research invaluable for their internal business purposes regarding apparatus purchases by state, product category, pump type and more.

*Image 7: Section of a flyer titled "Why Join FAMA?"[75]*

### B. FAMA Meetings

81. In addition to providing economic data to their members, FAMA also organizes twice-yearly meetings, in the spring and the fall, to "provide a forum [for members] to share information."[76]

82. At these meetings, attendees, including direct competitors, listen to presentations that include economic forecasts regarding the Fire Truck manufacturing

---

[73] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/data-research- committee (last visited Aug. 15, 2025).
[74] *Id.*
[75] FIRE APPARATUS MFRS. ASS'N, WHY JOIN FAMA, https://www.fama.org/wp-content/ uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf (last visited Aug. 15, 2025).
[76] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join (last visited Aug. 15, 2025).

market.



***Image 8: Anirban Basu, Chairman & CEO of the Sage Policy Group, presenting an economic forecast at a FAMA gathering.[77]***

83.     Attendees also engage in "purchasing roundtables" and FAMA members-only meetings and discussion groups.



***Image 9: FAMA: Purchasing Round Table 83[78]***

---

[77] Fire Apparatus  Mfrs.  Ass'n, *FAMA  Membership Meetings*, YOUTUBE.COM (Feb. 26, 2016), https://www.youtube.com/watch?v=dbdjUvqfFAw (last visited Aug. 15, 2025).
[78] *Id.*



**Image 10: Rosenbauer employees attending a FAMA meeting**[79]



*Image 11: FAMA members-only Meeting*[80]

---

[79] *Id.*

[80] *Id.*



**Image 12: FAMA discussion group**[81]



*Image 13: FAMA discussion group[82]*

---

[81] *Id.*
[82] *Id.*

84.    FAMA meetings provided Manufacturer Defendants an avenue to exchange sensitive commercial information and coordinate supply restrictions and price hikes at these meetings. FAMA advertises these "networking" events as one of the reasons to join FAMA.



**NETWORKING**

FAMA's spring and fall meetings provide a great opportunity to network with industry professionals. The meetings also keep members up-to-date with new information, allow for group formulations of organizational goals and provide a forum to share information.

*Image 14: Section of a flyer titled "Why Join FAMA?"[83]*

85.    In addition to the statistical reports and twice-yearly in-person meetings, FAMA "communicates with its members on a regular basis via emails, its website and an extensive FAMA newsletter."[84] These private communications offered another avenue for communication and coordination among Manufacturer Defendants.

**C.    Information Exchanges at FAMA Meetings**

**1.    FAMA Member Meetings 2016-2024**

86.    At FAMA's October 2016 meeting in Nashville, Tennessee, the Statistics Committee demonstrated how the statistics website worked, highlighting certain analytical features.

---

[83] Fire Apparatus Mfrs. Ass'n, *FAMA Membership Meetings*, YOUTUBE.COM (Feb. 26, 2016), https://www.youtube.com/watch?v=dbdjUvqfFAw (last visited Aug. 15, 2025).
[84] *Id.*

87.     At the March 2017 meeting in St. Pete Beach, Florida, the Board of Directors reported that one of its key initiatives was to "[d]evelop a five-year fire apparatus industry forecast for use with the statistical data."

88.     At the same meeting, the Statistics Committee reported on "2016 total fire apparatus sales ***broken down by product type***, total sales booked 4,214 and shipped 4,707." The Committee also noted that "the data analysis tool has been improved for more specific category selections"—i.e., to allow for more granular searching.

89.     In October 2017, the Statistics Committee presented "a 12-month rolling report of total apparatus sales with a ***break down by product types***." The Board also reported at this meeting that "Sage Policy Group" had been retained by FAMA "to develop a forecast report." The Statistics Committee presented slides, but they were not included with the minutes.

90.     FAMA met again in February 2018 in Coronado, California. At this meeting, the Board of Directors stated that it would "provide additional analysis of the FAMA statistical data via the Sage Policy Group Industry Report."

91.     The Statistics Committee reported sales results for several time periods and "provided a break-down of sales by product type."

92.     The Statistics Committee also "encourage[d] members to post their data within 30-days of quarter close." The Statistics Committee presented slides, but they were not included with the minutes.

93.     In October 2019 in Toronto, Ontario, the FAMA Board of Directors reported that its goals included "continu[ing] to evaluate value of The Sage Report" and to

"[d]evelop an 'Executive Summary' (single page) that can be used to disseminate data."

94.     The Statistics Committee presented data about fire apparatus orders from 2002 through 2019 YTD, rolling 12-month reports, and a data set "provided by product type."

95.     In early 2022, after the COVID outbreak, FAMA resumed in person meetings, with one being held in St. Pete Beach, Florida. The Board of Directors conducted an extensive discussion concerning the future of FAMA. According to the Board of Directors:

The FAMA's mission states,

*we are here to maximize profits of FAMA member companies*.

96.     The Board of Directors continued that the "primary reasons and key deliverables of FAMA are Statistics, Technical Committee, GAC [Government Affairs Committee], and Networking Opportunities."

97.     During its presentation, the Statistics Committee reported that there were 5,586 units booked, a 46.1% increase from 2020. It continued to note that three product categories represent 91% of the market (pumpers at 65%; aerials at 14%; and tankers at 13%). Then the Statistics Committee provided a detailed sales analysis for each product type.

98.     The Statistics Committee also conducted a poll. Over 75% of the respondents said the Statistics Committee data was valuable at a rate of 8 or higher on a scale of 1-10 (with 10 being the most valuable). Similarly, over half the respondents indicated that the statistics data was "actionable."

99. In March 2023, FAMA met again in Fort Lauderdale, Florida. The Statistics Committee again encouraged members to submit data in a timely fashion as well as broader participation in data sharing. With charts and graphs (again, not attached to the minutes) the Committee also provided detailed bookings and orders for each product type.

100. FAMA met again in February 2024 in St. Pete Beach, Florida. During its report, the Board of Directors reiterated that its "mission is to continue to provide industry-based value that maximizes the growth and profits of FAMA members companies." One way of accomplishing that is to "[c]reate and distribute pertinent information to members and end-users." Again, statistics was a key focus area for the Board.

101. At the same February 2024 meeting, the newly minted Data & Research Committee also provided its report, again providing precise, granular information about bookings and shipping for each primary product type.

### 2. FAMA's 2021 Virtual Fall Meeting

102. Although slides were not attached to the minutes of the meetings outlined above, the presentation slides for FAMA's 2021 Virtual Fall Meeting are available.

103. During that meeting, the Board announced an Apparatus Replacement Project Overview. The Overview was designed to be a survey of FAMA's customer base to data mine "for info primarily on fleet age, replacement cycles, down time, maintenance/ownership costs, etc." A goal of the project was to "[c]reat[e] the data set to pull from to grow our market . . ." The Overview would obtain "high level overviews" but also "granular data" on apparatus types, department types, etc.

36

104.    In 2021, there were six members of the Statistics Committee. Two of them (including the co-chair, John Schultz) worked at Pierce Manufacturing. Another worked at Rosenbauer America, LLC. Thus, half of the Committee worked at Manufacturer Defendants.

