# Exhibit A

ACCO

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA (Southern Division - Santa Ana)
# CIVIL DOCKET FOR CASE #: 8:26-cv-01246

| | |
|---|---|
| City of Fountain Valley v. OSHKOSH CORPORATION et al | Date Filed: 05/18/2026 |
| Assigned to: | Jury Demand: Plaintiff |
| Cause: 15:0001 Antitrust Litigation | Nature of Suit: 410 Anti-Trust |
| | Jurisdiction: Federal Question |

**Plaintiff**

**City of Fountain Valley**                    represented by   **Michael E Klenov**
Korein Tillery LLC
505 North 7th Street Suite 3600
Saint Louis, MO 63101
314-241-4844
Fax: 314-241-3525
Email: mklenov@koreintillery.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**OSHKOSH CORPORATION**

**Defendant**

**REV GROUP, INC.**

**Defendant**

**BOISE MOBILE EQUIPMENT, INC.
(BME)**

**Defendant**

**PIERCE MANUFACTURING INC.**

**Defendant**

**FERRARA FIRE APPARATUS, INC.**

**Defendant**

**EMERGENCY ONE (E-ONE), Inc.**

**Defendant**

**KOVATCH MOBILE EQUIPMENT
CORP. (KME)**

**Defendant**

**SPARTAN FIRE, LLC d/b/a SPARTAN
EMERGENCY RESPONSE (SPARTAN
ER)**

**Defendant**

SPARTAN FIRE, LLC d/b/a SPARTAN
FIRE APPARATUS AND CHASSIS

**Defendant**

SMEAL HOLDING, LLC d/b/a SMEAL
FIRE APPARATUS CO.

**Defendant**

SMEAL LTC, LLC d/b/a LADDER
TOWER COMPANY

**Defendant**

SIDDONS-MARTIN EMERGENCY
GROUP, LLC

**Defendant**

PIERCE ATLANTIC EMERGENCY
SOLUTIONS, INC.

**Defendant**

HUGHES FIRE EQUIPMENT INC.

**Defendant**

GOLDEN STATE FIRE APPARATUS,
INC.

**Defendant**

MACQUEEN EQUIPMENT, LLC

**Defendant**

SOUTH COAST FIRE EQUIPMENT,
INC.

**Defendant**

TEN-8 FIRE & SAFETY, LLC

**Defendant**

CONRAD FIRE EQUIPMENT, INC.

**Defendant**

FIREMATIC SUPPLY COMPANY, INC.

**Defendant**

FRONT RANGE FIRE APPARATUS,
LTD.

**Defendant**

RELIANT FIRE APPARATUS OF
MICHIGAN, INC. d/b/a RELIANT FIRE
APPARATUS, INC.

**Defendant**

**SPARTAN FIRE & EMERGENCY APPARATUS, INC.**

**Defendant**

**EMERGENCY EQUIPMENT PROFESSIONALS, INC.**

**Defendant**

**HALT FIRE, INC.**

**Defendant**

**GLICK FIRE EQUIPMENT CO. INC.**

**Defendant**

**MINUTEMAN FIRE AND RESCUE APPARATUS, LLC d/b/a ALLEGIANCE FIRE & RESCUE**

**Defendant**

**METRO FIRE APPARATUS SPECIALISTS, INC.**

**Defendant**

**GREENWOOD EMERGENCY VEHICLES, LLC**

**Defendant**

**FIRELINE, INC.**

**Defendant**

**ALLSOURCE ENTERPRISES, LLC D/B/A SAFE INDUSTRIES, INC.**

**Defendant**

**FIRE SERVICE, INC.**

**Defendant**

**SUNBELT FIRE, INC.**

**Defendant**

**VOGELPOHL FIRE EQUIPMENT, INC.**

**Defendant**

**ATLANTIC COAST FIRE TRUCKS, LLC**

**Defendant**

**W. CAMPBELL SUPPLY COMPANY OF SUSSEX COUNTY LLC**

**Defendant**

**W. CAMPBELL SUPPLY COMPANY OF SUSSEX COUNTY LLC**

**Defendant**

**BULLDOG FIRE APPARATUS, INC.**

**Defendant**

**SEA-WESTERN, INC.**

**Defendant**

**EMERGENCY VEHICLE GROUP, INC.**

**Defendant**

**R & R FIRE TRUCK REPAIR, INC.**

**Defendant**

**FIREFIGHTER ONE, LLC**

**Defendant**

**411 EQUIPMENT LLC**

**Defendant**

**ABSOLUTE FIRE PROTECTION COMPANY, INC.**

**Defendant**

**FIRST DUE EQUIPMENT SALES & REPAIR, INC. f/k/a WEST SHORE FIRE, INC.**

**Defendant**

**ED M. FELD EQUIPMENT CO., INC.**

**Defendant**

**PETES EQUIPMENT REPAIR, INC.**

**Defendant**

**FIRE CONNECTIONS, INC.**

**Defendant**

**PATRIOT FIRE, LLC**

**Defendant**

**BANNER FIRE EQUIPMENT, INC.**

**Defendant**

**FIRST CHOICE FIRE APPARATUS, LLC**

**Defendant**

FIRE TRUCK SOLUTIONS, LLC

**Defendant**

FIRE SAFETY USA, INC.

**Defendant**

FIRE LINE EQUIPMENT, LLC

**Defendant**

PREMIER FIRE APPARATUS, INC.

**Defendant**

FIRE MASTER FIRE EQUIPMENT, INC.

**Defendant**

CSI EMERGENCY APPARATUS, LLC

**Defendant**

HOOSIER FIRE EQUIPMENT, INC.

**Defendant**

HAWAII SPECIALTY VEHICLES, LLC

**Defendant**

MATHENY MOTOR TRUCK COMPANY d/b/a MATHENY FIRE & EMERGENCY, LLC

**Defendant**

GOODMAN SPECIALIZED VEHICLES, LLC

**Defendant**

AAA FIREPRO OF NEW MEXICO, INC.

**Defendant**

COLDEN ENTERPRISES, INC.

**Defendant**

JERRY'S TRANSMISSION SERVICE INC. d/b/a NORTH CENTRAL EMERGENCY VEHICLES

**Defendant**

LEO M. ELLEBRACHT COMPANY

**Defendant**

PAYETTE SALES & SERVICE, INC.

**Defendant**

**TRUE NORTH EQUIPMENT, INC. d/b/a TRUE NORTH EMERGENCY EQUIPMENT**

Defendant

**GORMAN ENTERPRISES, INC.**

Defendant

**A.E.C. FIRE SAFETY & SECURITY, INC.**

Defendant

**ADVANTECH SERVICE AND PARTS LLC d/b/a ADVANTECH 911 SERVICE AND PARTS**

Defendant

**HENDRICKSON FLEET SERVICE, INC. d/b/a HENDRICKSON FIRE RESCUE EQUIPMENT, INC.**

Defendant

**NORTHEAST EMERGENCY APPARATUS, LLC**

Defendant

**DESORCIE EMERGENCY PRODUCTS, LLC**

Defendant

**FIRE APPARATUS & SUPPLY TEAM, INC.**

Defendant

**AMERICAN EMERGENCY RESPONSE TRAINING, INC.**

Defendant

**FIRE DEPARTMENT SERVICE & SUPPLY, INC.**

Defendant

**FIRE AND RESCUE PRODUCTS OF HARRISBURG, LLC**

Defendant

**NEW ENGLAND FIRE EQUIPMENT & APPARATUS, CORP.**

Defendant

**HALL-MARK FIRE APPARATUS, INC.**

**Defendant**

**HALL-MARK FIRE APPARATUS, LLC**

**Defendant**

**HALL-MARK FIRE APPARATUS - TEXAS, LLC**

**Defendant**

**MILE-HI FIRE APPARATUS, INC.**

**Defendant**

**FIRED UP RESCUE LLC**

**Defendant**

**MID AMERICA FIRE APPARATUS INC. d/b/a JON'D MID AMERICA FIRE APPARATUS**

**Defendant**

**MID-AMERICA FIRE & SAFETY, LLC**

**Defendant**

**DELMARVA PUMP CENTER, INC. d/b/a DPC EMERGENCY EQUIPMENT**

**Defendant**

**ADIRONDACK EVG, Inc. d/b/a ADIRONDACK EMERGENCY VEHICLES**

**Defendant**

**NORTHWEST FIRE SERVICES INC.**

**Defendant**

**KEYSTONE FIRE APPARATUS, INC.**

**Defendant**

**MOLINES, INC. d/b/a BIG SKY FIRE EQUIPMENT**

**Defendant**

**1ST OUT SPECIALTY VEHICLES & EQUIPMENT LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 05/18/2026 | 1 | COMPLAINT Receipt No: ACACDC-42307387 - Fee: $405, filed by Plaintiff City of Fountain Valley. (Attorney Michael E Klenov added to party City of Fountain Valley(pty:pla))(Klenov, Michael) (Entered: 05/18/2026) |

| 05/18/2026 | 2 | CIVIL COVER SHEET filed by Plaintiff City of Fountain Valley. (Klenov, Michael) (Entered: 05/18/2026) |
| 05/18/2026 | 3 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by Plaintiff City of Fountain Valley. (Attachments: # 1 Attachment 1, # 2 Attachment 2) (Klenov, Michael) (Entered: 05/18/2026) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/18/2026 19:14:42 | | | |
| **PACER Login:** | meklenov | **Client Code:** | 25022 |
| **Description:** | Docket Report | **Search Criteria:** | 8:26-cv-01246 End date: 5/18/2026 |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

The CITY OF FOUNTAIN VALLEY, individually and on behalf of all others similarly situated,

Plaintiff,

v.

Oshkosh Corp.; REV Group, Inc.; Boise Mobile Equipment, Inc.; Pierce Manufacturing Inc.; Maxi-Metal, Inc.; Ferrara Fire Apparatus, Inc.; Emergency One ("E-ONE"); Kovatch Mobile Equipment; Spartan Fire, LLC d/b/a Spartan Emergency Response; Spartan Fire, LLC d/b/a Spartan Fire Apparatus and Chassis; Smeal Holding LLC d/b/a Smeal Fire Apparatus Co; Smeal LTC, LLC d/b/a Ladder Tower; Siddons-Martin Emergency Group, LLC; Pierce Atlantic Emergency Solutions, Inc.; Hughes Fire Equipment, Inc.; Golden State Fire Apparatus, Inc.; MacQueen Equipment, LLC; South Coast Fire Equipment, Inc.; Ten-8 Fire & Safety, LLC; Conrad Fire Equipment, Inc.; Firematic Supply Company, Inc.; Front Range Fire Apparatus, Ltd.; Reliant Fire Apparatus of Michigan, Inc. d/b/a Reliant Fire Apparatus, Inc.; Spartan Fire & Emergency Apparatus, Inc.; Emergency Equipment Professionals, Inc.; Halt Fire, Inc.; Glick Fire Equipment Co. Inc.; Minuteman Fire and Rescue Apparatus, LLC d/b/a Allegiance Fire & Rescue;

CASE NO. _____

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

Metro Fire Apparatus Specialists, Inc.; Greenwood Emergency Vehicles, LLC; Fireline, Inc.; Allsource Enterprises, LLC d/b/a Safe Industries, Inc.; Fire Service, Inc.; Sunbelt Fire, Inc.; Vogelpohl Fire Equipment, Inc.; Atlantic Coast Fire Trucks, LLC; W. Campbell Supply Company of Sussex County LLC; Kalmikov Enterprises, Inc. d/b/a Fire Apparatus Solutions; Bulldog Fire Apparatus, Inc.; Sea-Western Inc.; Emergency Vehicle Group, Inc.; R & R Fire Truck Repair, Inc.; Firefighter One, LLC; 411 Equipment LLC; Absolute Fire Protection Co., Inc.; First Due Equipment Sales & Repair, Inc. f/k/a West Shore Fire, Inc.; Ed M. Feld Equipment Co., Inc.; Pete's Equipment Repair, Inc.; Fire Connections, Inc.; Patriot Fire, LLC; Banner Fire Equipment, Inc.; First Choice Fire Apparatus, LLC; Fire Truck Solutions, LLC; Fire Safety USA, Inc.; Fire Line Equipment, LLC; Premier Fire Apparatus, Inc.; Fire Master Fire Equipment, Inc.; CSI Emergency Apparatus, LLC; Hoosier Fire Equipment, Inc.; Hawaii Specialty Vehicles, LLC; Matheny Motor Truck Company d/b/a Matheny Fire & Emergency, LLC; Goodman Specialized Vehicles; AAA Firepro of New Mexico, Inc.; Colden Enterprises, Inc.; Jerry's Transmission Service Inc. d/b/a North Central Emergency Vehicles; Leo M. Ellebracht Company; Payette Sales & Service, Inc.; True North Equipment, Inc. d/b/a True North Emergency Equipment; Gorman Enterprises, Inc.; A.E.C. Fire-Safety &

---

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

Security, Inc.; Advantech Service and Parts LLC d/b/a Advantech 911 Service and Parts; Hendrickson Fleet Service, Inc. d/b/a Hendrickson Fire Rescue Equipment, Inc.; Northeast Emergency Apparatus, LLC; Desorcie Emergency Products, LLC; Fire Apparatus & Supply Team, Inc.; American Emergency Response Training, Inc.; Fire Department Service & Supply, Inc.; Fire & Rescue Products of Harrisburg, LLC; New England Fire Equipment & Apparatus, Corp.; Hall-Mark Fire Apparatus, Inc.; Hall-Mark Fire Apparatus, LLC; Hall-Mark Fire Apparatus – Texas, LLC; Mile-Hi Fire Apparatus, Inc.; Fired Up Rescue LLC; Mid America Fire Apparatus Inc. d/b/a Jon'd Mid America Fire Apparatus; Mid-America Fire & Safety, LLC; Delmarva Pump Center, Inc. d/b/a DPC Emergency Equipment; Adirondack EVG, Inc. d/b/a Adirondack Emergency Vehicles; Northwest Fire Services Inc.; Keystone Fire Apparatus, Inc.; MOLINES, INC. d/b/a Big Sky Fire Equipment; 1st Out Specialty Vehicles & Equipment LLC,

Defendants.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

## Table of Contents

INTRODUCTION ................................................................................................... 1

I. JURISDICTION AND VENUE.......................................................................... 4

II. PARTIES ............................................................................................................ 5

    a. Plaintiff .................................................................................................... 5

    b. Defendants .............................................................................................. 5

III. RELEVANT MARKET ..................................................................................... 13

    a. Market Definition................................................................................... 13

    b. Fire Apparatus Described...................................................................... 15

    c. Fire Apparatus Business Basics ............................................................ 15

    d. Defendants' Market and Monopoly Power............................................ 18

    e. Fire Apparatus Market Features That Support the Existence of a Conspiracy.............................................................................................. 22

IV. DEFENDANTS' ANTICOMPETITIVE CONDUCT...................................... 32

    a. Collusive Supply Restriction ................................................................ 32

    b. Hub-and-Spoke: Market Allocation, Exclusive Dealing, & Resale Price Maintenance ...................................................................... 37

    c. Roll-Ups & Acquisitions....................................................................... 43

V. HARM TO COMPETITION ............................................................................. 47

VI. DEFENDANTS FRAUDULENTLY CONCEALED THEIR ILLEGAL ANTICOMPETITIVE CONDUCT ................................................................... 48

VII. CLASS ACTION ALLEGATIONS................................................................... 49

VIII. CLAIMS FOR RELIEF..................................................................................... 51

    a. Violations of Federal Antitrust Laws.................................................... 51

    b. Violations of State Laws ....................................................................... 59

IX. PRAYER FOR RELIEF..................................................................................... 64

X. DEMAND FOR JURY TRIAL.......................................................................... 65

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

# INTRODUCTION

In recent years, the price of firefighting vehicles and the amount of time it takes to deliver them have skyrocketed, with devastating consequences for firefighters and the communities they serve.