105.    The initiatives for the Statistics Committee included continuing to publish quarterly data and increasing participation of members reporting.

106.    Like other reports, the slides broke down sales data for each product type. For aerials, the slides distinguished between six different types of aerials and provided the precise quantity of sales for each type.

107.    For pumpers, the slides broke down sales for five different types of pumpers (and further distinguished them by gallons per minutes quantity), and also provided precise sales quantities for each type.

108.    The same held true for tankers—the slides distinguished between elliptical and rectangular tankers with precise data for each.

109.    Thus, FAMA regularly provided detailed, granular reports about bookings and shipping quantities for each of the primary product types.

**D.    FAMA Governance**

110.    Aside from providing detailed industry information, there also is significant overlap between leaders of FAMA and executives with Defendants or their subsidiaries.

111.    For example, Gary Pacilio was the president of FAMA for two consecutive years: 2023 and 2024. Prior to that, he was the treasurer of FAMA for the

37

three previous years (2020 to 2022). During that same time span, he was also a senior executive with Spartan Fire Chassis, REV Group, and E-ONE—all entities within the REV Group corporate family.

112. Even today, Pacilio remains on the FAMA Board of Directors in the past president position.

113. REV Group's influence over FAMA wasn't limited to Pacilio. Bert McCutcheon was the President and CEO of FAMA in 2020 and 2022. Again, during that same time period, he was a senior executive with Ferrara Fire Apparatus and the REV Group—both entities within the REV Group corporate family.

114. Thus, for four of the last six years, the president of FAMA has been a senior executive with some entity within the REV Group corporate family.

115. The overlap is not limited to the REV Group. John Slawson served for two years as a FAMA Director immediately before he became the CEO of Rombauer in October 2019.

116. Other examples (including Capilio and McCutcheon) are listed below:

| Executive | Fire Apparatus Manufacturers' Association Leadership Position (Year) | Affiliation(s) with Defendants / Subsidiaries |
|---|---|---|
| Phil Gerace | Past President (2016) | E-ONE (July 2023-June 2024) REV Group (June 2024-present) |

| Executive | Fire Apparatus Manufacturers' Association Leadership Position (Year) | Affiliation(s) with Defendants / Subsidiaries |
|---|---|---|
| Mike Schoenberger | Director at Large (2016)<br>Director at Large (2017) | Pierce (30 years)<br><br>Rosenbauer (May 2010-present) |
| John Slawson | Director at Large (2017)<br>Director at Large (2018) | OshKosh (2004-2009)<br><br>Rosenbauer (Oct. 2019-June 2022) |
| Michael Moore | Director at Large (2018) | Pierce Mfg. (1999-May 2018)<br><br>OshKosh (May 2018-present) |
| Jeromie Johnston | Director (2019) | Pierce Mfg. (Aug. 2013-July 2021) |
| Gary Pacilio | Treasurer (2020)<br>Treasurer (2021)<br>Treasurer (2022)<br>President (2023)<br>President (2024)<br>Past President (2025) | Spartan Fire Chassis (Apr. 2021-Aug. 2021)<br><br>REV Group (Sept. 2020-Dec. 2021) E-ONE (Nov. 2021-Feb. 2024) |
| Bert McCutcheon | President and CEO (2020)<br>Director (2021)<br>President and CEO (2022)<br>Past President (2023)<br>Past President (2024) | Ferrara Fire Apparatus (1998-2022)<br>REV Group (Jan. 2022-Nov. 2022) |

## IV.    The conspiracy enabled Defendants to raise prices of Fire Trucks.

### A.    Fire truck backlogs soared by 40% or more during the class period.

117.    Demand for Fire Trucks increased steadily from 2010 until approximately 2020.  Between 2020 and 2022, the number of Fire Truck orders spiked. Since about 2022, order activity has been between 5,500 and 6,500 trucks per year.

118.    Manufacturer Defendants' production has not kept pace with the increased demand. Particularly within the last few years, order backlogs substantially increased.  For example, REV Group reported a record $3.6 billion backlog in late 2023, a 41% increase over 2022.[85] REV Group's backlog increased again in 2024. As of last October, REV Group had a $4.4 billion backlog on fire and emergency vehicle orders in the United States.[86]

119.    Oshkosh and Rosenbauer have reported similarly mammoth backlogs. Oshkosh's backlog of Fire Truck orders quadrupled from 2019 to 2023; it recently reported some $4 billion in orders placed but not fulfilled.[87] And Rosenbauer announced an approximately $2.67 billion backlog at the end of 2024.[88]

---

[85] Reuters, *Fire Truck Boom Highlights Divide in US Manufacturing*, U.S. NEWS (Jan. 19, 2024), https://money.usnews.com/investing/news/articles/2024-01-19/fire-truck-boom-highlights-divide-in-us-manufacturing (last visited Aug. 15, 2025).
[86] Rev Group, Inc. SEC Form 10K (Oct. 31, 2024), https://www.sec.gov/Archives/edgar/data/1687221/000095017024135208/revg-20241031.htm (last visited Aug. 15, 2025).
[87] Baker, Farrell & Kovaleski, *supra* note 38.
[88] Christian Sandherr, *Rosenbauer International AG: Solid Start Into the Year/ Record High Order Backlog*, NUWAYS (May 14, 2025), https://www.nuways-ag.com/company/rosenbauer-international- ag/research/solid-start-into-the-year-record-high-order-backlog ("Q1 sales grew by 16.8% yoy to € 264m (eNuW: € 265m) thanks to the company's strong order backlog of € 2.28bn at the end of FY24.") (last visited Aug.

120. Increased backlogs have translated to substantial delays prior to delivery of new Fire Trucks. Wait times in some areas have more than quadrupled, from one year to 4.5 years.[89] An individual going by the username "Capttomo" complained in an online forum in January 2023 that "lead times for delivery from date the order is placed to final inspection has gone from 10-12 months to greater than 2 years in many cases and in some cases approaching 3 years."[90] Another user noted that a REV Group dealer "added 15 months to the delivery time" for a Fire Truck.[91] A third reported an estimated delivery time of 48 months from a Pierce dealer for "a very cookie cutter" truck "without any interior customization."[92] And yet another described a 435 day waiting period for a single component of a Rosenbauer truck, with full wait times up to 3 years.[93]



***Image 15: Forum comment by Capttomo regarding state of the Fire Truck industry.[94]***

---

15, 2025).

[89] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 2 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Aug. 15, 2025).

[90] *Id.*
[91] *Id.*
[92] *Id.*
[93] *Id.*
[94] *Id.*



***Image 16: Forum comment by Sfdc111 regarding state of the Fire Truck industry.[95]***



***Image 17: Forum comment by CFDMarshal regarding state of the Fire Truck industry.[96]***

121. As another example, Sue Finkam, the mayor of Carmel, Indiana, said her city was growing and needed to add more fire stations. But as matters stand now, the city expects to be able to acquire land, design a fire station, construct the building, hire firefighters and train them, while still waiting for the station's fire engines to be delivered.[97]

122. The data bears out these anecdotes. While orders spiked to 45% above average levels, order fulfillment dropped nearly 10% below average levels in 2022, as illustrated in the graph below.