**There is a reason for fire apparatus' soaring prices: coordinated and deliberate restriction of supply.** The two largest fire apparatus manufacturers—Oshkosh Corporation and REV Group, Inc.—have steadily neutralized their competition by absorbing them in a series of private equity roll-ups and strategic acquisitions. They now control approximately 76% of the U.S. fire apparatus market, and Oshkosh controls more than 50% of the market on its own—a monopoly share. Oshkosh and REV Group have so effectively consolidated the fire apparatus market that the index score used to calculate market concentration is nearly *double* the threshold at which the U.S. Department of Justice and Federal Trade Commission dub a market "highly concentrated" for antitrust purposes.[1] That consolidation depopulated the marketplace and allowed fire apparatus manufacturers ("Manufacturer Defendants") to choke supply without fear of market discipline.

When demand surges and prices increase—as has been the case in the fire apparatus market over the relevant period—economic logic dictates that manufacturers will increase production to grasp the opportunity. But Manufacturer Defendants did the opposite. They shuttered factories, eschewed investing in production capacity, and allowed their backlogs to grow so large that deliveries now commonly take half a decade. They did so deliberately, so that fire departments would

---

[1] *Cf.* Mike Baker, Maureen Farrell, & Serge F. Kovaleski, *As Wall Street Chases Profits, Fire Departments Pay the Price*, N.Y. Times (Feb. 17, 2025) (General President of the International Association of Fire Fighters, Edward Kelly, explaining, "what ends up being a main driver of higher cost and lag time in production: the monopolizing of fire truck and ambulance manufacturing in the United States.")

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

clamor and overpay to get in line for the life-saving equipment they and their communities desperately needed.

**Manufacturer Defendants and fire apparatus dealers ("Dealer Defendants") also entered into hub-and-spoke conspiracies—formalized through a series of exclusive dealing agreements—that suppress competition by allocating the United States fire apparatus market into a cartel of exclusive fiefdoms.** Dealer Defendants should compete with one another, but their conspiracy provides them with exclusive territory within which they are the only dealer that can sell a given fire apparatus brand—and that is the only brand they are allowed to sell. Outside of the territory, they cannot sell fire apparatus at all. Additionally, **Manufacturer Defendants require "their" dealers to use shared software called "configurators," which horizontally coordinates Dealer Defendants to prevent them from offering prices below a centrally-dictated minimum.** So although Dealer Defendants are allowed to set prices as high as they like, they are not allowed to set them as low as they like. This has helped Manufacturer Defendants and Dealer Defendants (collectively, "Defendants") increase prices at a clip that wildly outpaces inflation in the relevant sector.

This arrangement has dramatically diminished competition. If a purchaser in Southern California wants to buy a Ford automobile, they have myriad dealerships to choose from in their area alone. But if they want to buy a Pierce fire apparatus, they have one, and no other Pierce dealers are allowed to sell to them. Dealers are extremely important to fire apparatus purchasers, and they vary in quality. They offer different delivery timelines, servicing quality, *and prices*. The foreclosure of competition between dealers, therefore, has been a disaster for purchasers (and the communities they protect). Without meaningful competition, public entities have been forced to buy fire apparatus at higher prices, from dealers farther away from them, with longer delays, and worse servicing.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

All of this anticompetitive conduct enabled Defendants and their co-conspirators to jack up prices with impunity. Accordingly, fire apparatus prices have skyrocketed. And, to be clear, this is not the norm across similar industries. As just one example, consider the Pierce 1500 GPM pumper truck—a fire apparatus made by an Oshkosh Corporation subsidiary. Pumper trucks are among the more modestly priced fire apparatus. In 2015, you could buy one for about $480,000, on average. If its price had increased in accordance with the Producer Price Index ("PPI") for Heavy Duty Truck Manufacturing: Buses, Including Military and Firefighting Vehicles (Chassis of Own Manufacture), then you would be able to buy one today for approximately $555,000, on average. But that is not the price today. Today, the average price is approximately $885,000.

The consequences of these artificial price increases are not theoretical, they are lethal. These companies have abused their market and monopoly power to extract supracompetitive prices for essential emergency equipment. They have used their dominance not to improve public safety but to maximize returns. And while their profits soared, firefighters were held up and hurt, communities were incinerated, and people lost their lives. This lawsuit seeks to hold these companies accountable.

Plaintiff City of Fountain Valley, individually and as representative of a class of similarly situated entities, brings this action against certain named fire apparatus manufacturers and dealers. Plaintiff's action arises under Sections 1 and 2 of the Sherman Antitrust Act, Sections 3, 4, 7, and 16 of the Clayton Act, and various state statutes. Plaintiff seeks a declaration that the Defendants' conduct is unlawful, injunctive relief, treble damages, and other appropriate relief. The allegations stated herein are based on information and belief, including through investigation conducted by and through Plaintiff's counsel, except as to those allegations pertaining to Plaintiff itself.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

# I.    JURISDICTION AND VENUE

1.    Within the Class Period—and still to this day—Defendants promoted, sold, and distributed fire apparatus across state lines and in other ways that impacted interstate commerce.[2] This activity was tinged by anticompetitive conduct that targeted and harmed fire apparatus purchasers throughout the United States, including in this district. Defendants' anticompetitive activities were carried out within the flow of interstate commerce of the United States and were intended to, and did have, direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States—including by forcing fire apparatus purchasers throughout the United States and within this district to pay supracompetitive prices.

2.    This case responds to Defendants' anticompetitive activity, arising under Sections 1 and 2 of the Sherman Antitrust Act, (15 U.S.C. §§ 1–2); Sections 3, 4, 7, and 16 of the Clayton Act (15 U.S.C. §§ 14–15, 18, 26); and various state laws springing from the same common nucleus of operative facts. This is a class action involving common questions of law or fact, more than 100 class members—at least one of which is a citizen of a state different from that of one of the Defendants—and an aggregate amount in controversy exceeding $5,000,000 exclusive of interest and costs. Accordingly, this Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction), 1332(d) (CAFA jurisdiction), 1337(a) (commerce and antitrust jurisdiction), and 1367 (supplemental jurisdiction).

3.    A substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district. Additionally, Defendants reside, are found, have an agent, or transact business here. Venue in this district is therefore proper under 28 U.S.C. § 1391 (venue generally), and 15 U.S.C. §§ 15 and 22 (venue under the Clayton and Sherman Antitrust Acts, respectively).

---

[2] The "Class" and "Class Period" are defined, below, at Paragraph 209.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

## II.   PARTIES

### a.   Plaintiff

4.     Plaintiff City of Fountain Valley is a public entity located in Fountain Valley, California with a population of approximately 60,000 citizens. Within the effective limitations period, Plaintiff purchased fire apparatus from, through, dealt by, and/or manufactured by, Defendants; and/or experienced undue delays in their delivery. As just one example, in February of 2025, City of Fountain Valley purchased through South Coast Fire Equipment a fire apparatus manufactured by Oshkosh's Pierce costing approximately $1.1 million. It has yet to be delivered.

### b.   Defendants

5.     There are two groups of defendants in this action. The first are fire apparatus manufacturers (the "Manufacturer Defendants") and the second are fire apparatus dealers (the "Dealer Defendants").

#### i.   Manufacturer Defendants

##### 1.  Oshkosh Group Defendants

6.     Defendant Oshkosh Corporation is a publicly held corporation organized under the laws of Wisconsin, with its headquarters in Oshkosh, Wisconsin. Oshkosh Corporation is the parent company of fire apparatus manufacturers Pierce Manufacturing Inc. ("Pierce") and Maxi-Metal, Inc. ("Maxi-Metal").

7.     Pierce is organized under the laws of Wisconsin, with its headquarters in Appleton, Wisconsin.

8.     Maxi-Metal is organized under the laws of Quebec, Canada, with its headquarters in Saint-George, Quebec, Canada.

9.     Oshkosh, Pierce, Maxi-Metal, and any other Oshkosh subsidiaries are referred to collectively as "Oshkosh Group."

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

## 2. Boise Mobile Equipment

10. Defendant Boise Mobile Equipment, Inc. ("BME") is a privately held corporation organized under the laws of Idaho, with its headquarters in Boise, Idaho. BME is a fire apparatus manufacturer.

11. In approximately September 2021, Pierce acquired a partial, non-controlling ownership stake in BME.

## 3. REV Group Defendants

12. Defendant REV Group, Inc. is a publicly held corporation organized under the laws of Delaware, with its headquarters in Brookfield, Wisconsin. For much of the Class Period, REV Group, Inc. was owned by a private equity firm called American Industrial Partners ("AIP")—headquartered in New York, New York—but AIP reportedly divested almost all of its stake in REV Group, Inc. in 2024. *See* Mike Baker, Maureen Farrell, & Serge F. Kovaleski, *As Wall Street Chases Profits, Fire Departments Pay the Price*, N.Y. Times (Feb. 17, 2025) (hereafter, "Baker NYT Article"). In turn, REV Group, Inc. is the parent company of fire apparatus manufacturers Ferrara Fire Apparatus, Inc. ("Ferrara"), Emergency One ("E-ONE"), Kovatch Mobile Equipment ("KME"), Spartan Emergency Response ("Spartan ER"), Spartan Fire Apparatus and Chassis, Smeal Fire Apparatus Co. ("Smeal"), and Ladder Tower ("LT").

13. Ferrara is organized under the laws of Louisiana, with its headquarters in Holden, Louisiana.

14. E-ONE is organized under the laws of Florida, with its headquarters in Ocala, Florida.

15. KME is organized under the laws of Pennsylvania, with its headquarters in Nesquehoning, Pennsylvania.

16. Spartan ER is organized under the laws of Michigan, with its headquarters in Charlotte, Michigan.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

17.     Spartan Fire Apparatus and Chassis is organized under the laws of Michigan, with its headquarters in Charlotte, Michigan.

18.     Smeal is organized under the laws of Nebraska, with its headquarters in Snyder, Nebraska.

19.     LT is organized under the laws of Pennsylvania, with its headquarters in Ephrata, Pennsylvania.

20.     REV Group, Inc., Ferrara, E-ONE, KME, Spartan ER, Spartan Fire Apparatus and Chassis, Smeal, LT, and any other REV Group, Inc. subsidiaries are referred to collectively as "REV Group."

### ii.     Dealer Defendants

### 1.  Oshkosh Dealers

21.     The following entities are parties to exclusive dealing agreements with Oshkosh Group and are referred to collectively as "Oshkosh Group Dealers."

22.     Defendant Siddons-Martin Emergency Group, LLC is organized under the laws of Texas with its headquarters in Houston, Texas.

23.     Defendant Pierce Atlantic Emergency Solutions, Inc. is organized under the laws of Virginia with its headquarters in Manassas, Virginia.

24.     Defendant Hughes Fire Equipment, Inc. is organized under the laws of Oregon with its headquarters in Springfield, Oregon.

25.     Defendant Golden State Fire Apparatus, Inc. is organized under the laws of California with its headquarters in Sacramento, California.

26.     Defendant MacQueen Equipment, LLC is organized under the laws of Delaware with its headquarters in St. Paul, Minnesota.

27.     Defendant South Coast Fire Equipment, Inc. is organized under the laws of California with its headquarters in Corona, California.

28.     Defendant Ten-8 Fire & Safety, LLC is organized under the laws of Florida with its headquarters in Bradenton, Florida.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

29. Defendant Conrad Fire Equipment, Inc. is organized under the laws of Kansas with its headquarters in Olathe, Kansas.

30. Defendant Firematic Supply Company, Inc. is organized under the laws of New York with its headquarters in East Yaphank, New York.

31. Defendant Front Range Fire Apparatus, Ltd. is organized under the laws of Colorado with its headquarters in Frederick, Colorado.

32. Defendant Reliant Fire Apparatus of Michigan, Inc. (d.b.a Reliant Fire Apparatus, Inc.) is organized under the laws of Wisconsin with its headquarters in Slinger, Wisconsin.

33. Defendant Spartan Fire & Emergency Apparatus, Inc. is organized under the laws of South Carolina with its headquarters in Wellford, South Carolina.

34. Defendant Emergency Equipment Professionals, Inc. is organized under the laws of Mississippi with its headquarters in Horn Lake, Mississippi.