---

[95] *Id.*

[96] *Id.*

[97] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (last visited Aug. 15, 2025).



*Image 18: North America Fire Apparatus Trend.[98]*

123.    While the rate of order fulfillment has ticked up again in recent years, that increase has not been nearly enough to address the serious backlog.

124.    In addition to delays for new Fire Trucks, delays have also increased for replacement part orders. Gil Carpenter, a fire chief in Benton, Arkansas, explained that prior to REV Group rolling up Ferrara, he would call a contact named Charlie whenever he needed a Ferrara replacement part. Charlie would ship him the part the next day. But in 2024, when one of the department's vehicles needed new parts, delivery was delayed for more than 10 months. Mr. Carpenter's fire department was left without one of its eight trucks for nearly a year.[99]

---

[98] *FAMA Releases Fire Apparatus Industry Update*, FIRE ENGINEERING (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update (last visited Aug. 15, 2025).
[99] Baker, Farrell & Kovaleski, *supra* note 38; *see also* Fire Apparatus & Emergency

125. These backlogs cannot be explained by supply chain disruptions.



***Image 19: Global Supply Chain Pressure Index from June 30, 2017, to June 30, 2025.***[100]

## B. In the face of increasing demand, Manufacturer Defendants have suppressed the supply of Fire Trucks.

126. Under typical market conditions, such a significant surge in demand would be met with a corresponding increase in manufacturing capacity. But no such manufacturing capacity increase has materialized. REV Group has recently spent only a small portion of its revenue—about 1 percent—on upgrading its buildings and equipment. Alexander Yaggy, a former investor in REV Group's stock, called this minimal investment in the face of significant industry backlogs "reflective of an uncompetitive market."[101] And

---

Equipment Staff, *REV Group Fire Division Launches New E-Commerce Website for Fire Truck Aftermarket Parts Sales and Service*, FIRE APPARATUS & EMERGENCY EQUIPMENT (July 29, 2019), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-fire-division-launches-new- ecommerce-website-for-fire-truck-aftermarket-parts-sales-and-se (last visited Aug. 15, 2025).

[100] *Global Supply Chain Pressure Index (GSCPI)* , FED. RESERVE BANK OF N.Y. (July 2025), https://www.newyorkfed.org/research/policy/gscpi - /interactive (last visited Aug. 15, 2025).

[101] Baker, Farrell & Kovaleski, *supra* note 38.

neither Oshkosh nor Rosenbauer have attempted to meet this surge in demand or capture market share by ramping up their production.

127. Not only have Manufacturer Defendants failed to add manufacturing capacity, in some cases they have in fact shuttered existing plants. In September of 2021, REV Group shut down two KME custom Fire Truck manufacturing facilities in Pennsylvania and Virginia.[102] The closure cut the company's manufacturing footprint by roughly one third.[103]

128. In a press release, REV Group stated that orders currently in progress at the two KME facilities would be transferred to other REV Group manufacturing plants.[104] The process, unsurprisingly, resulted in additional, substantial delays. Matthew R. Timerman, a fire chief whose department had ordered a $1.2 million ladder truck from REV Group slated to be completed at the KME Pennsylvania plant, discovered the truck would instead be assembled at three different manufacturing sites, resulting in additional delays.[105] Eventually, Mr. Timerman's department received the truck more than four years after the department first placed the order.[106]

---

[102] Chris Reber, *KME Plant to Close in April 2022*, TIMES NEWS ONLINE, (Sept. 11, 2021), https://www.tnonline.com/20210911/kme-plant-to-close-in-april-2022(last visited Aug. 15, 2025).
[103] Baker, Farrell & Kovaleski, *supra* note 38.
[104] Andrew Corselli, *REV Group Announces Plans to Shift KME Production to Other REV Fire Group Facilities*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Sept. 10, 2021), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-announces-plans-to-shift-kme-production-to-other-rev-fire-group-facilities/ (last visited Aug. 15, 2025).
[105] Baker, Farrell & Kovaleski, *supra* note 38.
[106] *Id.*

129.    Despite these record-setting backlogs, the Manufacturer Defendants appear unconcerned that their customers might cancel orders or that a competitor might steal their business.[107] Mark Skonieczny, REV Group's current chief executive, explained during a 2023 conference call that the company did not expect the delays to cause cancellations because once a city sets aside the money, it is "earmarked" and REV Group gets a deposit. "That money is allocated to those units, so we feel good about that."[108] Skonieczny further commented, "I don't think it's impacting our market share."[109] According to REV Group's SEC reports, the company considers its backlog to enhance its value to shareholders by giving the company "strong visibility into future net sales."[110]

### C.    The price of Fire Trucks doubled during the class period.

130.    Unsurprisingly, given growing demand and flat or declining supply, the cost of Fire Trucks has soared. In the mid-2010s, a standard pumper truck cost approximately $300,000 to $500,000.[111] Within the last few years, prices have increased to an average

---

[107] Musharbash, *supra* note 10.

[108] Baker, Farrell & Kovaleski, *supra* note 38.

[109] Eman Abu-Khaled, *REV Group Takes Steps to Normalcy After Supply-Chain Setbacks*, TRAILER BODY BUILDERS (Mar. 22, 2023), https://www.trailer-bodybuilders.com/truck- bodies/article/21262503/rev-group-takes-steps-to-normalcy-after-supply-chain-setbacks (last visited Aug. 15, 2025).

[110] Musharbash, *supra* note 10.

[111] *Id.*; CHRIS GODFREY, AN EVALUATION OF FIRE APPARATUS USAGE AND OPERATING COST FOR GREEN TOWNSHIP FIRE & EMS at 9 (Aug. 2, 2013), http://www.ohiofirechiefs.com/aws/ OFCA/asset_manager/get_file/77188 (last visited Aug. 15, 2025); Patrick Varine, *Despite Grant, PA Dept. Says Rising Apparatus Costs a Challenge*, FIREHOUSE (Aug. 3, 2023), https://www.firehouse.com/apparatus/news/53068052/despite-fire-act-grant-export-pa-fire-department-says-rising-fire-apparatus-costs-a-challenge (last visited Aug. 15, 2025).

of $1 million per pumper truck.[112] Similarly, ladder trucks that cost $750,000 to $900,000 in the mid-2010s cost upward of $2 million today.[113] An industry leader commented that the industry has "reached a new level of price psychology. Today, relationships start at a half million dollars, and 10 years ago that was a remote concept."[114]

131.    Nor is seeking out competition a viable option for customers looking to get a better deal on fire apparatus. As one industry executive has observed, "[t]here are now times when all vendors at a bid table, each with a 'different' product, are all owned and managed by the same parent company. How is that competitive for the purchaser?"[115] Fire departments across the country have little alternative than to pay the exorbitant prices Manufacturer Defendants are charging for their Fire Trucks.

### D.    Manufacturer Defendants used "floating prices" to raise prices.

132.    On top of already high base prices for new Fire Trucks, REV Group, Oshkosh, and Rosenbauer have relied on the significant industry backlog to justify imposing "floating prices" on their customers. Using the purported difficulty of projecting material

---

[112] Musharbash, *supra* note 10.