35. Defendant Halt Fire, Inc. is organized under the laws of Michigan with its headquarters in Wixom, Michigan.

36. Defendant Glick Fire Equipment Co. Inc. is organized under the laws of Pennsylvania with its headquarters in Bird-in-Hand, Pennsylvania.

37. Defendant Minuteman Fire and Rescue Apparatus, LLC (d.b.a. Allegiance Fire & Rescue) is organized under the laws of Delaware with its headquarters in Walpole, Massachusetts.

## 2. REV Group Dealers

38. The following entities are parties to exclusive dealing agreements with REV Group and are referred to collectively as "REV Group Dealers."

39. Defendant Metro Fire Apparatus Specialists, Inc. is organized under the laws of Texas with its headquarters in Houston, Texas.

40. Defendant Greenwood Emergency Vehicles, LLC is organized under the laws of Massachusetts with its headquarters in North Attleborough, Massachusetts.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

41. Defendant Fireline, Inc. is organized under the laws of Georgia with its headquarters in Winder, Georgia.

42. Defendant Allsource Enterprises, LLC (d.b.a Safe Industries, Inc.) is organized under the laws of South Carolina with its headquarters in Easley, South Carolina.

43. Defendant Fire Service, Inc. is organized under the laws of Indiana with its headquarters in St. John, Indiana.

44. Defendant Sunbelt Fire, Inc. is organized under the laws of Alabama with its headquarters in Fairhope, Alabama.

45. Defendant Vogelpohl Fire Equipment, Inc. is organized under the laws of Kentucky with its headquarters in Erlanger, Kentucky.

46. Defendant Atlantic Coast Fire Trucks, LLC is organized under the laws of Pennsylvania with its headquarters in Denver, North Carolina.

47. Defendant W. Campbell Supply Company of Sussex County LLC is organized under the laws of New Jersey with its headquarters in South Brunswick, New Jersey.

48. Defendant Kalmikov Enterprises, Inc. (d.b.a. Fire Apparatus Solutions) is organized under the laws of California with its headquarters in Rialto, California.

49. Defendant Bulldog Fire Apparatus, Inc. is organized under the laws of Massachusetts with its headquarters in Woodville, Massachusetts.

50. Defendant Sea-Western Inc. is organized under the laws of Washington with its headquarters in Kirkland, Washington.

51. Defendant Emergency Vehicle Group, Inc. is organized under the laws of Nevada with its headquarters in Anaheim, California.

52. Defendant R & R Fire Truck Repair, Inc. is organized under the laws of Michigan with its headquarters in Belleville, Michigan.

53. Defendant Firefighter One, LLC is organized under the laws of New Jersey with its headquarters in Sparta, New Jersey.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

54. Defendant 411 Equipment LLC is organized under the laws of New Mexico with its headquarters in Albuquerque, New Mexico.

55. Defendant Absolute Fire Protection Co., Inc. is organized under the laws of New Jersey with its headquarters in South Plainfield, New Jersey.

56. Defendant First Due Equipment Sales & Repair, Inc. f/k/a West Shore Fire, Inc. is organized under the laws of Michigan with its headquarters in Allendale, Michigan.

57. Defendant Ed M. Feld Equipment Co., Inc. is organized under the laws of Iowa with its headquarters in Carroll, Iowa.

58. Defendant Pete's Equipment Repair, Inc. is organized under the laws of New Mexico with its headquarters in Albuquerque, New Mexico.

59. Defendant Fire Connections, Inc. is organized under the laws of North Carolina with its headquarters in Rocky Mount, North Carolina.

60. Defendant Patriot Fire, LLC is organized under the laws of Maryland with its headquarters in Grasonville, Maryland.

61. Defendant Banner Fire Equipment, Inc. is organized under the laws of Illinois with its headquarters in Roxana, Illinois.

62. Defendant First Choice Fire Apparatus, LLC is organized under the laws of Pennsylvania with its headquarters in Hanover Township, Pennsylvania.

63. Defendant Fire Truck Solutions, LLC is organized under the laws of Delaware with its headquarters in Phoenix, Arizona.

64. Defendant Fire Safety USA, Inc. is organized under the laws of Minnesota with its headquarters in Rochester, Minnesota.

65. Defendant Fire Line Equipment, LLC is organized under the laws of Pennsylvania with its headquarters in New Holland, Pennsylvania.

66. Defendant Premier Fire Apparatus, Inc. is organized under the laws of New York with its headquarters in Lake Katherine, New York.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

67. Defendant Fire Master Fire Equipment, Inc. is organized under the laws of Missouri with its headquarters in Springfield, Missouri.

68. Defendant CSI Emergency Apparatus, LLC is organized under the laws of Michigan with its headquarters in Grayling, Michigan.

69. Defendant Hoosier Fire Equipment, Inc. is organized under the laws of Indiana with its headquarters in Valparaiso, Indiana.

70. Defendant Hawaii Specialty Vehicles, LLC is organized under the laws of Hawaii with its headquarters in Honolulu, Hawaii.

71. Defendant Matheny Motor Truck Company (d.b.a Matheny Fire & Emergency, LLC) is organized under the laws of West Virginia with its headquarters in Parkersburg, West Virginia.

72. Defendant Goodman Specialized Vehicles is organized under the laws of Virginia with its headquarters in Amelia Court House, Virginia.

73. Defendant AAA Firepro of New Mexico, Inc. is organized under the laws of New Mexico with its headquarters in Clovis, New Mexico.

74. Defendant Colden Enterprises, Inc. is organized under the laws of New York with its headquarters in Kenmore, New York.

75. Defendant Jerry's Transmission Service Inc. (d.b.a. North Central Emergency Vehicles) is organized under the laws of Minnesota with its headquarters in Lester Prairie, Minnesota.

76. Defendant Leo M. Ellebracht Company is organized under the laws of Missouri with its headquarters in Wentzville, Missouri.

77. Defendant Payette Sales & Service, Inc. is organized under the laws of Michigan with its headquarters in Grosse Ile, Michigan.

78. Defendant True North Equipment, Inc. (d.b.a. True North Emergency Equipment) is organized under the laws of Oregon with its headquarters in Hillsboro, Oregon.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

79. Defendant Gorman Enterprises, Inc. is organized under the laws of New York with its headquarters in Elma, New York.

80. Defendant A.E.C. Fire-Safety & Security, Inc. is organized under the laws of Illinois with its headquarters in Springfield, Illinois.

81. Defendant Advantech Service and Parts LLC (d.b.a. Advantech 911 Service and Parts) is organized under the laws of Ohio with its headquarters in Midvale, Ohio.

82. Defendant Hendrickson Fleet Service, Inc. (d.b.a Hendrickson Fire Rescue Equipment, Inc.) is organized under the laws of New York with its headquarters in Islandia, New York.

83. Defendant Northeast Emergency Apparatus, LLC is organized under the laws of Maine with its headquarters in Auburn, Maine.

84. Defendant Desorcie Emergency Products, LLC is organized under the laws of Vermont with its headquarters in St. Albans, Vermont.

85. Defendant Fire Apparatus & Supply Team, Inc. is organized under the laws of Illinois with its headquarters in Lincoln, Illinois.

86. Defendant American Emergency Response Training, Inc. is organized under the laws of Indiana with its headquarters in Knoxville, Tennessee.

87. Defendant Fire Department Service & Supply, Inc. is organized under the laws of Kentucky with its headquarters in Louisville, Kentucky.

88. Defendant Fire & Rescue Products of Harrisburg, LLC is organized under the laws of Pennsylvania with its headquarters in Harrisburg, Pennsylvania.

89. Defendant New England Fire Equipment & Apparatus, Corp. is organized under the laws of Connecticut with its headquarters in North Haven, Connecticut.

90. Defendants Hall-Mark Fire Apparatus, Inc., Hall-Mark Fire Apparatus, LLC, and Hall-Mark Fire Apparatus – Texas, LLC are each organized under the laws of Florida, each with their headquarters in Ocala, Florida.

91.     Defendant Mile-Hi Fire Apparatus, Inc. is organized under the laws of Colorado with its headquarters in Northglenn, Colorado.

92.     Defendant Fired Up Rescue LLC is organized under the laws of Wyoming with its headquarters in Wheatland, Wyoming.

93.     Defendant Mid America Fire Apparatus Inc. (d.b.a. Jon'd Mid America Fire Apparatus) is organized under the laws of Missouri with its headquarters in Rogersville, Missouri.

94.     Defendant Mid-America Fire & Safety, LLC is organized under the laws of Indiana with its headquarters in Evansville, Indiana.

95.     Defendant Delmarva Pump Center, Inc. (d.b.a. DPC Emergency Equipment) is organized under the laws of Delaware with its headquarters in Marydel, Delaware.

96.     Defendant Adirondack EVG, Inc. (d.b.a. Adirondack Emergency Vehicles) is organized under the laws of New York with its headquarters in Bedford, New Hampshire.

97.     Defendant Northwest Fire Services Inc. is organized under the laws of Montana with its headquarters in Bigfork, Montana.

98.     Defendant Keystone Fire Apparatus, Inc. is organized under the laws of Pennsylvania with its headquarters in McKees Rocks, Pennsylvania.

99.     Defendant Big Sky Fire Equipment is organized under the laws of Montana with its headquarters in Lewistown, Montana.

100.    Defendant 1st Out Specialty Vehicles & Equipment LLC is organized under the laws of Pennsylvania with its headquarters in Moon Township, Pennsylvania.

## III.    RELEVANT MARKET

### a. Market Definition

101.    The "Relevant Market" is the market for fire apparatus in the United States.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

102.     The relevant *product* market is the fire apparatus market. Fire apparatus are distinct goods made for a distinct purpose (i.e., heavy duty vehicles made for firefighting), made by specialist manufacturers, distributed by their specialist dealers, and bought by a distinct group of consumers (i.e., largely public entities, which purchase them for their fire departments).[3]

103.     There are no reasonable substitutes for fire apparatus. As a result, a monopolist's small but significant non-transitory increases in price (SSNIPs) would not lead purchasers to buy alternate goods. Indeed, recent history shows that even very large increases in price have not resulted in purchases of alternate goods.

104.     Further, this market definition is drawn from industry participants themselves. Oshkosh Group and REV Group, for example, rely on the term. *See* Oshkosh Corp., Annual Report (Form 10-K) at 5 (Feb. 20, 2025) ("The Company believes the geographic breadth, size and quality of its Pierce fire apparatus dealer network are competitive advantages in a market characterized by a few large manufacturers . . . ."); REV Group, Inc., Annual Report (Form 10-K) at 4 (Dec. 13, 2023) ("Our Fire & Emergency ('F&E') segment sells (i) fire apparatus equipment . . . ."). And the industry has its own trade association and trade publication (i.e., the Fire Apparatus Manufacturers Association ("FAMA") and Fire Apparatus & Emergency Equipment Magazine, respectively).

105.     The primary relevant *geographic* market is the United States.

106.     The relevant geographic market for the State Law Subclass is California.

107.     In the alternative, the primary relevant geographic markets are each state in which Defendants have sold fire apparatus.

---

[3] The term "fire apparatus" has been used in rare instances to refer to non-vehicles. To avoid confusion, references to "fire apparatus" in this matter only refer to vehicles.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

### b. Fire Apparatus Described

108. Fire apparatus are heavy duty firefighting vehicles—for example, pumpers, which are trucks with water pumps, water tanks, and hoses:



MacQueen Equipment, *Pierce Pumpers.*[4]

109. These apparatus are critical public safety assets that require substantial capital investment by municipalities, counties, and other public entities.

110. Fire apparatus usually remain in service for ten or more years. Some public entities are required—e.g., by ordinance or union contracts—to replace fire apparatus on a predetermined schedule.

### c. Fire Apparatus Business Basics

111. Fire apparatus manufacturers, like Manufacturer Defendants, design and build fire apparatus. Fire apparatus dealers, like Dealer Defendants, sell them (or facilitate their sale) to customers—typically public entities, like Plaintiff and the Class members.

---

[4] Available at: https://www.macqueengroup.com/pierce-pumpers.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

### i.     Exclusive Dealing & Territorial Allocation

112.    Manufacturer Defendants distribute fire apparatus through Dealer Defendants with which they have established exclusive dealing/territorial allocation agreements.

113.    Each agreement identifies a specific territory that borders, but does not overlap, the territories identified in the Manufacturer Defendant's agreements with its other dealers. The agreement provides that *within the designated territory* the dealer cannot sell any brand other than the manufacturer's brands and the manufacturer cannot authorize anyone other than the dealer to sell their brands, and *outside of the designated territory* the dealer cannot sell fire apparatus at all. Thus, the agreements impose a triple foreclosure: (1) foreclosing the Dealer Defendant from selling any brand other than Manufacturer Defendant's brands,[5] (2) foreclosing anyone else from selling Manufacturer Defendant's brands within the designated territory, and (3) foreclosing the Dealer Defendant from selling any fire apparatus at all outside of the designated territory.

114.    In this way, Defendants have established cartels and carved up the market geographically such that purchasers can only buy a given brand of fire apparatus from the singular dealer to which they have allocated that territory.

115.    By way of example, if the City of Tucson, Arizona wanted to buy a Pierce pumper, it could only do so through the Pierce dealer located in Springfield, Oregon (Hughes Fire Equipment, Inc.), because that dealer has an exclusive dealing

---

[5] For a small set of niche apparatus (e.g., wildland fire apparatus), some Manufacturer Defendants appear to permit some of their dealers to sell brands other than the Manufacturer Defendant's brands. These apparatus are built on commercial, rather than custom chassis, and are not part of the industry's core products (i.e., custom chassis pumpers, aerials, and combinations). Additionally, in the last year or two, it appears that REV Group may have allowed a small number of its dealers to sell a small number of pumpers made by a small manufacturer called Fouts Bros., which builds apparatus on REV Group's own Spartan chassis.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

agreement with Pierce that covers several states throughout the West, including all of Arizona. Tucson could not seek better terms by purchasing through the Pierce dealers in Southern California or Texas.