[113] CHRIS GODFREY, AN EVALUATION OF FIRE APPARATUS USAGE AND OPERATING COST FOR GREEN TOWNSHIP FIRE & EMS at 9 (Aug. 2, 2013), http://www.ohiofirechiefs.com/aws/OFCA/ asset_manager/get_file/77188 (last visited Aug. 15, 2025); Baker, Farrell & Kovaleski, *supra* note 38; Jody Godoy, *As Fire Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe*, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/fire-truck-prices-hit-2-million-us-firefighters-demand-an-antitrust-probe-2025-05-13 (last visited Aug. 15, 2025); Musharbash, *supra* note 11.

[114] Chris Mc Loone, *Fire Industry Outlook: 10 Years After the Great Recession*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Dec. 1, 2018), https://www.fireapparatusmagazine.com/fire-apparatus/fire-industry-outlook-10-years-after-the-great-recession (last visited Aug. 15, 2025).

[115] Musharbash, *supra* note 10.

costs over a years-long lead time as an excuse, Manufacturer Defendants have added price clauses to their contracts that allow Manufacturer Defendants to increase the final price of a Fire Truck after it goes into production. Due to production delays, this means Manufacturer Defendants can increase their prices years after a fire department initially orders a truck.[116] Mark Fusco, the president of Rosenbauer America, has conceded that his company imposes "surcharges that might occur during the build times" on Rosenbauer customers.[117]

133.    One fire department in Massachusetts ordered a Fire Truck in 2022 and then added two more trucks to their original order in 2023. After the second order, the Fire Truck manufacturer increased the price of the truck ordered in 2022 by $150,000 to match the price of the trucks ordered in 2023. The manufacturer threatened not to deliver the truck ordered in 2022 unless the fire department agreed to the price increase. The fire chief felt "compelled to pay this increase out of fear that the process to get apparatus would take too long and we would not be able to provide service to our community."[118]

---

[116] Press Release, Sen. Jim Banks, Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing, https://www.banks.senate.gov/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing(last visited Aug. 15, 2025).

[117] Ed Ballam, *2022 Was Good for Fire Service Industry; 2023 Is Uncertain*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Dec. 20, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain (last visited Aug. 15, 2025).

[118] Press Release, Sen. Jim Banks, Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing, https://www.banks.senate.gov/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing (last visited Aug. 15, 2025).

134.   As another example, a fire department in Indiana was hit with a more than $100,000 price increase for the same pumper truck after a 7-month delay.[119] And in yet a third example, the Loveland Fire Rescue Authority in Colorado experienced a surcharge of $29,000 on a pending order.[120]

## V.   Defendants' conspiracy increased manufacturers' margins and revenues.

135.   Defendants have reaped the profits of these price increases. In July 2021, REV Group announced that it had "[e]xceeded consensus earnings estimates for five consecutive quarters."[121] In 2024, REV Group's profit margins jumped to what the company described as an "exceptional 8.9 percent" for the division that includes Fire Trucks.[122]

136.   In June 2025, Oshkosh stated that its adjusted operating margins had grown from 4.8% to 10.5% from 2022 to 2024, delivering on "key 2022 Investor Day targets one year early."[123]

---

[119] *Id.*

[120] *Floating" Prices & Lengthy Delivery Times for Fire Apparatus CSFC Members' Perspective*, at 1, https://static1.squarespace.com/static/5ea64a6b9614427b0ff93e6d/t/63080a517f782438bd d6f98e/1661471313934/Floating+Prices+Lenghty+Delivery+Time+for+Fire+Apparatus+ Aug+25+20 22%5B42%5D.pdf (last visited Aug. 15, 2025).

[121] *REV Group, Inc. Presentation*, REV GROUP at 4 (July 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf (last visited Aug. 15, 2025).

[122] Baker, Farrell & Kovaleski, *supra* note 38.

[123] *REV Group, Inc. Presentation*, REV GROUP at 4 (July 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf (last visited Aug. 15, 2025).



*Image 20: Oshkosh's financial performance, 2022 to 2024.[124]*

137.    Oshkosh anticipates its adjusted operating margins will grow to 12 or 14 percent by 2028, with revenue of $13-14 billion.[125] According to the company, that revenue growth will be "supported by strong backlog" and price increases.[126]

138.    With a few exceptions during the pandemic years, overall revenues for Fire Truck manufacturers in the U.S., including Manufacturer Defendants, have increased significantly since 2015.

---

[124] *Id.*
[125] *Id.* at 86.
[126] *Id.* at 87.

50



*Image 21: Fire Truck Manufacturing Revenue in the United States.*[127]

## VI. Market Power and Barriers to Entry

### A. Relevant Markets

139. One tool that courts use to assess the competitive effects of concerted action is defining the relevant market. The relevant market is the zone of competition among agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). Here, the product market is all Fire Trucks, and the geographic market is the United States, including specifically Oklahoma.

---

[127] Oliwier Samorajski, *Fire Truck Manufacturing in the US – Market Research Report (2015-2030)* , IBIS WORLD (Apr. 2025), https://www.ibisworld.com/united-states/industry/fire-truck-manufacturing/5645 (last visited Aug. 15, 2025).

51

### 1.    The product market encompasses all Fire Trucks.

140.    This case concerns Fire Trucks as recognized by the National Fire Protection Association ("NFPA") Standard 1900 regarding automotive fire apparatus and the National Wildfire Coordinating Group Standards for Wildland Fire Resource Typing (together, the "Standards"). These standards classify Fire Trucks within the United States into seven types, all of which are at issue in this case:[128]

- **Type 1** Fire Trucks are often referred to as an engine company, engine pumper, or structural firefighting truck. This is the most common type of Fire Truck in use today. Urban, suburban, and rural fire departments all rely on Type 1 Fire Trucks. Type 1 Fire Trucks carry all required NFPA firefighting equipment and support both structural firefighting and initial emergency medical services. Every Type 1 Fire Truck is required to have a pump with a minimum tank size of 300 gallons and to be equipped with 2.5-and 1.5-inch hoses of varying lengths. These trucks must also include a full complement of ground ladders, nozzles, forcible entry equipment, rear access and egress, and some level of first aid equipment. They are designed to carry four firefighters.

- **Type 2** Fire Trucks carry all required NFPA firefighting equipment and support both structural firefighting and initial emergency medical services. They are most commonly used in urban and suburban settings. They typically carry three to four firefighters.

---

[128] Types of Fire Trucks: An Overview and Comparison, PIERCE (Nov. 14, 2023), https://www.piercemfg.com/pierce/blog/types-of-fire-trucks (last visited Aug. 15, 2025).

- **Type 3** Fire Trucks are often referred to as a wildland Fire Truck or a brush truck. They are typically used in rural and wildland settings. NFPA standards require a Type 3 engine to have a minimum of a 500-gallon water tank and a pump capable of a minimum of 150 US gallons per minute at a pressure of 250 pounds per square inch. Many Type 3 fire engines also feature an auxiliary pump in addition to the main water pump. The auxiliary pump can be powered by a separate diesel engine that is connected to the pump. This pump-and-roll technique means that a truck operator can drive the truck while crew members man the pump and hoses, allowing firefighters to follow along as forest fires and brush fires move with the weather, and to create fire lines, wetting down areas ahead of an advancing wildfire. Type 3 Fire Engines must be equipped to carry at least three passengers.