### ii. The Importance of Dealers

116. Fire apparatus dealers are critical to fire apparatus purchasers. Indeed, for some purchasers, the choice of dealer is a more important decision than the choice of apparatus brand. There are a number of reasons for this. First, dealers are frequently involved in the earliest stages of the procurement process, sometimes serving as advisors to purchasers as they determine the types of fire apparatuses they will buy.

117. Second, fire apparatus need frequent servicing to remain operational. Much of that servicing is covered under five-year warranties that only dealers can provide. The service quality of the dealer, therefore, plays an important role in initial purchasing decisions.

118. Third, dealers' delivery timelines vary. Some maintain a stock of "demo" apparatus so that they can make quick deliveries when necessary. Others do not and (as discussed below) may take years to deliver.

119. And fourth, dealers are important because the industry's exclusive dealing agreements have kept their number relatively low. By way of comparison, an Orange County customer trying to buy a new Ford sedan can go to any one of at least 10 Ford dealerships that operate within their own county (*Ford Dealerships in Orange County*, Southern California Ford Dealers),[6] but there is only a single Pierce fire apparatus dealer for all the customers in Southern California, and no other Pierce dealers are allowed to sell to them. And elsewhere the situation is even starker—for example, customers in Illinois, Indiana, Minnesota, Nebraska, North Dakota, and South Dakota all share a single Pierce dealer.

---

[6] Available at https://www.socalforddealers.com/regions/orange-county-ca-ford-dealerships.html.

### iii.    Configurators

120.   Fire apparatus can, to a degree, be customized. Purchasers work with dealers to select various options. Configurators are software applications, provided by manufacturers, that dealers use to select those options. The configurators prevent dealers from proceeding with impossible designs, and provide important information about the designs they select, including pricing requirements.

### d.    Defendants' Market and Monopoly Power

121.   Historically, fire apparatus manufacturing was a fragmented industry composed of dozens of small- and medium-sized manufacturers. That fragmentation promoted competition, contributing to reasonable pricing and delivery schedules, and high-quality products and servicing.

122.   More recently, the industry has undergone a dramatic transformation due to a wave of acquisitions and roll-ups by Oshkosh Corporation and AIP. *See, e.g.*, Will Dowd, John Bender & Pete Sullivan, *Marblehead Fire Chief Keeps Watch as Truck Delays, Costs Increase Nationwide*, MARBLEHEAD CURRENT (June 4, 2025) ("Market share of independent fire truck builders dropped from 85% in 2006 to 20% in 2023.")[7] Oshkosh Corporation acquired Pierce in 1996[8]—which in turn bought a non-controlling ownership interest in BME in 2021[9]—and acquired Maxi-Metal in 2022.[10] AIP purchased E-ONE in 2008 and combined it with other specialty

---

[7] Available at: https://marbleheadcurrent.org/2025/06/04/marblehead-fire-chief-keeps-watch-as-truck-delays-costs-increase-nationwide/.

[8] *Oshkosh Acquires Pierce Manufacturing*, Mergr, https://mergr.com/transaction/oshkosh-acquires-pierce-manufacturing.

[9] *BME Joins Strategic Alliance with Pierce Manufacturing*, BME Fire, https://www.bmefire.com/bme-joins-strategic-alliance-with-pierce-manufacturing/.

[10] *Oshkosh Corporation Acquires Maxi-Métal Inc.*, Oshkosh Corporation, https://www.investors.oshkoshcorp.com/news/oshkosh-corporation-acquires-maxi-metal-inc/c5afbb77-38ec-4497-a391-f4f56b88d127/.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

vehicle manufactures to form Allied Specialty Vehicles, Inc.,[11] which it rebranded into REV Group in 2015.[12] REV Group went on to acquire KME in 2016,[13] Ferrara in 2017,[14] and Spartan ER, Spartan Fire Apparatus and Chassis, Smeal, and LT in 2020.[15]

123. These roll-ups and acquisitions reduced the number of independent fire apparatus manufacturers and consolidated approximately 76% of the U.S. fire apparatus market under its biggest two manufacturers, Oshkosh Group and REV Group. *See Fire Truck Manufacturing*, IBISWorld Industry Report OD5645 at 7 (Oct. 2021); *see also* Baker NYT Article (describing the history of fire apparatus market consolidation through acquisitions and roll-ups). And that figure actually understates the degree of market concentration, for two reasons.

124. First, the 76% market share is not evenly split—**Oshkosh Group has a greater-than 50% market share *on its own***. *Fire Truck Manufacturing*, IBISWorld Industry Report OD5645 at 7 (Oct. 2021) (showing Oshkosh Group with a 51.3%

---

[11] *E-ONE Sold to N.Y. Investment Firm*, Fire Apparatus Magazine (Aug. 1, 2008), https://www.fireapparatusmagazine.com/fire-apparatus/e-one-sold-to-n-y-investment-firm/.

[12] *SV Rebrands as REV Group Inc.*, METRO Mag. (Nov. 2, 2015), https://www.metro-magazine.com/10036286/asv-rebrands-as-rev-group-inc.

[13] *KME Fire Apparatus Sold to REVGroup*, Firehouse (Apr. 11, 2016), https://www.firehouse.com/apparatus/press-release/12193362/fire-apparatus-manufacturer-kme-kovtach-pumpers-aerials-heavy-rescue-fire-apparatus-builder-kme-fire-apparatus-sold-to-revgroup.

[14] *REV Group Acquires Ferrara Fire Apparatus, Inc.*, REV Group Investor Relations (Apr. 25, 2017), https://investors.revgroup.com/investor-releases/2017/04-25-2017-182251523.

[15] *REV Group, Inc. Completes Acquisition of Spartan Emergency Response*, REV Group Investor Relations (Feb. 3, 2020), https://investors.revgroup.com/investor-releases/2020/02-03-2020-135942281.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

market share).[16] Accordingly, **<u>Oshkosh Group presumptively has monopoly power in the U.S. fire apparatus market</u>**. *See* U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines (Dec. 18, 2023) ("The Agencies will generally infer, in the absence of countervailing evidence, that the merging firm has or is approaching monopoly power in the related product if it has a share greater than 50% of the related product market.").

125. To put this in context, consider how the U.S. fire apparatus market would fare under the U.S. Department of Justice and Federal Trade Commission's Horizontal Merger Guidelines. "As an aid to the interpretation of market data, [DOJ and FTC] use the Herfindahl-Hirschman Index ('HHI') of market concentration." U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 1.5, at 15 (1992, rev. 1997).[17] "The HHI is calculated by summing the squares of the individual market shares of all the participants." *Id.* DOJ and FTC consider HHI scores below 1000 to be unconcentrated, scores between 1000 and 1800 to be moderately concentrated, and scores above 1800 to be highly concentrated. *Id.* at 16. The fire apparatus market far exceeds the threshold for a highly concentrated market:

| Oshkosh Group | REV Group | Rosenbauer | HHI |
|---|---|---|---|
| 51.3% | 24.9% | 9.3% | **>3,338** |

---

[16] An analysis of Oshkosh Corporation and REV Group's public filings and investor materials indicates that these market shares (i.e., approximately 50% and approximately 25%, respectively) have remained approximately the same from 2021 to the present.

[17] Available at: https://www.justice.gov/sites/default/files/atr/legacy/2007/08/14/hmg.pdf.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

(Source: *Fire Truck Manufacturing*, IBISWorld Industry Report OD5645 at 7 (Oct. 2021)).[18] The HHI for the United States as a whole for that period is greater than 3,338—*nearly double* the threshold at which DOJ and FTC considers a market to be highly concentrated.

126. Second, on information and belief, Manufacturer Defendants' market shares are more highly polarized at the regional and state level. Manufacturer Defendants only distribute fire apparatus through Dealer Defendants with which they have established exclusive dealing agreements. Each agreement identifies a specific territory and then imposes a triple foreclosure: foreclosing the Dealer Defendant from selling any fire apparatus outside of the designated territory, foreclosing the Dealer Defendant from selling any brand other than Manufacturer Defendant's brands, and foreclosing any other dealer from selling the Manufacturer Defendant's brands within the designated territory. In this way, Defendants have carved up the market geographically such that public entities can only purchase a given fire apparatus brand from the one dealer to which they have allocated that territory. As a result, what appears as 76% when zoomed out to a national level becomes more extreme when zoomed in to a regional or state level.

127. In sum, Defendants' acquisitions and roll-ups, and territorial allocation and exclusive dealing schemes, have imbued Defendants with monopoly and market power at the national level, and in particular regions and states where they have cordoned off competition.

---

[18] This table calculates HHI by summing the squares of Oshkosh Group, REV Group, and Rosenbauer (the third largest fire apparatus manufacturer) market shares, but no other participants' market shares—meaning that the result is the <u>*minimum*</u> possible HHI. If the squares of the other participants' market shares were summed, the resulting HHI would be even higher.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

128. Defendants have used this power to impose supracompetitive prices and burdensome delays without suffering consequences from consumers that have no reasonable alternatives.

### e. Fire Apparatus Market Features That Support the Existence of a Conspiracy

129. The suppression of competition is reflected in several distinct features of the fire apparatus market.

### i. "Skyrocketing" Prices and Profits

130. As the industry has consolidated, fire apparatus prices and profits have surged. So much so, in fact, that the International Association of Fire Fighters implored Attorney General Pam Bondi and Federal Trade Commission Chair Andrew Ferguson to "investigate and take action against consolidation in fire and emergency vehicle manufacturers." Letter from Int'l Ass'n of Fire Fighters & Am. Econ. Liberties Project to Pam Bondi, Att'y Gen., et al., U.S. Dep't of Just., & Andrew Ferguson, Chair, Fed. Trade Comm'n (May 13, 2025) (hereafter "Firefighters' Letter") (decrying "skyrocketing prices"). In that letter, the firefighters noted that "[t]he cost of fire trucks has reportedly doubled over the past decade." *Id.*[19]

---

[19] (citing Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, BIG (Jan. 25, 2025), https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll (hereafter "Musharbash Article") ("The cost of fire trucks has skyrocketed in recent years—going from around $300–500,000 for a pumper truck and $750–900,000 for a ladder truck in the mid-2010s, to around $1 million for a pumper truck and $2 million for a ladder truck in the last couple years."); Tracy McCue, *Sunday Blog: Why Did That Fire Truck Cost $1.9 Million? Because It Just Does*, Sumner NewsCow (Mar. 31, 2024), https://www.sumnernewscow.com/sunday-blog-why-did-that-fire-truck-cost-1-9-million-because-it-just-does/ ("Former Fire Chief Tim Hay priced [an aerial fire truck] at $1 million. When the City of Wellington bid it out in January, the cheapest bid was $1.8 million. Earlier this month, Wellington City Manager Jeff Porter reported the cost had risen to $1.9 million. That was a $100,000 increase . . . in just one month.")

131. Public data backs up the firefighters' statement. Take, for example, the increase in price of a Pierce 1500 GPM pumper truck (made by Oshkosh Group), which cost approximately $480,000 in March of 2015 and approximately $885,000 in November of 2024.

132. Fire apparatus manufacturers sometimes attempt to justify these increases by citing inflation and rising input costs, but these explanations are pretextual. The Pierce 1500 GPM pumper truck's price increase equates to a compounding annualized interest rate increase of 6.5%. In contrast, the PPI for Heavy Duty Truck Manufacturing: Buses, Including Military and Firefighting Vehicles (Chassis of Own Manufacturer)—which calculates the inflation rate for manufacturing large vehicles like fire apparatus—was approximately 1.5%. *See* U.S. Bureau of Labor Statistics, *Producer Price Index by Industry: Heavy Duty Truck Manufacturing: Buses, Including Military and Firefighting Vehicles (Chassis of Own Manufacture)* (PCU3361203361203), FRED, Fed. Rsrv. Bank of St. Louis.

133. To put into perspective how big of a difference that is: if the Pierce Pumper truck's price had increased at the same rate as prices in the most relevant industry sector, it would have increased by about $75,000. Instead it increased by about $405,000—a more than five-fold difference.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED



(Source: GovSpend.com.[20])

134. These dramatic increases in prices for purchasers have translated to dramatic increases in profits for Defendants. And not just in pumpers. According to a former REV Fire Group executive, five years ago, REV Group considered $100,000 margins on 100-foot E-ONE aerials to be excellent, but now the company is reaping no less than $340,000 margins on the exact same apparatus—a more than three-fold profit increase in just a handful of years that seems to have contributed to an "exceptional 8.9 percent" profit margin for the company as a whole.[21]

135. Inflation and input cost increases cannot account for these price escalations. Something is happening in the fire apparatus industry that is not happening in other heavy duty truck manufacturing markets.

---

[20] GovSpend.com ("GovSpend") advertises itself as "the most exhaustive service available in the market" for accessing line-by-line public procurement data.

[21] Mike Baker, Maureen Farrell, & Serge F. Kovaleski, *As Wall Street Chases Profits, Fire Departments Pay the Price*, N.Y. Times (Feb. 17, 2025) ("Rev Group's profit margins jumped to what they described as an 'exceptional 8.9 percent' for the division that includes fire trucks in 2024. That same year, its longtime backer and owner, American Industrial Partners, sold nearly all of its shares, but before doing so awarded a special dividend of $180 million of which nearly $80 million went to A.I.P.").

## ii.     Reduced Production and "Brutal" Backlogs

136.     In a competitive market, when sale prices increase, sellers tend to increase production. But Manufacturer Defendants have done the opposite. They closed factories and declined to invest in production. In fact, rather than growing production to seize the opportunity that surging prices and demand present, REV Group recently used $88.4 million in available cash to simply buy back its own stock. *REV Group, Inc. Reports Strong Fiscal 2025 Second Quarter Results*, REV Group, Inc.[22] As a result, while demand has swelled, supply has stagnated.

137.     Accordingly, delivery times have ballooned. Fire apparatus that once took about a year to deliver now frequently take two, three, four, and sometimes even more years to complete. *See, e.g.*, David Kroman, *Firetruck Fleet Aging Faster Than Seattle Can Make Repairs*, GOV'T TECH. (Apr. 2, 2024), ("It used to take a year to replace a truck. Now, said Lombard, it's 54 months for a ladder truck — 4.5 years.");[23] Baker NYT Article ("Delivery has been delayed multiple times – with the most recent projection for late this year, more than four years after the order was placed.");[24] Firefighters' Letter.