- **Type 4** Fire Trucks, like Type 3 trucks, are often used in wildland firefighting. Compared to Type 3 trucks, Type 4 trucks have a larger water tank and reduced hose capacity requirements. Type 4 Fire Trucks must have a 750-gallon water tank that offers 50 gallons per minute of water transfer at a pressure of 100 pounds per square inch. Type 4 trucks must be equipped to carry at least two people.

- **Types 5, 6, and 7** Fire Trucks are often grouped together because they feature many of the same design qualities. These vehicles are typically pick-up truck-based with 4-wheel drive on a medium duty chassis. The main difference between Type 5, Type 6, and Type 7 Fire Trucks is the difference in their

53

maximum gross vehicle weight rating ("GVWR"):

Type 5 trucks have a maximum GVWR of 26,000 pounds; Type 6 trucks have a maximum GVWR of 19,500 pounds, and Type 7 trucks have a maximum GVWR of 14,000 pounds. Type 5, 6, and 7 trucks typically carry a 300-gallon water tank and a small booster pump with a minimum capacity of 50 gallons per minute. They must be equipped to carry two firefighters.



| SPECS | STRUCTURE | | WILDLAND BRUSH TRUCKS | | | | |
|---|---|---|---|---|---|---|---|
| | TYPE 1 | TYPE 2 | TYPE 3 | TYPE 4 | TYPE 5 | TYPE 6 | TYPE 7 |
| TANK MIN. CAPACITY (GAL) | 300 | 300 | 500 | 750 | 400 | 150 | 50 |
| PUMP MIN. FLOW (GPM) | 1000 | 500 | 150 | 50 | 50 | 50 | 10 |
| @ RATED PRESSURE (PSI) | 150 | 150 | 250 | 100 | 100 | 100 | 100 |
| HOSE 2½" (MIN. FT) | 1200 | 1000 | ✕ | ✕ | ✕ | ✕ | ✕ |
| HOSE 1½" (MIN. FT) | 500 | 500 | 1000 | 300 | 300 | 300 | ✕ |
| HOSE 1" (MIN. FT) | ✕ | ✕ | 500 | 300 | 300 | 300 | 200 |
| LADDERS | ✓ | ✓ | ✕ | ✕ | ✕ | ✕ | ✕ |
| PUMP AND ROLL | ✕ | ✕ | ✓ | ✓ | ✓ | ✓ | ✓ |
| MAX. GVWR (LBS) | ✕ | ✕ | ✕ | ✕ | 26,000 | 19,500 | 14,000 |
| PERSONNEL (MIN.) | 4 | 3 | 3 | 2 | 2 | 2 | 2 |
| TYPICAL USES | STRUCTURAL FIRE RESPONSE | STRUCTURAL FIRE RESPONSE | BRUSH FIRE RESPONSE | BRUSH FIRE RESPONSE | INITIAL ATTACK, BRUSH PATROL | INITIAL ATTACK, BRUSH PATROL | PATROL, MOP UP, INITIAL ATTACK |

✓ REQUIRED ✕ NOT REQUIRED/OPTIONAL

***Image 22: Firetruck types and specifications.[129]***

---

[129] BOISE MOBILE EQUIPMENT, *Types of Fire Trucks and Their Purpose* (Feb. 21, 2022), https://www.bmefire.com/types-of-fire-trucks (last visited Aug. 15, 2025).

141.    Some trucks are specially equipped to conform to additional standards. For example, NFPA Chapter 5 describes the requirement for a truck to be considered a Pumper Fire Apparatus, NFPA Chapter 9 describes the requirements for a Quint Fire Apparatus, NFPA Chapter 11 describes the requirements for a Mobile Foam Fire Apparatus, and NFPA Chapter 19 describes the requirements for Aerial Fire Apparatus (which include trucks equipped with aerial ladders, elevating platforms or towers, and water tower devices).[130] These specialty trucks are also included in the relevant product market.

### 2.    The geographic market is the United States, including Oklahoma.

142.    As described above, all three Manufacturer Defendants sell Fire Trucks across the 50 states. The relevant market is the United States, including Oklahoma.

### B.    Manufacturer Defendants have market power in the relevant market.

143.    As a result of industry roll-ups from the mid-2010s through today, the overwhelming majority of the Fire Truck industry's sales and capacity are now concentrated among three dominant manufacturers: REV Group, Oshkosh, and Rosenbauer. As described above, REV Group captures around $1 billion of annual Fire Truck sales made in the United States, Oshkosh captures around $750 million, and Rosenbauer captures around $307 million. In combination, these three companies capture between 70 and 80 percent of the national market. [131]

---

[130] PIERCE, *Types of Aerial Fire Trucks: NFPA Classification Overview* (Nov. 8, 2022), https://www.piercemfg.com/pierce/blog/types-of-aerial-fire-truck (last visited Aug. 15, 2025).

[131] Baker, Farrell & Kovaleski, *supra* note 38.

**C.      The barriers to entry protect Manufacturer Defendants' market shares.**

144.     Fire trucks are expensive, made-to-order, specialty equipment. End-users can specify nearly every aspect of the apparatus they order, from the size of the motor, to the placement of emergency lights, to the location of equipment storage compartments.

145.     This demand for customization stems from the diversity of department location and size throughout the United States and Oklahoma fire department community. There are approximately 52,000 fire stations across the country with each fire department, and sometimes each fire station, having its own specific set of requirements.[132] [133]

146.     Given this backdrop, breaking into the Fire Truck industry is challenging. The cost of producing Fire Trucks, combined with the long lead times, mean that only well-funded, established corporations have much chance of sustaining themselves through the initial investment period. The large capital outlays required limit market entry, as it can be difficult for firms to raise the required funds.

147.     The specialized nature of the Fire Truck market is an additional barrier to entry. The niche engineering expertise needed to meet NFPA standards and fire departments' demands is largely confined to current manufacturers. The effort required to develop the necessary expertise is another deterrent to would-be competitors.

---

[132] *Id.*

[133] FULD & CO., *What a Competitive Strategy Analyst Thinks About the Fire Apparatus Industry*, https://www.fuld.com/what-a-competitive-strategy-analyst-thinks-about-the-fire-apparatus-industry (last visited Aug. 15, 2025).

### D. The conspiracy has harmed Plaintiff and Class members.

#### 1. Plaintiff and Class members overpaid for Fire Trucks.

148. If the price of Fire Trucks had increased only at the rate of inflation between 2015 and 2025, pumper trucks would cost approximately $680,000 (rather than the current cost of $1 million), and ladder trucks would cost approximately $1.2 million (rather than $2 million).[134] Municipalities across the country, including the City of Shawnee and respective Class members are therefore paying approximately 47 percent (or $320,000) more for pumpers and 66 percent (or $800,000) more for ladder trucks in 2025 than would be expected based on inflationary costs alone.