138.     These delays—which firefighters describe as "brutal"—impose serious public safety risks, forcing fire departments to operate with aging, malfunctioning vehicles. Firefighters' Letter. But Defendants *like* them. In materials they provide to their investors, Defendants crow about the size of their backlogs and how they ensure growing returns into the foreseeable future. *See, e.g.*, Rev Group, Inc., Investor Presentation (July 2021), (highlighting a $2.3 billion backlog as a contributor to

---

[22] Available at https://investors.revgroup.com/investor-releases/2025/06-04-2025-120033297.

[23] Available at: https://www.govtech.com/em/disaster/firetruck-fleet-aging-faster-than-seattle-can-make-repairs.

[24] Available at: https://www.nytimes.com/2024/03/03/us/fire-trucks-wall-street.html.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

"growing momentum.")[25] Translation: supply shortages help fuel the price inflation that drives Defendants' skyrocketing profits.

### iii. Dealer Exclusivity and Territorial Allocation

139. As explained above, Manufacturer Defendants only distribute fire apparatus through Dealer Defendants with which they have established exclusive dealing agreements. These agreements give Dealer Defendants expansive, non-overlapping geographic territories, often encompassing entire states or multistate regions. Each agreement (1) forecloses the Dealer Defendant from selling any fire apparatus outside of the designated territory, (2) forecloses the Dealer Defendant from selling any brand other than Manufacturer Defendant's brands, and (3) forecloses any other dealer from selling the Manufacturer Defendant's brands within the designated territory.

140. These exclusive dealing agreements diminish inter-brand competition between manufacturers, completely foreclose intra-brand competition between dealers, and enable the manufacturers to maintain tight control over pricing and supply within large areas of the country. If a customer wants to purchase fire apparatus *from a specific dealer*, they are foreclosed from purchasing all but one group's brands. And if a customer wants to buy *a specific brand*, they are foreclosed from purchasing through all but one dealer—even if they are farther away and offer the same product at a higher price, with a longer delay, and poorer servicing than other dealers. This structure removes key competitive safeguards that would otherwise operate to discipline pricing and performance. The result is a dealer network that allows Defendants to allocate the market and stifle competition.

---

[25] Available at: https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

#### iv. Structural Features Conducive to Anticompetitive Conduct

141. Multiple features of the fire apparatus industry help to fuel and sustain Defendants' anticompetitive behavior.

142. ***High barriers to entry.*** The fire apparatus industry has such high barriers to entry that no new manufacturers have entered the market in at least 20 years.[26]

143. One such barrier is high capital costs. Building fire apparatus is resource intensive.

144. Rules requiring a minimum amount of time in the industry raise additional barriers. For example, rules prohibit the Shelby County Fire Department in Tennessee from even considering purchasing from companies unless they "have an established reputation in the field of fire apparatus construction *and have been in business for a minimum of 20 years.*" Shelby County Fire Dep't, *Specifications for a Triple Combination Pumper* (April 29, 2025) (on file with author) (emphasis added). Requirements like these preclude new entrants (if there were any) from winning business.

145. Exclusive dealing agreements are also a barrier. Virtually all existing dealers are locked into exclusive relationships with manufacturers, which makes it hard for new entrants to bring their goods to market. To make matters more difficult, many states have laws prohibiting direct sales, which blocks new entrants from pursuing even a second-best option.

---

[26] The only half-exception is US Fire Apparatus, which is not so much a new entrant as the return of an old one. Chris Ferrara founded Ferrara, but when he sold the company to REV Group, he signed a non-compete agreement that kept him out of the market for some years. Once the non-compete provision lapsed, Mr. Ferrara started producing fire apparatus again, this time under the name US Fire Apparatus. On information and belief, the company's market share is negligible.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

146.    The high barriers to entry and absence of new entrants give existing players leeway to engage in anticompetitive behavior free from the kind of discipline that a competitive market would impose.

147.    ***Insulated "floating" prices.*** Contracts often include "floating price" terms that shift the costs of slow production from Defendants to customers by allowing Defendants to impose retroactive price increases around the time of delivery (i.e., long after the original bid was accepted). Firefighters' Letter ("Manufacturers reportedly wield their market power to reserve the ability to levy surprise price hikes after order placement through 'floating' price terms.") (citing CFSC, "Floating" Prices & Lengthy Delivery Times for Fire Apparatus, CSFC Members' Perspective," August 25, 2022.).[27] The advertised purpose of these terms is to account for increases in the cost of inputs that could occur over the course of the fire apparatus' build time. The more pertinent benefit to Defendants, however, is that they shift the costs of slow production onto customers—eliminating a source of market discipline that would incentivize speedier deliveries and undermine Defendants' supply restriction scheme. And, as described above, slow production and supply shortages fuel price increases.

148.    Put simply: floating prices help Defendants restrict supply by forcing purchasers to bear the costs of Defendants' slow production.

149.    ***Vertical constraints.*** Some manufacturers rely on parts supplied by Manufacturer Defendants. For example, some manufacturers build fire apparatus on Spartan chassis, which is a REV Group product. *See* More Perfect Union, *Did Private Equity Worsen the LA Fires?*, YouTube (uploaded Apr. 7, 2025).[28] As essential

---

[27] Available at: https://static1.squarespace.com/static/5ea64a6b9614427b0ff93e6d/t/63080a517f782438bdd6f98e/1661471313934/Floating+Prices+Lenghty+Delivery+Time+for+Fire+Apparatus+Aug+25+2022%5B42%5D.pdf.

[28] Available at: https://youtu.be/HvW-RtTRm8w?si=eYX67CXnxiANsule.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

suppliers for their competitors, REV Group is able to negatively influence the volume, price, and pace of their competitors' production, and obtain their competitively sensitive information. *See id.*

150. ***Inelastic demand.*** Public entities have limited flexibility to defer or substitute fire apparatus purchases. Doing so can be dangerous and some public entities are subject to policies or contracts compelling them to purchase new equipment on predetermined time intervals. *See, e.g.*, City of Livermore, Cal., City Council Staff Report, Item No. 5.9 (Nov. 13, 2023) (citing the City of Livermore's Fleet Policy of replacing fire apparatus every 15 years). These factors enable manufacturers to impose price hikes with minimal demand reduction.

151. For example, on information and belief, around 2021, FDNY purchased rescue trucks for approximately $1.2 million per truck. About three years later, it sought to purchase more of the exact same trucks. This time, however, FDNY had to buy the rescue trucks pursuant to its union contract, which required trucks to be replaced on a strict schedule. On information and belief, a dealer knew that FDNY <u>had</u> to buy the trucks and offered to sell them for $3.4 million apiece. That was the best offer FDNY received, and so it had to buy several rescue trucks at nearly triple the price it paid just a few years prior.

152. ***Opportunities to coordinate.*** Practices within the fire apparatus industry provide ample opportunities to obtain competitively sensitive information and coordinate—either expressly or tacitly. First, toward the end of each calendar year, Manufacturer Defendants send letters to fire departments forecasting the percent range within which their prices will increase in the coming year. Ostensibly, they send the letters to motivate their customers to purchase before prices increase. In practice, however, the Manufacturer Defendants reach out to their fire department contacts to get information on what their competitors' letters say. Anecdotally, Pierce is known for waiting to see other Manufacturer Defendants' letters before issuing their own.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

153. Second, there are purchasing cooperatives known as "buyboards" that publish dealer offers. Defendants scour them to obtain insight into one another's pricing.

154. In addition to price, Defendants sometimes disclose detailed information on future production plans. Manufacturer Defendants publish webpages disclosing their production queue. The webpages ostensibly exist for the benefit of customers so that they can track the construction progress of the apparatus they ordered. In practice, however, Defendants can visit their competitors' webpages and assess their future production plans. Historically, anyone could access these pages. Recently some Manufacturer Defendants have limited access to customers, but some webpages remain open for all to view. *See, e.g.*, **In-Process Trucks**, E-ONE Galleries (2022), https://galleries.e-one.com/2022In-Process-Trucks.

155. Manufacturer Defendants also facilitate unique opportunities for Dealer Defendants to coordinate. Manufacturer Defendants host annual dealer meetings that convene all dealers with which they have exclusive dealing agreements. And Manufacturer Defendants put some of their exclusive dealers on "dealer advisory boards," where dealers (which would compete against one another were it not for Defendants' territorial allocation schemes) coordinate and exert influence on the Manufacturer Defendants' business decisions.

156. Finally, the fire apparatus industry has an organization called the Fire Apparatus Manufacturers' Association (FAMA), which provides a forum for the dominant firms to meet, share market intelligence, and coordinate behavior. They do so interpersonally at FAMA's periodic conferences and symposia, (*see, e.g.*, Fire Apparatus Manufacturers' Association, *2025 FEMSA/FAMA Annual Fall*

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

*Conference*, FAMA (Sept. 23–26, 2025)),[29] as well as through data exchange. FAMA advertises as much:

157. Among the most powerful benefits of FAMA membership are the statistical reports provided quarterly and encapsulated for every year-end. Only those companies that participate in the statistical studies and members are privy to these reports. FAMA does not release this information to the public. Members find this research invaluable for their internal business purposes.

Fire Apparatus Manufacturers' Ass'n, *Why Join*, FAMA (2025).[30]

> The Fire Apparatus Manufacturers' Association (FAMA) collects a lot of data on fire apparatus sold to the fire service. To our members, it's one of the most valuable reasons why they join our association.

Paul C. Darley, *The Fire Apparatus Market is Coming Back… Just Look at the Data*, FAMA (Dec. 2015).[31]

158. *Earmarking.* Public entities "earmark" (i.e., reserve) funds for large purchases, like fire apparatus. Once funds have been earmarked, manufacturers take a deposit payment, and it becomes very difficult to change course. Fire apparatus manufacturers know that and take advantage of it. They delay delivery for extended periods with knowledge that they will not lose the order. REV Group has acknowledged as much:

> "Mark Skonieczny, Rev Group's current chief executive, said at a 2023 conference call that the company did not

---

[29] Available at: https://www.fama.org/event/2025-femsa-fama-annual-fall-conference/.

[30] Available at: https://www.fama.org/membership/why-join/.

[31] Available at: https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data/.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

expect the delays to cause cancellations because once a city

sets aside the money, it is 'earmarked' and Rev Group gets

a deposit. 'That money is allocated to those units, so we feel

good about that.'"

Baker NYT Article. Moreover, because of their "floating price" terms, they will not even lose value to time. Manufacturers suffer no negative consequences for delaying. Indeed, doing so fuels price increases and the profits they engender.

## IV. DEFENDANTS' ANTICOMPETITIVE CONDUCT

159. Fire apparatus price increases and delivery delays cannot be attributed to organic causes. Rather, these price increases are attributable to anticompetitive conduct and conspiracies carried out by Defendants, who have artificially increased prices to supracompetitive levels through a combination of artificial supply restriction, exclusive dealing, market allocation, resale price maintenance, and acquisitions.

### a. Collusive Supply Restriction

160. Manufacturer Defendants have coordinated to restrict supply. Despite overwhelming demand and surging prices that would incentivize increased production in a competitive market, Manufacturer Defendants have collectively eschewed expanding production capacity. Instead, they have allowed backlogs to mount to historic levels and told investors that these production delays are positive indicators for long-term revenue stability. This economically illogical parallel conduct across multiple competitors—simultaneously restricting supply in the face of unprecedented demand and price increases—supports a strong inference of coordination among Manufacturer Defendants to artificially constrain supply in order to boost prices and profits.

161. In a competitive market, manufacturers facing sustained high demand and the ability to command premium prices would be expected to invest in additional production capacity to capture market share and maximize profits. The economic

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

incentive to expand production becomes even stronger when competitors are experiencing lengthy backlogs, as a manufacturer that could deliver products more quickly would gain a significant competitive advantage. Yet neither of the Manufacturer Defendants have responded to these powerful market trends by substantially increasing their production capacity. This coordinated failure to expand production is particularly suspicious given that fire apparatus demand reached historic highs during the Class Period. *See* Musharbash Article (explaining that, as federal COVID-19 assistance filled state and local government coffers, "fire truck orders grew approximately 50% from 2020 to 2022, reaching roughly 6,000 units for the first time since 2008.")

162. Public reporting and internal statements make clear that Manufacturer Defendants do not view their giant backlogs as failures or even opportunities for growth by expanding production, but rather as "financial advantage[s]."[32] For example, in 2021 REV Group crowed to its investors about its $2 billion backlog. REV Group, Inc., *Investor & Analyst Day*, 8 (Apr. 15, 2021).[33] By 2024, that backlog had more than doubled to $4.2 billion, and the company bragged about it in a section of its 10-K that it titled, "Business Model Produces Attractive Financial

---

[32] Musharbash Article ("[I]t appears that the dominant manufacturers have managed to turn their delivery failures into financial advantage. Using the purported difficulty of projecting material costs over a 2-3-year lead time as an excuse, they have imposed 'floating' price clauses onto their customers — allowing them to increase the final price of a rig when it finally goes into production. In effect, the bottleneck in fire truck production that REV Group, Oshkosh, and to a lesser extent, Rosenbauer created with their M&A and operating strategies are giving them *even more* bargaining power vis-à-vis fire departments. Not only that but, according to REV Group's SEC reports, the twenty-four-month backlog it is running is literally enhancing its value to shareholders — AIP being the largest among them — by giving the company 'strong visibility into future net sales.'").