149. There are approximately 5,000 new Fire Trucks sold in the United States every year.[135] Of these, about 75% are pumpers.[136] That means that since 2016, Plaintiff and other Class members have contributed to a combined total of approximately $56.25 billion for new Fire Trucks[137]—$19.8 billion more than expected based on increased inflation alone.[138]

---

[134] Calculated assuming a pumper cost $500,000 and a ladder truck cost $900,000 in 2015.

[135] Jeffrey Bonior, *Get to Know Sutphen, Which Has Been Making Fire Engines in the United States Since 1890*, SUTPHEN (Mar. 12, 2021), https://www.sutphen.com/get-to-know-sutphen-which-has-been- making-fire-engines-in-the-united-states-since-1890 (last visited Aug. 15, 2025).

[136] Alan M. Petrillo, *What's the Right Size Pump for Your Apparatus and How Does It Affect the Design?*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Sept. 27, 2023), https://www.fireapparatusmagazine.com/fire-apparatus/pumpers/whats-the-right-size-pump-for-your-apparatus-and-how-does-it-affect-the-design (last visited Aug. 15, 2025).

[137] Calculated as ((3,750 pumper trucks per year * 9 years *$1 million) + (1,250 ladder trucks per year * 9 years * $2 million)).

[138] Cost based on inflation alone ($36.45 billion) calculated as ((3,750 pumper trucks per year * 9 years *$680,000) + (1,250 ladder trucks per year * 9 years * $1.2 million)).

150. Even accounting for issues facing the Fire Truck market in terms of supply chain and labor shortage challenges, these increases are far beyond what would be expected in a competitive market.

### 2. Inflated prices and long backlogs have prevented Class members from timely replacing old vehicles in their Fire Truck fleets, and their fleets have suffered as a consequence.

151. As fire vehicles age, they become prone to more frequent and serious breakdowns, leading to more costly repairs and prolonged downtime. The National Fire Protection Association recommends that apparatuses should be moved from the frontlines to the reserve fleet after 15 years and removed from service completely at the 20- or 25-year mark.

152. Skyrocketing prices and longer delivery times have made it difficult for municipalities to replace aging vehicles in their fire departments' fleets in a timely manner. In many cases, fire departments are operating using trucks that have exceeded their service life because buying new trucks is prohibitively expensive. According to the president of the International Association of Fire Fighters, Edward Kelly, cities and towns across the country are facing a crisis where demand for new Fire Trucks has outstripped availability and funding.[139]

---

[139] Jody Godoy, *As Fire Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe*, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/fire-truck- prices-hit-2-million-us-firefighters-demand- an-antitrust-probe-2025-05-13 (last visited Aug. 15, 2025).

### 3. Reduced Fire Truck fleets are less able to respond to disasters.

153. High prices and long waits for fire apparatus are endangering public safety in communities across the country, particularly those facing natural disasters.

154. Los Angeles's experience in January 2025, when two large fires raged for days and killed 29 people, is a particularly poignant example of the harm communities can suffer when their Fire Truck fleets are reduced.[140] More than 100 of the Los Angeles Fire Department's ("LAFD") 183 Fire Trucks were out of service at the time the fires broke out.[141] Chuong Ho, a firefighter and union leader who was among those who reported for work during the fires, said the lack of fire apparatuses meant many of the firefighters who were available to help that day could not be sent to the front lines.[142] Kristin Crowley, the LAFD fire chief, confirmed that the lack of a fully staffed Fire Truck fleet impeded the department's ability to respond to the fires.[143] Had additional firefighters been able to combat the blazes, they might have been able to prevent the devastation that followed, including $350 million in damage to L.A. public facilities[144] and the loss of homes and

---

[140] Jody Godoy, *As Fire Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe*, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/fire-truck-_prices-hit-2-million-us-firefighters-demand-_an-antitrust-probe-2025-05-13 (last visited Aug. 15, 2025).

[141] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-_FTC-and-DOJ-re-Firetrucks.pdf (last visited Aug. 15, 2025).

[142] Baker, Farrell & Kovaleski, *supra* note 38.

[143] *Id.*

[144] David Zahniser, *Fires and Windstorms Caused at Least $350 Million in Damage to L.A. Public Facilities, Report Says*, L.A. TIMES (Jan. 22, 2025), https://www.latimes.com/california/story/2025-01-_22/la-me-wildfire-costs-los-angeles-

lives.[145]



***Image 24: Out-of-service Fire Trucks sitting in the LAFD's Bureau of Supply and Maintenance lot while fires ravage the city.[146]***



***Image 25: Out-of-service Fire Trucks sitting in the LAFD's Bureau of Supply and Maintenance lot while fires ravage the city[147]***

public-infrastructure (last visited Aug. 15, 2025).

[145] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Aug. 15, 2025).

[146] Perkin Amalaraj, *Dozens of Fire Trucks Waiting for Repair while Fires Ravage LA*, DAILY MAIL (Jan. 14, 2025), https://www.msn.com/en-ae/news/other/dozens-of-fire-trucks-waiting-for-repair-while-fires-ravage-la/ar-BB1rr7vy (last visited Aug. 15, 2025).

[147] *Id.*

155. Other communities have faced similar difficulties. Jesse M. Flax, the fire chief in Camden, New Jersey, said that Fire Truck manufacturing delays and rising prices were "creating greater risk for the public and firefighters."[148] During a 2024 house fire in Camden, crews were slowed in their response by mechanical trouble on a truck that caused its hose to go limp. A resident died in that blaze.[149] And in Castle Rock, Colorado, firefighters responded to incidents in Type 3 brush trucks, rather than in other preferred vehicles, due to a four-year delivery delay of new apparatus.[150]

## VII.    Defendants concealed the conspiracy and Plaintiff could not have discovered it.

156. Plaintiff had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the price of Fire Trucks. Throughout the class period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff.

157. Defendants concealed their conspiracy by communicating competitively sensitive information to one another through FAMA Statistical Reports that are unavailable to the public. They also attended members-only discussions during twice-annual FAMA

---

[148] Baker, Farrell & Kovaleski, *supra* note 38.

[149] *Id.*

[150] Isabelle Crow, *IAFF Spotlight Apparatus Crisis and Its Impact*, FIRE & SAFETY J. (June 20, 2025) https://fireandsafetyjournalamericas.com/iaff-spotlight-apparatus-crisis-and-its-impact (last visited Aug. 15, 2025).

meetings, allowing the existence of written records. Because the public had no access to either the FAMA Reports or the FAMA members-only meetings, there was no reason for Plaintiff to suspect that Defendants were engaged in an unlawful anticompetitive scheme.

158. What's more, Defendants' anticompetitive conspiracy, by its very nature, was inherently self-concealing. Fire trucks are not exempt from antitrust regulation. Prior to the investigative articles by Basel Musharbash[151] and journalists with the New York Times,[152] Plaintiff reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Manufacturer Defendants' Fire Truck prices before these recent events.

159. By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff has as a result of the unlawful conspiracy alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

160. Plaintiff brings this action on behalf of itself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and treble damages under the federal antitrust laws, as well as injunctive relief pursuant to federal law, and damages and threefold damages and injunctive relief pursuant to State of Oklahoma anti-trust laws and the common law, on behalf of the members of the following

---

[151] Musharbash, *supra* note 10.
[152] Baker, Farrell & Kovaleski, *supra* note 38.

class: All Oklahoma Public Safety entities, including but not limited to, governmental entities, municipalities and subdivisions, that manage or maintain fire departments, special incorporated or chartered fire districts, and volunteer fire departments, that purchased fire trucks from the Manufacturing Defendants from January 1, 2016 until the time of trial (the "Class").