[33] Available at: https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-investor-day-v18.pdf.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

Characteristics." Rev Group, Inc., Form 10-K, at 11 (filed Dec. 11, 2024). Similarly, Oshkosh Group's global backlog went from approximately $1 billion in 2019, to $4 billion in 2023,[34] to $5.3 billion in 2024.[35]

163. Rather than investing in expanded production capacity to meet this unprecedented demand, Manufacturer Defendants restricted supply. REV Group's conduct has been particularly egregious in this regard. Shortly after acquiring KME, REV Group announced plans to close two of the company's firetruck manufacturing facilities (representing about a third of its manufacturing capacity) even though there was strong demand for the KME fire apparatus those factories produced. *See* Baker NYT Article. The decision to eliminate substantial production capacity during a period of surging demand defies economic logic and strongly suggests coordination aimed at maintaining artificial scarcity.

164. REV Group's approach to capital allocation further evidences its strategy of prioritizing supply restriction over meeting customer demand. In 2025, rather than using available cash to expand production capacity to address its massive backlog, REV Group spent $88.4 million to buy back its own stock. *REV Group Announces Second Quarter 2025 Results*, REV Group, Inc.[36] This decision to return cash to shareholders instead of investing in production capabilities during a period of unprecedented demand and multi-year backlogs defies economic logic and, when combined with the observation that its competitors are *also* refusing to increase production, supports an inference of collusive supply restriction.

165. REV Group has also restricted supply—and insulated its supply restriction conspiracy from market discipline—by leveraging its control of critical

---

[34] Baker NYT Article.

[35] Firefighters' Letter.

[36] Available at: https://investors.revgroup.com/investor-releases/2025/06-04-2025-120033297.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

components used by other manufacturers. Each year the industry receives about 700 orders for fire apparatus built on third-party custom chassis. REV Group's Spartan supplies about 600 of those chassis. But unlike HME (which supplies the remaining 100 chassis) REV Group does not sell to all comers. Instead, REV Group is selective as to which competitors it will supply and leverages its vertical integration to control the availability of Spartan chassis and the fire apparatus that are built on them. By restricting the sale of these chassis to competitors, REV Group simultaneously constrains its own and others' production. This dual restriction amplifies the supply shortage across the entire market while ensuring that REV Group cannot be outcompeted by manufacturers offering shorter delivery times.

166. The coordinated nature of this supply restriction becomes apparent when examining Manufacturer Defendants' response to mounting backlogs. Despite lead times ballooning from less than a year to two, three, four, and sometimes even more years, Manufacturer Defendants declined to make substantial investments in expanding production capacity. Firefighters' Letter; *see, e.g.*, David Kroman, *Firetruck Fleet Aging Faster Than Seattle Can Make Repairs*, GOV'T TECH. (Apr. 2, 2024), ("It used to take a year to replace a truck. Now, said Lombard, it's 54 months for a ladder truck — 4.5 years."). Compared to average manufacturing companies, these firms spend disproportionately small portions of their revenue—about 1 percent in REV Group's case—on upgrading buildings and equipment. Baker NYT Article. As one former REV Group investor observed, "How can you have a $4 billion backlog and not spend any money to support it? It's reflective of an uncompetitive market." *Id.*

167. This parallel conduct is insulated from competitive pressure by Manufacturer Defendants' other anticompetitive practices. The exclusive dealership networks and market allocation agreements prevent purchasers from shopping outside their assigned dealer regions even when facing multi-year-long backlogs. The use of "floating" price terms allows Defendants to raise prices after orders are placed,

eliminating any financial penalty for delayed delivery. And because purchasers are often required by law or contract to replace fire apparatus on periodic schedules, and often "earmark" funds and put down deposits years in advance, they have no meaningful ability to cancel orders in response to delays. As REV Group executives have admitted, these constraints protect their sales even with multi-year delays, with one executive noting that earmarked deposits mean the company can feel confident it will not lose orders—even if delivery is delayed for years. Baker NYT Article ("Mark Skonieczny, Rev Group's current chief executive, said at a 2023 conference call that the company did not expect the delays to cause cancellations because once a city sets aside the money, it is 'earmarked' and Rev Group gets a deposit. 'That money is allocated to those units, so we feel good about that.'")

168. The anticompetitive purpose and effect of this coordinated supply restriction is evident in its results. By manufacturing scarcity in a market with inelastic demand, Defendants have been able to impose and maintain supracompetitive prices while simultaneously extending delivery times without fear of losing business to competitors. Fire departments have been forced to rely on aging fleets that are more prone to breakdowns, leaving public safety agencies dangerously under-equipped. *See, e.g.*, Perkin Amalaraj, *Dozens of Fire Trucks Waiting for Repair While Fires Ravage L.A.*, MSN News (Apr. 2025) (reporting that during the recent wildfires in Los Angeles, over 100 of the Los Angeles Fire Department's 183 fire trucks were out of service, in part due to the inability to replace or repair them in a timely manner).[37]

169. Defendants' restriction of supply is not an unfortunate byproduct of external conditions or natural market forces. It is a deliberate and coordinated mechanism of their anticompetitive scheme, designed to create and exploit scarcity, force price increases, and extract supracompetitive profits from public entities that

---

[37] Available at: https://www.msn.com/en-ae/news/other/dozens-of-fire-trucks-waiting-for-repair-while-fires-ravage-la/ar-BB1rr7vy

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

cannot delay or forego these critical safety purchases. The parallel nature of this conduct across all major manufacturers, combined with their collective ability to maintain these restrictions without competitive discipline, demonstrates that Manufacturer Defendants have successfully coordinated to manipulate supply in furtherance of their price-fixing conspiracy.

**b.      Hub-and-Spoke:  Market Allocation, Exclusive Dealing, & Resale Price Maintenance**

170.     Defendants orchestrate and participate in two, nearly identical hub-and-spoke conspiracies, establishing dealer cartels that systematically diminish competition in the fire apparatus market. In each scheme, the Manufacturer Defendants serve as the "hubs," the Dealer Defendants serve as the "spokes," and the exclusive dealing/territorial allocation agreements and shared resale price maintenance technology (i.e., the configurators) form the "rims" that connect the spokes and facilitate coordination among dealers. Thus, one conspiracy has Oshkosh Group at the hub and Oshkosh Group Dealers at the spokes, and the other has REV Group at the hub and REV Group Dealers at the spokes.

171.     The hub-and-spoke structure operates as a mechanism for coordination among dealers. Through their common participation in exclusive dealing/territorial allocation agreements and their use of shared configurator technology, dealers who would otherwise compete with one another are brought into a coordinated framework that eliminates meaningful competition. The result is a market where competition between dealers—whether intra-brand or inter-brand—has been systematically degraded.

172.     ***The Hubs: Manufacturer Defendants as Coordinating Centers.*** Each Manufacturer Defendant operates as a hub that coordinates the activities of multiple dealers. Through their exclusive dealing/territorial allocation agreements, shared configurator software, dealer meetings, and dealer advisory boards, Manufacturer

37

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

Defendants serve as central points through which information flows and coordination occurs among a cartel of dealers who would otherwise compete with one another.

173. ***The Spokes: Dealer Defendants as Coordinated Participants.*** The Dealer Defendants serve as the spokes extending from each manufacturer hub. While these dealers are ostensibly independent businesses, their participation in the exclusive dealing/territorial allocation agreements and their use of manufacturer-controlled configurator systems makes them active participants in the anticompetitive scheme. Each dealer's conduct is coordinated through their hub manufacturer, creating a cartel within which "competing" dealers align their behavior.

174. ***The Rim: Exclusive Dealing Agreements and Configurator Technology.*** The rim of this hub-and-spoke conspiracy consists of two interconnected elements: the exclusive dealing/territorial allocation agreements, and the shared configurator technology.

175. *Market Allocation Through Exclusive Dealing Agreements.* Each Manufacturer Defendant entered into exclusive dealing/territorial allocation agreements with strategically selected Dealer Defendants across the United States. These agreements create the structure that connects all spokes (dealers) within each wheel and establishes the rules that govern their anticompetitive conduct. These agreements impose a triple foreclosure on the market:

- *Dealer-territorial foreclosure:* Each agreement forecloses the Dealer Defendant from selling any fire apparatus outside of their designated territory—diminishing competition by preventing them from competing with dealers (of any brand) outside of their territory, even when they could offer better prices, faster delivery, superior service, or greater geographic proximity to purchasers.

- *Dealer-brand foreclosure:* Each agreement forecloses the Dealer Defendant from selling any brand other than the Manufacturer Defendant's brands—diminishing inter-brand competition by preventing

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

them from offering better brand options to customers that would prefer to purchase through that dealer.

- *Manufacturer-dealer foreclosure:* Each agreement forecloses any other dealer from selling the Manufacturer Defendant's brands within the designated territory—eliminating all intra-brand competition between dealers by preventing dealers from selling the same brand within the same territory.

176. The non-overlapping geographic territories created by the exclusive dealing agreements effectively divide the entire United States among the conspirators—and because public entity purchasers are immobile, the territorial allocation is also a customer allocation. The non-overlapping nature of these territories is a form of coordination, ensuring that no two dealers of the same brand compete against each other and preventing purchasers from shopping around for better terms for the same goods.

177. Defendants take this geographic allocation seriously, actively monitoring and enforcing the territorial restrictions in their exclusive dealing agreements. When dealers have been caught selling to customers outside their designated territories, Manufacturer Defendants have intervened to coordinate penalties and remedies—for example, by requiring the violating dealer to compensate the dealer whose territory was encroached upon.

178. *Resale Price Maintenance Through Configurator Technology.* The configurator systems serve as a critical component of the rim, providing a technological mechanism for coordinating pricing across all dealers within each hub-and-spoke network. Each Manufacturer Defendant requires its exclusive dealers to use proprietary configurator software to design and price fire apparatus for customers.

179. These configurators are not merely design tools—they are instruments of price coordination. When Dealer Defendants input specifications for a fire apparatus using a Manufacturer Defendant's configurator, the software calculates and

39

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

displays a minimum allowable price. Manufacturer Defendants forbid Dealer Defendants from proceeding with quotes, bids, or sales below these centrally determined minimums.

180. Through the configurator system, Manufacturer Defendants effectively engage in resale price maintenance by setting and enforcing minimum prices that their dealers must charge customers. This eliminates price competition among dealers and ensures that all participants in each hub-and-spoke network maintain coordinated pricing discipline.

181. ***Anticompetitive Effects of the Hub-and-Spoke Scheme.*** This coordinated system produces several harmful effects. It (1) completely eliminates intra-brand dealer competition because the only dealers permitted to sell a given Manufacturer Defendant's brands are forbidden from competing against one another (for example, by offering better prices or delivery times); (2) diminishes inter-brand competition because Dealer Defendants are forbidden from selling competitor manufacturers' brands (limiting the ability of purchasers to compare options from multiple manufacturers through a single dealer relationship);[38] and (3) impairs competition generally by preventing dealers from selling to customers outside of their designated territories. Thus, a fire department seeking a particular manufacturer's product is restricted to purchasing from a single, territorially-assigned dealer—regardless of price, delivery timelines, or quality of service—and a fire department committed to working through a specific dealer is restricted to purchasing a single

---

[38] There is some indication that inter-brand competition may be further diminished by inter-brand coordination. REV Group Vice President of Sales, Mike Virnig, was reported as saying that he "won't tolerate . . . negative selling"—describing the practice of marketing one brand by disparaging another. *REV Group Invests in the Strength of Fire Apparatus Brands*, Fire Apparatus Magazine (June 23, 2020). He continued: "I won't tolerate it *with our competitors*, and I won't tolerate it within the group. If I even get a hint or see anything like a dealer taking a shot at another dealer, we step in and say, 'Stop it.'" *Id.* (emphasis added).

brand. Additionally, the exclusive dealing arrangements make it extremely difficult for new manufacturers (were any to arise) to establish viable dealer relationships, as virtually all significant dealers are locked into exclusive arrangements with existing Manufacturer Defendants. And the configurator-enforced minimum pricing eliminates price competition across each hub-and-spoke system's dealer network.

182. Speaking more tangibly: the scheme inflates prices. We know this thanks in part to a natural experiment facilitated by Oshkosh Group's September 2021 partial acquisition of BME, whereby Pierce acquired a 25% non-controlling stake in the company. Prior to the partial acquisition, BME exclusively sold its fire apparatus directly to consumers without utilizing dealers ("Direct Distribution Model"), but after the deal it also started selling through Oshkosh Group's exclusive dealer network ("Dealer Distribution Model"). Pierce Mfg., Inc., *Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment* (Sept. 16, 2021).[39] Accordingly, we can compare the price of BME fire apparatus direct sales against its sales through Oshkosh Group's exclusive dealer network to see how big of an impact the exclusive dealing scheme has on price.

183. Under the pre-acquisition and post-acquisition Direct Distribution Model, prices for BME fire apparatus increased at an annualized interest rate of approximately 9.5% and 7.8%, respectively. But once plugged in to Oshkosh Group's exclusive dealing scheme, prices for BME fire apparatus shot up at an annualized interest rate of approximately 17.7%. By the fourth quarter of 2024, BME fire apparatus sold through Oshkosh Group's exclusive dealers cost, on average, more than $160,000 and 40% more than those distributed through direct sales.

---

[39] Available at: https://www.piercemfg.com/pierce/press-release/pierce-manufacturing-completes-ownership-interest-in-boise-mobile-equipment.



TOTAL BME SALES BY UNIT PRICE

$1,000,000

$0

Oct-18   Mar-20   Jul-21   Dec-22   Apr-24

● Pre-Acquisition Direct Distribution Model   ▲ Post-Acquisition Dealer Distribution Model

(Source: GovSpend.) And this difference is not a mere byproduct of different models being sold through different methods, because the phenomenon holds true even controlling for model.

184.   The Type 3 is BME's most popular model. Under the pre-acquisition and post-acquisition Direct Distribution Model, prices for BME Type 3 models increased at an annualized interest rate of approximately 5.9% and 8.8%, respectively. But through Oshkosh Group's Dealer Distribution Model, prices for BME Type 3 models increased at an annualized interest rate of approximately 13.5%, achieving an approximately 20% and $90,000 average difference in just three years.

42

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED



**BME TYPE 3 SALES BY UNIT PRICE**

- Pre-Acquisition Direct Distribution Model
- ▲ Post-Acquisition Dealer Distribution Model
- Post-Acquisition Direct Distribution Model

(Source: GovSpend.)