161.    Specifically excluded from this Class are Defendants; the officers, directors or employees of any Defendant; and any entity in which any Defendant has a controlling interest.

162.    The proposed class satisfies Federal Rule of Civil Procedure 23(a). A class action is warranted in this case because the Class members are so numerous that joinder of all members is impracticable; there are questions of law or fact common to the Class; the claims of the representative parties are typical of the claims of the Class; and the Plaintiff named in this Complaint will fairly and adequately protect the interests of the Class.

163.    **Numerosity**: Class members are so numerous (including at least hundreds of municipalities) that joinder of all Class members in a single proceeding would be impracticable. The disposition of the claims asserted through this class action will enhance efficiency and will benefit the parties and the Court.

164.    **Commonality**: Plaintiff's antitrust claims are common to all Class members, and individual complaints otherwise may result in inconsistent or varying adjudications.

165.    **Typicality**: Plaintiff's claims and harms resulting from Defendants' alleged unlawful conduct are typical of the legal violations and harms suffered by all Class members.

166. **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class members in that Plaintiff has no interests adverse to, or that conflict with, the Class which Plaintiff seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex class actions of this nature.

167. In addition to satisfying the prerequisites of Fed. R. Civ. P. 23(a), this case qualifies for class action treatment because questions of law or fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for adjudicating the controversy.

168. **Predominance**: Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, but are not limited to:

- whether Defendants engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of Fire Trucks sold in interstate commerce in the United States and Oklahoma;

- the duration of the conspiracy alleged herein and the acts performed by Defendants in furtherance of the conspiracy;

- whether the alleged conspiracy violated the federal antitrust laws;

- whether the alleged conspiracy violated State antitrust laws;

- whether the conduct of Defendants, as alleged in this Complaint, caused injury to the Plaintiff and other Class members;

- the effect of Defendants' alleged conspiracy on the prices of Fire Trucks sold

64

in the United States and Oklahoma during the class period;

- whether Plaintiff and other Class members are entitled to, among other things, damages and injunctive relief and if so, the amount of such damages and the nature and extent of such injunctive relief; and

- the appropriate Class-wide measure of damages.

169. **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. It would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct, both for Class members themselves and for the court system. Individualized litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the courts. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## ANTITRUST INJURY

170. Defendants' anticompetitive conduct had the following effects, among others:

- price competition has been restrained or eliminated with respect to Fire Trucks;

- the prices of Fire Trucks have been fixed, raised, stabilized, or maintained at artificially inflated levels;

- Plaintiff and other Class members have been deprived of free and open competition; and

- Plaintiff and other Class members have paid artificially inflated prices for Fire Trucks, causing substantial harm to Plaintiff and other Class members.

171. The purpose of Defendants' conspiratorial conduct was to raise, fix, or maintain the price of Fire Trucks. As a direct and foreseeable result, Plaintiff and other Class members paid supra-competitive prices for Fire Trucks during the class period.

172. By reason of the alleged violations of the antitrust laws, Plaintiff and other Class members have been injured because they paid higher prices for Fire Trucks than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy. This is an injury of the type that the antitrust laws were meant to punish and prevent.

### COUNT I
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, for conspiracy to restrain production
### (Brought by Plaintiff and the Class against all Defendants)

173. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

174. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016, and continuing through the present, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize price of Fire Trucks in the United States and Oklahoma, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

175. In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants achieved the following conspiratorial outcomes:

- Fixing, raising, and stabilizing the price of Fire Trucks; and

- Allocating among themselves and collusively reducing the production of Fire Trucks.

176. The combination and conspiracy alleged herein has had the following effects, among others:

- Price competition has been restrained or eliminated with respect to Fire Trucks;

- The production of Fire Trucks has been restrained at artificially low levels;

- The price of Fire Trucks has been fixed, raised, stabilized, or maintained at artificially inflated levels;

- Plaintiff and other Class members have been deprived of free and open competition; and

- Plaintiff and other Class members have paid artificially inflated prices for Fire Trucks, causing substantial harm to Plaintiff and other Class members.

177. Plaintiff and other Class members have been injured and will continue to be injured by paying more for Fire Trucks from Manufacturer Defendants than they would have paid and will pay in the absence of the combination and conspiracy.

178. The conspiracy is a per se violation of the federal antitrust laws.

179. Plaintiff and other Class members are entitled to damages, treble damages, and an injunction against Defendants, preventing and restraining the violations alleged herein.

**COUNT II**
**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1,**
**for conspiracy to exchange competitive information**
**(Brought by Plaintiff and the Class against all Defendants)**

180. Plaintiff incorporates and realleges, as though fully set forth herein each and every allegation set forth in the preceding paragraphs of this Complaint.

181. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016, and continuing through the present, Defendants entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

182. The relevant product market is Fire Trucks as recognized by NFPA Standard 1900 regarding automotive fire apparatus and the National Wildfire Coordinating Group Standards for Wildland Fire Resource Typing. The relevant geographic market is the United States, including specifically Oklahoma. Manufacturer Defendants possess market power in the relevant market. Manufacturer Defendants control a large percentage of the relevant market. Manufacturer Defendants' collective market power includes the power to artificially deflate the number of Fire Trucks produced below competitive levels and to artificially inflate the price Plaintiff and other members of the Class pay for Fire Trucks above competitive levels.

183. An increase in the price of Fire Trucks could be imposed collectively by Manufacturer Defendants without losing customers. The Fire Truck market is a unique product market.

184. The information regularly exchanged by Defendants pursuant to the agreement consisted of detailed, competitively sensitive and non-public economic information. The information exchanges included the exchange through FAMA Statistical Reports and FAMA meetings.

185. Manufacturer Defendants' regular information exchanges through FAMA reflected concerted action between competitors in the market for Fire Trucks. Each Manufacturer Defendant furnished competitively sensitive information to other Manufacturer Defendants through FAMA with the understanding that it would be reciprocated. FAMA enforced this understanding by requiring Manufacturer Defendants to share data in order to receive comparable data.

186. The agreement to regularly exchange detailed and non-public economic information about their companies suppressed competition between Manufacturer Defendants. When defendants that are competing for the same consumers and exchange competitive information, it reduces the incentives to compete on price. Accordingly, Manufacturer Defendants used the data obtained through FAMA to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the Fire Truck market. This strategic information was a material factor in Manufacturer Defendants' decisions to inflate the prices that Plaintiff and other members of the Class paid for Fire Trucks during the class period.

187. Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive purpose.

188. The information-exchange agreement has had the effect of (1) reducing and suppressing competition among Manufacturer Defendants in the market for Fire Trucks in the United States and Oklahoma, and (2) inflating the prices of Fire Trucks during the class period.

189. As a result of the unlawful agreement alleged herein to exchange information, Plaintiff and the other Class members have been injured in their business or property by paying artificially inflated prices for Fire Trucks during the class period.