185. These increases demonstrate the inflationary impact that these exclusive dealing schemes have on prices.

**c. Roll-Ups & Acquisitions**

186. The fire apparatus market was already ultra-concentrated and vulnerable to further anticompetitive harm when Defendants engaged in a final wave of acquisitions that eliminated the last vestiges of meaningful competition. With an HHI already far above the threshold at which DOJ and FTC consider a market "highly concentrated," any additional consolidation was presumptively anticompetitive and virtually certain to cause substantial harm to competition.

187. Despite the market's extreme concentration, Defendants proceeded with three competitively harmful acquisitions between 2020 and 2022: REV Group's 2020 acquisition of Spartan, Smeal, and LT; Oshkosh Group's 2021 partial acquisition of BME; and Oshkosh Group's 2022 acquisition of Maxi-Metal. These transactions

further consolidated the market and provided Defendants with additional mechanisms to restrict supply, control pricing, and exclude potential competition. As discussed above, they used this additional power restrict supply and dramatically increase prices. *See* Sec. III(e)(i) ("Skyrocketing" Prices and Profits), *supra*.

188. ***REV Group's 2020 Acquisition: Spartan, Smeal, and LT.*** In February 2020, REV Group completed its acquisition of Spartan, Smeal, and LT, expanding its control over both the fire apparatus manufacturing market and a critical upstream market for custom chassis.

189. This acquisition was particularly harmful because acquiring Spartan gave REV Group control over approximately six-sevenths of the third-party custom chassis market. Each year, the fire apparatus industry receives about 700 orders for apparatus built on third-party custom chassis. REV Group's Spartan supplies approximately 600 of those chassis, while HME supplies the remaining 100. This vertical integration allows REV Group to bottleneck its competitors' production capabilities.

190. Unlike HME, which sells chassis to any manufacturer who will pay, REV Group has used its dominant position in the chassis market strategically. REV Group selectively determines which competitors receive Spartan chassis and when they receive them. This control allows REV Group to handicap smaller manufacturers and restrict the overall supply of fire apparatus in the market while obtaining competitively sensitive information about its competitors' production plans and customer relationships.

191. Through its control of Spartan chassis supply, REV Group can effectively determine which of its competitors succeed or fail. A manufacturer that depends on Spartan chassis but falls out of favor with REV Group may find itself unable to fulfill customer orders, while those that remain in REV Group's good graces can continue production—subject to REV Group's supply constraints and information gathering. Further, by restricting production or distribution of Spartan chassis, REV

44

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

Group can protect its own supply restriction conspiracy by preventing competitors from meeting the demand that REV Group and Oshkosh Group refuse to supply.

192. REV Group also acquired Smeal and LT, further consolidating the market by eliminating two additional independent manufacturers. These acquisitions removed potential sources of competitive pressure and added their production capacity to REV Group's arsenal of supply restriction tools.

193. Although these acquisitions occurred in 2020, the harm they imposed manifested during the Class Period.

194. ***Oshkosh Group's 2021 partial acquisition of BME.*** In September 2021, Oshkosh Group's Pierce acquired a 25% non-controlling ownership stake in BME. Areeda and Hovenkamp have explained why such acquisitions are disfavored and can constitute Clayton Act Section 7 violations:

> An acquisition of part of the stock of a competitor may affect the situation and competitive decisions of either company. The acquired firm might be prejudiced, or the competitive zeal of each firm might be reduced. Indeed, these effects could be realized even at fairly small ownership percentages. For example, if GM were a 10 percent shareholder in Ford, it might not have enough shares to assert significant control, but it might be inclined to be far less aggressive against a firm in whom it had a significant investment. Further, Ford's management might be less aggressive so as not to offend a large shareholder.

Antitrust Law ¶ 1203b. Indeed, they go on to explain that partial acquisitions are sometimes more suspect than whole acquisitions:

> Ordinarily, there can be no efficiencies without the integration of control. The legitimate reason for a partial acquisition of, say, a rival would presumably be its

45

attractiveness as an investment in an industry that the acquirer knows intimately. But the universe of portfolio investments seems so broad that forbidding acquisitions of competitors and the like would not appreciably narrow the acquirer's investment opportunities. Thus, the balance of harm and benefit might seem generally less favorable to partial acquisitions than to full acquisitions.

*Id.* at 1203d.

195. As part of the transaction, BME began selling through Oshkosh Group's exclusive dealer network and, as shown above, those prices increased at a much greater rate than the direct sales.

196. The harm that this partial acquisition imposed manifested during the Class Period.

197. ***Oshkosh Group's 2022 acquisition of Maxi-Metal.*** In 2022, Oshkosh Group completed its acquisition of fire apparatus manufacturer, Maxi-Metal, Inc. This acquisition further consolidated the already ultra-concentrated fire apparatus market and eliminated another independent competitor that could have provided competitive pressure on pricing and delivery times.

198. The acquisition of Maxi-Metal was harmful because it removed one of the few remaining independent manufacturers with significant production capacity. Rather than compete against Maxi-Metal's offerings, Oshkosh Group simply absorbed the company and its production capabilities, further reducing the number of independent operators in an already concentrated market.

199. This acquisition also demonstrates Defendants' strategy of using acquisitions to prevent the emergence of competitive alternatives. Rather than allowing Maxi-Metal to potentially expand its operations or reduce prices to gain market share, Oshkosh Group removed it from the competitive landscape entirely.

46

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

200. In total, these acquisitions served not to promote efficiency or consumer welfare, but to reduce competitive pressures in the market, to reduce the threat that a manufacturer might increase production capacity, and to exert pricing power over vulnerable public entities. The resulting concentration has enabled Defendants to extract supracompetitive prices with impunity.

## V.   **HARM TO COMPETITION**

201. Defendants' antitrust conspiracy had the following effects, among others:

   1.   Supply of fire apparatus has been artificially restricted;

   2.   The delivery schedules of fire apparatus have been fixed, protracted, or stabilized at artificially elongated timelines;

   3.   The prices of fire apparatus have been fixed, raised, maintained, or stabilized at artificially inflated levels;

   4.   Price competition has been restrained or eliminated with respect to the pricing of fire apparatus;

   5.   Quality competition has been restrained or eliminated with respect to delivery timelines, convenience, and servicing quality;

   6.   Convenience has been diminished by restricting the dealers from which purchasers can buy fire apparatus;

   7.   Servicing quality and prices have been diminished by restricting the dealers from which purchasers can buy fire apparatus;

   8.   Purchasers of fire apparatus have paid artificially inflated prices, suffered artificially imposed inconveniences, received artificially degraded servicing, and endured artificially elongated delivery timelines;

   9.   Purchasers of fire apparatus have been deprived of the benefits of free and open competition.

47

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

202. The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to suppress competition and to fix, raise, stabilize and/or maintain the price of fire apparatus.

203. The precise amount of the overcharge impacting the prices of fire apparatus paid by Plaintiff and the Class can be measured and quantified using well-accepted models.

204. By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Class have sustained injury to their property, among other things, having paid higher prices for fire apparatus than they would have in the absence of Defendants' illegal contracts, combinations, or conspiracies and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VI. DEFENDANTS FRAUDULENTLY CONCEALED THEIR ILLEGAL ANTICOMPETITIVE CONDUCT

205. Plaintiff and the Class members could not have discovered through the exercise of reasonable diligence that the inflated prices they endured were the result of illegal anticompetitive conduct. Defendants took affirmative steps to fraudulently conceal their conspiracy from Plaintiff and the Class, thereby tolling the statute of limitations applicable to the claims.

206. Defendants and their co-conspirators kept the existence and details of their anticompetitive conduct secret, including by:

- Structuring their conspiracy through private communications and closed-door meetings;
- Entering exclusive dealing arrangements and structuring those arrangements to appear as independent business decisions rather than horizontal agreements to allocate markets; and

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

- Presenting supracompetitive price increases as the product of inflation or cost increases, when in fact they were the result of collusive conduct and manufactured scarcity.

207. Because of this concealment, Plaintiff and the Class could not have discovered the existence of their claims until shortly before the filing of this Complaint, when investigative reporting, whistleblower disclosures, trade publications, and statements by public officials and fire department purchasers revealed for the first time the underlying facts demonstrating collusion, market allocation, and coordinated restrictions on supply and pricing.

208. As a result of Defendants' fraudulent concealment, the statute of limitations applicable to Plaintiff's claims has been tolled. Further, Plaintiff and the Class are entitled to equitable tolling of the statute of limitations, or to assert a continuing violation theory, such that all conduct alleged herein is actionable regardless of when it began.

## VII.   CLASS ACTION ALLEGATIONS

209. Plaintiff brings this action on behalf of itself, and on behalf of members of the following class (the "Class"), under Federal Rules of Civil Procedure 23(a) and (b)(3), and/or (b)(2), and/or (c)(4):

> All public entities in the United States and its territories that purchased fire apparatus (1) manufactured by the Manufacturer Defendants, (2) through a Dealer Defendant, (3) at any time from the first moment they were injured by Defendants' anticompetitive conduct until the present (the "Class Period").

210. This Class includes a Subclass of persons and entities located in California who during the Class Period purchased fire apparatus made by or from Defendants. This subclass will be referred to herein as the "State Law Subclass."

211. The following are specifically excluded from the Class and the State Law Subclass: any persons or entities that purchased any fire apparatus from Defendants

49

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

solely for the purpose of reselling them to others, any judicial officer presiding over this action and the members of their immediate family and judicial staff; any juror assigned to this action; and any co-conspirator identified during the course of this action.

212. At least hundreds of entities have purchased a fire apparatus manufactured by Defendants during the Class Period.

213. Plaintiff's claims are typical of the claims of the Class and where applicable, the State Law Subclass.

214. Plaintiff and all members of the Class and the State Law Subclass were injured in the form of overcharges and delivery delays caused by Defendants' anticompetitive conduct.

215. Plaintiff will fairly and adequately protect and represent the interests of the Class and the State Law Subclass. Plaintiff's interests are not antagonistic to those of the Class or the State Law Subclass.

216. Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

217. Questions of law and fact are common to the members of the Class or the State Law Subclass and predominate over questions, if any, that may affect only individual members because Defendants have acted on grounds generally applicable to the entire Class and State Law Subclass. Such generally applicable conduct is inherent in Defendants' anticompetitive conduct in the Relevant Market, as more fully alleged above.

218. Questions of law and fact common to the Class and the State Law Subclass include:

- Whether the Defendants intentionally or unlawfully impaired or impeded competition in the Relevant Market;
- Whether the Defendants have, or attempted to obtain or maintain, monopoly or market power in the Relevant Market;

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

- Whether the Defendants willfully maintained or enhanced their monopoly or market power in the Relevant Market;
- What effect the Defendants' conduct had on prices for fire apparatus;
- What effect the Defendants' conduct had on delivery delays;
- Whether the Defendants' conduct caused antitrust injury to Plaintiff and members of the Class and the State Law Subclass in the nature of overcharges; and
- What the proper measure of damages is.

219. The Class and the State Law Subclass are readily identifiable and are ones for which records should exist.

220. Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that might arise in management of this class action.

221. Plaintiff knows of no difficulty to be encountered in maintenance of this action as a class action.

## VIII. CLAIMS FOR RELIEF

### a. Violations of Federal Antitrust Laws

#### i. First Claim for Relief
Violation of Sherman Act Section 1 (15 U.S.C. § 1)
(On Behalf of the Class – Against Defendants)

222. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

51

223.   Beginning at a time currently unknown to Plaintiff, but at least as early as April 21, 2022 (further investigation and discovery may reveal an earlier date), and continuing through the present, and as described in the complaint above, Defendants willfully entered into contracts, combinations, conspiracies, and agreements with one another to facilitate the following acts:

a.   ***Collusive supply restriction.*** Manufacturer Defendants conspired to forgo competition and inflate prices by restricting the supply of fire apparatus amidst surging demand.

b.   ***Hub-and-spoke: market allocation, exclusive dealing, and resale price maintenance.*** Manufacturer Defendants and Dealer Defendants entered into hub-and-spoke conspiracies through exclusive dealing agreements that allocated the market and foreclosed various forms of competition. Defendants also engaged in resale price maintenance through the use of shared configurator software, which established price floors.

224.   The purpose and effect of these acts, individually and in combination with one another, was to harm competition and unreasonably restrain trade.

225.   These acts occurred within the flow of, and substantially affected, interstate commerce.

226.   Defendants had market power when engaging in these acts.

227.   Any proffered business justification or asserted pro-competitive benefits for these acts would be pre-textual, outweighed by the anticompetitive effects of the aforementioned conduct, and in any event could be achieved by means less restrictive than the conduct alleged herein.

228.   These contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Alternatively, they are "quick look" or rule of reason violations of Section 1 of the Sherman Antitrust Act.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

229. Plaintiff and Class members purchased fire apparatus from Defendants at supracompetitive prices and endured undue delivery delays, suffering material antitrust injury and damages as a proximate result of their violative conduct.

230. Plaintiff and Class members have sustained injury to their property, among other things, by reason of the above-described violation of the antitrust laws, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

231. Plaintiff and Class members are threatened with irreparable and immediate future injury to their property, among other things, by reason of the above-described continuing violation of the antitrust laws, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

232. Plaintiff and members of the Class are entitled to recover damages for the injury caused by Defendants wrongful conduct, and to an injunction against them, preventing and restraining the violations alleged herein.

**ii.     Second Claim for Relief**
**Violation of Sherman Act Section 2 (15 U.S.C. § 2) –**
*Monopolization or Attempted Monopolization, & Combination and Conspiracy to Monopolize*
**(On Behalf of the Class – Against Oshkosh Group and Oshkosh Group Dealers)**

233. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

234. At all times relevant to assessing its conduct, Oshkosh Group and Oshkosh Group Dealers had monopoly power in the Relevant Market, or attempted to obtain monopoly power in the Relevant Market and created a dangerous probability of achieving it.