190. The conspiracy is a per se violation of the federal antitrust laws.

191. Plaintiff and other Class members are entitled to damages, treble damages, and an injunction against Defendants, preventing and restraining the violations alleged herein.

**COUNT III**
**Violation of the Oklahoma Antitrust Reform Act, 79 O.S. §§ 201, *et seq.***
**(Brought by Plaintiff and the Class against all Defendants)**

192. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

193. Defendants were at all times engaged in trade and commerce within the State of Oklahoma.

194. The acts alleged in the Complaint constitute violations of the Oklahoma Antitrust Reform Act, 79 O.S. §§ 201, *et seq.*

195. The acts alleged in the Complaint constitute unlawful monopolization of a part of trade of commerce in the State of Oklahoma.

70

196. As set forth herein, Defendants' anticompetitive conduct constitutes an unreasonable restraint of trade in or has substantially affected commerce in the State of Oklahoma.

197. Defendants' anticompetitive conduct has caused unreasonable restraints in the Fire Truck market in the State of Oklahoma.

198. As a result of Defendants' unlawful conduct, Plaintiff and the Class have been harmed by paying inflated and fixed prices for Fire Trucks.

199. Plaintiff and members of the Class seek relief under the Oklahoma Antitrust Reform Act, 79 O.S. §§ 201, *et seq.*, including, without limitation, the following:

    a. Injunctive and other equitable relief pursuant to 79 O.S. § 205;

    b. Disgorgement and restitution pursuant to 79 O.S. § 205;

    c. Threefold damages pursuance to 79 O.S. § 205;

    d. Costs and attorneys' fees pursuant to 79 O.S. § 205; and

    e. Other remedies as the Court may deem appropriate under the facts and circumstances of the case.

**COUNT IV**
**Unjust Enrichment**
**(Brought by Plaintiff and the Class against All Defendants)**

200. Plaintiff incorporates and realleges, as though fully set forth herein each and every allegation as set forth in the preceding paragraphs of this Complaint.

201. As a result of Defendants' unlawful conduct, Defendants have and will continue to be unjustly enriched from their conspiracy to increase prices and stifle production.

71

202.    Defendants should not be entitled to retain the benefits of their unlawful behavior resulting in overpayments to Plaintiff and the Class.    Defendants should be disgorged of the profits obtained from their unlawful behavior.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the Class, demands judgment against Defendants as follows:

a. The Court determine that this action may be maintained as a class action under Federal Rule of Civil Procedure 23;

b. Appoint Plaintiff as Class Representative and its counsel of record as Class Counsel;

c. Direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

d. Adjudge and declare that the unlawful conduct, conspiracy or combination alleged herein violates Section 1 of the Sherman Act and Oklahoma state antitrust and common law;

e. Adjudge and declare that Plaintiff and the Class are entitled to recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgment in favor of Plaintiff and the other Class members be entered against Defendants in an amount to be trebled to the extent such laws permit;

f. Enjoin and restrain Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees

72

thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

g.  Enjoin and restrain Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that is withheld from the public;

h.  Award pre- and post-judgment interest as provided by law in favor of Plaintiff and Class members, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint; and

i.  Award Plaintiff and Class members their costs of suit, including reasonable attorneys' fees, as provided by law.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable.

DATED: March 16, 2026          Respectfully submitted,


By:   s/*Matthew J. Sill*       
Matthew J. Sill (OBA #21547)
Email: msill@fulmersill.com
**FULMER SILL, PLLC**
14005 N. Eastern Ave
Edmond, OK 73013
Phone: (405) 509-6300
Fax: (800) 978-1345

*Attorneys for Plaintiff, City of Shawnee, Oklahoma*

74

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

City of Shawnee, Oklahoma, individually and on behalf of all others similarly situated

**(b)** County of Residence of First Listed Plaintiff    Pottawatomie, OK
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Fulmer Sill, PLLC, 14005 N. Eastern Ave., Edmond, OK 73013, (405) 509-6300

## DEFENDANTS

Oshkosh Corporation; Pierce Manufacturing, Inc.; REV Group, Inc.; Rosenbauer America LLC; and Fire Apparatus Manufacturers' Association

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### CIVIL RIGHTS
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty
**Other:**
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

### IMMIGRATION
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### INTELLECTUAL PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [x] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Sections 1 and 3 of the Sherman Act, 15 USC 1, 3 and Section 4 of the clayton Act, 15

Brief description of cause:
Defendants conspiring to limit supply and sell Fire Trucks at fixed prices at supra-competitive levels

## VII. REQUESTED IN COMPLAINT:

[x] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____ DOCKET NUMBER _____

DATE: Mar 16, 2026

SIGNATURE OF ATTORNEY OF RECORD: /s/ Matthew J. Sill

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

ERWIN,_CER

# U.S. District Court
## Western District of Oklahoma[LIVE] (Oklahoma City)
## CIVIL DOCKET FOR CASE #: 5:26-cv-00515-D

Shawnee City of Oklahoma et al v. Oshkosh Corporation et al
Assigned to: Chief Judge Timothy D. DeGiusti
Cause: 15:1 Antitrust Litigation

Date Filed: 03/16/2026
Jury Demand: Plaintiff
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

**Plaintiff**

**Shawnee City of Oklahoma**
*Individually*

represented by **Matthew J. Sill**
Sill Law Group
Oklahoma
14005 N. Eastern Ave
Edmond, OK 73013
405-509-6300
Email: matt@sill-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shawnee City of Oklahoma**
*on behalf of all others similarly situated*

represented by **Matthew J. Sill**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Oshkosh Corporation**

**Defendant**

**Pierce Manufacturing Inc**

**Defendant**

**REV Group Inc**

**Defendant**

**Rosenbauer America LLC**

**Defendant**

**Fire Apparatus Manufacturers Association**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/16/2026 | 1 | COMPLAINT against Fire Apparatus Manufacturers Association, Oshkosh Corporation, Pierce Manufacturing Inc, REV Group Inc, Rosenbauer America LLC filed by Shawnee |

| | |
|---|---|
| | City of Oklahoma (Individually), Shawnee City of Oklahoma (on behalf of all others similarly situated). (Attachments: # 1 Civil Cover Sheet)(kb) (Entered: 03/17/2026) |
| 03/17/2026 | PAYMENT FOR A CIVIL CASE Filing fee $ 405, receipt number AOKWDC-4945387. (Sill, Matthew) (Entered: 03/17/2026) |

<table>
<tr><td colspan="4" align="center"><b>PACER Service Center</b></td></tr>
<tr><td colspan="4" align="center"><b>Transaction Receipt</b></td></tr>
<tr><td colspan="4" align="center">03/17/2026 12:20:48</td></tr>
<tr><td><b>PACER Login:</b></td><td>mattsill</td><td><b>Client Code:</b></td><td>firetruckdw</td></tr>
<tr><td><b>Description:</b></td><td>Docket Report</td><td><b>Search Criteria:</b></td><td>5:26-cv-00515-D Start date: 1/1/1974 End date: 3/17/2026</td></tr>
<tr><td><b>Billable Pages:</b></td><td>1</td><td><b>Cost:</b></td><td>0.10</td></tr>
</table>