235. Beginning at a time currently unknown to Plaintiff, but at least as early as April 21, 2022 (further investigation and discovery may reveal an earlier date), and continuing through the present, and as described in the complaint above, Oshkosh Group and Oshkosh Group Dealers willfully engaged in the following conduct:

a. ***Exclusive dealing and market allocation.*** Oshkosh Group and Oshkosh Group Dealers entered into exclusive dealing agreements that allocated the market and foreclosed various forms of competition, including by deterring new market entrants.

236. The purpose and effect of these acts, individually and in combination with one another, was to prevent, exclude, foreclose, and harm competition, and to obtain or maintain monopoly power, or to create the dangerous probability of achieving monopoly power.

237. These acts occurred within the flow of, and substantially affected, interstate commerce.

238. Any proffered business justification or asserted pro-competitive benefits for these acts would be pre-textual, outweighed by the anticompetitive effects of the aforementioned conduct, and in any event could be achieved by means less restrictive than the conduct alleged herein.

239. Oshkosh Group and Oshkosh Group Dealers violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by willfully maintaining or acquiring monopoly power in the Relevant Market through the aforementioned anticompetitive conduct.

240. Plaintiff and Class members purchased fire apparatus from Oshkosh Group and Oshkosh Group Dealers at supracompetitive prices, suffering material antitrust injury and damages as a proximate result of their violative conduct.

241. Plaintiff and Class members have sustained injury to their property, among other things, by reason of the above-described violation of the antitrust laws, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

242. Plaintiff and Class members are threatened with irreparable and immediate future injury to their property, among other things, by reason of the above-described continuing violation of the antitrust laws, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

243. Plaintiff and members of the Class are entitled to recover damages for the injury caused by Oshkosh Group and Oshkosh Group Dealers, and to an injunction against them, preventing and restraining the violations alleged herein.

**iii.    Third Claim for Relief
Violation of Sherman Act Section 2 (15 U.S.C. § 2) –
*Attempted Monopolization & Combination and Conspiracy to Monopolize*
(On Behalf of the Class – Against REV Group and REV Group Dealers)**

244. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

245. At all times relevant to assessing its conduct, REV Group and REV Group Dealers attempted to obtain monopoly power in the Relevant Market and created a dangerous probability of achieving it.

246. Beginning at a time currently unknown to Plaintiff, but at least as early as April 21, 2022 (further investigation and discovery may reveal an earlier date), and continuing through the present, and as described in the complaint above, REV Group and REV Group Dealers willfully engaged in the following conduct:

   a. ***Exclusive dealing and market allocation.*** REV Group and REV Group Dealers entered into exclusive dealing agreements that allocated the market and foreclosed various forms of competition, including by deterring new market entrants.

247. The purpose and effect of these acts, individually and in combination with one another, was to prevent, exclude, foreclose, and harm competition, and to obtain monopoly power.

248. These acts occurred within the flow of, and substantially affected, interstate commerce.

249. Any proffered business justification or asserted pro-competitive benefits for these acts would be pre-textual, outweighed by the anticompetitive effects of the

aforementioned conduct, and in any event could be achieved by means less restrictive than the conduct alleged herein.

250. REV Group and REV Group Dealers violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by willfully attempting to obtain monopoly power in the Relevant Market through the aforementioned anticompetitive conduct.

251. Plaintiff and Class members purchased fire apparatus from REV Group and REV Group Dealers at supracompetitive prices, suffering material antitrust injury and damages as a proximate result of their violative conduct.

252. Plaintiff and Class members have sustained injury to their property, among other things, by reason of the above-described violation of the antitrust laws, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

253. Plaintiff and Class members are threatened with irreparable and immediate future injury to their property, among other things, by reason of the above-described continuing violation of the antitrust laws, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

254. Plaintiff and members of the Class are entitled to recover damages for the injury caused by REV Group and REV Group Dealers, and to an injunction against them, preventing and restraining the violations alleged herein.

### iv. Fourth Claim for Relief
### Violation of Clayton Act Section 3 (15 U.S.C. § 14)
### (On Behalf of the Class – Against Defendants)

255. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

256. Beginning at a time currently unknown to Plaintiff, but at least as early as April 21, 2022 (further investigation and discovery may reveal an earlier date), and continuing through the present, and as described in the complaint above, Defendants willfully engaged in the following conduct:

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

a. ***Exclusive dealing.*** Manufacturer Defendants and Dealer Defendants entered into exclusive dealing agreements that foreclosed various forms of competition, including by conditioning the ability to sell a given Manufacturer Defendants' goods on the Dealer Defendants' agreement not to deal in other manufacturers' goods.

257. The purpose and effect of these acts was to substantially lessen competition or tend to create a monopoly in the Relevant Market.

258. These acts occurred within the flow of, and substantially affected, interstate commerce.

259. Any proffered business justification or asserted pro-competitive benefits for these acts would be pre-textual, outweighed by the anticompetitive effects of the aforementioned conduct, and in any event could be achieved by means less restrictive than the conduct alleged herein.

260. Defendants violated Section 3 of the Clayton Act, 15 U.S.C. § 14, by engaging the aforementioned acts.

261. Plaintiff and Class members purchased fire apparatus from Defendants at supracompetitive prices, suffering material antitrust injury and damages as a proximate result of their violative conduct.

262. Plaintiff and Class members have sustained injury to their property, among other things, by reason of the above-described violation of the antitrust laws, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

263. Plaintiff and Class members are threatened with irreparable and immediate future injury to their property, among other things, by reason of the above-described continuing violation of the antitrust laws, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

264. Plaintiff and members of the Class are entitled to recover damages for the injury caused by Defendants' wrongful conduct, and to an injunction against them, preventing and restraining the violations alleged herein.

**v.    Fifth Claim for Relief**
**Violation of Clayton Act Section 7 (15 U.S.C. § 18)**
**(On Behalf of the Class – Against Oshkosh Group, BME, and REV Group)**

265. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

266. Beginning at a time currently unknown to Plaintiff, but at least as early as April 21, 2022 (further investigation and discovery may reveal an earlier date), and continuing through the present, and as described in the complaint above, Oshkosh Group, BME, and REV Group willfully engaged in the following conduct:

    a.    ***Roll-ups and acquisitions.*** Oshkosh Group and REV Group engaged in anticompetitive acquisitions and partial acquisitions, further consolidating an already ultra-concentrated industry, and reducing competition.

267. The purpose and effect of these acts, individually and in combination with one another, was to substantially lessen competition and to tend to create a monopoly in the Relevant Market.

268. These acts occurred within the flow of, and substantially affected, interstate commerce.

269. Any proffered business justification or asserted pro-competitive benefits for these acts would be pre-textual, outweighed by the anticompetitive effects of the aforementioned conduct, and in any event could be achieved by means less restrictive than the conduct alleged herein.

270. Oshkosh Group, BME, and REV Group violated Section 7 of the Clayton Act, 15 U.S.C. § 18, by engaging the aforementioned acts.

271. Plaintiff and Class members purchased fire apparatus from Defendants at supracompetitive prices, suffering material antitrust injury and damages as a proximate result of their violative conduct.

272. Plaintiff and Class members have sustained injury to their property, among other things, by reason of the above-described violation of the antitrust laws, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

273. Plaintiff and Class members are threatened with irreparable and immediate future injury to their property, among other things, by reason of the above-described continuing violation of the antitrust laws, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

274. Plaintiff and members of the Class are entitled to recover damages for the injury caused by Oshkosh Group, BME, and REV Group's wrongful conduct.

**b.     Violations of State Laws**

275. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

276. The above-alleged conduct will, when proven, establish claim under the state antitrust and consumer protection laws cited below.

277. Each Defendant's above-described conduct constitutes unfair competition, unconscionable conduct, and deceptive acts and practices in violation of the state consumer protection statute set forth below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, and/or unconscionable acts or practices, Plaintiff and members of the Class paid higher prices for fire apparatus than they should have.

278. The gravity of harm from Defendants' wrongful conduct significantly outweighs any conceivable utility from that conduct. Plaintiff and State Law Subclass

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

members could not reasonably have avoided injury from Defendants' wrongful conduct.

279. There was and is a gross disparity between the price that Plaintiff and members of the State Law Subclass paid for fire apparatus and the value they received.

280. The following claims for relief are pleaded on behalf of Plaintiff and members of the State Law Subclass.

**i.      Sixth Claim for Relief**
**Violation of California's Cartwright Act (Cal. Bus. & Prof. Code § 16700, et seq.)**
**(On Behalf of the State Law Subclass – Against Defendants)**

281. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

282. The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

283. California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

284. A trust in California is any combination of capital, skills or acts by two or more persons intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any commodity, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. *Id.* § 16726.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

285. Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade of commerce in the Relevant Market, a substantial part of which occurred within California.

286. Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Market, a substantial part of which occurred within California, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Market.

287. Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq.*

288. Specifically, this claim is based on the following legal theories, as more fully alleged above:

289. ***Collusive supply restriction.*** Manufacturer Defendants entered into a combination and conspiracy to restrict the supply of fire apparatus in order to artificially inflate prices.

290. ***Hub-and-spoke conspiracy for market allocation, exclusive dealing, and resale price maintenance.*** Manufacturer Defendants and Dealer Defendants entered into combination and conspiracy through exclusive dealing agreements that allocated the market geographically and foreclosed competition, and through configurator software that established and enforced minimum resale prices.

291. Plaintiff and/or other members of the Class purchased fire apparatus within the State of California during the Class Period. But for each Defendant's conduct set forth herein, the price of fire apparatus would have been lower and the delivery of fire apparatus would have occurred more quickly, the amount and value of which shall be determined at trial.

292. Plaintiff and members of the Class were injured in their property, among other things, with respect to purchases of fire apparatus in California and are entitled

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

### ii. Seventh Claim for Relief
### Violation of California's Unfair Competition Law (The "UCL") (Cal. Bus. & Prof. Code § 17200, et seq.) (On Behalf of the State Law Subclass – Against Defendants)

293. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

294. The violations of federal antitrust law set forth above also constitute violations of Section 17200, *et seq.*, of the California Business and Professions Code.

295. Defendants have engaged in unfair competition in violation of the UCL by engaging in the acts and practices specified above and as follows:

296. *Unlawful.* Defendants' conduct violated, and continues to violate, (a) the federal antitrust laws, including Section 1 of the Sherman Act (collusive supply restriction and hub-and-spoke conspiracy), Section 2 of the Sherman Act (monopolization and attempted monopolization through exclusive dealing), Section 3 of the Clayton Act (exclusive dealing), and Section 7 of the Clayton Act (anticompetitive acquisitions); and (b) the Cartwright Act (collusive supply restriction and hub-and-spoke conspiracy involving market allocation, exclusive dealing, and resale price maintenance), as set forth in the Sixth Claim for Relief.

297. *Unfair.* Defendants' conduct is unfair because their anticompetitive practices—including coordinated supply restriction, territorial market allocation through exclusive dealing agreements, resale price maintenance through configurator software, and anticompetitive acquisitions—have caused substantial injury to Plaintiff and members of the Class, which injury is not outweighed by any countervailing benefits to consumers or competition and which Plaintiff and members of the Class could not reasonably have avoided.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

298. *Fraudulent.* Defendants' conduct is fraudulent because they concealed their anticompetitive conduct and misrepresented the causes of supracompetitive price increases as being attributable to inflation or input costs, rather than their coordinated restriction of supply, market allocation, and price-fixing.

299. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated the UCL.

300. Defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of Section 16720, *et seq.*, of California Business and Professions Code, set forth above.

301. Plaintiff and members of the Class are entitled to, *inter alia*, full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business acts or practices.

302. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

303. The unlawful and unfair business practices of each Defendant have caused and continue to cause members of the Class to pay supracompetitive and artificially inflated prices for fire apparatus sold in the State of California. Plaintiff and/or other members of the Class suffered injury in fact and lost money or property as a result of such unfair competition.

304. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and the members of the Class are accordingly entitled to equitable relief including

restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to California Business and Professions Code Sections 17203 and 17204.

## IX.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, respectfully ask the Court for a judgment that:

a. Certifies the Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) and directs that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, and declares Plaintiff as representatives of the Class;

b. Appoints Plaintiff and their attorneys as class representatives and class counsel, respectively;

c. Enters judgment against Defendants, and in favor of Plaintiff and the Class, holding Defendants liable for the antitrust violations alleged;

d. Awards a declaratory judgment that Defendants' conduct was done for illegal, anticompetitive purposes, was an unreasonable restraint of trade, and had anticompetitive effects on the Relevant Market in violation of Sherman Antitrust Act Sections 1 and 2, and Clayton Act Sections 3 and 7;

e. Grants permanent injunctive relief:

  i. Enjoining Defendants from engaging in future anticompetitive conduct with the purpose or effect of foreclosing the Relevant Market to competition from actual or potential rivals; and

  ii. Requiring Defendants to take affirmative steps to dissipate the continuing effects of their prior unlawful conduct.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

f. Awards Plaintiff and the Class actual, treble, and exemplary damages as permitted and as sustained by reason of the antitrust violations alleged herein, plus interest in accordance with the law;

g. Awards such equitable relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, including disgorgement, restitution, and the creation of a constructive trust;

h. Awards Plaintiff and the Class their costs of suit, including reasonable attorneys' fees provided by law; and

i. Directs such further relief as it may deem just and proper.

## X.  DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

Dated: May 18, 2026

Respectfully submitted,

By: */s/ Michael E. Klenov*
Michael E. Klenov
(Cal. Bar No. 277028)
mklenov@koreintillery.com
**KOREIN TILLERY LLC**
505 North 7th Street, Suite 3600
Saint Louis, MO 63101
Tel.: (314) 241-4844

George A. Zelcs
(N.D. Il. Bar No. 3123738)
gzelcs@koreintillery.com
Daniel A. Epstein
(N.D. Il. Bar No. 6320580)
depstein@koreintillery.com
Labeat Rrahmani
(N.D. Il. Bar No. 6340286)
lrrahmani@koreintillery.com
**KOREIN TILLERY LLC**
205 North Michigan, Suite 1950
Chicago, IL  60601
Tel.: (312) 641-9750

*Counsel for Plaintiff City of Fountain Valley, California*

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED